```
 1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF NEW YORK
 2
     - - - - - - - - - - - - - - - -X
 3   IRA HEASTON,                    : 19-CV-5569 (PKC)
                                     :
 4            Plaintiff,             :
                                     :
 5        -against-                  :
                                     : United States Courthouse
 6   BORRIS, INC., SALMIN BLAKE,     : Brooklyn, New York
     "JANE" BLAKE, THE CITY OF       :
 7   NEW YORK, NYPD P.O. AND JANE    :
     DOE 1-2;                        :
 8                                     Monday, October 5, 2020
              Defendants.             1:00 p.m.
 9   - - - - - - - - - - - - - - - -X

10


11       TRANSCRIPT OF CIVIL CAUSE FOR EVIDENTIARY HEARING
           BEFORE THE HONORABLE PAMELA K. CHEN
12                UNITED STATES DISTRICT JUDGE

13


14              A P P E A R A N C E S :

15   For the Plaintiff:        GARNETT H. SULLIVAN, ESQ.
                               1080 Grand Avenue
16                             Suite 200
                               South Hempstead, New York 11550
17

18   For the Defendants       NEW YORK CITY LAW DEPARTMENT
     The City of New          ASSISTANT CORPORATE COUNSEL
19   York, NYPD P.O.          100 Church Street
     John and Jane Doe        New York, New York 10007
20   1-2:                     BY:  RAJU SUNDARAN, ESQ.
                                   SOO-YOUNG SHIN, ESQ.
21

22   For the Defendants       SHIRYAK, BOWMAN, ANDERSON, GILL.
     R.K.H.L, Inc., GMA          & KADOCHNIKOV, LLP
23   Enterprises, and        80-02 Kew Gardens Road.
     Borris, Inc.:            Suite 600
24                            Kew Gardens, New York 11415
                              BY:  ALEXANDER KADOCHNIKOV, ESQ.
25
```

1          A P P E A R A N C E S (Continued)

2

3    Court Reporter:        DAVID R. ROY, RPR
                             225 Cadman Plaza East
4                            Brooklyn, New York 11201
                             drroyofcr@gmail.com
5

6    Proceedings recorded by Stenographic machine shorthand,
     transcript produced by Computer-Assisted Transcription.
7

8

9

10             P R O C E E D I N G S

11

12                      --oo0oo--

13

14         (All participants appearing via videoconference.)

15         THE COURTROOM DEPUTY:  Civil cause for a

16   evidentiary hearing, Docket 19-CV-5569, Heaston versus

17   Borris, Inc., et al.

18             Before asking the parties to state their

19   appearances, I would like to note the following:  Persons

20   granted remote access to proceedings are reminded of the

21   general prohibition against photographing, recording, or

22   rebroadcasting of court proceedings.  Violation of these

23   prohibitions may result in sanctions, including removal of

24   Court-issued media credentials, restrictive entry to future

25   hearings, denial of entry to future hearings, or any other

1    sanctions deemed necessary by the Court.

2            Would the parties please state their appearances

3    for the record, starting with the plaintiff.

4            MR. SULLIVAN:  Thank you, Your Honor --

5            MR. HEASTON:  Ira Heaston.

6            THE COURT:  I'm sorry, Mr. Heaston, can you raise

7    your hand?

8            MR. HEASTON:  (Indicates.)

9            THE COURT:  Oh, I'm sorry.  That went by a little

10   quickly for --

11           MR. HEASTON:  Ira Heaston.

12           THE COURT:  Oh, I see.  Okay.  I only see your

13   attorney, but you're saying --

14           MR. SULLIVAN:  Unfortunately, Judge, we're using

15   the same device.  We had some technical difficulty so we

16   have to share the same device.

17           THE COURT:  Okay.  So actually I want the lawyer

18   to state his name for the record.

19           MR. SULLIVAN:  Garnett Sullivan appearing for the

20   Plaintiff Ira Heaston.

21           THE COURT:  Okay.

22           And Mr. Heaston is present via the video there as

23   well?

24           MR. HEASTON:  Yeah.

25           MR. SULLIVAN:  That is correct, Judge.

1          THE COURT:  Okay.

2          So, Mr. Heaston, I don't know how you have your

3    computer positioned, but I can only see the very top of your

4    head.  It may be helpful if you position yourself so your

5    entire head is visible perhaps?  It's not essential, but you

6    can work on that.

7          Okay.  Let me hear from Defendants' Attorneys

8    next?

9          MR. SUNDARAN:  Raju Sundaran for the defendants,

10   Your Honor.

11         THE COURT:  Good afternoon.

12         MS. SHIN:  Soo-Young Shin for the defendants.

13   Good afternoon.

14         THE COURT:  Good afternoon.

15         MR. KADOCHNIKOV:  Your Honor --

16         THE COURT:  All right.  Now, we are have some

17   other individuals present, at least on --

18         MR. KADOCHNIKOV:  Good afternoon, Your Honor.

19   Alexander Kadochnikov for Defendant.

20         THE COURT:  Okay.

21         And, David, did you get that appearance?

22         THE COURT REPORTER:  Yes, Judge, I did.

23         THE COURT:  All right.

24         THE COURT REPORTER:  Thank you for asking,

25   Your Honor.

1          THE COURT:  And you have the defendant with you;

2    is that correct?

3          MR. KADOCHNIKOV:  Yes.

4          THE COURT:  Okay.  That's Mr. Borris; am I -- or

5    actually, who is it that you're representing, sir?

6          MR. KADOCHNIKOV:  I represent corporate

7    defendants -- I represent the two corporate defendants,

8    Borris, Inc. and -- the other one -- R.K.H.L Group.

9          THE COURT:  Okay.  Thank you.

10         All right.  And then lastly, we have two other

11   lawyers that appeared?

12         MR. PAWAR:  Good afternoon, Your Honor.  Vik Pawar

13   and Robert Blossner.

14         THE COURT:  All right.

15         MR. BLOSSNER:  I'm Mr. Blossner, Your Honor.

16         THE COURT:  Okay.  Mr. Pawar, I'm sorry, I didn't

17   recognize you.  And Mr. Blossner.  Okay.  Perfect.

18         Now, I know the detective also appears to be on

19   the conference as well.

20         Are you Detective Portillo, sir?

21         (No audible response.)

22         THE COURT:  Okay, you're on mute.

23         MR. PORTILLO:  Yes.  I'm raising my right hand.

24         THE COURT:  Okay.  Well, don't raise your right

25   hand yet, sir.

1          MR. PORTILLO:  Oh, okay.

2          THE COURT:  So you can go on mute again for a

3     moment.

4          Mr. Sundaran, you had mentioned you wanted to

5     address some preliminary matters, but bear in mind that we

6     have at least three potential witnesses on the conference

7     already.  Do you want to wait and address these out of the

8     earshot of these individuals at some other time so that we

9     can get started, or is this going to affect the presentation

10    of evidence?

11         MR. SUNDARAN:  This is to expedite the

12    presentation of evidence, Your Honor.

13         THE COURT:  Okay.  Go ahead.

14         MR. SUNDARAN:  Well, for starters in terms of

15    exhibits, would Your Honor like Defendants to lay the

16    foundation for each individual exhibits, or can we deem some

17    of them admitted simply because they are a matter of public

18    record?

19         THE COURT:  Yes, the latter.  So let's expedite

20    that part of the process.

21         MR. SUNDARAN:  All right.  Then the next question,

22    Your Honor, is we just would like to let Your Honor know

23    that Ms. Kirkland will not be showing up today.  She was

24    informed of the hearing.  She submitted an affidavit in

25    support, but for the past couple of days, we have not been

1  able to get in contact with her, so we wanted to let

2  the Court know.

3          The last matter is --

4          THE COURT:  Hang on, hang on, hang on.  Hang on.

5          David, did you get that; that was Ms. Kirkland, I

6  think?

7          THE COURT REPORTER:  Yes, Your Honor, I did.

8  Thank you.

9          THE COURT:  Okay.

10          All right.  Go ahead, Mr. Sundaran.

11          MR. SUNDARAN:  The last question for Your Honor

12  is, after each witness's testimony, would the Court like the

13  witnesses to leave or to stay?

14          THE COURT:  They can do either.  More my concern

15  is they are not being present before they testify.  So I am

16  going to, basically on my own, invoke the Rule on the

17  witnesses hereon.  So this will affect the two attorneys who

18  have actually appeared, in which I appreciate.

19          So, Mr. Pawar and Blossner, I think that we will

20  ask you to -- Fida, tell me the best way in terms of

21  technology to ensure that they can come back.  But for now I

22  would like to have Mr. Pawar and Mr. Blossner leave the

23  conference as if they were exiting the courtroom.

24          So, Fida, should they just disconnect and

25  then come back when --

1          THE COURTROOM DEPUTY:  Yes, Judge, they will have

2     to disconnect and click on the link again to join us.

3          THE COURT:  Okay.

4          All right.  So why don't we do this:  Since

5     Detective Portillo's testimony is estimated to last about a

6     half an hour, if I could have Mr. Pawar come back at 2:05.

7     So reconnect with us at 2:05.

8          And then Mr. Blossner, you should go into another

9     room, because I can see you are both in the same room.  So

10    effectively leave the courtroom -- not be in the courtroom

11    during Mr. Pawar's testimony, and then come back at 2:20 or

12    exchange -- what we could do is Mr. Pawar, when you're done,

13    you could just let Mr. Blossner know so that he can come in.

14    All right?

15         MR. PAWAR:  Judge, if I may?  I think Mr. Sundaran

16    had listed Mr. Blossner first, and I believe Mr. Blossner's

17    testimony will be extremely limited.

18         THE COURT:  Okay.

19         MR. PAWAR:  So I would request if Mr. Blossner

20    could come back.  And once he's done, I can come back, and

21    then we'll be -- we'll be in the same room.

22         THE COURT:  That's perfectly fine.  I'm working

23    off a list that lists -- a list that has a different order,

24    but that's fine.

25         MR. SUNDARAN:  (Indicating.)

1        THE COURT:  And I see Mr. Sundaran nodding his
2    head "yes."
3            So let's have Mr. Blossner come back in at 2:05 --
4    or actually, why don't you come back at 2:00 and then that
5    way we won't have any gap in time.  And then Mr. Pawar is
6    going to let you know when you can come in.  Okay?
7            MR. PAWAR:  Right.
8            Judge, just one thing:  The reason Mr. Blossner's
9    here is he's not very savvy with the computer.  So at
10   2 o'clock I will come back in -- just come back in with him
11   to connect with Your Honor --
12           THE COURT:  Okay.
13           MR. PAWAR:  -- and then I will leave the room.
14           THE COURT:  All right.  That sounds fine.
15           MR. PAWAR:  Okay.  So --
16           THE COURT:  Now, you folks can handle your own
17   safety precautions, but you should probably wear a mask
18   while you are standing around, not for nothing, but that's
19   entirely up to you.
20           MR. PAWAR:  I've been through it already, Judge.
21           THE COURT:  Okay.  All right.  That's fine.
22           All right.  So let's have you folks --
23           MR. PAWAR:  So 2 o'clock?
24           THE COURT:  Yes, 2 o'clock.  Thank you.
25           All right.  Let's get right to it.  Either

1  Ms. Shin or Mr. Sundaran, why don't you call your first

2  witness?

3          MR. SUNDARAN:  Your Honor, at this time we would

4  like to give an opening statement, if that's okay with

5  the Court?

6          THE COURT:  You know what?  How long are you going

7  to be?

8          MR. SUNDARAN:  Five minutes, Soo-Young?

9          THE COURT:  All right.

10         MS. SHIN:  Yes.

11         THE COURT:  All right.  Yes, go ahead.  But don't

12  rush just because I said that, for our court reporter's

13  sake.

14         MS. SHIN:  Thank you, Your Honor.

15         Your Honor, we would like to address the Court in

16  its evidentiary hearing to determine whether fraud was

17  perpetrated on the Court by Plaintiff and his former

18  attorney, Defendants will be calling witnesses and

19  introducing exhibits.  Through testimony and documentary

20  evidence, Defendants will show this Court that there were

21  materially false statements which were put forth repeatedly,

22  in fact, by both Plaintiff and his former counsel, and that

23  the claims in this case were entirely without colorable

24  basis or merit and brought in bad faith for an improper

25  purpose.  The testimony and evidence will show that the

1  behavior of both the plaintiff and plaintiff's former

2  counsel interfered with Your Honor's ability to impartially

3  adjudicate this matter and needlessly extended this

4  meritless lawsuit for the past year.

5            With respect to the sanctions against Plaintiff,

6  you will hear from witnesses today, among other things, that

7  the plaintiff was never a lawful tenant at the subject

8  premises, that he submitted falsified records to

9  Queens Civil Court in order to obtain an order to allow him

10  to be restored possession of this property, and that he

11  never properly noticed or served the rightful owners of the

12  property, so this all occurred without their knowledge.  You

13  will further hear how it was impossible for the plaintiff to

14  have had a lease starting in January of 2019 at the subject

15  premises, because the building was not yet certified to be

16  occupied.  And as you know that this plaintiff --

17            (Audio cuts out briefly.)

18            THE COURT:  Hang on, hang on.

19            I think you said "certified to be occupied"; is

20  that right, Ms. Shin?

21            MS. SHIN:  Yes.

22            THE COURT:  You cut out.

23            Did, you get that David?

24            THE COURT REPORTER:  Yes, Your Honor, I did.

25  Thank you.

1        THE COURT:  All right.

2        Go ahead, Ms. Shin, after "certified to be

3   occupied."

4        MS. SHIN:  Thank you, Your Honor.

5        -- and as you know, that this plaintiff presented

6   these same false statements to bring the instant action, and

7   in fact, attached these same documents to his

8   Second Amended Complaint, the operative complaint in his

9   federal lawsuit.  You will hear that this plaintiff

10  burglarized the subject premises prior to unlawfully

11  obtaining the Queens Civil Court order and was arrested on

12  April 26, 2019 by Detective Ramon Portillo based on the

13  owner of property manager's complaint that Plaintiff did not

14  have permission to reside there.

15       Now, turning to the second issue of sanctions

16  against Mr. Pawar.  You will hear, among other things, that

17  the property manager notified Mr. Pawar about the history of

18  Borris's purchase of the property, and that Borris, Inc.

19  never rented the subject premises to Plaintiff.  Mr. Pawar

20  was even provided with documentary evidence approximately a

21  year ago, shortly after this lawsuit was filed, much of the

22  same documentary evidence which was included in our motion

23  and which will be presented today; and that despite being

24  presented with overwhelming evidence to the contrary,

25  Mr. Pawar persisted in pursuing this meritless lawsuit, and

1    even more --

2              (Audio cuts out briefly.)

3              THE COURT:  Hang on, hang on.  Ms. Shin, you broke

4    up again.

5              "...even more..."  -- "...even more..." something?

6              MS. SHIN:  Yes, Your Honor.

7              -- even more brazenly negotiated a confidential

8    settlement with the private defendants in this case without

9    filing the settlement terms on the docket.  You will also

10   hear that Mr. Pawar never corrected the several versions of

11   the complaints he filed with the Court, even when he was

12   presented with ample evidence which cast serious doubt as to

13   the validity of Plaintiff's factual assertions.  Instead,

14   Mr. Pawar simply withdrew from representing the plaintiff

15   once he was served with our Rule 11 motion and never

16   withdrew this case.  Mr. Pawar now seeks to escape the

17   consequences of his own bad actions by hiding behind the

18   shield of attorney/client privilege and attempted to solicit

19   this Court's guidance; however, fraud on the Court or the

20   parties is not protected as an exception to the

21   attorney/client privilege.

22             In sum, you will hear through the testimony and

23   evidence that a web of lies was the sole basis of

24   Plaintiff's lawsuit before this Court, and that both

25   Plaintiff and Mr. Pawar were the driving forces to continue

1   this lawsuit until the City Defendant's letter to the Court

2   and subsequent Rule 11 motion that ultimately caused the

3   plaintiff to withdraw the case.  This hearing is an

4   opportunity for the truth to be told about the facts and

5   circumstances of Plaintiff's arrest and to restore integrity

6   to the judicial proceedings, which thus far have been marred

7   with material fabrications.

8           We thank the Court for this opportunity to be

9   heard.

10          THE COURT:  Thank you very much, Ms. Shin.

11          Mr. Sullivan, did you want to make an opening?

12          MR. SULLIVAN:  Just very briefly, Judge.

13          This lawsuit was commenced by the plaintiff

14  because he was arrested at a particular date and time on

15  April -- in April of last year for a particular crime by

16  police officers of the New York City Police Department, and

17  he was charged with particular crimes.  He did not believe

18  his arrest was justified.  He did not procure his own

19  arrest.  He did not arrange to be arrested.  He did not

20  cause the police -- the police instead arrested him.  He did

21  not believe his arrest was justified.  He did not even know

22  the reasons why they arrested him, but when he was arrested,

23  he indicated that he wanted a lawyer.

24          He was held and brought to Central Booking.  And

25  instead of being arraigned, the District Attorney at the

1    County of Queens, whose prerogative it is to prosecute

2    people in the County of Queens, determined and issued a

3    letter to him indicating that they would not be prosecuting

4    him, and the basis of any prosecution, as the Court is well

5    aware, is probable cause for arrest, okay, and that was the

6    decision.  And now Plaintiff now goes to a lawyer and

7    complains that he was arrested falsely, and the complaint is

8    filed by that lawyer alleging false arrest against the

9    defendants who arrested him.  And although Plaintiff has

10   withdrawn that lawsuit, I would submit that that lawsuit

11   has -- that it has merit; that there was not an actual

12   probable cause for the arrest, and this is the crux of all

13   false arrest cases.  So it certainly is way more than

14   probable claim that was filed by Plaintiff.

15          The Defendant wants to focus on things that

16   happened in Queens Civil Court between the landlord and

17   tenant and the rights of occupants.  That's not what this is

18   about.  This is about whether Plaintiff's lawsuit against

19   the City of New York and against the Bureau of Police

20   Officers, the defendants, for an arrest without probable

21   cause and without any colorable basis in fact, and I submit

22   to you that the evidence will establish that it certainly

23   does.

24          THE COURT:  Okay.  Thank you, Mr. Sullivan.

25          Although this is somewhat unusual, I do have to

1   ask you one question because I do not believe that the

2   plaintiff is intending to testify at this hearing; am I

3   correct?

4           MR. SULLIVAN:  Yes, Judge, particularly in light

5   of -- in the case -- in the Government's -- whatever -- the

6   City's reply, I'm sorry, in the defendants' reply papers,

7   they specifically asked this Court to refer my client to the

8   U.S. Attorney's Office.  So under those circumstances, it

9   would be my practice and my preference to allow him to

10  testify under these circumstances, being a criminal lawyer

11  and having practiced criminal law since 1981.

12          THE COURT:  Okay.  But yet, you're making

13  statements about why your client filed this lawsuit, and I

14  am stopping you for a moment because it seems to me what you

15  just said is contrary to the affidavit that you submitted in

16  support of the opposition to the sanctions motion.  In

17  Mr. Heaston's affidavit, he said he never saw the complaints

18  filed with the Court.

19          MR. SULLIVAN:  That is correct, but he has seen it

20  since, Judge.

21          THE COURT:  But it suggested he did not know that

22  the case was being filed, and yet, you are saying he

23  definitively wanted to file this lawsuit because he believed

24  he had been falsely arrested --

25          MR. SULLIVAN:  Could I just --

1          THE COURT:  -- and that --

2          MR. SULLIVAN:  Judge, everything that's set forth

3    in the complaint is -- I'm sorry, not in the complaint, in

4    that affidavit by my client I stand by it --

5          THE COURT:  And that --

6          MR. SULLIVAN:  -- in the plaintiff's affidavit

7    that was submitted in opposition to the motion, we stand by

8    all the allegations.

9          THE COURT:  I apologize, David.  I interrupted --

10          MR. SULLIVAN:  And he went to a --

11          THE COURT:  Hang on, Mr. Sullivan.

12          David, I interpreted Mr. Sullivan, but he said "I

13    stand by it."

14          Is that correct?

15          MR. SULLIVAN:  Yes.

16          And he went to a lawyer initially about property

17    that was missing subsequent to his arrest, and just having

18    the discussions with that lawyer, the lawyer brought up the

19    issue that there does not appear to be probable cause for

20    his arrest and referred him to Mr. Pawar.

21          THE COURT:  Okay.

22          MR. SULLIVAN:  It was there Mr. Heaston met with

23    Mr. Pawar and they prepared a notice of claim and decided to

24    pursue the lawsuit with the knowledge of my client, but my

25    client did not see the complaint that --

1          (Indistinguishable and indiscernible audio.)

2          (Requested portion read back.)

3          MR. SULLIVAN:  Yeah.

4          So there's no doubt that my client under these

5    circumstances met Mr. Pawar, but a notice of claim was

6    prepared and signed by my client and that notice of claim, I

7    believe is an exhibit and it states exactly what the nature

8    of his claims were, the false arrest.  Okay?  So that

9    discussion occurred with Mr. Pawar.  And so there's nothing

10   we're seeing that's contrary to -- that we do not say that

11   he didn't authorized the lawsuit, that's certainly not the

12   complaint.  All I said is that he didn't see the specific

13   allegations in the complaint.  That's all I'm saying.

14   Never -- he was never given an opportunity to review the

15   complaint before and that didn't happen, so --

16          THE COURT:  Mr. Sullivan, you need to do

17   something.  Get closer to the computer, okay, and speak

18   slower and louder.

19          MR. SULLIVAN:  Okay.

20          THE COURT:  We are all having difficulties hearing

21   and understanding you.

22          So what you are saying is that your client did not

23   see the complaint before it was filed; that's what his

24   declaration says, right?

25          MR. SULLIVAN:  Yes.  Not until after the attorney

1   withdrew and sent him his entire packet of -- entire packet
2   of papers.

3          THE COURT:  And is there anything in the
4   complaint, I assume he's seen it now, that he is saying is
5   not true?

6          MR. SULLIVAN:  I must admit I did not go through
7   the entire complaint with him -- as a matter of fact, I
8   never went through the exact complaint with him and say, Is
9   this true; is this not true?  We never did that paragraph by
10  paragraph, admit or deny.

11         THE COURT:  Okay.  He --

12         MR. SULLIVAN:  I actually --

13         THE COURT:  But he is not backing off of his claim
14  that he was falsely arrested by the police, correct?

15         MR. SULLIVAN:  He has withdrawn the complaint as
16  to these -- this laden -- as to these allegations.  After
17  discussing it with prior counsel and with myself, we decided
18  that was the best course of action, because even with
19  credibility issues and all the things that were raised
20  there, that the best course would be to withdraw the lawsuit
21  at this stage.

22         THE COURT:  Okay.

23         MR. SULLIVAN:  But that does not mean he does not
24  believe he was falsely arrested.

25         THE COURT:  Okay.  That is my question.  So he is

1    not saying he wasn't falsely arrested, correct?

2              MR. SULLIVAN:  No.

3              THE COURT:  All right.  And he is still saying

4    that he had a right to be in that apartment; that's the

5    issue, right?

6              MR. SULLIVAN:  No, that's not the issue.  That is

7    not the issue before the Court.  That's not the nature of

8    the charge -- of the allegations that were made.  The

9    allegations were he was not inside the place when he was

10   arrested.  He didn't even know why he was arrested.  He was

11   arrested outside the premises.  He wasn't arrested for -- I

12   don't believe for anything that happened that day.

13             THE COURT:  What's the basis --

14             MR. SULLIVAN:  We don't even believe --  I'm

15   sorry, Your Honor.

16             THE COURT:  What is the basis of his false arrest

17   claim, then?

18             MR. SULLIVAN:  That he was arrested that day on

19   April 29th, I believe it was, without probable cause, and

20   the District Attorney he believes agreed with him in

21   dismissing the case.

22             THE COURT:  I am not sure how you can defend him

23   in this case without ever having him read the actual

24   complaint because he doesn't know what was said in it and

25   you cannot tell me which parts of it he is saying are false

1    or not false such that I can determine whether or not he

2    lied in some way to his lawyer or he's lying to me, but you

3    so broadly say he doesn't take any responsibility for

4    anything that was filed in this Second Amended Complaint.

5              (Pause in proceedings.)

6              THE COURT:  I don't know how you can do that

7    unless you read --

8              (Mr. Sullivan exits the proceedings.)

9              (Pause in proceeding.)

10             THE COURT:  It appears that we have lost

11   Mr. Sullivan.

12             Fida, is there any way to determine what is going

13   on with Mr. Sullivan's connection --

14             (Mr. Sullivan reconnects to the proceedings.)

15             THE COURT:  Oh, there.  All right.  There we go.

16             All right.  You know, let's move on Mr. Sullivan.

17   I think you may have cut out somewhere in the middle of my

18   comments, but let's move on and let me hear the evidence and

19   we can have further argument on this issue later.

20             All right.  Call your first witness, Mr. Sundaran

21   or Ms. Shin.

22             MR. SUNDARAN:  Yes, Your Honor.  Defense calls

23   Plaintiff Ira Heaston as their first witness.

24             THE COURT:  Okay.

25             MR. SULLIVAN:  You're on.

1          THE COURT:  Oh, my apologies.  I hadn't actually

2   realized you were calling -- I guess I'm working off of a

3   different -- oh, here we go.  Okay.

4          MR. SUNDARAN:  Your Honor, if you prefer I can

5   give you a list of the order of witnesses.

6          THE COURT:  No, that's fine.  Proceed in whatever

7   order you want.  That's fine.

8          So why don't we start with Mr. Heaston?

9          Well, let me ask a question, though.  So I

10  understand that Officer Portillo is no longer on the call;

11  is that right?

12         MR. SUNDARAN:  I believe he's not in the box, but

13  my colleague, Ms. Shin, can try to reach him by text at PD

14  Communications.

15         THE COURT:  Well, she can --

16         MR. PORTILLO:  Your Honor, I'm -- I'm here again.

17         MR. SUNDARAN:  Okay.

18         THE COURT:  Okay.  Can I ask you to do me a favor?

19  Either leave where you are or turn off your microphone.  I

20  know it sounds unusual, but I don't want to lose your

21  connection because it was so difficult to get you on the

22  conference.  But I am going to ask you to turn off your

23  microphone so that you do not hear the testimony or leave

24  the room where the computer is.

25         MS. SHIN:  Judge, just very quickly, would that

1  apply to the President of Borris, Inc., who is sitting in

2  the conference room right now with the attorney for

3  Borris, Inc., because he will be also a witness?

4          THE COURT:  Am I incorrect that they were a

5  defendant at one point in this case?

6          MS. SHIN:  Yes.

7          MR. SUNDARAN:  They were, indeed, Your Honor.

8          THE COURT:  You know, I think it's slightly

9  typical to all parties, even though they have settled, this

10 is an usual posture, but I think that they can remain in the

11 room.

12         MS. SHIN:  Yes, Your Honor.

13         THE COURT:  Any representative of a party, even if

14 they have settled or resolved the case can remain in the

15 conference.

16         Okay.  So let's go ahead and start with this

17 witness.

18         Mr. Heaston.  If you will raise your right hand to

19 be sworn in.

20         Just remember to unmute.

21         THE WITNESS:  Yeah.  I'm here.

22 I R A   H E A S T O N,

23         called as a witness having been first duly

24         sworn/affirmed, was examined and testified as

25         follows:

1      THE COURTROOM DEPUTY:  Please state and spell your

2  name for the record.

3      THE WITNESS:  Ira Heaston, I-R-A; H-E-A-S-T-O-N.

4      THE COURT:  You may inquire, Mr. Sundaran or

5  Ms. Shin.

6      MR. SUNDARAN:  Thank you, Your Honor.

7  DIRECT EXAMINATION

8  BY MR. SUNDARAN:

9  Q    Good afternoon, Mr. Heaston.

10 A    Good afternoon.

11 Q    Do you go by any nicknames or aliases?

12 A    Under the advice of my counsel --

13      (Audio cuts out briefly.)

14 A    -- the Fifth Amendment.

15 Q    Were you --

16      THE COURT:  Hang on.

17      "On the advice of my counsel, I'm taking the

18 Fifth Amendment?"

19      (Audio cuts out briefly.)

20      THE COURT:  Wait.  Say it again, sir.  Get closer

21 to the computer.

22 A    Under the advice of my counsel, I'm going to invoke my

23 Fifth Amendment right.

24 BY MR. SUNDARAN:

25 Q    Mr. Heaston, where do you currently reside?

1   A     Under the advice of my counsel, I'm going to submit --

2   or invoke my Fifth Amendment right.

3          THE COURT:  Mr. Heaston, have you ever resided at

4   84-21 Chapin Parkway, Queens, New York?

5          THE WITNESS:  Under the advice of my counsel, I'm

6   going to invoke my Fifth Amendment right.

7   BY MR. SUNDARAN:

8   Q     Mr. Heaston, do you presently work?

9   A     Under the advice of my counsel, I'm going to invoke my

10  Fifth Amendment right.

11  Q     Mr. Heaston, did you accept settlement monies from

12  Borris, Inc. as a result of this action that you've brought

13  to federal court?

14  A     Under the advice of my counsel, I'm going to invoke my

15  Fifth Amendment right.

16  Q     Mr. Heaston, were you aware that there were three

17  lawsuits filled in connection with your action in this

18  the Court?

19  A     Under the advice of counsel, I'm invoking my Fifth

20  Amendment right.

21  Q     Are you aware that your housing court proceedings was

22  attached as an exhibit to the Second Amended Complaint filed

23  with this Court --

24         MR. SULLIVAN:  I'm going to object --

25         THE COURT:  We can't hear you, Mr. Sullivan.  Get

1    closer to the computer.

2             MR. SULLIVAN:  I'm objecting to the further

3    questioning of my client.  It's clear to counsel and the

4    Court that --

5             THE COURT:  Okay.  Mr. Sullivan, get closer to the

6    computer.  You are all jumbled and we are not hearing you.

7             (Pause in proceedings.)

8             MR. SULLIVAN:  So I am objecting to the further

9    questioning of my client.  He has exercised -- indicated in

10   very clear terms, exercised his right.  He's made it clear

11   that he's exercised his right and he advocates --

12            (Audio cuts out briefly.)

13            MR. SULLIVAN:  -- particularly --

14            THE COURT:  Okay.  Stop.

15            Okay.  So the last part, you have made it clear

16   that he's exercising his rights.  And then you said

17   "particularly" what, sir?

18            MR. SULLIVAN:  Particularly --

19            (Audio cuts out briefly.)

20            THE COURT:  Nope.  I'm sorry.  Again,

21   "particularly"?

22            MR. SULLIVAN:  -- in view of the application --

23            THE COURT:  -- "in view of the application" --

24            MR. SULLIVAN:  -- of Defense Counsel to be

25   referred to the U.S. Attorney's Office.

1        So I don't see the point of asking these
2   questions, but it's clear that he's -- that my client is
3   exercising his Fifth Amendment rights.
4        THE COURT:  Okay.  So I am going to overrule that
5   objection for two reasons:  First of all, with respect to
6   the invocation of a Fifth Amendment right, it has to be
7   specific as to one certain question.  It cannot be a broad
8   invocation as to all questions being asked, because in order
9   to defend that, there has to be specific questions that are
10  asked so that I can determine if the invocation as it stands
11  of that right is proper.
12       And the second reason is is that in a civil
13  proceeding, and that's what a sanctions proceeding is as
14  opposed to a criminal proceeding, I can take a negative
15  inference based on his implication of his Fifth Amendment
16  rights for purposes of deciding the sanctions motion.
17  That's separate from whether or not the U.S. Attorney's
18  Office takes any action based on the allegations here or his
19  testimony.
20       So I don't know if you have advised Mr. Heaston,
21  but it could be that his invocation of the Fifth could lead
22  to I inferring negatively as to any specific question that
23  he is asked as to which he invokes his Fifth Amendment
24  right.
25       So, Mr. Heaston, I hope you are aware that while

1   you may be invoking the Fifth to protect yourself against

2   criminal exposure, in a civil proceeding your invocation

3   could lead to my making an inference that is negative to

4   you.  So for example if you are asked a question of, Did you

5   know that the lease was attached to the

6   Second Amended Complaint and you invoke the Fifth, I could

7   negatively infer that you did know that because of your

8   invocation.  And that's a different rule than what applies

9   in a criminal lawsuit.  So I want you to be aware of that as

10  you are invoking the Fifth Amendment as to every question.

11  And I am going to allow the defense attorney, Mr. Sundaran,

12  to ask all of the questions, because as I said before, I

13  have to find that your invocation is proper as to each

14  question and that you cannot blanketly assert the

15  Fifth Amendment as to any question that is asked of you in

16  today's proceedings.

17          So, Mr. Sundaran, with that, why don't you

18  continue.

19          MR. SUNDARAN:  Thank you, Your Honor.

20          If I could ask the court reporter to repeat the

21  last question and answer.

22          (Requested portion read back.)

23          MR. SUNDARAN:  Thank you.

24  BY MR. SUNDARAN:

25  Q    Mr. Heaston, were you aware that your lease in the

1   housing court proceeding actions was attached in the

2   Second Amended Complaint filed in this court?

3   A    No.

4   Q    And, Mr. Heaston, what is your relationship to Salim

5   Blake?

6   A    Under advice of my counsel, I'm going to invoke my

7   Fifth Amendment right.

8            THE COURT:  Excuse me, Mr. Sundaran.

9            Can you position the camera, Mr. Sullivan, so I

10  can see Mr. Heaston as he is testifying?

11           MR. SULLIVAN:  (Complies.)

12           THE COURT:  Okay.  Thank you.

13           MR. SUNDARAN:  May I proceed, Your Honor?

14           THE COURT:  Yes.

15  BY MR. SUNDARAN:

16  Q    Mr. Heaston, are you aware whether or not Salim Blake

17  is the principal and owner of Borris, Inc.?

18  A    Under the advice of my counsel, I invoke my

19  Fifth Amendment right.

20  Q    Mr. Heaston, did you enter into a lease for the

21  second-floor apartment for the middle apartment at

22  84-21 Chapin Parkway for the months of January 2019 through

23  April of 2019?

24  A    Under the advice of my counsel, I invoke my Fifth

25  Amendment right.

1  Q    Mr. Heaston, are you aware that the lease you submitted

2  in connection with this lawsuit and in connection with the

3  housing court proceedings was a fraudulent lease?

4  A    Under the advice of my counsel, I invoke my Fifth

5  Amendment right.

6  Q    Mr. Heaston, are you claiming to have paid the security

7  deposit and rent for the months of January 2019 through

8  April of 2019?

9  A    Under the advice of my counsel, I invoke my Fifth

10 Amendment right.

11 Q    Mr. Heaston, as you sit here today, do you still

12 maintain that you were illegally locked out from

13 84-21 Chapin Parkway --

14             THE COURT:  Uh-oh.

15             (Mr. Pawar enters the proceeding.)

16             MR. PAWAR:  Did I come too early?

17             THE COURT:  Yes.  Sorry, Mr. Pawar, we've had some

18 delays.  If you could give us another 15 minutes, that would

19 be great.

20             MR. PAWAR:  All right.

21             THE COURT:  Thank you.  We would appreciate it.

22 All right.

23             You seem to have dropped off again, correct, Fida?

24             THE COURTROOM DEPUTY:  That is correct,

25 Your Honor.

1    THE COURT:  All right.  I do see -- oh, there we

2  go.  Okay.  I see Mr. Heaston.

3        Go ahead.

4        MR. SUNDARAN:  Thank you, Your Honor.

5  BY MR. SUNDARAN:

6  Q    Mr. Heaston, as you sit here today before this Court,

7  are you still claiming that you were illegally locked out of

8  84-21 Chapin Parkway on April 26, 2019?

9  A    Under the advice of my counsel, I'm invoking my Fifth

10  Amendment right.

11  Q    Mr. Heaston, as you sit here today, are you still

12  claiming to have been locked out of 84-21 Chapin Parkway

13  several times?

14  A    Under the advice of my counsel, respectfully, I'm

15  invoking my Fifth Amendment right.

16  Q    Mr. Heaston, on April 26, 2019 did you call the police

17  for assistance in your illegal-lockout claim at the premises

18  of 84-21 Chapin Parkway?

19  A    Respectfully on the advice of my counsel, I'm invoking

20  my Fifth Amendment right.

21  Q    Mr. Heaston, on April 26, 2019 did you present to the

22  officers who responded your lease and housing court order?

23  A    Respectfully, I'm -- under the advice of my counsel,

24  I'm invoking my Fifth Amendment right.

25  Q    Mr. Heaston, did you settle your claim against

1  Borris, Inc. for a monetary amount?

2  A     Under the advice of my counsel, I'm --

3              MR. SULLIVAN:  You can answer that.

4              THE WITNESS:  Answer that?

5  A     Yes, my attorney said I can answer --

6              THE COURT:  Yes.  Mr. -- go ahead.  Finish your

7  answer.  I'm sorry.

8  A     My attorney -- my attorney -- my former attorney had

9  settled and sent through his --

10             (Audio cuts out briefly.)

11 A     -- my former settled and sent me a --

12             (Audio cuts out briefly.)

13             THE COURT:  Sent you a what?

14             THE WITNESS:  I said he sent a check.

15             THE COURT:  Sent a check?

16             THE WITNESS:  Yes.

17             THE COURT:  Okay.

18             Mr. Sundaran, will you spell Borris; is it

19 B-O-R-I-S or B-O-R-R --

20             MR. SUNDARAN:  No, Your Honor.  Borris is spelled

21 with two "Rs," Your Honor, B-O-R-R-I-S, Inc., as it appears

22 on the Second Amended Complaint.

23             THE COURT:  All right.

24             MR. SUNDARAN:  That is the correct spelling,

25 Your Honor.

1        THE COURT:  All right.

2        And that is who you settled with, Mr. Heaston?

3        THE WITNESS:  Honestly, I'm not for sure.

4        THE COURT:  Okay.

5        All right.  Go ahead, Mr. Sundaran.

6   BY MR. SUNDARAN:

7   Q    Mr. Heaston, how much money did you receive from

8   Borris, Inc. as part of the settlement?

9   A    Well, I don't -- I received money from my attorney

10  $2,000.

11  Q    How much?

12  A    $2,000.

13       THE COURT:  Two?

14       THE WITNESS:  $2,000.  $2,000 in a check form from

15  Vik Pawar.

16       THE COURT:  In a what?

17       THE WITNESS:  In a check form from Vik Pawar.

18       THE COURT:  From Vik Pawar, okay.

19  BY MR. SUNDARAN:

20  Q    Mr. Heaston, did you understand that that check from

21  Mr. Pawar was in connection with your lawsuit in this court

22  against Borris, Inc.?

23  A    Yes.

24  Q    Mr. Heaston, did you commence a housing court action in

25  Queens Civil Court in or around April of 2019?

1    A    Respectfully with the advice of my counsel, I am

2    invoking my Fifth Amendment right.

3    Q    Mr. Heaston, did you follow a verified petition

4    claiming to be a resident at 84-21 Chapin Parkway in

5    Queens Civil Housing Court in or around April of 2019?

6    A    Respectfully with the -- under the advice of my

7    counsel, I'm invoking my Fifth Amendment right.

8    Q    Mr. Heaston, did you file an affidavit of service

9    indicating proof of service on Borris, Inc. in Queens Civil

10   Housing Court in or around April of 2019?

11   A    With the advice of my counsel, I'm invoking my Fifth

12   Amendment right.

13          THE COURT:  All right.  Let's abbreviate this by

14   just saying "Fifth Amendment" whenever you're invoking your

15   Fifth Amendment right.

16          THE WITNESS:  Perfect.

17          THE COURT:  All right.  Go ahead.

18   BY MR. SUNDARAN:

19   Q    Mr. Heaston, did Judge Lydia C. Lai issue a written

20   decision and order from Queens Civil Housing Court in

21   connection with your complaint for illegal lockout?

22   A    Fifth Amendment.  I plead the Fifth Amendment.

23   Q    Did you receive a copy of Judge Lai's order from

24   Queens Civil Housing Court?

25   A    My Fifth Amendment.

1   Q    Mr. Heaston, did you pay Salim Blake or anyone from

2   Borris, Inc. $2,000 as a security deposit for the

3   premises -- for the apartment at 84-21 Chapin Parkway?

4   A    I plead my Fifth Amendment right.

5   Q    Did you pay the amount of $2,650 for the month of

6   January 2019 in connection with the apartment at

7   84-21 Chapin Parkway?

8   A    I plead the Fifth Amendment.

9   Q    Did you pay $2,650 for the month of February of 2019

10  for the apartment at 84-21 Chapin Parkway?

11  A    I plead the Fifth Amendment right.

12  Q    For the month of March of 2019, did you pay a rental

13  payment in the amount of 2650 in connection with the

14  apartment at 84-21 Chapin Parkway?

15  A    Plead the Fifth Amendment right.

16  Q    For the month of April of 2019, did you make a payment

17  of $2,650 for an apartment that was located at

18  84-21 Chapin Parkway?

19  A    Plead the Fifth Amendment right.

20  Q    Mr. Heaston, did you not introduce copies of that

21  security deposit receipt and rental receipt in Queens Civil

22  Housing Court?

23  A    I didn't hear you.  I'm sorry.  I didn't hear you.

24  Q    Did you introduce copies of the security deposit and

25  rental receipts in connection with your housing court

1   proceeding?

2   A    Plead the Fifth Amendment right.

3   Q    Did you introduce the security deposit and rental

4   receipts in connection with your apartment at

5   84-21 Chapin Parkway in this action in federal court?

6   A    No.

7   Q    I'm sorry.  Your answer was "no"?

8   A    Yes.

9        THE COURT:  Yes, it was "no," just so the record's

10  clear.

11       THE WITNESS:  Can you ask the question again?

12  BY MR. SUNDARAN:

13  Q    Did you introduce copies of the security deposit and

14  rental receipts in connection with this lawsuit filed in

15  federal court?

16  A    No.

17  Q    Were you aware that your lawyer had introduced copies

18  of the security deposit receipt and rental receipts in

19  connection with the lawsuit brought on your behalf in this

20  court?

21  A    Honestly, no.

22  Q    Mr. Heaston, sitting here today, are you telling this

23  Court that you were completely unaware that any lawsuit was

24  filed in this court?

25  A    That is not what I'm saying.

1    Q    Were aware that a lawsuit was filed on your behalf in

2    this court?

3    A    I mean, the fact of when I know, I didn't -- I didn't

4    know when it was filed.  I found out myself that it was

5    filed, but I had reason to believe that it would be filed;

6    that it may be filed because when I left his office he said

7    that he would be in contact with me.  I just took it for

8    granted.

9    Q    Mr. Heaston, the question is a little bit more

10   specific.  Were you aware -- prior to sitting here today,

11   were you aware -- or prior to Mr. Pawar sending you copies

12   of your lawsuit, were you aware that a lawsuit was filed in

13   this court on your behalf?

14   A    No.

15   Q    Were you aware --

16        THE COURT:  I'm sorry.

17   Q    -- that your --

18        THE COURT:  Hang on a second, Mr. Sundaran.

19        I'm sorry, sir.  Was your answer, "no," you were

20   not aware that a lawsuit was filed on your behalf in this

21   court?

22        THE WITNESS:  Well, I mean, no, it wasn't really

23   until like June, like July, I didn't know when he filed it.

24   I just went to his office to sign papers in like October

25   last -- last October.  And then this year he was actually --

1   he told me actually --

2           (Audio cuts out briefly.)

3   A    -- I questioned -- actually --

4           (Audio cuts out briefly.)

5           (Pause in proceeding.)

6           THE COURT:  Okay.  Hang on.  Hang on.  Hang on.

7   Hang on.  Hang on.  You have to start again.

8           THE WITNESS:  Well --

9           THE COURT:  Hang on.  Hang on.  Hang on.

10          David, would you please read back where we left

11  off and where we dropped off?

12          (Requested portion read back.)

13  A    I'm saying no, I wasn't aware -- I'm aware of --

14          (Audio cuts out briefly.)

15  A    -- lawsuit and when it was filed --

16          (Audio cuts out briefly.)

17  A    -- no, over the monetary suit --

18          (Audio cuts out briefly.)

19  A    -- and I'm not aware when it was filed --

20          THE COURT:  Stop, stop, stop, stop, stop, stop,

21  stop, stop.  I'm sorry.

22          You said something about "monetary."  You

23  didn't -- David, I don't know how much you got, but I only

24  caught the part where you're saying -- and let's just answer

25  this in small bites, okay?

1          Are you saying that at the time your lawsuit was

2    filed, you did not know it was filed; is that right?

3          THE WITNESS:  Absolutely.

4          THE COURT:  And you're saying you found out

5    afterwards that it had been filed?

6          THE WITNESS:  I found out when it -- because I

7    spoke to him one time when I caught up with him, and then

8    maybe eight -- 80 --

9          (Audio cuts out briefly.)

10          THE WITNESS:  -- I met with someone else for a

11    hearing and that's it.  Like I spoke to him --

12          THE COURT:  Okay.  Hang on, hang on, hang on.

13          Maybe you should -- possibly you should back away

14    from the computer a bit.

15          THE WITNESS:  Okay.

16          THE COURT:  Okay.  Try that again.

17          David, I'm sorry, where do you have him dropping

18    off?

19          (Requested portion read back.)

20          THE COURT:  Okay.  Let's try this again.

21          When did you find out a lawsuit had been filed on

22    your behalf?

23          THE WITNESS:  Maybe before -- before the summer,

24    like around the summer, maybe, of 2020.

25          THE COURT:  Okay.  And how did you find out?

1          THE WITNESS:  I looked up my name.

2          THE COURT:  You look up what, sir?

3          THE WITNESS:  I Googled my name, because I was --

4          THE COURT:  One more time.  You Googled your own

5    name?

6          THE WITNESS:  Yeah, I Googled my name.  I Googled

7    my name and Vik Pawar's name because --

8          THE COURT:  Excuse me.  But why didn't you just

9    call Mr. Pawar?

10         THE WITNESS:  I called Mr. Pawar many different

11   times.  Mr. Pawar doesn't return phone calls.  Like I only

12   spoke to him for maybe three or four times.

13         THE COURT:  And is it your testimony that

14   Mr. Pawar never showed you a copy of the original complaint

15   that he filed on your behalf?

16         THE WITNESS:  I have, honest to God, never seen

17   a -- seen a copy of the complaint that was filed on my

18   behalf until now.

19         THE COURT:  And Mr. Pawar never told you about

20   what he was going to file?

21         THE WITNESS:  Mr. Pawar said, Sit tight.  I'm

22   going to take care of you.

23         THE COURT:  All right.  So Mr. Pawar said, "Sit

24   tight.  I'm going to take care of you"?

25         THE WITNESS:  Yeah.

1          THE COURT:  And then what else did he say?

2          THE WITNESS:  That's it.  That's what -- I'd been

3     waiting.  And then he hit me with the nugget that he said

4     that he's leaving the case.  Like, I don't even know what

5     was going on.

6          THE COURT:  I'm sorry.  But in between there,

7     though, you said you got a settlement?

8          THE WITNESS:  Yeah.

9          (Mr. Pawar enters the proceeding.)

10         THE COURT:  Mr. Pawar, actually I need you to

11    leave again.  I'm so sorry.

12         MR. PAWAR:  All right.

13         THE COURT:  Give us another 15 minutes.  We are

14    having technical issues.

15         MR. PAWAR:  Okay.  Judge, just one thing,

16    Your Honor, I need to --

17         THE WITNESS:  Like I said --

18         THE COURT:  Hang on, hang on.

19         THE WITNESS:  Oh, okay.

20         MR. PAWAR:  I have a 2:45 telephone conference

21    with Judge Pollak.

22         THE COURT:  Okay.  Well, we are actually not going

23    to hear from you next anyway.  We are going hear from

24    Mr. Blossner, so if we have to, we will take you out of

25    order.  Are you doing your conference --

1          MR. PAWAR:  All right.

2          THE COURT:  -- are you doing your conference by

3     computer?

4          MR. PAWAR:  No, no, I'm going to call.  But as I

5     said, I have to come in to set up this up for

6     Mr. Blossner --

7          THE COURT:  All right.

8          MR. PAWAR:  -- so I will be back at 2:30.

9          THE COURT:  Yes, absolutely.

10         MR. PAWAR:  All right.  Thank you.

11         THE COURT:  Okay.  Thank you.  Sir.

12         (Mr. Pawar exits.)

13         THE COURT:  All right.  David, where did we leave

14    off?  I am so sorry -- oh, never mind.  Hang on, I remember

15    where we were.

16         I was saying to you, Mr. Heaston, that at some

17    point, though, between when the complaint was filed and now,

18    you said Mr. Pawar sent you a check?

19         THE WITNESS:  Yeah, that was in the summertime

20    when --

21         THE COURT:  Okay.  And you knew there was a

22    lawsuit filed, right?

23         THE WITNESS:  I did not know anything.  I

24    actually -- every time I see him Mr. -- every time I asked

25    him, and he was like -- I was like, What's going on with my

1   court -- with my court proceeding?  And he was like, When I

2   need you, I'll let you know.  That's it.  That's all he

3   would say.

4         THE COURT:  Okay.  Let me turn this back to

5   Mr. Sundaran, because the technical issues are a bit

6   daunting.

7               Try not to move too much.

8         THE WITNESS:  All right.

9         THE COURT:  Stay still and stay as far as you are

10  away from your computer.

11        MR. SUNDARAN:  May I proceed, Your Honor?

12        THE COURT:  Yes.

13              Everyone else mute, please.

14        MR. SUNDARAN:  Your Honor, at this time, the

15  defendants ask that the Court take judicial notice of the

16  original complaint filed October 2nd, 2019; that the Court

17  take judicial notice of the First Amended Complaint, filed

18  October 9, 2019; and that the Court take judicial notice of

19  the Second Amended Complaint, filed March 9th of 2020.

20  BY MR. SUNDARAN:

21  Q    Mr. Heaston, are you aware that Mr. Pawar settled your

22  claim with Borris, Inc. back on March 9th of 2020?

23  A    No.

24  Q    Mr. Heaston, did you present yourself and participate

25  at a 50-h Hearing on November 13, 2019 --

1   A    Yes --

2   Q    -- after the filing of the First Amended Complaint?

3   A    I don't know about after anything, but I know I did go

4   to a -- to a hearing, yes.

5   Q    That was last year in November sometime?

6   A    Yes.

7   Q    And you were represented by a Mr. Robert Blossner from

8   Mr. Pawar's office, correct?

9   A    Yes.

10  Q    And you were made aware that was in connection with a

11  claim that you had against the City in connection with your

12  false arrest claim from April 26th, correct?

13  A    No, I just -- he just said that it was a hearing and to

14  tell the truth at the hearing.  That's what he told me, it

15  was a hearing and he said to tell the truth.  He said that

16  it -- it could help my case.

17  Q    Sir, are you telling this Court that you participated

18  in a 50-h Hearing, and you had -- you had no idea it had to

19  do with your arrest?

20  A    Honestly -- no, I mean he said -- he said to tell the

21  truth, it could help your case.  I didn't know -- like,

22  that's it.  That's what I did.  They asked me questions and

23  I -- I spoke to them.

24  Q    Did you make representations under oath at your 50-h

25  that you were a resident at 84-21 Chapin Parkway?

1    A    With my counsel's advice, I plead the Fifth Amendment

2    right.

3    Q    Did you make representations under oath at your 50-h

4    that you entered into a two-year lease agreement with

5    Borris, Inc.?

6    A    Under my counsel's advice, I plead my Fifth Amendment

7    right.

8    Q    Did you make representations under oath at your 50-h

9    proceeding that you were falsely arrested by the officers of

10   the NYPD?

11   A    I plead the Fifth Amendment.

12            MR. SUNDARAN:  Your Honor, at this time,

13   Defendants ask the Court to take judicial notice of 50-h

14   transcript attached as Defendants' Exhibit Q.

15            THE COURT:  And just so the record is clear, the

16   other exhibits that you referenced, the complaint, the

17   First Amended Complaint, and the Second Amended Complaint

18   what are those exhibit numbers?

19            MR. SUNDARAN:  Sure.  The complaint, the

20   First Amended Complaint, and the Second Amended Complaint

21   are Exhibits A, B, C respectively.

22            THE COURT:  Okay.  A, E, C?

23            MR. SUNDARAN:  A, as in "apple"; B, as in "boy";

24   and C, as in "Charlie."

25            THE COURT:  Okay.  Perfect.  Thank you.

1    MR. SUNDARAN:  Defendants would also like to move

2  into evidence Exhibit D -- D, as in "David"; E, as in

3  "elephant"; F, as in "Frank"; G, as in "Gary"; H, as in

4  "Harry"; I, as in "Ingrid"; J, as in "John"; and K, as in

5  "Kate."

6    THE COURT:  And what is your proffer as to what

7  these are?  I mean, I have them in electronic format, but

8  it's a little hard to --

9    MR. SUNDARAN:  Oh, sure.  Exhibits A, B, C are the

10 plaintiff's complaints.  D, E, F, G, H, I, J, K were all

11 attached to his Second Amended Complaint -- I'm sorry, with

12 the exception of J, with the exception of J.  D, E, F, G, H,

13 I, and K were attached to the Second Amended Complaint.

14    J, I'm offering as a public record.  And Exhibit

15 Q, as Plaintiff has now demonstrated, are from the

16 50-h Hearing.

17    THE COURT:  All right.  All of those are --

18    MR. SUNDARAN:  Are they in --

19    THE COURT:  Yes, all of those are admitted as

20 public records.

21    (Defendants' Exhibits A, B, C, D, E, F, G, H, I,

22 J, K, and Q so marked and received in evidence.)

23 BY MR. SUNDARAN:

24 Q    Mr. Heaston, at your 50-h Hearing on November 13th,

25 2019, did you allege that you suffered physical injuries as

1   a result of your arrest on April 26, 2019?

2   A    Yes.

3   Q    Mr. Heaston, did you produce any medical records to

4   Mr. Pawar or medical releases to Mr. Pawar in connection was

5   your alleged physical injuries?

6   A    No.

7   Q    Did you produce any photos of your alleged physical

8   injuries to Mr. Pawar?

9   A    Yes.

10  Q    Are you aware of whether or not Mr. Pawar produced

11  those photos to us?

12  A    Well, I'm not aware of anything -- any paperwork that

13  he do.

14  Q    Mr. Heaston, did you call the police on April 26, 2019

15  outside of 84-21 Chapin Parkway?

16  A    Yes.

17  Q    Did you tell the police that you were illegally locked

18  out?

19  A    Plead the Fifth Amendment right.

20  Q    Did you complain to the police officer on April 26,

21  2019 that your apartment looked like someone had taken

22  everything?

23  A    Plead the Fifth Amendment right.

24  Q    Did you tell the police who responded that a Samsung TV

25  was stolen?

1    A    Plead the Fifth Amendment right.

2    Q    Did you tell the police who responded that a burgundy

3    leather love seat was stolen?

4    A    Plead the Fifth Amendment right.

5              (Continued on the next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  DIRECT EXAMINATION

2  BY MR. SUNDARAN (continuing):

3  Q    Did you tell the police who responded that silverware,

4  boxes of clothes, two twin beds, a microwave oven were also

5  missing?

6  A    Plead the Fifth Amendment right.

7  Q    Did you also tell the police that shades and curtains

8  were missing?

9  A    Plead the Fifth Amendment right.

10  Q    Did you ever produce receipts or -- Mr. Heaston, isn't it

11  true that you and Salim Blake are childhood friends?

12  A    Plead the Fifth Amendment right.

13  Q    Mr. Heaston, isn't it true that you and Salim Blake grew

14  up in the same foster home?

15  A    False.  Plead the Fifth Amendment right.

16  Q    Mr. Heaston, isn't it true that you are currently

17  residing with Mr. Salim Blake?

18  A    False.

19  Q    Mr. Heaston, did Salim Blake ever live at

20  84-21 Chapin Parkway?

21  A    Plead the Fifth Amendment right.

22  Q    Did Salim Blake have any business or office at

23  84-21 Chapin Parkway?

24  A    Plead the Fifth Amendment right.

25  Q    Mr. Heaston, did you show a copy of the lease that you

1   had with Mr. Blake to the police officers responding?

2   A    Plead the Fifth Amendment right.

3   Q    Did you show copies of the housing court documents to the

4   police that responded?

5   A    Plead the Fifth Amendment.

6   Q    Did detectives respond to the scene on April 26, 2019?

7   A    Plead the Fifth Amendment right.

8   Q    Did one of the detectives who responded to

9   84-21 Chapin Parkway show you a photograph, where you

10  identified yourself on it?

11  A    Plead the Fifth Amendment right.

12  Q    Did the detective who responded on April 26 ask you to

13  come with him back to the precinct to sort out information

14  pertaining to a burglary report at 84-21 Chapin Parkway?

15  A    No.

16  Q    Did the detective who responded advise you that there

17  were reports of a burglary at 84-21 Chapin Parkway?

18  A    Plead the Fifth Amendment right.

19           MR. SULLIVAN:  Judge, I think -- he doesn't --

20  were --

21           THE COURT REPORTER:  I didn't hear what Mr. Sullivan

22  said, Your Honor.

23           THE COURT:  Mr. Sullivan, what did you say?

24           MR. SULLIVAN:  I was instructing him to exercise his

25  Fifth Amendment right to that question, on what the police

1   should be told.

2           THE WITNESS:  They didn't tell me.

3           MR. SUNDARAN:  May I proceed, Your Honor?

4           THE COURT:  No.  I'm sorry.  I can't understand

5   what's being said.

6           Mr. Sullivan, you said you advised Mr. Heaston to

7   exercise his Fifth Amendment right, and then what did you say,

8   Mr. Heaston?

9           MR. SULLIVAN:  Just the opposite.  I said with

10  respect to that question I advised him to not assert the

11  privilege.

12          THE COURT:  Okay.  So to not assert the privilege.

13  Okay.

14          Go ahead and answer the question then, Mr. Heaston.

15          THE WITNESS:  Can you repeat the question?

16          MR. SUNDARAN:  Madam Court Reporter, can you please

17  read the question back.

18          (Record read.)

19  A    (Continuing) No.

20  Q    Mr. Heaston, are you telling this court that you were not

21  shown a photograph depicting an image on it by the detective

22  that responded?

23  A    I plead the Fifth Amendment.

24  Q    Mr. Heaston --

25  A    Yes?

1   Q     -- did you sign a notice of claim in connection with your

2   lawsuit against the City?

3   A     Notice of claim, you said?

4   Q     Yes.

5   A     Yes.

6   Q     And in that notice of claim, did you assert a host of

7   physical injuries?

8         MR. SULLIVAN:  Do you remember?

9   A     Yeah, I don't.

10        MR. SULLIVAN:  Sit back.

11        THE COURT:  You know what.  Hang on one second.

12        I think the unusual setting for this made me forget

13  about a basic fact, or rule rather, which is that,

14  Mr. Sullivan, you shouldn't be advising your client while he

15  is on the stand as to how to testify.  So you need to stop

16  giving him advice, or else we have to move him to a different

17  room.

18        MR. SULLIVAN:  Judge --

19        THE COURT REPORTER:  Your Honor, I can't understand

20  what he is saying.

21        THE COURT:  Yes.  So Mr. Sullivan asked me if he is

22  allowed to advise him about his Fifth Amendment right; and my

23  answer to that is no, not while he is on the stand.  So he is

24  technically on the witness stand, and you are not seated

25  anywhere near him ordinarily, to be whispering into his ear.

1   So I want you to stop doing that.

2          All right.  Go ahead, Mr. Sundaran.

3   BY MR. SUNDARAN:

4   Q   Mr. Heaston, did you sign under oath the complaint in

5   connection with your lawsuit against the City?

6          THE COURT:  Mr. Heaston, I want you to do this.

7   Don't look at your lawyer.  I want you to just testify.

8          (No sound for plaintiff.)

9          THE COURT:  I can't hear you.  Are you using a phone

10  or a computer?  Okay.  Go ahead, Mr. Heaston.

11         Do you remember the question?

12         MR. SUNDARAN:  Mr. Heaston, are you able to hear me?

13  You are on mute.  Mr. Heaston, could you please unmute

14  yourself.  You are on mute.

15         THE COURT:  He can't hear us, it appears.  Okay.

16         You did something to the phone or the computer.  Can

17  you hear now, Mr. Heaston?  Can you hear us?  Mr. Heaston, if

18  you can hear us say something.

19         (No video for plaintiff.)

20         THE COURT:  Mr. Heaston, can you hear us now?

21         (No video for plaintiff.)

22         MR. SUNDARAN:  Sorry, judge.

23         THE COURT:  No, that's okay.

24         Can you hear us, Mr. Heaston?  If you can hear me,

25  let me suggest that you disconnect and then reconnect.

1   Mr. Heaston?  Can you hear us?  Okay.  We can't hear you at

2   all.  You are on mute, it would appear.  Can you unmute

3   yourself.

4               (No video for plaintiff.)

5               THE COURT:  We may be at the point of perhaps taking

6   the testimony of other witnesses.

7               MR. SUNDARAN:  That's fine, Your Honor.  I don't

8   have too much more to go.

9               THE COURT:  Okay.  Let's try to get through the rest

10  of this.  I'm not sure it's all that fruitful at this point,

11  or necessary.

12              MR. SUNDARAN:  I understand.

13              THE COURT:  I mean, it's not your fault at all.

14  Just the challenges.

15              MR. SUNDARAN:  Next witness is Mr. Kandkhorov.

16              THE COURT:  Let's wait.  We have lost his lawyer as

17  well.

18              UNIDENTIFIED SPEAKER:  Can you hear us, Your Honor?

19              THE COURT:  We can hear you.  We can't see you.

20              I think at this point, though, what we are going to

21  do is perhaps interrupt Mr. Heaston's testimony, and as long

22  as you can hear --

23              MS. SHIN:  Judge Chen, I apologize.  That is

24  actually our witness, and his attorney that just spoke.  I

25  apologize.

1          THE COURT:  Okay.  Thank you.  Okay.  All right.
2    So --
3          Mr. Heaston, can you hear us?
4          (No sound or video from plaintiff.)
5          THE COURT:  Mr. Heaston?
6          UNIDENTIFIED SPEAKER:  Hello?  Can you hear me now?
7          THE COURT:  Who is that?  Mr. Sullivan, are you --
8          MR. SULLIVAN:  It's another device.
9          THE COURT:  I'm sorry.  Is that you, Mr. Sullivan?
10         MR. SULLIVAN:  I'm trying to use a different --
11         MR. PAWAR:  Should I just come back, judge?
12         THE COURT:  Yes.  Come back, Mr. Pawar, in 15, just
13   before your other conference.
14         MR. PAWAR:  Judge, I apologize.
15         THE COURT:  Go ahead, Mr. Pawar.
16         MR. PAWAR:  So, judge, my conference is at 2:45.
17         THE COURT:  Yes.
18         MR. SULLIVAN:  I had to testify before Mr. Blossner.
19   If it's okay, I don't think my conference will be more than
20   ten, fifteen minutes.  So can I check back in at 3 o'clock
21   with Mr. Blossner?
22         THE COURT:  Yes.  Why don't we do that.  We will
23   take you out of order, if need be.
24         Mr. Sundaran, can you continue with someone else
25   besides either Mr. Pawar or Mr. Blossner?

1           MR. SUNDARAN:  Yes, Your Honor.  We have

2    Mr. Kandkhorov and Ms. Davoudi, two other witnesses.

3           MR. PAWAR:  So I will come back at 3 o'clock?

4           THE COURT:  Yes, sir.  Come back as soon as you are

5    done with your conference, and check in.

6           MR. PAWAR:  Okay.  Thank you.

7           THE COURT:  Mr. Sullivan, can you hear us?

8    Mr. Sullivan, can you hear us?

9           MR. SULLIVAN:  Yes.

10          THE COURT:  Okay.  Good.  Where is Mr. Heaston?

11          (Plaintiff's screen is frozen.)

12          MR. SUNDARAN:  Your Honor, maybe I can proceed with

13   the next witness while they work out their technology issues.

14          THE COURT:  Yes.  Although Mr. Sullivan and his

15   client have a right to hear and see.  So we have to wait for

16   them, in any event.

17          I am having my doubts about whether or not we are

18   going to be able to proceed in this fashion.

19          Mr. Sullivan, I think that you may just have to call

20   in and listen, if you can't actually get your video to work

21   properly, because we can't keep waiting.

22          (Pause.)

23          THE COURT:  Mr. Sullivan, we are going to do this.

24   Can you hear me?

25          (No video or sound from plaintiff.)

1          THE COURT:  If Mr. Sullivan gets back on the line,

2     I'm going to tell him to switch to phone and listen in because

3     this is not working, and we will deal with Mr. Heaston's

4     testimony later.  Unless, Mr. Sundaran, you have decided you

5     have what you need, and we can just move on.

6          MR. SUNDARAN:  Your Honor, I am ten -- five minutes,

7     seven minutes from completion.  I just wanted to lay out a few

8     more foundational questions, and I think no more than five to

9     seven minutes.

10          THE COURT:  All right.  Well, I will let you do that

11     by phone, if necessary, because the only consequence of that

12     is I won't see Mr. Heaston; but I feel like I have had

13     sufficient opportunity to observe him.

14          Let's see if he gets back on.

15          MR. SUNDARAN:  Your Honor, if I may ask a procedural

16     question.  I just want to know whether Defendants' Exhibit O

17     is in evidence, the notice of claim.

18          THE COURT:  I don't believe that was one of the ones

19     you moved.

20          MR. SUNDARAN:  Okay.

21          THE COURT:  Fida, correct me if I'm wrong.

22          THE COURTROOM DEPUTY:  Say that again, judge,

23     please.

24          THE COURT:  Mr. Sundaran wants to know if O was

25     admitted.

1          THE COURTROOM DEPUTY:  I don't have that.

2          THE COURT:  Yes.  Okay.  So when we go back on the

3    record you can move for the admission of O, because I think we

4    skipped and went to Q.

5          MR. SUNDARAN:  Yes.  Should we wait for Mr. Sullivan

6    to get back on?

7          THE COURT:  Yes.  Let's wait for Mr. Sullivan.

8          (Pause.)

9          THE COURT:  Fida, is there any way to call him on

10   the phone and just tell him to connect by phone rather than

11   attempting video?

12         THE COURTROOM DEPUTY:  I will try the phone number

13   on the docket sheet.

14         THE COURT:  Yes.  I'm sorry.

15         (Pause.)

16         THE COURT:  Okay.  Mr. Sullivan, here is what I

17   suggest.  If we lose contact with you again, I want you just

18   to call back on your phone and participate in this conference

19   via phone, because your video is too unstable.  It's causing

20   too much delay.

21         So Mr. Sundaran is going to try to finish his exam

22   of Mr. Heaston, but, if we lose you, just come back into the

23   conference via your phone; and we will just hear you but not

24   see you.  Okay?

25         MR. SULLIVAN:  Very well.

1          THE COURT:  Go ahead, Mr. Sundaran.

2          THE COURTROOM DEPUTY:  I'm sorry to interrupt, Judge

3   Chen.  I gave Mr. Sullivan the phone number earlier, before

4   the proceeding started.  I would like to repeat it just in

5   case he doesn't have it handy.

6          THE COURT:  Yes.  Go ahead.

7          THE COURTROOM DEPUTY:  The phone number is

8   571-353-2300.  The access code is 038106492.  Go ahead.

9          THE COURT:  Okay.  Go ahead, Mr. Sundaran.

10          MR. SUNDARAN:  Thank you, Your Honor.

11   BY MR. SUNDARAN:

12   Q    Mr. Heaston, did you verify or swear out the notice of

13   claim in connection with your accident against the City of New

14   York?

15   A    Yes.

16   Q    In that notice of claim did you allege physical injuries?

17   A    Somewhat.

18   Q    Specifically, did you claim in your notice of claim dated

19   May 8, 2019, did you claim injuries to your body, head, neck,

20   eyes, ears, mouth, face, arms, legs, nerves, and nervous

21   system?

22   A    No.

23   Q    Did you sign the document?

24   A    I signed the document.

25   Q    Did you read it before you signed it?

1    A    No.

2    Q    So you signed your sworn-to notice of claim without

3    reading it?

4    A    Yes.  I don't even -- I only signed one piece of paper

5    and gave it to him.  He brought me one piece of paper.  I

6    signed it, and it was the front, the paper where it needs the

7    signature.

8         MR. SUNDARAN:  Ms. Shin, can you please put up

9    Defendants' Exhibit O, please.

10        Your Honor, I would like to offer this into

11   evidence.

12        THE COURT:  Yes, O is admitted.

13        (Defendants' Exhibit O so marked and received in

14   evidence.)

15        (Published.)

16   Q    Can you see that?

17   A    May 10, I never even seen that.

18   Q    Mr. Heaston, have you seen this document before?

19   A    I never seen that, no.

20   Q    Can you go to the second page, please.

21   A    I signed that part, yeah.  Oh, no, that's not my

22   signature.  That's not my signature.

23   Q    Mr. Heaston --

24   A    That's not me.

25   Q    On page 2 of this document, is that your name printed?

1  A      That's my signature.

2           THE COURT:  Mr. Pawar (sic), you need to step away

3  from the witness.

4           Mr. Heaston, no question is posed right now.  So

5  wait a second.  Stop speaking.  Okay.  Wait for Mr. Sundaran

6  to pose a question.  Do you hear me, Mr. Heaston?

7           Okay.  Go ahead, Mr. Sundaran.

8  BY MR. SUNDARAN:

9  Q      Mr. Heaston, is that your name printed on the upper

10 right-hand side?

11 A      The only thing I seen was the back part of it.

12          THE COURT:  Mr. Heaston, you have to do two things.

13 Stop talking to your lawyer during your testimony, and listen

14 to Mr. Sundaran's question and only answer his question.

15 Okay.

16          Go ahead, Mr. Sundaran.

17 BY MR. SUNDARAN:

18 Q      Mr. Heaston, is that your name printed on the upper

19 right-hand side of the page?

20          THE WITNESS:  Hello?

21          MR. SUNDARAN:  Yes.

22          THE COURT:  Mr. Sundaran, why don't you move on to

23 the signatures.

24          THE WITNESS:  I can't hear no more.  I can't hear

25 him.

1          MR. SUNDARAN:  Mr. Heaston?

2          (No video for plaintiff.)

3          MR. SUNDARAN:  I can go with the next witness, Your

4    Honor.

5          THE WITNESS:  Yeah.  I'm here, I'm here.

6    Q    Mr. Heaston, on the bottom right-hand side of the page

7    that you are looking at, is that your signature?

8    A    Yes.  That's the page I signed, yes.

9          THE COURT:  So the record is clear, above where it

10   says "Claimant"; is that right?

11         THE WITNESS:  Yes.

12         THE COURT:  Go ahead, Mr. Sundaran.

13   Q    That is your signature?

14   A    Yes.  That's the piece of paper I signed.  That's the

15   only piece of paper that was put for me to sign.

16   Q    And in that verification, it says that you read the

17   foregoing notice of claim and know the contents thereof and

18   that the same is true to your knowledge, correct?

19   A    I'm not understanding your question.

20   Q    The verification says that you read the notice of claim

21   and you believe the contents to be true, correct?

22   A    I'm going to plead the Fifth.

23         THE COURT:  Let me ask one question.  I'm sorry.

24         How much money were you seeking, Mr. Heaston, from

25   this claim, do you know?

1    THE WITNESS:  I didn't have a monetary amount.  The

2    day I left, he said that -- I think on the front of the piece

3    of paper it says $1 million.  And then I heard him change.  I

4    heard it was two.  I knew -- I don't want -- I didn't come to

5    him with a money value.  I signed papers, and then he gave me

6    something that said a million dollars.  At the end of it, it

7    was a one with zeros, and that's it.

8            But then the -- in June, when he said -- it was

9    August -- no, June was the payment.  I Googled it.

10           THE COURT:  So you knew at the time you signed this

11   form that it was asking for a million dollars; is that right?

12           THE WITNESS:  Not at the moment.  When I went home I

13   Googled the -- that piece of paper, and at the top -- well, at

14   the top it says $1 million.  So I found out maybe two days

15   later.  No monetary amount when I first signed this.

16           THE COURT:  So you had a copy of this paper we have

17   marked as Exhibit O and took it home with you; is that right?

18           THE WITNESS:  I'm not sure.  Those specific

19   papers -- from my lawyers, like what is that?  Like I don't

20   know I have a copy of it.  There is only one piece of paper,

21   and the rest were it's like --

22           THE COURT:  I'm sorry.  There was only one piece of

23   paper and what?  There was only one piece of paper and?

24           THE WITNESS:  I said, I think it was like -- it was

25   some papers from his office.

1              THE COURT:  All right.  Go ahead, Mr. Sundaran.

2     BY MR. SUNDARAN:

3     Q     Mr. Heaston, looking at paragraph four, do you see the

4     words injury to your body, head, neck, eyes, ears, mouth,

5     face, arms, legs, nerves, and nervous system?

6     A     I'm going to plead the Fifth.  I don't know what was in

7     the complaint.  I didn't read what was in the complaint.

8     Q     In this document, Defendants' Exhibit O, do you see those

9     stated injuries in paragraph four?

10    A     Paragraph four?

11    Q     Yes.

12    A     Yes, I see them.  I mean, I had injury to my legs, my

13    arms, and my wrists.  That's what I told Vik.

14    Q     And do you see other injuries that are listed in that

15    category?

16    A     This is the first time I'm seeing, yes.

17    Q     Are you saying that the other injuries were not

18    authorized by you to be on this document?

19    A     I plead the Fifth Amendment.  I don't know.

20    Q     Mr. Heaston?

21    A     Yes?

22    Q     When you signed this document, did you read paragraph

23    four, which listed your claimed injuries?

24    A     I'm not sure what I read or what I signed, honestly, with

25    Vik.  This was last year.

1   Q    Did you read or see that you were -- that a claim for a
2   million dollars was being sought on your behalf?
3   A    I read that part, yes.
4   Q    Did you get a million dollars from the City?
5   A    No.
6   Q    At the time that you sat for your 50-H hearing, you were
7   made aware that there was a lawsuit that was filed, correct?
8   A    No.
9   Q    Mr. Heaston, you appeared for a 50-H on November 13,
10  2019, correct?
11  A    Yeah.
12  Q    Sometime in November of 2019?
13  A    Yes.
14  Q    And whenever it is that you were sent the complaint, you
15  noticed that there were two complaints filed in October of
16  2019, correct?
17  A    I didn't notice anything.
18  Q    You accepted settlement money after you sat for your
19  50-H, correct?
20  A    Plead the Fifth.  Yes.  I mean --
21       MR. SUNDARAN:  Your Honor, if I could just ask for
22  the answer to be struck.
23       THE COURT:  Yes.  Mr. Sullivan, you cannot
24  communicate with Mr. Heaston while he is on the stand.  I
25  can't be more emphatic about it.  If you need to go to another

1   room, go to another room.

2          MR. SULLIVAN:  My only concern is the Fifth

3   Amendment.

4          THE COURT:  I don't care what your concern is.  You

5   can't be -- hey, listen to me.  You can't be talking to your

6   client while he is on the stand.  Do you understand?  This is

7   a hearing.  So back off and sit somewhere else and stop

8   talking to him.

9          THE COURT REPORTER:  I can't hear Mr. Sullivan.

10         THE WITNESS:  He said he is leaving the room.

11         THE COURT:  Good.  Let's move on.

12         MR. SUNDARAN:  Ms. Shin, can you put up Defendants'

13  Exhibits R1 through R8 for identification.

14  BY MR. SUNDARAN:

15  Q    Mr. Heaston, I'm going to ask that you look at these

16  photos, Defendants' Exhibits R1 through R8, and tell me if you

17  recognize them.

18         THE COURT:  Ms. Shin, if you can -- go ahead.  I was

19  going to say enlarge them.  They are hard to see.

20         MR. SUNDARAN:  Ms. Shin, can you enlarge them?

21         THE COURT:  Thank you.

22         (Published.)

23  Q    Mr. Heaston, Defendants' R1, do you recognize anyone in

24  the photo?

25  A    I plead the Fifth.

1          MR. SUNDARAN:  Mr. Shin, if you can go to

2    Defendants' Exhibit R2.

3    Q    Same question:  Do you recognize anyone in the photo?

4    A    Plead the Fifth.

5    Q    Same question:  Do you recognize anyone in the photo?

6    A    Plead the Fifth.

7    Q    Mr. Heaston, do you recognize anyone in this photo,

8    Defendants' Exhibit R4?

9    A    Plead the Fifth.

10         MR. SUNDARAN:  Wait.  Ms. Shin, don't scroll down

11   yet.  Can you go back.

12   Q    Mr. Heaston, who is the individual's name that appears on

13   the top of that page?

14         Does that say Salim Blake?

15   A    I plead the Fifth.

16         MR. SUNDARAN:  Next photo, Ms. Shin.  You can skip

17   that.  Next photo.

18   Q    Mr. Heaston, do you recognize any of the individuals in

19   this photo?

20   A    Plead the Fifth.

21   Q    Does Salim Blake's name appear on this photograph?

22   A    Plead the Fifth.

23         MR. SUNDARAN:  Next exhibit, Ms. Shin.

24   Q    Mr. Heaston, again, do you recognize anyone in this

25   photograph?

1  A     Plead the Fifth Amendment.

2  Q     Do you see Salim Blake's name on that photo, R7?

3  A     Plead the Fifth Amendment.

4          MR. SUNDARAN:  Next image, Ms. Shin.

5  Q     Defendants' R8, do you recognize any of the individuals

6  in this photo?

7  A     Plead the Fifth.

8  Q     Do you see Salim Blake's name appear on this photo?

9  A     Plead the Fifth.

10 Q     Mr. Heaston, are you aware that Salim Blake was not the

11 owner of Borris, Inc., correct?

12 A     Plead the Fifth.

13 Q     You were aware that Salim Blake was not living or had a

14 business at 84-21 Chapin Parkway, correct?

15 A     Plead the Fifth.

16 Q     Mr. Heaston, did you file an affidavit in opposition in

17 connection with defendants' sanctions motion?

18 A     Repeat that again.

19 Q     Did you file an affidavit in connection with defendants'

20 sanctions motion against you?

21 A     Plead the Fifth.

22 Q     Did you tell Mr. Pawar, Mr. Heaston, to withdraw your

23 lawsuit?

24 A     Yes.

25 Q     According to you, Mr. Pawar withdrew as counsel, correct?

1  A    I mean, according to me or according to Pawar?

2  Q    According to you, you asked Mr. Pawar to withdraw your

3  lawsuit, correct?

4  A    Mr. Pawar asked me if I wanted to withdraw my lawsuit.

5  Q    Did you authorize him to withdraw your lawsuit?

6  A    Yes.  I said, I don't care, you can withdraw it.

7  Q    You are aware that -- you are alleging that Mr. Pawar

8  simply withdrew as counsel, correct?

9  A    Yes.

10  Q    Did you have any conversations with Mr. Pawar as to why

11  he withdrew as counsel?

12  A    No.  He said that technically he's already not my lawyer,

13  he can't speak to me.

14  Q    Just so that the record is abundantly clear, you are

15  claiming up until the time that Mr. Pawar, according to

16  your -- strike that.

17         According to your affidavit that you filed, you were

18  completely unaware of this lawsuit until you got copies of

19  this complaint, correct?

20  A    I didn't say I was unaware of the lawsuit.  I was unaware

21  of the complaint, what was said in it, the complaints, when

22  they were amended.

23  Q    Mr. Heaston, paragraph eight of your complaint, you claim

24  that you were not aware that an actual lawsuit has been filed,

25  correct?

1   A    Yeah, I did.  I don't know when the lawsuit was filed.  I

2   don't know when it was in court.  So I was expected to come to

3   a hearing in -- the end of last year, going into the new year.

4   He would tell me I had to show up for court and things like

5   that.

6           There was nothing until he sent me money, and then

7   in August he said -- he asked me if I knew in particular

8   anybody, and then -- but everything in this case is --

9           THE COURT REPORTER:  Your Honor, he is cutting in

10  and out.  I'm having a hard time understanding.

11  A    (Continuing) Every time I asked something going on with

12  the case, he said nothing to tell you about, I will let you

13  know.

14  Q    Mr. Heaston, when Mr. Pawar sent you the complaints in

15  this lawsuit, is that the first time you became aware of it,

16  yes or no?

17  A    That's the first time I became aware of the complaint and

18  what was in the complaint, that, yes.

19  Q    And when you became aware of the statements in the

20  complaint, did you take any steps to correct it?

21  A    Plead the Fifth.

22          MR. SUNDARAN:  Your Honor, if I can just have one

23  minute, I just want to quickly confer with my co-counsel, and

24  then I can finish up with this witness.

25          THE COURT:  Okay.

1          (Pause.)

2          MR. SUNDARAN:  Nothing further, Your Honor, for this

3    witness.

4          THE COURT:  Okay.  Let's have Mr. Sullivan come back

5    in the room, although now that I think about him leaving the

6    room, it's perhaps not good if he didn't hear what happened,

7    but I guess that was his choice.  All right.

8          Mr. Sullivan, do you have any questions of

9    Mr. Heaston?

10          MR. SULLIVAN:  Yes.

11          MS. SHIN:  Just a minute.  I think -- are plaintiff

12    and his attorney on two different lines?

13          MR. SULLIVAN:  No.

14          MS. SHIN:  I think that might be causing the echo.

15    I just wanted to make sure.

16          THE COURT:  Does someone have a phone on while the

17    computer is also on?  Because if you have your phone connected

18    as well as your computer, you need to mute your computer.

19          MR. SULLIVAN:  No.

20          THE COURT:  Okay.  So go ahead and ask your

21    questions, Mr. Sullivan.

22    CROSS-EXAMINATION

23    BY MR. SULLIVAN:

24    Q    How did you come to meet -- are we hearing each other?

25          THE COURT:  Yes.

1           THE WITNESS:  Hello?  Hello?

2           THE COURT:  We can hear you.

3           THE WITNESS:  Is there audio?  Hello?  Can you guys

4    hear us?  You can hear us?  We can't hear you, though.  Can

5    someone talk?

6           THE COURT:  Okay.  You need to fix it.

7           (Pause.)

8           THE COURT:  Let's have our detective, actually.

9    Detective, do you mind turning -- leaving the room or turning

10   your mic, your microphone -- your speaker off.  Sorry.  Okay.

11          Go ahead, Mr. Sullivan.

12          MR. SULLIVAN:  Hello?

13          THE COURT:  Yes.  Mr. Sullivan?

14          MR. SULLIVAN:  Yes.

15          BY MR. SULLIVAN:

16   Q    Mr. Heaston, how did you come to meet your attorney Vik

17   Pawar?

18   A    Through a friend of his or, I guess, a friend of his.  I

19   called a lawyer, a number I got off of -- I think it was like

20   a light post.  I called a number I got off of a light post for

21   a lawyer, and I just called him and told him what happened and

22   I asked him how would I go about getting my belongings; and he

23   took my paperwork that was from like the court system and

24   started something.

25          He said I have someone I want you to talk to.  His

1  name is Vik Pawar.

2         MR. PAWAR:  Judge, I'm here.

3  A    (Continuing) He called Vik.

4         MR. PAWAR:  Judge, I'm here.

5         THE COURT:  Oh, Mr. Pawar.  Yes.  We need to have

6  you leave.

7         MR. PAWAR:  Right.  So Your Honor said to come back

8  when the conference was over, so I did.  So just give me a

9  time, and I will come back on.

10        THE COURT:  Right.  3:15.  I'm sorry to keep doing

11 this to you.  Thank you.

12        MR. PAWAR:  No problem.  Thank you.

13        THE COURT:  Go ahead, Mr. Sullivan.

14 BY MR. SULLIVAN:

15 Q    You were explaining -- go ahead, Mr. Heaston.

16        THE COURT REPORTER:  I didn't hear what Mr. Sullivan

17 asked.  I'm sorry.

18        THE COURT:  He said you were explaining, and then he

19 fell off.  Go ahead, Mr. Heaston.

20 BY MR. SULLIVAN:

21 Q    Can you tell us how you met Mr. Pawar.

22        THE COURT:  Hang on, hang on, hang on.  He was

23 explaining how he met Vikrant Pawar, or Vik Pawar.  Go ahead.

24 A    Yes.  So I got a number, this number for like for a

25 lawyer about -- like, I just wanted to get my stuff that was

1  left there.  Like I had a cable box, stuff that was at that

2  premises.

3            Long story short, I want to get things; and I called

4  him and he said you might have another case.  You need to

5  speak to my friend.  I said okay.  So he called Vik, and to me

6  Vik was, you know, like he was a little rude.  So I said, no,

7  I'm not going over there; and Vik -- like they hung up the

8  phone, and he called Vik back and we had a conversation, and

9  then Vik was like, okay, walk the guy over here.

10            So all along I was like, ah, I told him I don't

11  really want to go.  He said, no, just trust me.  I want to

12  introduce you.  Let him take a look at your paperwork, stuff

13  like that.

14            THE COURT:  I'm going to stop you.  This is not

15  particularly relevant, but let me ask you a question.

16            You said you wanted to get your possessions.  Where

17  were they?

18            THE WITNESS:  I don't know.  I had got arrested.  So

19  when I got arrested.

20            THE COURT:  I see.  So it was because you got

21  arrested you lost your possessions; is that right?

22            THE WITNESS:  Missing some things.  I was missing --

23            THE COURT:  Hang on.  Your affidavit that said your

24  possessions that were in the premises when I was arrested.

25  What premises was that?

1          THE WITNESS:  That was 84 Chapin.

2          THE COURT:  84-21 Chapin Parkway?

3          THE WITNESS:  Uh-huh.

4          THE COURT:  So your belongings were in that

5     apartment?

6          THE WITNESS:  Plead my Fifth Amendment.

7          THE COURT:  All right.  Go ahead.  But your

8     affidavit said you called Mr. Pawar about getting your

9     possessions from the 84-21 Chapin Parkway apartment; is that

10    correct?

11         THE WITNESS:  No, no.  I didn't call Mr. Pawar.  I

12    was introduced to Mr. Pawar.

13         THE COURT:  Okay.  Sorry.  But what did you ask

14    Mr. Pawar to do when you met him?

15         THE WITNESS:  I told him -- I just told him -- I

16    didn't even ask Pawar.  I was -- it was an older guy, like

17    Rosenberg or something his name was.  I don't remember his

18    name, but I just told him I was arrested and how do I get some

19    things that I had; and, long story short, he looked at my

20    paperwork.  He said I think you should just talk to my friend.

21         THE COURT:  Hang on, hang on, hang on.  Things of

22    yours, where were they?

23         THE WITNESS:  I plead my Fifth Amendment.

24         THE COURT:  Okay.  Go ahead, Mr. Sullivan.

25    Continue.

1  BY MR. SULLIVAN:

2  Q    Mr. Heaston, after speaking -- did the other attorney

3  bring you to Mr. Pawar's office?

4  A    Yes.  He walked me to Mr. Pawar's office.

5  Q    About how long did you spend with Mr. Pawar?

6  A    I was there maybe 25 minutes, 30 minutes.

7  Q    You indicated that you signed a document, a notice of

8  claim.

9         Was it in that visit that you signed it?

10 A    Yes.

11 Q    And other than signing that document, do you not recall

12 if you signed a retainer, if you know?

13 A    I don't recall.  I don't.  I just signed that piece of

14 paper and gave that piece of paper to him when I left.

15 Q    And was any amount stated as to any amount that you were

16 suing for; was there any discussion like that?

17 A    We honestly didn't discuss it, but I later on saw it on

18 the paperwork.  Two days later, when I got home I saw it.

19 Q    That was the $1 million in the notice of claim?

20 A    Yes.

21 Q    Subsequent to that, after that time, before the

22 withdrawal of Mr. Pawar, did you ever receive any documents in

23 the mail, by e-mail, or in any other way from Mr. Pawar?

24 A    I have never received no e-mail, no mail, or anything

25 from Mr. Vik Pawar.

1   Q    How about the check, the settlement check of $3,000?

2   A    Yeah.  Well, yeah, he sent that to another -- he didn't

3   send it to my home address.  He sent that to somewhere to be

4   held up.  He sent me that, yeah.

5   Q    Okay.  Other than the check -- by the way, when you got

6   the check for the $3,000 --

7   A    Two.

8   Q    For $2,000, did you know exactly what that was for?

9   A    No.  I asked him what it was for.  He was like one of the

10  cases settled.  I mean, he said one of the defendants settled.

11  He didn't tell me who.  I didn't know where it came from.

12         I asked him, is it more.  He was like, don't worry

13  about it.  He just -- it came, he said he had to do it from

14  his checking account.  So he wrote a check from his checking

15  account.

16  Q    And the complaint that you got from Mr. Pawar, when you

17  got it filed, had you ever seen those before?

18  A    No.  That was the first time I ever seen anything about

19  this case physically, period.

20  Q    Now, you mentioned something about $2 million, that you

21  realized it was two million.

22         How did you find that out?

23  A    Well, their witness told my sister that, oh, he got

24  $2 million.  That's it, because he supposedly Googled PACER or

25  something like that.

1  Q     And when you met with -- when Mr. Pawar -- at some point

2  Mr. Pawar advised you about allegations to be made against you

3  by your -- by this lady, Margaret Kirkland?

4  A     Said what?

5  Q     Did he advise you of some allegations being made by her?

6  A     By Margaret?

7  Q     Yes.

8  A     It's like, boom, he just asked me who was that.  I told

9  him who that was, to my knowledge.

10 Q     Now, now after that time, when was the next time that you

11 spoke with Mr. Pawar?

12 A     Somewhere in early August, when he asked me.  He said, do

13 I want to withdraw the case or keep going by myself; and I

14 told him I can't keep going by myself.  I don't know what's

15 going on.  So it's withdraw the case.

16          Then I heard later from -- days later, with an

17 e-mail, that said he was going to withdraw from the case.

18 Q     Prior to that, did you receive e-mails from Mr. Pawar?

19 A     No.  I haven't received e-mails.

20 Q     After that, did you come to see me about Vik?

21 A     I came to see you because Vik said that after he did

22 another lawyer and maybe somebody that practiced criminal.  I

23 said, what do you mean.  He said that's what I have to tell

24 you.  I can call you on.

25 Q     After consulting with me, did you authorize me to

1  withdraw your lawsuit?

2  A    Yes.  I authorized Vik to.

3  Q    What was the -- how did you authorize Vik to --

4        THE COURT REPORTER:  I'm having a hard time

5  understanding, Your Honor.

6        THE COURT:  He said, how did you authorize him, Vik,

7  to withdraw your lawsuit.

8  A    I told him verbally and by text.  He called me that last

9  day in August, and he just led me on.  He said I'm going to

10 send you paperwork by e-mail in a few, and then it came in

11 like the next day.

12 Q    You said you texted him?

13 A    Yes.

14 Q    And did you authorize the withdrawal of the lawsuit in

15 the text?

16 A    Yes.  I told him numerous times.  I texted to dismiss it,

17 but he just kept asking me who this person was.

18        MR. SULLIVAN:  I have nothing further, judge.

19        THE COURT:  Okay.  Mr. Sundaran, I'm going to

20 interrupt what I presume will be your redirect, but to ask

21 some questions.

22        Mr. Heaston, you went to Mr. Pawar because you

23 wanted to get your possessions back from the premises,

24 correct?

25        THE WITNESS:  I actually went to Mr. Pawar for the

1  other, maybe he suggested that I --

2  Q     The other guy suggested you might have a case, right?

3  A     He suggested -- he didn't even know -- he highly advised

4  me to talk to this particular lawyer, he is my friend.

5             THE COURT:  Okay.  Enough.  That's good.

6             What did you tell Mr. Pawar about your situation?

7             THE WITNESS:  I got there.  I gave him the -- the

8  guy explained to him.  He asked me, and I told him about where

9  I was living and I told him that I got arrested; and he asked

10  me do I have anything from central booking, something like

11  that.

12            THE COURT:  Stop for a second.  Where did you tell

13  him you were living?

14            THE WITNESS:  You said what?

15            THE COURT:  Where did you tell him you were living?

16            THE WITNESS:  I didn't hear you.

17            THE COURT:  Where did you say you were living?

18            THE WITNESS:  Okay.  I mean, I plead the Fifth.  We

19  didn't discuss it.

20            THE COURT:  Okay.  So you told Mr. Pawar you were

21  living somewhere, but you won't say where.

22            And then what else did you say?

23            THE WITNESS:  You said what?

24            THE COURT:  You said you told Mr. Pawar that you

25  were living somewhere, though you won't give the address; and

1  then you stated --

2          THE WITNESS:  Where was I living, with all

3  respect --

4          THE COURT:  Okay.  A moment ago, sir, you said, I

5  told Mr. Pawar I was living somewhere and I got arrested.  The

6  record is what it is.

7          But, Mr. Heaston, what else did you tell Mr. Pawar

8  that, according to your own affidavit, caused Mr. Pawar to say

9  you could have a good false arrest claim?  What did you say

10  about the circumstances of your arrest?

11          THE WITNESS:  I said I got arrested, and the judge

12  didn't see me.  They let me out the back of central booking at

13  2:45 a.m. in the morning.

14          THE COURT:  Hang on.  What did you tell Mr. Pawar

15  happened before you got arrested?

16          THE WITNESS:  You mean -- I told him I got arrested

17  and I just told him I got arrested and the prosecutor didn't

18  prosecute me.

19          THE COURT:  Okay.  Where did you tell Mr. Pawar you

20  got arrested?

21          THE WITNESS:  I told him I got arrested in 84-21

22  Chapin.

23          THE COURT:  Inside or outside?

24          THE WITNESS:  I was outside the premises.

25          THE COURT:  You were outside?

1    THE WITNESS:  Yes.  I called the police, and I was

2  standing outside when they came.

3    THE COURT:  When you called the police, what did you

4  say?

5    THE WITNESS:  I told them I wanted to make a report;

6  but this is -- you are going back into, as in -- I plead the

7  Fifth.  I don't understand that.

8    THE COURT:  Did you call the police to tell them

9  that you had belongings in 84-21 Chapin Parkway?

10    THE WITNESS:  Plead the Fifth.

11    THE COURT:  Okay.  But the police responded to that

12  address, and you were outside the apartment, correct?

13    THE WITNESS:  Yes.

14    THE COURT:  Okay.  You are answering that you were.

15    Is that what you told Mr. Pawar happened?

16    THE WITNESS:  I mean, I didn't really tell -- that's

17  what I'm trying to say.  I didn't really tell Mr. Pawar

18  anything.  He spoke to his friend.  I told the guy.  I told --

19  his name was like Rosenberg.  I told him everything.  That's

20  what I was saying, like I was in his office like an hour.  We

21  listened to --

22    THE COURT:  Okay.  Hang on, hang on, hang on.  Stop,

23  stop, stop.

24    So what did you tell Mr. Rosenberg?

25    THE WITNESS:  I just told him that I got arrested

1   and they let me out of central booking.

2          THE COURT:  Okay.  Hang on, hang on.

3          Did you tell Mr. Rosenberg what you were doing just

4   before you got arrested?

5          THE WITNESS:  I told him that I'm coming to you

6   because I got arrested, and I need my -- I need to find out

7   how I can get my belongings.  That's the reason why I spoke to

8   him.

9          THE COURT:  Okay.  Did you tell Mr. Rosenberg that

10  you got arrested after you called the police about getting

11  your belongings?

12         THE WITNESS:  I didn't call -- I plead the Fifth.

13         THE COURT:  But you are saying that whatever you

14  told Mr. Rosenberg was what was communicated to Mr. Pawar; is

15  that right?

16         THE WITNESS:  Yes, and then Mr. Pawar looked at all

17  the paperwork, and then he went in the other room and then he

18  came back with paperwork for me to sign.  He was like, sign

19  right here, and he said, trust me, I got you on this.

20         THE COURT:  Okay.  So let me ask you a very direct

21  question, Mr. Heaston.

22         THE WITNESS:  When I got --

23         THE COURT:  Hang on, hang on.  Stop.

24         Did you also tell Mr. Rosenberg that you had

25  belongings in the apartment at 84-21 Chapin Parkway?  Did you

1  tell that to Mr. Rosenberg?

2         THE WITNESS:  Did I tell him that I had belongings?

3         THE COURT:  Yes, that you had possessions in that

4  apartment.

5         THE WITNESS:  I plead the Fifth.  I don't know what

6  you are --

7         THE COURT:  Okay.  Did you tell Mr. Rosenberg that

8  the reason the police showed up at that apartment was because

9  you called them about your belongings?

10         THE WITNESS:  I plead the Fifth.

11         THE COURT:  Okay.  Did you tell Mr. Rosenberg that

12  the 84-21 Chapin Parkway was your apartment?

13         THE WITNESS:  I plead the Fifth.

14         THE COURT:  Did you tell Mr. Rosenberg that the

15  reason that the arrest was bogus was because you were entitled

16  to be inside that apartment at 84-21 Chapin Parkway?

17         THE WITNESS:  No.

18         THE COURT:  You didn't tell him that you were

19  entitled to be in that apartment?

20         THE WITNESS:  I didn't tell him.

21         THE COURT:  Do you know why it is -- or let me

22  rephrase that.

23         What's the basis, if you know, of your false arrest

24  claim?  Why was it false?

25         THE WITNESS:  You have to ask the lawyer.

1        THE COURT:  Okay, but do you know anything that you

2   told Mr. Pawar that went into the complaint that says the

3   police falsely arrested you?

4        THE WITNESS:  I plead the Fifth.  This claim was

5   not -- like, in the claim -- it's not like -- my lawyer made

6   the claim.  My lawyer made the claim.  Like, I don't even have

7   no idea.  I told him some things.  I don't want to go too far

8   into it, but --

9        THE COURT:  Okay.  Mr. Heaston, at any point did you

10  tell either Mr. Rosenberg or Mr. Pawar that you had the right

11  to be inside the apartment at 84-21 Chapin Parkway?

12       THE WITNESS:  No, I never said that.  They asked me

13  for paperwork.  I showed him the paperwork where the judge,

14  where the D.A. declined to prosecute.  They asked me for that,

15  and I made multiple copies of that.

16       THE COURT:  Did you ever show them the housing court

17  document?

18       THE WITNESS:  No, not at that -- I'm not -- I plead

19  the Fifth.

20       THE COURT:  At any point did you show Mr. Pawar or

21  give Mr. Pawar or Mr. Rosenberg the housing court document

22  that said you were entitled to be in the apartment at

23  84-21 Chapin Parkway?

24       THE WITNESS:  I plead the Fifth.

25       THE COURT:  All right.  Mr. Sundaran, do you want to

1  ask anything else, based on what I asked or otherwise, as

2  redirect?

3         MR. SUNDARAN:  Yes, Your Honor, very briefly.

4  REDIRECT EXAMINATION

5  BY MR. SUNDARAN:

6  Q    Mr. Heaston, you claim that you were trying to recover

7  some of your belongings.

8         What were those belongings?

9  A    I plead the fifth.

10 Q    Did those belongings include a Samsung TV?

11 A    Plead the Fifth.

12 Q    A burgundy leather couch?

13 A    Plead the Fifth.

14 Q    When the court was referring to Mr. Rosenberg, or

15 Mr. Rosenblatt, do understand that person to be Mr. Blossner,

16 Mr. Vik's law associate?

17 A    No.  It was not Mr. Blossner.

18 Q    Who is Margaret Kirkland?

19 A    Plead the Fifth.

20 Q    Who is Toi Williams?

21 A    Plead the Fifth.

22 Q    Are you aware that Ms. Kirkland submitted an affidavit

23 divulging your fraudulent scheme with Salim Blake?

24        MR. SULLIVAN:  Objection.

25        THE COURT:  Sustained.

1   Q    Are you aware that Ms. Kirkland submitted an affidavit

2   disclosing the scheme that you were part of with Mr. Salim

3   Blake?

4              MR. SULLIVAN:  Objection.

5              THE COURT:  Sustained.

6   Q    Are you aware that Ms. Kirkland submitted an affidavit in

7   connection with your relationship to Salim Blake and this

8   case?

9              MR. SULLIVAN:  Objection.

10             THE COURT:  Sustained.  You don't -- don't ask him

11  about other evidence.

12             MR. SUNDARAN:  Okay.

13  Q    Mr. Heaston, you referenced that you had a home address

14  and the settlement check was mailed to a different address.

15             What was your home address at the time?

16  A    Plead the Fifth.

17  Q    What was the address that the settlement check was mailed

18  to?

19  A    Plead the Fifth.

20  Q    What was the amount of the settlement check?

21  A    $2,000.

22  Q    What was your understanding as to what that settlement

23  check was for?

24  A    Plead the Fifth.

25  Q    Mr. Heaston, you dismissed the case after receiving money

1  from Borris, Inc., correct?

2  A     Plead the Fifth.

3  Q     You dismissed the case after defendant served you with a

4  sanctions motion, correct?

5  A     Yes.

6         MR. SUNDARAN:  Nothing further, Your Honor.

7         THE COURT:  Okay.  Thank you.  Anything further from

8  you, Mr. Sullivan?

9         MR. SULLIVAN:  No, judge.

10        THE COURT:  Okay.  Do you folks need a five-minute

11 break?  I'm only asking this of the lawyers.  If not, let's

12 march on.

13        MR. SUNDARAN:  I'm fine proceeding on.

14        THE COURT:  Let's go with your next witness.  Can I

15 suggest that it be Mr. Pawar, if there is a possibility of

16 keeping the detective on hold for a bit?

17        MS. SHIN:  Judge --

18        MR. SUNDARAN:  I'm sorry.  Go ahead.

19        MS. SHIN:  Judge, I think there are two witnesses

20 from Borris, Inc. who have been sitting throughout this

21 hearing and waiting.  They will be fairly quick, and we can

22 expedite a little bit.

23        THE COURT:  Okay.  Go ahead.  I'm just trying to

24 tell you that I think the most important witnesses are

25 Mr. Pawar and Mr. Heaston; but it's obviously your case.  So

1    go ahead.

2            MR. SUNDARAN:  I will make it very brief, Your

3    Honor.

4            THE COURT:  Go ahead.  Okay.

5            MR. SUNDARAN:  Your Honor, the defendants call

6    Mr. Vyacheslav Kandkhorov.

7            THE COURT:  Please raise your right hand,

8    Mr. Kandkhorov.

9            Fida.

10   **V Y A C H E S L A V   K A N D K H O R O V**,

11       called as a witness having been first duly

12       sworn/affirmed, was examined and testified as

13       follows:

14           THE COURTROOM DEPUTY:  You need to move closer to

15   the microphone so we can hear you.

16           THE WITNESS:  Yes, it's true.

17           MR. SULLIVAN:  I can't see the person.

18           THE COURTROOM DEPUTY:  Please state --

19           THE COURT:  Let's dispense with the spelling,

20   assuming that the court reporter has it.

21           Do you have it, Michele?

22           THE COURT REPORTER:  I believe I do, Your Honor.

23           THE COURT:  Go ahead.  You have the witness list,

24   right?

25           THE COURT REPORTER:  Yes, I do.

1      THE COURT:  All right.  Mr. Sullivan, did you say

2   you can't see or hear?

3      MR. SULLIVAN:  Whatever was --

4      THE COURT:  I don't know what your video screen is

5   looking like, but there is a gentleman very clearly depicted

6   in a video screen, wearing a blue sweatshirt and a blue shirt,

7   it looks like.

8      MR. SULLIVAN:  I got it.

9      THE COURT:  You may inquire, Mr. Sundaran.

10  DIRECT EXAMINATION

11  BY MR. SUNDARAN:

12  Q    Good afternoon, Mr. Kandkhorov.

13       What -- do you own Borris, Inc.?

14  A    Yes, I do.

15  Q    What is your title or position at Borris, Inc.?

16  A    I'm owner and president.

17  Q    And how long have you owned Borris, Inc.?

18  A    From -- 2017.

19  Q    Has Borris, Inc. ever used 84-21 Chapin Parkway as a

20  business address?

21  A    Never.

22  Q    What type of building or what type of property is

23  84-21 Chapin Parkway?

24  A    Residential.

25  Q    And are there any records or documents that show that you

1   own that residential premises?

2   A    Yeah.  We have deed.  When we bought it we have a deed.

3         MR. SUNDARAN:  Ms. Shin, can you put up Defendants'

4   Exhibit T.

5         For the record, this is Defendants' Exhibit T, as in

6   "Tom."

7   Q    Mr. Kandkhorov, do you see the document in front of you?

8   A    It disappeared from our screen.  We can see it now.

9         (Published.)

10        MR. SUNDARAN:  Ms. Shin, if you can scroll to the

11  second page.

12  Q    Mr. Kandkhorov, do you see the document in front of you?

13  A    It's kind of blurry.  Can you increase it a little bit?

14        MR. SUNDARAN:  Okay.

15        THE COURT:  Similarly -- hang on.  I similarly ask

16  Mr. Kandkhorov's lawyer to remain silent and let

17  Mr. Kandkhorov testify.  If he can't see something --

18        THE WITNESS:  I'm sorry, Your Honor.

19        THE COURT:  Yes, I know the format misleads

20  everybody into thinking we are having a conference.  Go ahead.

21  BY MR. SUNDARAN:

22  Q    Do you now see the document, Mr. Kandkhorov?

23  A    Yes, I see.

24  Q    Is that the deed that's connected to the property at

25  84-21 Chapin Parkway?

1       THE WITNESS:  Can we go up and down a little bit?

2       MR. SUNDARAN:  Yes.

3       Ms. Shin, can you please scroll to the end of the

4   document.  If you can scroll all the way to the end, Ms. Shin.

5   A    Right, it is.

6       MR. SUNDARAN:  If you go back to the signature page.

7   All right.  Keep going back.  I'm sorry.  Yeah.  Keep going.

8   Keep going.

9   Q    Mr. Kandkhorov, is this the referee's deed in connection

10  with the property 84-21 Chapin Parkway?

11  A    Yes, yes.

12      MR. SUNDARAN:  Your Honor, defendants would like to

13  move this into evidence as Defendants' Exhibit T.

14      THE COURT:  Okay.  It's admitted.

15      (Defendants' Exhibit T so marked and received in

16  evidence.)

17  Q    Just for the record, Mr. Kandkhorov, you purchased this

18  on August 3rd, 2017?

19  A    Right.

20  Q    Was it certified for occupancy when you purchased it on

21  August 3, 2018?

22  A    Just a second.  No.

23      (Continued on the next page.)

24

25

1    DIRECT EXAMINATION

2    BY MR. SUNDARAN (Continued):

3    Q    When was it certified for occupancy,

4    84-21 Chapin Parkway?

5    A    We received C of O on March 28, 2018.

6    Q    Thank you.

7             MR. SUNDARAN:  Ms. Shin, can you please put up

8    Defendants' Exhibit U for identification?

9             THE COURT:  Okay.  And while you are doing that,

10   Mr. Kandkhorov, I just want to clarify what you said for the

11   court reporter.  You said a CO --

12            THE WITNESS:  C of O, certificate of occupancy.

13   Yes.

14            THE COURT:  Sorry?  Say it again, sir.

15            THE WITNESS:  Certificate of occupancy, yes.

16            THE COURT:  Okay.

17   Q    Mr. Kandkhorov, is --

18            MR. SUNDARAN:  Ms. Shin, can you scroll down a

19   little bit?

20            A little bit lower?

21   Q    Mr. Kandkhorov, is this the certificate of occupancy you

22   received in connection with 84-21 Chapin Parkway?

23   A    Yes.

24   Q    All right.  The effective date that's on this document on

25   the upper right side is March 28, 2019?

1  A     March 28th?  Let me see.  March 28, 2019, right.

2  Q     And that's when you received the certificate of

3  occupancy?

4  A     Yes.  After renovation, yes.

5  Q     And the renovations took place between January and March

6  of 2019?

7  A     Renovation, yes.

8  Q     Okay.  At this point the --

9  A     2017.

10  Q     Okay.  And it continued through January of 2019, January

11  or February of 2019?

12  A     Right.

13        MR. SUNDARAN:  Your Honor, at this time defendants

14  would like to move into evidence Defendants' Exhibit U.

15        THE COURT:  U is admitted.

16        (Defendants' Exhibit U so marked and received in

17  evidence.)

18        MR. SUNDARAN:  And, Ms. Shin, can you --

19  Q     Mr. Kandkhorov, did you use an engineering firm to do the

20  renovations in connection with the property?

21  A     Yes, we did.  Yes, we did.

22  Q     What was the name of the engineering firm?

23  A     If I'm not mistaken, Bernie -- Barry -- it's -- I have my

24  associate Edna, she runs the business.  I am just the owner.

25  Q     If I said Barry --

1  A     She can tell you.

2  Q     If I said Barry J. Bank, do you agree that that was the

3  professional --

4  A     Right, right, right, right.  Yes.

5          MR. SUNDARAN:  Ms. Shin, can you put up Defendants'

6  Exhibit V for identification?

7          THE COURT:  Mr. Sundaran, remember we have a court

8  reporter, so go a little slower.

9          MR. SUNDARAN:  I apologize, Your Honor.  I am

10  rushing in the interest of time, but I will speak slower.

11  Q     Mr. Kandkhorov, do you recognize this document?

12  A     Yes.

13  Q     And what is this document?

14  A     This is, they getting a contract with Barry to do our

15  paperwork to present to the City, do all the explanation, what

16  is going to be done.  And after all inspections, we apply for

17  certificate of occupancy.

18  Q     So this is a --

19          THE COURT:  Hang on.  So the record is clear, this

20  is Exhibit V, as in Victor?

21          MR. SUNDARAN:  It is V as in Victor, Your Honor.

22          THE COURT:  Okay.  Go ahead.

23          MR. SUNDARAN:  Defendants would like to move this

24  into evidence at this time, Your Honor.

25          THE COURT:  Okay.  V is admitted.

1           (Defendants' Exhibit V so marked and received in

2    evidence.)

3    Q    Mr. Kandkhorov, is this the statement of the work that

4    was being done at the premises of 84-21 Chapin Parkway between

5    November 20 --

6    A    It's very blurry.  I cannot see.

7    Q    Sure.

8           MR. SUNDARAN:  Ms. Shin, can you enlarge it?

9    Q    Is this a statement of the work that was being done by

10   the professional engineer, Barry Bank, between November 2017

11   through January 2019?

12   A    Retainer -- yes, yes, yes.  Right.

13          THE COURT:  Hold on one second, Mr. Sundaran.  We

14   may have lost Mr. Sullivan and Mr. Heaston.

15          (Pause.)

16          THE COURT:  Okay, there they are again.  Okay, go

17   ahead.

18   Q    Mr. Kandkhorov, on May 1st, 2019 -- I'm sorry.

19          MR. SUNDARAN:  Ms. Shin, can you put up Defendants'

20   Exhibit W for identification?

21          And Ms. Shin, can you enlarge it?

22          THE COURT:  Mr. Sullivan, can you mute your phone or

23   computer or whatever it is?  Because as the person is marching

24   around, it is creating all sorts of noise.

25          Go ahead, Mr. Sundaran.

1          MR. SUNDARAN:  Ms. Shin, can you enlarge the size of

2     this document?

3     Q    Mr. Kandkhorov, do you recognize this document?

4     A    Again, I'm not involving in details.  Edna Davoudi, she

5     will tell you all the details.

6     Q    Who is the landlord on this lease?

7     A    I am landlord.

8          MR. SUNDARAN:  Okay.  Ms. Shin, can you go to the

9     second page?

10    Q    The signature that appears next to landlord, is that your

11    signature?

12         MR. SULLIVAN:  We are not seeing that.

13    A    Can we return to the beginning of the lease?

14    Q    Sure.

15         MR. SUNDARAN:  Ms. Shin, can you go back to the

16    beginning of the lease?

17         THE COURT:  Mr. Sullivan, did you say you cannot see

18    the document?

19         (Pause.)

20         THE COURT:  Oh, boy.

21    A    Okay.  Now scroll down the document.

22         THE COURT:  Sorry, Mr. Sullivan, it is on the

23    screen.  Are you looking at a computer?

24         MR. SULLIVAN:  Yes, I am looking, but --

25         MR. HEASTON:  It was there earlier.  It was there a

1    minute ago.

2            MR. SULLIVAN:  The other documents, we saw.  The

3    other documents, the previous documents, we saw them.  Here,

4    the screen, it just -- the way we're supposed to see the

5    documents, it's just turned blank.

6            THE COURT:  Okay.  Let me just say --

7    A    I recognize --

8            THE COURT:  Hang on.  Hang on.

9    A    I recognize signatures of Kimberly, Jose.  They were

10   tenants before, yes.  They have --

11           THE COURT:  Mr. Kandkhorov.

12           THE WITNESS:  Yes.

13           THE COURT:  Could you stop speaking for a second?

14           Mr. Sullivan, you received, I assume, copies of the

15   exhibits before today, correct?

16           (Pause.)

17           THE COURT:  Mr. Sundaran, we lost Mr. Sullivan for a

18   moment.  Did you provide electronic versions of the exhibits

19   to Mr. Sullivan and Mr. Heaston?

20           MR. SUNDARAN:  We had provided -- we had filed the

21   exhibits on ECF, Your Honor.

22           THE COURT:  Okay.  So, Mr. Sullivan, you have access

23   to the exhibits from the docket.  This is W.  So even if you

24   cannot see it on your screen even though the rest of us can,

25   you should go ahead and refer to what is in the docket and

1  marked as W.

2          MR. SULLIVAN:  Okay.

3          THE COURT:  Okay.  Go ahead, Mr. Kandkhorov.  I

4  interrupted you.

5  Q    Mr. Kandkhorov, I guess the question is, is this the

6  lease in connection with one of the apartments at

7  84-21 Chapin Parkway?

8  A    Correct, yes.

9  Q    Is this the lease for the apartment that was broken into?

10 A    That I'm not --

11 Q    Okay.  Who --

12 A    I think so, yes.

13 Q    Okay.  Who are the tenants to this lease?

14 A    They were students for the -- which college?  It's some

15 of the colleges next to that area.

16 Q    Is Ira Heaston one of the tenants listed on this lease?

17 A    No, never.

18 Q    Is that your signature next to the landlord?

19 A    Yes.

20         MR. SUNDARAN:  Okay.  Ms. Shin, can you go back up

21 for a second?

22 Q    And Mr. Kandkhorov, this lease was scheduled to begin --

23 I mean, this lease was signed March 17, 2019?

24 A    March 17, 2019?  March?  In May.

25 Q    It was signed.  It was signed March 17th?

1  A    No.

2  Q    Okay.  Let me ask you this:  When was the lease scheduled

3  to begin?

4  A    May 1, 2018.

5  Q    And then when was it supposed to end?

6  A    One-year lease.

7  Q    April 30th, 2020?

8  A    Yes.

9        THE COURT:  Just so the record is clear --

10  Q    Mr. Kandkhorov --

11        THE COURT:  Hang on.

12        Just so the record is clear, did you say 2019 or

13  2018?

14        THE WITNESS:  Lease started May 1, 2018, one-year

15  lease.  So it's April what?  30th, 2019.  It's finished, this.

16        THE COURT:  Okay.  I'm sorry.  Mr. Sundaran, I am

17  staring at the document.  It says, I believe, May 1, 2019 --

18        MR. SUNDARAN:  Yes.

19        THE COURT:  -- to April 30th, 2020.

20        MR. SUNDARAN:  That is correct, Your Honor.  I

21  believe the witness has it wrong.

22        THE WITNESS:  Maybe.

23  Q    Mr. Kandkhorov, if I told you that the lease began May 1,

24  2019 and ended April 30th, 2020, would you say that's correct?

25  A    Yes, most probably.  Again, all the details, my associate

1   Edna, she knows.  She will -- you can ask her that question to

2   her.  She will do it clear.

3   Q    And the monthly rent that's on this lease is 2,550,

4   right?

5   A    Right.

6   Q    On this document.

7            MR. SUNDARAN:  Okay.  Your Honor, at this point

8   defendants offer Exhibit W into evidence.

9            THE COURT:  Okay.  It is admitted.

10           (Defendants' Exhibit W so marked and received in

11  evidence.)

12  Q    Mr. Kandkhorov, did you ever authorize Ira Heaston to

13  reside in any of the apartments at 84-21 Chapin Parkway?

14  A    No, never.

15  Q    Did you ever authorize Salim Blake to rent out any

16  apartments at 84-21 --

17  A    Never.  I don't know even those people.

18  Q    So your testimony is you don't know Ira Heaston or Salim

19  Blake?

20  A    At all.

21  Q    And is it fair to say that you first learned of who Salim

22  Blake and Plaintiff Ira Heaston were when you were sued?

23           MR. SULLIVAN:  Objection.

24  A    Yes.

25           THE COURT:  Overruled.

1  A    Yes, it is.

2         MR. SUNDARAN:  Your Honor, if I could just have a

3  moment to confer?

4         THE COURT:  Yes, go ahead.

5         (Pause.)

6  Q    Mr. Kandkhorov, did you settle with the plaintiff?

7  A    Yes, we did.

8  Q    Why did you settle with the plaintiff?

9  A    Because I'm busy man.  I cannot go back and forth.  I

10 respect my lawyer, but all the retainers will cost me more for

11 them to run this case, the time frame.  You know, it's --

12 that's why we decide to settle this and we send a check.

13 Q    Did you settle with Mr. Heaston because you believed he

14 had a right to be at the premises 84-21 Chapin Parkway?

15        MR. SULLIVAN:  Objection.

16        THE COURT:  Overruled.

17 A    Say it again?

18 Q    Did you settle with Mr. Heaston because you believed he

19 was a rightful tenant at 84-21 Chapin Parkway?

20 A    No, of course not.  He was never been there.  Never.

21 Never, ever.

22 Q    Mr.  Kandkhorov, would you like your money back, the ones

23 that you paid to Mr. Heaston?

24 A    I would love to have, of course.  Of course.  Because

25 it's not right money.

1    MR. SUNDARAN:  I have nothing further of this

2    witness, Your Honor.

3    THE COURT:  Okay.  Mr. Sullivan.

4    CROSS-EXAMINATION

5    BY MR. SULLIVAN:

6    Q    Sir, is it fair to say that the plaintiff --

7    THE COURT:  No, no.  Mr. Sullivan, no one can hear

8    you.

9    Q    Is it your testimony that the plaintiff never -- the

10   premises that we are --

11   THE COURT:  Say it again?  "Is it your testimony

12   that the plaintiff" -- and that would be Ira Heaston.  What is

13   the rest of that sentence?  I think you said never occupied?

14   MR. SULLIVAN:  Yes.

15   THE COURT:  The premises at 84-21 Chapin Parkway?

16   That is the question?

17   MR. SULLIVAN:  Yes.

18   THE COURT:  Okay.  What is the answer?

19   Is it your testimony, sir, that Mr. Heaston never

20   occupied the premises at 84-21 Chapin Parkway?

21   THE WITNESS:  Who there?  I'm sorry, you asking me?

22   Sorry, sorry.

23   THE COURT:  Yes.

24   THE WITNESS:  What was the question?

25   THE COURT:  Is it your testimony that Mr. Heaston

1  never occupied the premises at 84-21 Chapin Parkway?

2          THE WITNESS:  He never occupied legally this

3  apartment, never.

4          THE COURT:  Say it again, sir?  He never?

5          THE WITNESS:  He never occupied this premises,

6  never.

7  Q    Well, let me ask, did you ever --

8          THE COURT:  We cannot hear you at all, Mr. Sullivan.

9  I do not know what is going on with your audio feed.

10          (Pause.)

11          THE COURT:  Oh, boy.

12          MR. SULLIVAN:  Hello?

13          THE COURT:  Okay.  Mr. Sullivan, are you back?

14          MR. SULLIVAN:  Can you hear me now?

15          THE COURT:  No, you are breaking up.  I do not

16  understand what is going on with your connection.

17          MR. SULLIVAN:  Hello?

18          THE COURT:  Yes, we can hear you.  Okay.  Go ahead,

19  Mr. Sullivan.

20          Oh, I think you have lost the connection entirely.

21          MR. SULLIVAN:  Your Honor?

22          THE COURT:  Yes.

23  Q    Sir, did you -- the rentals yourself for the premises?

24          THE COURT:  Okay.  You broke up again, Mr. Sullivan.

25          Can I ask you, are you using a phone, like a video

1  on a phone to do this?

2          MR. SULLIVAN:  Yes.

3          THE COURT:  You don't have a computer with a

4  microphone on it?

5          No, you are completely breaking up.  I don't know

6  what to suggest.

7          MR. SULLIVAN:  The computer won't work.

8          THE COURT:  Okay.  Fida, do you have any thoughts?

9  Should we just have them connect by phone and just skip the

10  video part of it?

11          THE COURTROOM DEPUTY:  He would be able to do that,

12  Judge, yes.

13          THE COURT:  Okay.  So call on the phone,

14  Mr. Sullivan, because you are breaking up.  It is impossible

15  to hear you.

16          MR. SULLIVAN:  Hello?

17          THE COURT:  Okay.  Yes, just turn off the video.

18          MR. SULLIVAN:  Hello?

19          THE COURT:  Yes, we can hear you now.

20          MR. SULLIVAN:  Okay.

21  BY MR. SULLIVAN:

22  Q    Sir, did you personally handle all the leases and rental

23  to the premises?

24          THE WITNESS:  This question is for me?

25          THE COURT:  Yes.  Yes, these are all questions for

1  you.

2  A    Yes, yes.

3  Q    And in 2018, there were people living on the first floor,

4  second floor, and third floor?  In the year 2018?

5  A    May 1st, first floor was rented for nice tenants,

6  students, as I call.  Second floor was rented on April 5th.

7  Q    Sir, isn't it a fact that before you obtained a

8  certificate of occupancy, the premises were rented?

9  A    Never, because it was under construction.

10  Q    Now, did you ask the police to arrest Ira Heaston?

11  A    Personally, I didn't call.  Never.  Never, because we

12  have alarm system there.  When the alarm went off, the cops

13  went there.

14  Q    So you were not present for any of the circumstances that

15  led to the arrest of Ira Heaston; isn't that correct?

16  A    Ask it again?

17  Q    You were not present for any of the circumstances that

18  led to the arrest of Ira Heaston; isn't that correct?

19  A    Present or not present?  I don't do resident -- it's

20  maybe Edna, you can ask her this question.

21  Q    No, I'm just asking about things that you know.  You have

22  no knowledge as to the circumstances that led to the arrest of

23  Ira Heaston, do you?

24  A    They did arrest.  All details, I don't know.  Again, we

25  had alarm system.  It was on.  When it went off, they on duty,

1  supposed to react on that, and they came.

2  Q    No.  My question to you is whether you have any personal

3  knowledge whatsoever as to the circumstances that led to the

4  arrest of Ira Heaston.

5           THE COURT:  Why don't we try it this way, sir.  Were

6  you present when they arrested Mr. Heaston at

7  84-21 Chapin Parkway?

8           THE WITNESS:  Physically, I wasn't there.  Maybe I

9  came later.  You know, because all neighborhood was like, you

10 know, something is going on.

11          THE COURT:  Did you see the police there?

12          THE WITNESS:  Yes, I saw.

13          THE COURT:  Did you see Mr. Heaston?

14          THE WITNESS:  No, never.

15          THE COURT:  Okay.  So you didn't see him being

16 arrested by the police on that day?

17          THE WITNESS:  No, not at all.

18          THE COURT:  And I have no idea, Mr. Sullivan, what

19 day you are talking about, but I am going to assume it is

20 April 26, 2019.

21          MR. SULLIVAN:  Right.

22 Q    On April 26, 2019, you were not present at the premises

23 when Ira Heaston was arrested; is that correct?

24 A    Never.  Again, I came later there.

25 Q    Okay.  But you didn't see his arrest, right?

1  A    The neighbors calling like, you know, to let us know

2  what's going on there, and then we came.

3  Q    Okay.  So that's how you knew, because a neighbor called

4  you and told you police was at your house, right?

5  A    Right.

6  Q    Okay.  Now, do you recall ever speaking to a D.A., to a

7  prosecutor, a Queens D.A. regarding any charges against

8  Ira Heaston?

9  A    Any charges?  No.

10  Q    "No."

11       MR. SULLIVAN:  I have nothing further, Judge.

12       THE COURT:  Anything from you, Mr. Sundaran?

13       MR. SUNDARAN:  Yes, a couple of followup questions,

14  Your Honor.

15  REDIRECT EXAMINATION

16  BY MR. SUNDARAN:

17  Q    Mr.  Kandkhorov, were you at the premises

18  84-21 Chapin Parkway on April 4, 2019?

19  A    I don't remember the date.

20  Q    Okay.  Before April 26, 2019, did you speak to the police

21  about a burglary at 84-21 Chapin Parkway?

22       MR. SULLIVAN:  Objection; leading.

23       THE COURT:  Overruled.

24  A    Maybe Edna, my associate, she did.  Because it's --

25       MR. SULLIVAN:  I would move to strike, Judge, as to

1  why anybody else might have said.

2          THE COURT:  Overruled.

3          Move on, Mr. Sundaran.

4  Q   Mr. Kandkhorov, did the police speak to you at any time

5  in April of 2019?

6  A   Yes, I remember now.  Because they -- first of all, they

7  ask who is owner.  I remember, yes.

8  Q   Did you tell the police you were the owner?

9  A   Yes, of course.

10 Q   Did they ask you if Mr. Heaston lived at the premises?

11 A   No.  There was no questions.  No names, no nothing.

12          MR. SUNDARAN:  Nothing further, Your Honor.

13          THE COURT:  Okay.  Thank you, Mr. Sundaran.

14          Anything further from you, Mr. Sullivan, for this

15 witness?

16 RECROSS EXAMINATION

17 BY MR. SULLIVAN:

18 Q   So it's your testimony, sir, that the police asked you no

19 questions in regard to Ira Heaston; is that correct?

20 A   I'm sorry, maybe my understanding not that good.  This is

21 how it works.  We have alarm.  Alarm went off.  The police

22 come.  We get --

23 Q   Sir.

24 A   Let me finish.

25 Q   My question --

1   A    Let me finish.  I know, I explain.  Let me finish.

2        Alarm went off --

3   Q    No, no.  No, sir.  Sir, I have a very specific question.

4        THE COURT:  Mr. Sullivan, let him finish.

5        Go ahead, Mr. Kandkhorov.

6        THE WITNESS:  Thank you.  Thank you, Your Honor.

7        THE COURT:  Yes.

8   A    Alarm went on.  We got notification.  Police was present

9   there.  After that, we went there like, what, 15, 20 minutes,

10  you know.  And we see every neighbor's there, you know, all

11  the cops there.  And this is what we see.  They ask who is

12  owner.  I approach and I say I am owner.  You know, I show the

13  deed.  And then did regular routine, whatever they supposed to

14  do.

15       MS. SHIN:  That's it.

16       THE COURT:  Go ahead, Mr. Sullivan.

17       MR. SULLIVAN:  I have nothing further, Judge.

18       THE COURT:  Okay.  All right.  Thank you,

19  Mr. Kandkhorov.

20       THE WITNESS:  You're welcome.

21       THE COURT:  Call your next witness, Mr. Sundaran.

22       MS. SHIN:  Your Honor, we will call Ms. Edna

23  Davoudi.

24       THE COURT:  Okay.

25       MR. SULLIVAN:  Judge, I cannot see the video, but is

1  that the same lady that was sitting in the -- is she sitting

2  in the same room as this witness?  Or who -- I can't see the

3  video, so I don't know.

4        THE COURT:  The room which Mr. Kandkhorov sat had

5  only a lawyer with him, a male lawyer.

6        MR. SULLIVAN:  Okay, okay.

7        THE COURT:  They are going to bring in Ms. Davoudi

8  now.

9        (Pause.)

10        THE COURT:  Oh, you know, I erred before by not

11  having Mr. Kandkhorov state his name for the record.  But to

12  the lawyers, that was Mr. Kandkhorov; is that right?

13        MR. SUNDARAN:  Yes, Your Honor.

14        THE COURT:  Well, I guess that is Mr. Sundaran.

15        Let's move on.  Let's have Ms. Davoudi raise her

16  right hand.

17  **E D N A   D A V O U D I**,

18      called as a witness having been first duly

19      sworn/affirmed, was examined and testified as

20      follows:

21        THE COURTROOM DEPUTY:  Please state and spell your

22  name for the record.

23        THE WITNESS:  Edna Davoudi.

24        THE COURTROOM DEPUTY:  Spell your first and last

25  name slowly, please.

1          THE WITNESS:  Edna Davoudi.

2          THE COURT:  Just spell your name, please.

3          THE WITNESS:  Okay.  E-d-n-a.  Davoudi is

4    D-a-v-o-u-d-i.

5          THE COURT:  Okay.  Thank you.  I think your lawyer

6    is likely more comfortable if you put your mask back on.

7          THE WITNESS:  Yes.  Just for spelling the name.

8          THE COURT:  Yes.  Okay, thank you.

9          Go ahead, you may inquire, Ms. Shin.

10         MS. SHIN:  Thank you, Your Honor.

11         If I could have everyone mute?  There's a lot of

12   feedback.

13   DIRECT EXAMINATION

14   BY MS. SHIN:

15   Q    Okay.  Ms. Davoudi, what type of business are you in?

16   A    Real estate.

17   Q    And do you have any ongoing business relationships or

18   partnerships?

19   A    Yes, I do.

20   Q    And who is that with?

21   A    Borris, Inc.

22   Q    And what do you do for Borris, Inc.?

23   A    Management.

24   Q    And when you say management, what specifically do you do

25   in terms of management?

1  A    Well, we find them the properties.  I find them the

2  properties.  We buy them, we renovate them, we rent them

3  after.

4  Q    Okay.  So is it fair to say that you act as an agent of

5  Borris, Inc.?

6  A    Yes.

7  Q    And did you ever manage 84-21 Chapin Parkway in Jamaica,

8  New York?

9  A    Yes.

10 Q    And as a property manager and agent of Borris, Inc., what

11 were your responsibilities with 84-21 Chapin Parkway?

12 A    So first I find it, then we bought it.  Then we had some

13 people there that we had to evict.  So after that, when the

14 permits and everything else was ready, we started construction

15 and we renovated the place.  After we finished, we got our

16 certificate of occupancy, we looked for tenants for them and

17 we rented these.

18 Q    Okay.  And when --

19          (Telephone interruption.)

20          THE WITNESS:  I'm sorry.  I apologize.  Give me one

21 second, let me turn off this.

22          (Pause.)

23          THE WITNESS:  Sorry.

24 Q    And was the building bought in August of 2017?

25 A    Yes.

1  Q    And what type of building is 84-21 Chapin Parkway?

2  A    So it's a three-level building, you can say.  There is

3  three units.  First is a walk-in.  Then you have, you go up

4  the stairs, there is what we call a first floor.  And then

5  this is the subject property with three bedroom, one and a

6  half bathroom.  And then you have the second floor, the third

7  floor.  The third level, that is a duplex.

8  Q    And when you first began managing the property at

9  84-21 Chapin Parkway, was it lawfully occupied?

10 A    No.

11 Q    Okay.  Were there any individuals living there?

12 A    Yes, there were squatters there.  And we paid them

13 lawfully, asked for key and we got them out.

14 Q    And did there come a time when renovations began on the

15 property?

16 A    So I think it was around October 2017, right, we started.

17 Q    Okay.  During the time that the property was undergoing

18 renovations, what were you doing to manage the property?

19 A    So I visited the property almost, almost I could say, on

20 a daily basis, every other day.  I could not say every day,

21 but every other day I would go there, see all the construction

22 is going on, how everything else is working out.  And I was

23 there very often.

24 Q    And was there any security system at the property?

25 A    So as soon as we got electricity running, we do -- we

1  usually do install alarm systems in our properties because of

2  those events that happens.  So we did have alarm in the whole

3  building.

4  Q    Okay.  And when you say -- so at 84-21 Chapin Parkway,

5  there was an alarm system?

6  A    Yes, there was.

7  Q    Okay.  And was it for the entire building?

8  A    So there is three entrances to the building, right?  So

9  they put for us sensors in each entrances and then we have

10  motion detectors inside the apartments, so yes.

11  Q    And directing your attention to kind of the subject of

12  the lawsuit, the second -- the unit on the second level of the

13  building, when did that unit become occupied?

14  A    So that unit officially was occupied May 1st.

15  Q    And is that of 2019?

16  A    Yes.

17  Q    And prior to that, was it vacant?

18  A    Yes, it was.

19  Q    And how did you know it was vacant?

20  A    So, first of all, since I was managing the property, the

21  listing of rental was with us and with my office.  I have

22  agents going in there.  I was myself there.  We used to go,

23  show it, come back.  All the time we check on the property.

24  So we been there very often.

25  Q    And did you see any furniture or personal belongings

1  before May 1, 2019?

2  A    Not at all.

3  Q    Did anything -- mm-hm?

4  A    The only time, about what was inside the properties, when

5  we had this alarm guy calling me telling me if I put black

6  blinds on the window.  That was the only time.

7  Q    Okay.

8  A    Yes.

9  Q    Okay.  So speaking about that time, what, if anything,

10 happened on April 4th, 2019?

11 A    So you see, the second floor, the third floor you could

12 say, was rented on April 5th.  Okay?  Usually the alarm system

13 ask us, do you want -- yes?

14 Q    I'm just going to ask you to stop.

15       So when you say April 5th, 2019, the second floor

16 unit was due to be rented?

17 A    Yes.

18 Q    You mean the third level of the property, right?

19 A    The third level.

20       So usually the alarm guy says, ask us, can you

21 please let your tenant keep the service?  Because this is how

22 he makes his business after giving us the service.  And so we

23 ask the tenant.  They say no, we are not interested in this,

24 we don't want it.  So I called him and I said come and remove

25 the alarm.  So, but happened that at the same day we had this

1  incident happening.  So I got an e-mail saying that something

2  is going on with the alarm.  I was under the impression that

3  my guy is going there to remove it, and actually it was

4  somebody else.

5           MR. SULLIVAN:  Objection.

6  Q    So on April 4, 2019, did you receive a notification from

7  the security system?

8  A    Yes.

9  Q    What did you do after receiving the notification?

10  A    So I called the office to see if anyone went there and no

11  one was there.  But I was thinking it was the alarm guy who

12  was there.  So later on during that day, the alarm guy is

13  calling me and he's telling me listen, did you put black

14  blinds on the property in the apartment?  I said no.  And then

15  he said, I cannot get in because the key we have doesn't go in

16  the lock.  Somebody went in, broke in, put those blinds and

17  change all the locks.  And this is when we call the cops and

18  the whole thing started there.

19           THE COURT:  Ms. Shin, can you have the witness

20  clarify what apartment we are talking about now?  Because

21  there has been a discussion of the third floor and the second

22  floor.

23           THE WITNESS:  Second floor.

24           MS. SHIN:  Yes, Your Honor.

25  Q    So, Edna, the apartment that now had blinds up in it, was

1   that the second-level unit or --

2   A    Correct.

3           THE COURT:  Ms. Shin, hang on.  Ms. Shin, be careful

4   of leading or testifying yourself.

5           So which apartment was it that had the blinds?

6           THE WITNESS:  The second level.

7           THE COURT:  Okay.  Go ahead.

8           MS. SHIN:  Thank you, Your Honor.

9   Q    So after you received the call or after you spoke with

10  the security person, what, if anything, did you do next?

11  A    So what we did, we call the cops.  I call Steve,

12  Mr. Kandkhorov, the owner, and we went there.  And when the

13  cops got there, they said don't touch the door, we don't know

14  who is in there.  So they make us, like, go downstairs in the

15  street and we waited.  The cops opened the door, they go

16  inside.  Then they see nobody is there.  They say okay, come

17  inside.  We went in.  And the only thing was really there was

18  a little bit garbage of the blinds' packaging and the black

19  blinds all over the windows.

20  Q    Okay.  And prior to April 4, 2019, when was the last time

21  you were in that apartment?

22  A    April 3rd.  That was the day before.

23  Q    And what else was different about that apartment aside

24  from the blinds being there?

25  A    So the panel.  The panel of the alarm was removed.  So he

1    broke the panel.

2              THE COURT:  What panel?

3              THE WITNESS:  The alarm system panel.

4    Q    And what, if anything, was different about the locks?

5    A    So he changed all the locks.  We could not get in with

6    our keys.

7    Q    And were all the locks for the entire building changed?

8    A    No.  I'll tell you exactly.  There is two locks on that

9    subject apartment.  One lock is the entrance and one lock is a

10   door going to downstairs.  So he changed those two locks.

11   Basically, the two locks that leads to this subject apartment.

12   Q    And so did you speak with the police?

13   A    Yes, of course.  They came, we had a whole report.  And

14   actually, we also have a video of it.  And that's about it.

15   Q    Okay.  And did the detective show you anything -- what,

16   if anything, did the detective show you on the night of

17   April 4th, 2019?

18   A    He showed me a picture of -- you see it clearly that he's

19   walking the driveway.  You see him in the picture.  He has the

20   box of those blinds and he's walking.  And he show me the

21   picture.  He said, do you recognize this gentleman?  I said I

22   never saw him in my life.

23   Q    Okay.  And after that point, did there -- oh, withdrawn.

24             After then, after the police left the premises, did

25   you -- locks to the unit?

1  A    I'm sorry, I didn't hear you.  Did we change the locks?

2  I didn't hear you well.  I'm sorry.

3  Q    I'll repeat.

4        After the police left, did you change the locks to

5  the unit?

6  A    Yes.  We called for to come and change it, yes.

7  Q    And did you ever speak with detectives again regarding

8  that burglary complaint?

9  A    Yes.  After April -- I think it was April 26, 27.  I

10  don't recall the exact date, but it was few weeks later

11  because I think this was the second time and then they

12  arrested him.

13  Q    Okay.  I'm going to turn to the lawsuit.

14        So, when did you first hear the name Ira Heaston?

15  A    The first time I saw it is when we saw the federal case.

16  Q    Okay.  And prior to that, had you ever heard the name Ira

17  Heaston before?

18  A    Never.  Never.

19  Q    Have you ever heard the name -- withdrawn.

20        Prior to this lawsuit, had you ever heard the name

21  Salim Blake?

22  A    Never.

23  Q    So how did you become aware of this lawsuit?

24  A    So apparently one of the tenants had it on the mailbox.

25  And they gave it to Steve or his wife, I don't know to whom,

1    and they came and they told me this is the paper we got.  I

2    look at it the very first time, I see federal case.  It was

3    very surprising to us.  So this is how we find out about it.

4            MS. SHIN:  Okay.  Judge, I'm just going to seek your

5    permission to publish what is in evidence as Exhibit B.

6            THE COURT:  All right.  Go ahead.

7            MS. SHIN:  Okay.  So this is -- I'm showing the

8    witness Exhibit B.

9    Q    Do you recognize this as the complaint filed in this

10   case?

11   A    Yes.

12   Q    Can you see it, Ms. Davoudi?

13   A    Yes, I see it.  It's not so clear, but I see it.  Yes,

14   this is something that we got when we find out about the

15   lawsuit.

16   Q    Okay.  And what did you do when you found out about the

17   lawsuit?

18   A    So, first of all, it came to us as very surprising

19   because it was -- we were just mesmerized.  I told -- first I

20   talk to Alex, our attorney.  At that time we didn't hire him

21   yet.  I said okay, listen, it's obvious this is a scam.  It's

22   obvious this is fraudulent.  It's obvious that nobody really

23   was there and everything else.

24            So I decided to call the attorney, Vik Pawar.  On

25   the bottom there is the attorney's name, phone number and

1  everything else.  And I tried to, I talked to him maybe two,

2  three time and I try to explain him.  I said, I am associate

3  broker, I've been working in this business for a long time.  I

4  know what I'm telling you.  Please, listen to me.  Don't go on

5  with it because this is not going to take you anywhere.  And I

6  explained to him.  I said, listen, if you want, I'm going to

7  provide you some documents that you're going to see that at

8  the time he's claiming he was living there, we still had

9  inspections going on, we still had showings going on, we still

10  had the bills, all the utility bills that we were paying for

11  the unit.  And so I try to convince him that this is nowhere

12  to go, to not go forward.

13          Then he told me no, I'm sorry, I have to believe my

14  client.  I don't know you, I have to believe my client.  I

15  even ask him, how well do you know this client?  He told me, I

16  don't know him that well, but if somebody is hiring me, then I

17  have to go forward.

18          Anyway, so we saw that it doesn't go anywhere.  We

19  were at that time planning a trip out of overseas with my

20  client, with Borris, Inc.  So I told him just give me a little

21  extension.  When I come back, I will hire an attorney.  So

22  even before, before I come to Alex, I give -- pay him a

23  retainer, I tried one more time.  I said, listen, this is so

24  crazy what you doing.  And he says no, go pay your attorney,

25  get your -- pay your retainer, we are going to go forward.  So

1  this is what we do.

2  Q    And so approximately how many times did you speak with

3  Mr. Pawar?

4  A    I could say about two, three times.  One time I call him

5  for an extension.  Two time I try to convince him.  And I have

6  few e-mails that I could show you, all the e-mails that was --

7  that I try to explain him.  I gave him all the chronologic

8  dates; when we bought, when we had even the inspections,

9  Department of Buildings inspection.  I told him listen, at the

10 date he's claiming that he's living there, I had the

11 inspection.  How is something like this possible?  So I tried,

12 but he just refused.

13 Q    Okay.  And approximately, around when did you speak with

14 Mr. Pawar?

15 A    So I don't remember exactly because we were going in

16 November -- it was I think somewhere between October to

17 November we were talking to this gentleman.  I could give you

18 exact date if you want, I have it on my e-mail.

19 Q    Ms. Davoudi, it's fine.  Is that October to November of

20 2019?

21 A    Right.

22 Q    Okay.  And you mentioned -- did you send him documents

23 related to the property?

24 A    I did, I sent him.  So, you know, I'm not an attorney,

25 but I wanted to make it professional.  I put for him

1  Exhibit 1, Exhibit 2, Exhibit 3.  And according to what was my

2  documents, I tell him, okay, my Exhibit 1, for instance, is my

3  certificate of occupancy, Exhibit 2 is my listing from the

4  MLS, Exhibit 3 is this, Exhibit 4 is this.  So I explain him.

5  I gave him invoices from the alarm company.  I gave him

6  invoices from the architect.  I gave him -- I don't recall

7  what else.  I gave him the MLS, from what was listing on the

8  -- on MLS.  A few of those things.

9  Q    Okay.  And I'm going to turn to Ms. Davoudi.  So as the

10 property manager for 84-21 Chapin Parkway, are you involved in

11 every lease signing for the property?

12 A    Yes, we are.  I am.

13 Q    And did Ira Heaston ever rent an apartment at

14 84-21 Chapin Parkway?

15 A    Never.  I never saw him.

16 Q    Okay.  So I'm now going to show you what is already in

17 evidence as Exhibit W.

18       Okay.  So do you recognize -- and then can you see

19 my screen?

20 A    Yes, I do see it.  This is our lease and with all the

21 real tenants.

22 Q    And is this the lease for the subject unit, the

23 second-level unit?

24 A    That's correct.  That's correct.  You call it first

25 floor, you call it second level, it's the same apartment.

1  Q    Okay.  And is this the same unit that was broken into and
2  you saw the blinds on?
3  A    Correct.
4  Q    Okay.  And when was this lease signed?
5  A    March 17th.  And they were moving in May 1st.
6  Q    Okay.  And this is all in 2019?
7  A    Correct.
8  Q    And were you there when this lease was signed?
9  A    Yes.
10 Q    And does it say Ira Heaston or Salim Blake anywhere on
11 this lease?
12 A    Absolutely not.
13 Q    Now, at this time I am going to show you what is already
14 in evidence as Exhibit D.  So this document and -- have you
15 ever seen this document before?
16 A    We never ever use this kind of lease.  Our standard lease
17 is what you saw before.
18 Q    So this is not a standard lease form that you use for
19 84-24 Chapin Avenue?
20 A    Absolutely not.  No.
21 Q    And where it says -- I'm going to scroll down.  It says
22 at the end here, under landlord, Salim Blake and Borris, Inc.
23 Do you know a Salim Blake?
24 A    No.
25 Q    And what, if anything, do you notice about how Borris,

1    Inc. appears here?

2    A    Yeah, Borris is B-o-r-r, double R, i-s.  This one has it

3    as one R.

4    Q    And has Borris, Inc. ever done business at

5    84-21 Chapin Parkway?

6    A    No.  This is a residential unit.  No.

7    Q    And as a property manager for 84-21 Chapin Parkway, do

8    you believe that this lease is false?

9    A    100 percent it is.  It is a false lease.  We never, ever

10   gave a lease like that.

11   Q    And now I'm going to show you what is already in evidence

12   as Exhibits E, F and G.  Just bear with me while I flip

13   through.

14           Okay.  Have you ever seen E, F or G before?

15   A    Never.

16           (Continued on the next page.)

17

18

19

20

21

22

23

24

25

1  DIRECT EXAMINATION

2  BY MS. SHIN (Continued):

3  Q    Did you see these documents when you saw the housing

4  court case file?

5  A    No.

6  Q    So are these are Exhibits, E, F and G the type of

7  receipts that you would provide to your tenants at

8  84-21 Chapin Parkway?

9  A    No.

10  Q    So, Ms. Davoudi, did there come a time when you learned

11  there was also a civil or a housing court matter filed by the

12  plaintiffs?

13  A    Yes.  So when we came to our attorney we asked, you know

14  we also have a civil court, he never responded.  I said, we

15  never knew about the civil court.  So again, we had to hire

16  another retainer because we didn't want to be at default with

17  the other one, so we hired another -- we paid another retainer

18  for the civil court.

19  Q    And I'm going to just briefly show you what's already in

20  evidence in Exhibits H, I, J.  This is Exhibit H.

21        Prior to you talking with your attorney on this

22  federal case, had you ever seen this document before?

23  A    No.

24  Q    How about this document?

25  A    The only time we were aware of the civil court was when

1   we came to our attorney with the federal case.  We didn't have

2   no clue whatsoever that there was also a civil court and this

3   is when our attorney suggested us that we should be taking

4   care of it because we didn't know, so we again had retainer

5   and took care of the civil court.

6   Q    So prior to learning about this federal lawsuit,

7   Borris, Inc. and you were never aware of the civil court

8   lawsuit.

9   A    Absolutely not.

10          MS. SHIN:  Just one minute, Your Honor.

11  Q    I'm just going to direct you back to Exhibit B.  So can

12  you see what I'm looking at right now and can you read

13  exhibit -- can you actually -- you don't have to read it out

14  loud but is it visible on your screen --

15  A    It is.

16  Q    -- the paragraph?

17  A    Right.  It is.  "The Facts."

18  Q    Yes.  So it says in paragraph 10, I'm reading from

19  Exhibit B in evidence, Plaintiff entered into a lease with the

20  private defendants to rent a second floor apartment at

21  84-21 Chapin Parkway, Queens, New York, (subject premises.)

22          Is that true?

23  A    Absolutely not.

24  Q    The lease was to commence on January 15, 2019 and run

25  through January 15, 2021, a term of two years.  Is that true?

1  A    Absolutely not.

2  Q    Plaintiff made the duly required payments of security

3  deposits and paid their monthly rent.

4  A    We didn't get a penny from these people, we never -- we

5  don't know who they are.  Absolutely not.

6  Q    It says:  On April 4th, 2019 at approximately 7:30 p.m.

7  plaintiff, his wife, seven-year old daughter, three-year old

8  son were locked out of the subject premises after the private

9  defendants changed the locks.  This was the second such

10 incident.  Private defendants previously allowed plaintiff and

11 his family access after locking them out the first time.

12         Is that true?

13 A    Total lie.

14 Q    What did you say?

15 A    No, it is not true.

16         MS. SHIN:  Just one more minute, Your Honor, I

17 apologize.

18 Q    On -- it says on paragraph 14:  Following the second

19 illegal lockout, plaintiff sought the intervention of the New

20 York City Court because he had a wife and two minor children

21 who were once again inconvenienced by the illegal conduct and

22 lockout by the private defendants.  Is that true?

23 A    No.

24 Q    Well, were you aware that he, Ira Heaston, went to a New

25 York Civil Court?

1   A    Absolutely not.

2   Q    After a hearing on or about April 9th, 2019, the NYC

3   Court issued an order directing that plaintiff and his family

4   be allowed to regain possession of the subject premises and

5   directed the NYPD to assist plaintiff and restore their rights

6   within the subject premises.

7   A    Absolutely not.

8   Q    Were you aware of this order?

9   A    Absolutely not.

10  Q    And on April 26th, 2019 at approximately 2 p.m. plaintiff

11  and his family were once again locked out illegally by the

12  private defendants.  Is that true?

13  A    No.

14       MS. SHIN:  Your Honor, I have nothing further.

15       THE COURT:  Do you, Mr. Sullivan, have any questions

16  of this witness?

17       MR. SULLIVAN:  Yes, Judge.

18  CROSS-EXAMINATION

19  BY MR. SULLIVAN:

20  Q    There is one item that was shown to you as you said

21  (inaudible) that was a never -- that was never signed by the

22  company, correct?

23  A    I'm sorry, I can't hear you.  Can you talk louder,

24  please.

25       MR. SULLIVAN:  Sure, let me try.

1  Q     One the last lease that was shown to you --

2  A     Yes.

3  Q     -- that was not signed by Borris, the company that you

4  were associated with; is that correct?

5  A     The lease she showed us?

6  Q     Yes.

7  A     No.  Absolutely not.

8  Q     And on that lease somebody represented themselves to be

9  the owner of the property, right?

10 A     Yes.  That's what it said.

11 Q     And you don't know who that is, right?

12 A     I don't have no idea who it is on the lease.

13 Q     You don't know whether that person collected any money as

14 far as that was concerned, do you?

15 A     I don't have no idea.

16 Q     And the receipts that were there, neither you nor the

17 person who owned the property (inaudible) --

18 A     Absolutely.  None of us ever have any receipts like this,

19 never gave receipts to anyone like that.

20 Q     Do you know whether anybody else indicated that they were

21 the owner of the property?

22 A     No one else would rent up this property without me

23 knowing about it.

24 Q     And you were the real estate broker; is that correct?

25 A     Yes, I am the real estate broker and I am managing this

1  property.

2  Q    And initially when the property was purchased, there were

3  people occupying the property, correct?

4  A    I'm sorry, I can't hear you.  When we bought it?

5  Q    Yes, was it being occupied?

6  A    Yes, when we bought it those are foreclosure property,

7  when we bought there was squatters in them.

8  Q    And when you say there were squatters, you mean there

9  were people living in them, right?

10  A    They were living there but illegally living there.  They

11  weren't really tenants.  The house was --

12  Q    What were --

13  A    It was abandoned house which belonged to lady who had

14  Alzheimer's from what we understood and they sold it in the

15  Court --

16  Q    The question is, were there people living there --

17          (Audio interference.)

18  A    The people living --

19          THE COURT:  Hang on both of you.  Ms. -- I forget

20  your last name, I'm sorry, you can't speak over the lawyer, so

21  try to give him a second to finish the question.

22          THE WITNESS:  I can't hear him.

23          THE COURT:  Okay.  Yes.

24          THE WITNESS:  I can't hear him.

25          THE COURT:  And, Mr. Sullivan I don't know why you

1  abandoned the phone and you're back to video.  We could hear

2  you better when you were just on the phone.

3           MR. SULLIVAN:  The reason, Judge, the power was out,

4  and we had to put the video on.  The power was dying on the

5  phone.

6           THE COURT:  Okay, but you're cutting in and out and

7  this is just not acceptable.  So I don't know what you can do.

8  Maybe plug your phone in and then use it that way.  Because --

9           MR. SULLIVAN:  That's what we had just done and that

10  wasn't working, now we're back on video.

11           THE COURT:  Whatever you're doing is not working.

12  So plug your phone back in and sit by the wall unit, the

13  electrical outlet and use your phone.

14           Go off the video, the video is not working for you.

15           MR. SULLIVAN:  I don't know --

16           THE COURT:  While we have this break, I do need to

17  tell defense counsel we don't have too much time today because

18  I actually had to push back up a 4:30 appointment -- interview

19  aside, so you need to get your next witness on and I suggest

20  it be Mr. Pawar instead of the detective because at this point

21  that's who I want to hear from.

22           Mr. Sullivan, can you hear us?

23           MR. SULLIVAN:  Yes, Judge.  I have nothing further.

24           THE COURT:  Okay.  Thank you very much.  You're

25  excused.  I apologize I forgot, Ms. Davoudi, you're excused.

1          THE WITNESS:  I'm excused, I'm done?

2          THE COURT:  Yes, you are.  Thank you.

3          (Witness excused.)

4          THE COURT:  Call your next witness.

5          MR. SUNDARAN:  Your Honor, based on the Court's

6    instruction, the defendants call Vik Pawar.

7          THE COURT:  Fida, you have to call Mr. Pawar.

8          I also want to speak to the attorneys about how we

9    deal with Detective Portillo's testimony.  We don't have an

10   affidavit from him, so I would accept one in lieu of his live

11   testimony, but if you want to adjourn to have his testimony

12   presented via video, with the instruction, Mr. Sullivan, that

13   you need to fix your video connection to make it work, we

14   could do that, put his testimony on very briefly put on the

15   record.  Alternatively, we could try to -- I don't want to

16   keep the court reporters any later, we would have to take a

17   half hour break and go back on the video record and record it.

18         THE COURTROOM DEPUTY:  Judge, we can't record on the

19   video.

20         THE COURT:  Oh.  We can't record any of it.

21         THE COURTROOM DEPUTY:  Correct.  Only on the phone

22   line we can do it, the AT&T line.

23         THE COURT:  Okay.  Maybe we'll switch to AT&T.

24   That's an idea.  We can switch to phone line then we can

25   record.

1        Hi, Mr. Pawar, have a seat.

2        MR. PAWAR:  Judge, do you want to take Mr. Blossner

3    first and I'll step out of the office.

4        THE COURT:  I'll leave it to the defense attorney.

5    I don't know what Mr. Blossner is going to testify about, but

6    I think it's more important to hear from you.

7        MR. SUNDARAN:  Your Honor, that's fine we can start

8    with Mr. Pawar.

9        MR. PAWAR:  All right.  Does that mean Mr. Blossner

10   can leave if he wants to?

11       THE COURT:  I don't know how important his testimony

12   is, Mr. Sundaran or Ms. Shin.

13       MR. SUNDARAN:  We can dispense with Mr. Blossner's

14   testimony.

15       THE COURT:  Thank you Mr. Blossner for waiting

16   around so long, we appreciate that.  Go ahead.

17       Mr. Pawar, if you raise your right hand.

18       (Witness sworn.)

19   **V I K R A N T   P A W A R,**

20            called as a witness, having been first duly

21            sworn/affirmed, was examined and testified as

22            follows:

23       THE COURTROOM DEPUTY:  Please state and spell your

24   name for the record.

25       THE WITNESS:  Sorry.  Vik, V-I-K.  P-A-W-A-R.

1        THE COURT:  You may inquire, Mr. Sundaran.

2   DIRECT EXAMINATION

3   BY MR. SUNDARAN:

4   Q    Now, Mr. Pawar, just for the record, your full name is

5   Vikrant Pawar, correct?

6   A    That's correct.

7   Q    Do you presently work?

8   A    Yes.

9   Q    And what is your current occupation?

10  A    I'm an attorney.

11  Q    And are you a licensed attorney?

12  A    I am.

13  Q    How long have you been licensed?

14  A    Approximately 18 years in New York and 19 in New Jersey.

15  Q    Do you have a license to practice in the federal courts

16  of the Eastern District and Southern District of New York?

17  A    Yes.

18  Q    How long have you had those licenses?

19       THE COURT:  I think technically speaking they are

20  admissions.

21       Are you admitted to both the Eastern and Southern

22  District?

23       THE WITNESS:  Yes.

24       MR. SUNDARAN:  I'm sorry.

25       THE COURT:  How long?

1      THE WITNESS:  Judge, if I had to guess since 2003

2  approximately.

3      THE COURT:  2003?

4      THE WITNESS:  Yes, back in the day you get admitted

5  in the same place and then you go over to the Eastern District

6  and get a certificate.

7  BY MR. SUNDARAN:

8  Q    Mr. Pawar, what type of cases do you typically bring in

9  the Southern District and the Eastern District?

10 A    It's a mixed bag but I would say the majority of them are

11 1983 civil rights cases.

12 Q    Can you ballpark how many civil rights cases you've

13 brought in the Southern and Eastern Districts --

14 A    I would say --

15 Q    -- since you began?

16 A    -- two, 300.

17 Q    Other than the practice of law, do you do anything else

18 to support yourself financially?

19 A    No.

20 Q    Have you ever been disciplined in any court, federal or

21 state?

22 A    No.

23 Q    Have you ever been sanctioned in court, federal or state?

24 A    I don't -- I may have gotten a sanction in the Southern

25 District for posting something that I wasn't supposed to.  I'm

1   not sure if that was a sanction or violation of the court

2   order, I'm not sure.

3   Q    Are you familiar with the *Troy Britt versus City of*

4   *New York* case?

5   A    Yes, that was -- I think I was sanctioned or fined $500.

6   Q    Correct.  And you were also sanctioned for withholding

7   some photographs by Judge Moses, correct?

8   A    I don't believe so.

9        MR. SUNDARAN:  Docket number 132.  We would ask that

10  the Court -- I'm sorry, Your Honor, we would ask at this time

11  that the Court take judicial notice of *Troy Britt versus*

12  *City of New York, 17-CV-931.*  The judges are Alison Nathan and

13  Barbara Moses.  It's docket number 181 dated February 20th,

14  2019, it is a sanction order regarding discovery misconduct.

15  Q    Mr. Pawar, are you familiar with that order?

16  A    I take your word for it.

17  Q    Have you ever been suspended from the practice of law by

18  any court?

19  A    No.

20  Q    You are currently plaintiff's former counsel, correct?

21  A    Yes.

22  Q    You represented him from the original filing of the

23  initial pleading until August 6 of 2020, correct?

24  A    Yes.

25  Q    You filed a notice of claim before bringing plaintiff's

 1  lawsuit in this court, correct?

 2  A    Did I file a notice of claim bringing a federal lawsuit,

 3  yes.

 4  Q    And you filed a notice of claim on May 8th, 2019, right?

 5  A    I don't have it in front of me but if that's what the

 6  date is then, yes.

 7  Q    That was approximately two weeks after plaintiff's

 8  April 26th arrest?

 9  A    It's possible.

10  Q    And the party on the notice of claim was Ira Heaston,

11  correct?

12  A    That's correct.

13  Q    And your signature also appears on that document,

14  correct?

15  A    If it's there then, yes, it's my signature.

16  Q    Typically, as a federal civil rights practitioner you

17  sign notices of claim, right, as a standard practice?

18  A    That's correct.

19  Q    So is it fair to say that your signature would have

20  appeared in the notice of claim filed on plaintiff's behalf?

21  A    I don't have it in front of me but I'll take your word

22  for it.

23  Q    You also alleged a series of injuries that plaintiff

24  sustained, correct?

25  A    That's correct.

1      MR. SUNDARAN:  Ms. Shin, can you put up Defendants'
2  Exhibit O.
3  Q    Mr. Pawar, are you familiar with this document?
4  A    Yup.
5      MR. SUNDARAN:  Ms. Shin, can you scroll to
6  paragraph 4.
7  Q    If you look at paragraph 4, Mr. Pawar, you claim that
8  plaintiff suffered injuries to his body, head, neck, eyes,
9  ears, mouth, face, arms and legs, nerves, and nervous system,
10  medical treatment and unlawful imprisonment.
11      Do you see that?
12  A    Yes.
13  Q    Did you come up with those list of damages and injuries?
14  A    No, those are just the standards that I put in every
15  notice of claim.
16  Q    Sir, where did you get that information from?  Did you
17  get that from the plaintiff or did you make it up?
18  A    I must have gotten it from plaintiff.
19  Q    Did you seek $1 million from the City of New York?
20  A    That's the amount claimed is, yes.
21  Q    And, Ms. Shin, can you go to the second page at that
22  paragraph beginning with, The undersigned claimant.  You
23  understood that if the City did not pay or adjust the claim on
24  behalf of the plaintiff, you would then commence an action on
25  that claim, correct?

1  A    That's correct.  Can I just say something about the

2  second page?

3  Q    Yes.

4  A    The handwriting on the top of the claimant where it says

5  "Ira Heaston" that's my handwriting.  This one here it's also

6  my handwriting but --

7  Q    When you say "this one" is that the one with the

8  verification, individual verification?

9  A    Yes, but I believe that's his signature.

10  Q    But your signature appears on the top left, correct?

11  A    That's correct.

12  Q    And, in fact, the City did not pay or adjust your claim,

13  right, on plaintiff's behalf?

14  A    That is correct.

15  Q    And so you filed a lawsuit on plaintiff's behalf,

16  correct?

17  A    That is correct.

18  Q    And at the time you filed the initial complaint on or

19  about October 2nd, 2019, you had made plaintiff aware of the

20  lawsuit, correct?

21  A    Absolutely.

22  Q    Now prior on -- you received a series of notices with

23  regard to a 50-H hearing, correct, your office?

24  A    Yes, I recall -- yes.

25  Q    Okay, and each of those notices of the 50-H hearing were

1    also communicated to the plaintiff, correct?

2           THE WITNESS:  Judge, I apologize I should have asked

3    Your Honor this before, perhaps we can do this retroactively

4    if it's possible.  I don't know if the plaintiff has waived

5    his Fifth Amendment right, and if he has not I would just ask

6    that Your Honor order me to answer the questions that I'm

7    going to or the questions that I've already answered.

8           THE COURT:  Yes, I am going to direct you to answer

9    the questions.  Let me just say this, I think the crime fraud

10   exception could well apply here or does apply based on the

11   allegation and then also I think there is a waiver exception

12   because Mr. Heaston has certainly raised the defense --

13   perhaps every one should mute.  Raised the defense that he did

14   not know what was in the complaint and therefore it was solely

15   the invention of his attorney and that would be you.  So,

16   therefore, I think he's, in effect, waived any right to keep

17   you from providing truthful testimony if you're capable -- not

18   if you're capable, but rather providing truthful testimony.

19          THE WITNESS:  Thank you, Judge.

20          THE COURT:  All right.  Go ahead.

21          THE WITNESS:  Thank you, Judge.  Go ahead, Mr.

22   Sundaran.

23          MR. SUNDARAN:  Ms. Shin, can you please put up for

24   identification Defendants' Exhibit P1.

25   Q    Mr. Pawar, this is a notice of 50-H hearing addressed to

 1   your office on May 24th, 2019.

 2   A    Yes.  And --

 3   Q    And the hearing date and place was communicated to the

 4   plaintiff?

 5   A    Yes.  And he didn't make it the first time but there was

 6   a second hearing date set.

 7           MR. SUNDARAN:  Ms. Shin, could you put up Exhibit P2

 8   please.

 9   Q    Now, Mr. Pawar, this is an adjournment of the 50-H

10   hearing dated August 14th indicating a new date for the

11   hearing, right?

12   A    That's correct.  And it was in conflict with my schedule

13   so I believe Mr. Blossner covered that 50-H hearing.

14   Q    Was this notice communicated to the plaintiff?

15   A    Yes.

16           MR. SUNDARAN:  Ms. Shin, can you put up P3.

17   Q    Mr. Pawar, this is an adjournment of the 50-H hearing now

18   dated September 9th, 2019.

19   A    You mean November 13th of 2019?

20   Q    No, the date of the hearing, the adjournment notice dated

21   September 9th?

22   A    Yes, I misspoke.

23   Q    No problem.

24   A    I misspoke.  Mr. Blossner covered the actual hearing.  I

25   remember it was adjourned either once or twice before but it

1  was communicated to plaintiff, yes.

2  Q    And this notice your office received, as you answered,

3  you communicated to plaintiff, correct?

4  A    That's correct.

5  Q    Okay.  And the date of the actual hearing on this notice

6  on September 3 is November 13th, 2019?

7  A    Yes, that's what it says.

8  Q    And plaintiff, to your knowledge, appeared at the 50-H

9  that day?

10 A    I know he was in my office and I know Mr. Blossner went

11 with him to the 50-H hearing, so the answer is, yes.

12 Q    And, for the record, Mr. Blossner represented him at the

13 50-H hearing.

14 A    That's right.

15 Q    You were not there?

16 A    I was not.

17 Q    Now the date of the 50-H hearing, November 13th, 2019, by

18 that date there was two complaints, two federal complaints

19 filed with the lawsuit, right, the original complaint and the

20 first amendment?

21 A    I didn't know -- the dates speak for themselves so, that

22 was --

23 Q    If I told you the first complaint was dated October 2nd,

24 2019, would you agree?

25 A    I would agree, yes.

1   Q    If I told you that the second -- or first amended

2   complaint was filed on October 9th, 2019, would you agree?

3   A    I would agree.

4   Q    Would you agree that those dates preceded the 50-H

5   hearing on November 13th, 2019?

6   A    That's correct.

7   Q    So were those -- was the first -- was the original

8   lawsuit and the first amended -- was the original complaint

9   and the first amended complaint communicated to plaintiff at

10  or near the time that they were filed?

11  A    Absolutely.

12  Q    Were the factual allegations in the original complaint

13  and the first amended complaint communicated to the plaintiff

14  at or near the time that it was filed?

15  A    Just one second, Mr. Sundaran, I'm just reading through

16  the -- all right.  The best that I can answer that question is

17  that the substance of the allegations in the complaint were

18  received from plaintiff and the fact that a lawsuit was filed

19  was communicated to plaintiff.  Whether I let him know that I

20  amended the complaint or not, I don't know if that was

21  communicated to him, but the information that was contained in

22  the complaint itself was information that I received from the

23  plaintiff.

24          MR. SUNDARAN:  Ms. Shin, can you put Defendants'

25  Exhibit (inaudible).

1    THE COURT:  What did you say?

2    MR. SUNDARAN:  B as in boy.

3    THE COURT:  Okay.

4    Mr. Sundaran, don't go too fast even though your

5  short of time because the court reporter has to get

6  everything.

7    MR. SUNDARAN:  Understood, Your Honor.

8  Q    Mr. Pawar, this is the first amended complaint filed by

9  you on plaintiff's behalf on October 9th, 2019.

10 A    Okay.

11 Q    Am I correct?

12 A    Yeah, it looks like it, yeah.

13   MR. SUNDARAN:  Ms. Shin, if you can go to the

14 factual -- all right.

15 Q    Paragraph 10.  Plaintiff entered into a lease with

16 private defendants to rent a second floor apartment at

17 84-21 Chapin Parkway, Queens, New York, (subject premises.)

18   Did plaintiff provide you with that information?

19 A    Absolutely.

20 Q    Did you make up that information?

21 A    No.

22 Q    The next paragraph:  The lease was to commence on

23 January 15, 2019 and run through January 15, 2021, a term of

24 two years.

25   Did plaintiff provide you with that information?

1    A    Yes.

2    Q    In the interest of efficiency I'm just going to call out

3    the numbered paragraphs.

4            Paragraph 12 on Defendants' B, as in boy, did

5    plaintiff provide you with that information?

6    A    Yes.

7    Q    Paragraph 13, did plaintiff provide you with that

8    information?

9    A    Yes.

10   Q    Paragraph 14, did plaintiff provide you with that

11   information?

12   A    Yes.

13   Q    Paragraph 15, did plaintiff provide you with that

14   information?

15   A    Yes.

16   Q    Paragraph 16, did plaintiff provide you with that

17   information?

18   A    Yes.

19   Q    Paragraph 17, did plaintiff provide you with that

20   information?

21   A    Yes.

22   Q    Paragraph 18, did plaintiff provide you with that

23   information?

24   A    Yes.

25   Q    Paragraph 19, did plaintiff provide you with that

1    information?

2    A    Yes.

3    Q    Paragraph 20, did plaintiff provide you with that

4    information?

5    A    Yes.  Except --

6    Q    Paragraph 21 --

7    A    I'm sorry.  Except for the commentary that the (audio

8    interference) what the NYC Court order put in itself.

9    Q    Paragraph --

10   A    In sum and substance the answer is yes.

11   Q    Paragraph 21, did plaintiff provide you with that

12   information?

13   A    Yes.  And the same with 22.

14   Q    And the same with 23?

15   A    Yes.

16           MR. SUNDARAN:  Ms. Shin, is there a paragraph 24?

17   A    Yes.

18   Q    Paragraph 24, did plaintiff provide you with that

19   information?

20   A    Yes.

21   Q    So just to sum it up, plaintiff caused you to believe

22   that he was a lawful resident of an apartment at

23   84-21 Chapin Parkway?

24   A    I had no reason to believe that he was not.

25   Q    Did he tell you he was a lawful resident at

1  84-21 Chapin Parkway?

2  A    Yes.

3  Q    And you took his word for it?

4  A    Absolutely.  And the document that he showed me.

5  Q    Well, Mr. Pawar, did you, after filing the first amended

6  complaint on October 9th, 2019, had Ms. Davoudi from

7  Borris, Inc. had reached out to you, correct?

8  A    I'm not sure exactly when she reached out to me but it

9  was -- I remember --

10            (Video dropped.)

11            THE COURT REPORTER:  I lost the answer.

12            THE COURT:  I think we all lost the answer.

13            Can everyone hear me?

14            MR. SUNDARAN:  Yes.

15            THE COURT:  Start again, Mr. Pawar, we all seem to

16  have lost the audio when you started your answer.

17            So Ms. Davoudi, you don't know when she contacted

18  you is I think where you started.

19            MR. SUNDARAN:  You're on mute, Mr. Pawar.

20            THE COURT:  Unmute.

21            MR. SUNDARAN:  Unmute.

22            THE WITNESS:  I'm sorry, I don't know how I did

23  that.

24            So I don't know when she contacted me but I remember

25  she had called me and she said would you accept and she gave a

1   dollar amount to settle this case.  I said, no.  And then I

2   said, I really think you should get yourself a lawyer.  And

3   she said that -- I think she said he may have been out of the

4   country or something and I said, well, he can't appear on

5   defendants' behalf anyway because it's a corporation and you

6   have to have an attorney present.

7           So I went to Judge Scanlon at some point letting her

8   know that somebody did reach out to me and I'm giving them

9   time to file an answer when they obtain representation.

10  BY MR. SUNDARAN:

11  Q    Mr. Pawar, did Ms. Davoudi contact you sometime in

12  October or November of 2019?

13  A    I can't -- I can't tell you the date.

14  Q    Mr. Pawar, did Ms. Davoudi inform you that Borris, Inc.

15  had closed on the property known as 84-21 Chapin Parkway on

16  August 3rd, 2017?

17  A    I don't recall that.

18  Q    Did Ms. Davoudi inform you that Borris, Inc. had received

19  on April 20 an approved plan by the Department of Buildings to

20  convert it to a (inaudible) home?

21  A    I don't recall that.

22  Q    Did Ms. Davoudi inform you that Borris, Inc. received a

23  certificate of occupation for 84-21 Chapin Parkway on

24  March 28, 2019?

25  A    Not at that time but I do recall seeing that when they

1    filed a motion to vacate the order in the housing court.

2    Q    Did Ms. Davoudi inform you that Borris, Inc. had signed a

3    lease for their first tenant on or about April 4th, 2019?

4    A    It's possible, but there were three families in the house

5    so...

6    Q    Did Ms. Davoudi inform you that Borris, Inc. had received

7    information from their security company on April 4th that

8    someone had changed the locks and put a block?

9    A    I do believe -- yeah, I do recall, yeah, I do remember

10   that specific thing, yes.

11   Q    Did Ms. Davoudi inform you that there was no way that the

12   plaintiff, your former client, could have had a lease from

13   January 15, 2019 to April 23rd, 2019?

14   A    Well, I had no reason to believe Ms. Davoudi one way or

15   the other because I've seen from many clients when landlords

16   change locks to illegally lock out their tenants.  So I had no

17   reason to believe one way or the other what she was stating.

18   Q    Mr. Pawar, did Ms. Davoudi offer you proof of her MLS

19   listing for 84-21 Chapin Parkway as well as plans filed with

20   the Department of Buildings and a Certificate of Occupancy?

21   A    I don't recall that.

22   Q    Mr. Pawar, did you conduct any independent investigation

23   into plaintiff's claims other than taking his word for it?

24   A    I'm not sure what do you mean by -- did I hire a private

25   investigator to go to verify whether Ms. Davoudi was telling

1  the truth or my client was telling the truth, the answer is

2  no.

3  Q    Mr. Pawar, as a licensed attorney before bringing a

4  lawsuit, you're aware that you have an obligation to conduct a

5  reasonable investigation into the factual assertions, correct?

6  A    Yup.

7  Q    Did you look up the property address on the New York City

8  ACRIS system to get the details of 84-21 Chapin Parkway?

9  A    Yeah, I actually got a picture from the plaintiff telling

10 me what the property looked like.

11 Q    Did you independently look up on the New York City ACRIS

12 system to get the details of 84-21 Chapin Parkway?

13 A    To do what?

14 Q    To conduct a reasonable investigation?

15 A    Into what?

16 Q    Into plaintiff's factual claims?

17 A    Whether a plaintiff was a tenant at 84-21 Chapin Parkway

18 would not show up on the ACRIS report.

19 Q    But the owner of the property would, right, Mr. Pawar?

20 A    I suppose, I don't know.

21 Q    And you also suppose that the owner, Salim Blake, would

22 not have appeared (audio dropped) on the property address on

23 the New York ACRIS, correct?

24 A    That's not necessarily true at all.

25 Q    Okay.  Did you conduct a search with the Department of

1  Buildings to confirm anything that you heard from Ms. Davoudi

2  about the Certificate of Occupancy for a proof -- for approved

3  renovation?

4  A    No.

5  Q    Did you speak to the alleged landlord on plaintiff's

6  lease, Salim Blake?

7  A    I couldn't find him.

8  Q    Did you ask plaintiff for his phone number?

9  A    I did.

10  Q    Did you call him?

11  A    The number was disconnected.

12  Q    Did you make attempts to call him again?

13  A    The number was disconnected and I had a court order.  The

14  court order said that plaintiff was a tenant at this residence

15  and the court order said the tenant -- the plaintiff should be

16  restored to his residence.

17  Q    Sir, that's not the question.

18  A    Hold on, hold on.  If you want me to go and question and

19  look up things that question a judge's order, the answer is

20  no.

21  Q    Okay.  Did you go to the address listed for Salim Blake

22  on the residential lease, 84-21 Chapin Parkway?

23  A    No.

24  Q    Sir, I again remind you under Rule 11 you understand

25  there is an independent obligation to conduct a reasonable

1   investigation into the facts, correct?

2   A    Well, your definition of reasonableness might be

3   different than mine.

4   Q    Did you reach out to any agent of Borris, Inc. in

5   connection with plaintiff's claim?

6   A    I'm not sure if I did.

7   Q    You understand that Borris, Inc. is a registered domestic

8   corporation that -- whose information is listed on the

9   New York State Division of Corporations' website, right?

10  A    Well, I'm not sure of the -- of the address.  I'm trying

11  to think of how I got in touch with Alex, the attorney for the

12  private defendants.  I may have served them at a location in

13  Queens, so I must have gotten somehow their business address.

14              (Continued on the next page.)

15

16

17

18

19

20

21

22

23

24

25

1          MR. SUNDARAN:  Ms. Shin, if you could put up

2     Defense Exhibit C?

3          MS. SHIN:  (Complies.)

4     DIRECT EXAMINATION

5     BY MR. SUNDARAN (Continued):

6     Q    By the way, Mr. Pawar, what did you do after you became

7     aware that Borris, Inc. had filed a motion to vacate in

8     housing court?

9     A    I had a conversation with Alex, and I said, You know, I

10    don't know that it really affects my case because my clients

11    had a law order, a state court order, and the client has to

12    file a motion, an order to show cause to dismiss or to

13    vacate the order, then I'm not going to oppose it because I

14    don't think I need that to go forward with my case against

15    the city defendant.

16    Q    Sir, are you aware that in the order to show cause

17    there was a certificate of occupancy attached to it?

18    A    I don't recall.

19    Q    Are you aware that there were lease agreements, the

20    proper lease agreements that Borris, Inc. issued in that

21    order to show cause?

22    A    I'm not -- I don't recall what was in there.

23    Q    Are you aware that there was also the architect's

24    statement of invoice attached to that motion to vacate?

25    A    I don't recall.

1   Q    Did you conduct any reasonable investigation into the

2   housing court proceeding and the documents attached to that?

3   A    No.  Because I thought that the private defendants,

4   they settled the case and they wanted to get this thing

5   off of their -- off of the Court's docket so they were

6   proceeding as such, and I really didn't bother with it.

7   Q    Did it concern you that the housing court order that

8   Plaintiff presented you with might have been fraudulently

9   obtained?

10  A    I had no reason to believe that it was fraudulent at

11  the time.

12  Q    And that's because you conducted no reasonable

13  investigation, correct?

14  A    That's not true.

15  Q    Now, looking at the Second Amended Complaint,

16  Defendants' C, are you familiar with this document?

17  A    Yep.

18  Q    You filed it, right?

19  A    Yep.

20  Q    Okay.  So this was filed after Plaintiff sat for his

21  50-H Hearing, right, on May 9th, 2020?

22  A    Let me just -- I'm pulling it up on my computer, so if

23  it contains state law claims and if it says that -- well,

24  yes.

25  Q    Okay.  And again, Plaintiff was made aware of the

1  factual allegations of this lawsuit as well, right?

2  A    Absolutely.

3  Q    And on May 9th, 2020 you had also settled with the

4  private defendant, Borris, Inc., correct?

5  A    I don't recall the date, but there was a settlement,

6  yes.

7  Q    Sir, is Borris, Inc. listed as a defendant in the

8  Second Amended Complaint?

9  A    No.  Because I think we had settled the case prior to

10  me filing the Second Amended Complaint.

11  Q    So sometime on or before March 9th, 2020, you settled

12  with Borris, Inc., correct?

13  A    If that's when the Second Amended Complaint was filed,

14  then the answer is yes.

15  Q    And Plaintiff was also aware that you had settled with

16  Borris, Inc., correct?

17  A    Yes.  He received a check.

18  Q    And he understood that the check was in connection with

19  his lawsuit against the City, its officers, and

20  Borris, Inc., correct?

21  A    Well, in the suit there's a -- there's a check for --

22  in the settlement with the private defendants, not with the

23  City, and --

24  Q    Right.  But in connection with this lawsuit?

25  A    Yeah --

1   Q     Okay.

2   A     -- of course.

3   Q     And you made Plaintiff aware of that fact, correct?

4   A     That -- the fact that he was --

5   Q     The fact that he was getting money pursuant to a

6   lawsuit he had filed with Borris, Inc. as a co-defendant in

7   the First Amended Complaint?

8   A     In sum and stance, yes.

9   Q     And now if you want to take a look at the facts --

10        MR. SUNDARAN:  Ms. Shin, if you could scroll to

11  the facts section?

12  Q     And you could just read this to yourself, 10, 11 --

13        MR. SUNDARAN:  And could you please scroll, scroll

14  slowly, Ms. Shin?

15  A     No.  I'm all the way up to 24, yes.

16  BY MR. SUNDARAN:

17  Q     You're good up to 24?

18  A     Yep.

19  Q     So --

20  A     I think --

21  Q     -- you agree that -- you agree that the factual

22  allegations are clearly similar in the

23  Second Amended Complaint as it is in the first and original

24  complaints correct?

25  A     Yep.  Yep, they appear to be.

1    Q    Okay.

2         Now, I want to refer your attention to

3    Paragraph Number 42.

4         MR. SUNDARAN:  Ms. Shin, if you can go to that?

5    Q    Paragraph Number 42 reads, NYPD Defendants failed to

6    undertake a proper investigation and simply arrested

7    Plaintiff because he, quote, "looked like another black male

8    suspect."

9         Mr. Pawar, was that something that Plaintiff told

10   you about; was that something that was communicated to you

11   by Plaintiff?

12   A    "Looked like another..." -- in -- in sum and stance,

13   yes.

14   Q    He told you -- I'm sorry.  Mr. Heaston told you that he

15   believed he was arrested because he looked like another

16   black male suspect?

17   A    Well, look, just to clarify certain things, I don't

18   know what was said when I was not present at the prior

19   testimony, but Mr. Heaston has a twin, and anytime there's

20   an issue, he would say, Maybe it was my twin who did it.

21   Q    That's not the question, Mr. Pawar.

22        Did Mr. Heaston tell you that he was arrested

23   because he looked like another black male suspect?

24   A    You know, what?  Sitting here today, I -- I can't

25   recall.

1   Q    So you inserted this --

2   A    I don't think I --

3   Q    -- you inserted this without Plaintiff's knowledge?

4   A    Like I said, I do not recall.

5   Q    Okay.

6            Now, Paragraph Number 43 has a NYPD Civil

7   Court Exhibit attached to it, do you see it?

8   A    Yes.

9   Q    It references an exhibit?

10  A    Yes.

11  Q    And that exhibit is the plaintiff's order to show cause

12  to verified petition; the decision from Judge Lai; and the

13  security rent receipts; and Plaintiff's version of the

14  events, correct?  You attached all of those documents to the

15  complaint?

16  A    If Exhibit 1 was attached to this lawsuit, then yes,

17  the answer is yes.  I just don't see it where I'm looking at

18  it, but yes.

19  Q    Well, if I told you you attached the housing court

20  proceedings, Plaintiff's version of the lease, and the

21  security rent receipts, would you agree with me?

22  A    I would.

23  Q    And in addition to the housing court records, you had

24  other information concerning Plaintiffs' April 26th arrest,

25  correct?

1  A     Well, do you mean when I filed the
2  Second Amended Complaint?
3  Q     Yes.
4  A     Yeah.  I believe I had initial disclosures from your
5  office.
6  Q     Right.  And they were provided to you on January 29th,
7  2020?
8  A     I -- if that's the date, then the answer is yes.
9  Q     And the initial disclosures included DD5's associated
10 with an open burglary complaint, correct?
11 A     That is correct.
12 Q     And those DD5's included the name of the complainants,
13 Ms. Davoudi and Mr. Kandkhorov, correct?
14 A     I'm not sure if their names were on there or if you had
15 redacted them.  But if there's an -- yeah, sure.
16 Q     But a reference, Complaining Victim, correct?
17 A     Yes, yes.
18 Q     Okay.  And despite receiving this evidence from
19 Defendant back on January 29th, 2020, you did not withdraw
20 the case, correct?
21 A     I had no reason to.
22 Q     Okay.
23        On April 20th -- on April 29th of 2020 the City
24 provided you with copies of the Queens Civil Housing Court
25 file, correct?

1   A    Yep.

2   Q    And that file included Defense --

3   Co-Defendant Borris, Inc.'s case; Plaintiff's default

4   judgment; and it included affidavits from Ms. Davoudi, as

5   well as attachments, which included the real leases, which

6   is at 84-21 Chapin Parkway certificate of occupancy, and

7   other documents proving that Plaintiff could not have lived

8   there at that time, right?

9   A    If it's a landlord thing, from -- what I gather from

10  this document, it's a landlord thing.  I didn't do anything

11  wrong.  I wonder if the default judgment will be vacated.

12  It happens all the time when a tenant says something, the

13  landlord wants to absolve itself of any responsibility, so

14  it was not unusual for me to see that, but I didn't contest

15  it.

16  Q    Would it be unusual that the building department issued

17  a certificate of occupancy only on March 28, 2019 when your

18  former client complained to you that he was living there at

19  that time?

20  A    I have no knowledge of when this DOB disputed occupancy

21  and when my client -- former client says that he was there.

22  Q    Sir, this document is a public record, correct?

23       MR. SULLIVAN:  Your Honor -- Your Honor --

24  Your Honor, if I may?  Can you hear me?

25       THE COURT:  I can hear you, yes.

1    MR. SULLIVAN:  Yes, if I can -- I just need --

2         (Audio cuts out briefly.)

3         THE COURT:  Mr. Sullivan, we can't hear you.

4         MR. SULLIVAN:  I just need a few minutes for a

5    bathroom break.  We've been going since 1:00 o'clock.  I

6    just need to use the bathroom.

7         THE COURT:  Okay.  Go ahead.

8         Let's take ten minutes.  Everyone please come

9    right back.

10        (Recess taken.)

11        THE COURT:  All right.  Next question,

12   Mr. Sundaran?

13   BY MR. SUNDARAN:

14   Q   Mr. Pawar, you had an opportunity to go and investigate

15   the claims of Plaintiff, correct?

16   A   I don't know what he's talking about.  I have a -- I

17   had the state court order.  I looked at the order --

18   Q   Sir --

19   A   -- I looked at the --

20   Q   -- the question is --

21   A   No, no, no.

22   Q   -- did you have an opportunity --

23   A   No, no --

24   Q   -- to investigate --

25        THE COURT:  Mr. Sundaran, stop.

1          Mr. Sundaran, let Mr. Pawar finish.

2          Go ahead.

3  A     No.  Stop accusing me of doing something that I haven't

4  done, okay?  That's number one.

5          Number two, we all had cases before.  When my

6  client says that he was abused by the police, you don't go

7  and tell the cops, Hey, you know, I'm going to admonish you

8  for doing this?  So let's cut to the chase here.  What --

9  are you -- are you accusing me of not doing my investigation

10 for this case?  I didn't have -- I did as much as I had to

11 because of the state court order, but the receipts, which

12 gave me reasonable belief that Plaintiff was supposed to be

13 there when he was arrested.

14         So what is your next question?

15         THE COURT:  All right, Mr. Pawar -- hey, hey, hey.

16 Both of you calm down.  Okay?

17         Mr. Sundaran, move on.  You can make arguments,

18 but you needn't try to get Mr. Pawar to agree with you that

19 he could have done more.  He's --

20         MR. SUNDARAN:  Understood --

21         THE COURT:  He's made his --

22         MR. SUNDARAN:  Understood, Your Honor.

23         THE COURT:  He's made a statement on that.

24         MR. SUNDARAN:  Thank you.

25         THE COURT:  Okay.

1  BY MR. SUNDARAN:

2  Q    Mr. Pawar, the supplemental production by Defendants on

3  April 29th, 2020 included an NYPD wanted flyer with your

4  client's photograph on it, correct?

5  A    No.  It was a -- it was a photograph of an

6  African-American male.

7  Q    And that photograph resembled your client; is that

8  correct?

9  A    I can't -- no.  I mean --

10 Q    Did you show that photo to your client?

11 A    Yes, and he said it was not him.

12 Q    Okay.

13       All right.  On May 7th, 2020 you participated in

14 telephone -- in a telephone conference with Defense Counsel

15 before Judge Scanlon regarding writings of service,

16 proceeding of additional discovery, and prospects of

17 settlement, correct?

18 A    That is correct.

19 Q    On May 8th, 2020 Defense Counsel informed you of their

20 conversation with Margaret Kirkland, who provided additional

21 information regarding Plaintiff's claim to have been a valid

22 leaseholder at 84-21 Chapin Parkway, correct?

23 A    For all I knew, Margaret Kirkland was working with the

24 landlord.  I have no idea who this woman is.  When I asked

25 Plaintiff about who this woman is, he said that she was an

1    angry mother-in-law who was trying to sabotage my case.

2    Q    I'm sorry.  You said, for all you know, are you

3    inferring --

4    A    I'm not --

5    Q    -- that there must have been some sort of conspiracy

6    between Ms. Kirkland and the landlord?

7    A    I have no idea who this woman was -- or is.

8    Q    On July 17th, following your refusal to withdraw from

9    the case, Defendants filed a letter for inquest to this

10   Court; do you recall that?

11   A    No.  You never filed a letter for inquest.

12   Q    We asked for a hearing on -- we asked for a hearing by

13   letter dated July 17th.

14   A    That is correct, but not a -- not an inquest.

15   Q    Do you recall you submitted a reply to that letter also

16   dated July 17th, 2020?

17   A    I did.  And I sent it, and I told the Court that

18   it's -- it's not my job to judge what my client is telling

19   me.  I have to go where the fact take me.

20   Q    In fact, not only did you object, but you made some

21   very serious allegations and incendiary remarks, correct?

22            THE WITNESS:  I don't know what he's talking --

23   A    I don't know what you're talking about.

24            THE COURT:  Sustained as to charging.

25            MR. SUNDARAN:  Okay.

1          THE COURT:  Go ahead and ask him what it is he

2     supposedly said.

3     BY MR. SUNDARAN:

4     Q    Your opposition, Mr. Pawar, for claims for any hearing

5     on Plaintiff's misconduct would have an unprecedented

6     chilling effect on the adversarial system, correct?

7     A    Absolutely.  And that's -- and -- and it's correct,

8     because if -- if I -- if I make some -- if my client's

9     making some sort of an allegation and another party says,

10     Well, that's not true, what am I supposed to do?  Take

11     your -- take the adversary's word for it?  Take your word

12     for it and drop all the lawsuits?  Otherwise, you wouldn't

13     have any civil rights lawsuits.  So I -- I -- I...

14     Q    Mr. Pawar, your opposition continued to claim that

15     Plaintiff, an African-American male, was arrested after he

16     called 911 for aid in gaining entrance to an apartment he

17     rented from the co-defendant landlord's agent, despite his

18     displaying an order from housing court to the Defendant

19     Officers, correct?

20     A    Absolutely correct.

21     Q    Your opposition further added, "As current events have

22     unfortunately brought out, such is not an usual response

23     when minorities summon law enforcement for assistance."  You

24     wrote that too, right?

25     A    Yes.

1  Q    Did Plaintiff tell you he was arrested because he was a

2  minority?

3  A    Plaintiff --

4        THE WITNESS:  Judge, what is the purpose of this

5  question?  I mean...

6        MR. SUNDARAN:  You're on mute, Your Honor.

7        (Pause in proceedings.)

8        THE COURT:  My apologies.  I muted myself.

9        Just answer the question.  Did your client say

10 that to you or not?

11 A    Well, I inferred the fact that my -- did my client say

12 that to me?  I don't recall.  But I inferred, because they

13 had a wanted poster for an African-American male and my

14 client happens to be an African-American male who called 911

15 for assistance, and they arrested him instead.  So I don't

16 know if my client specifically told me that, but I inferred

17 it.

18 Q    Sir, the flyer was a surveillance photo captured; it

19 wasn't a drawing?

20 A    Whatever it was, it looked like an African-American

21 male.  It did not look like my client.

22 Q    Your opposition also claims that it would have been

23 immaterial at the time of Plaintiff's arrest -- I'm sorry.

24        Your opposition also claims that the housing court

25 order had been -- that even if the housing court order had

1  been procured by fraud, it would have been material at the

2  time because the defendant officers would not have known

3  that such order was fraudulent; your opposition also stated

4  that, too, right?

5  A    I -- I don't recall the exact language of my

6  opposition.

7  Q    Okay.  Your opposition also complained that

8  Ms. Kirkland was a disgruntled family member, correct?

9  A    Yes, I do recall stating that.  Yes.

10  Q    And that she had sent Mr. Heaston erratic and

11  threatening messages, correct?

12  A    That is correct.

13  Q    You also --

14        THE COURT:  Mr. Sundaran, let me just -- hold on.

15        Let me just say this:  You don't need to read back

16  the entire opposition -- oh, hang on.  I'm sorry.  I'm

17  sorry.

18        Yeah.  You needn't read the whole thing.  I was

19  giving you some leeway because I thought you were going to

20  ask a follow-up, but don't read the entire opposition back

21  to him.

22        MR. SUNDARAN:  Okay.

23        THE COURT:  But you can make your argument about

24  it.

25        MR. SUNDARAN:  Okay.

1  BY MR. SUNDARAN:

2  Q    Mr. Pawar, you're familiar with your Rule 11 obligation

3  as an attorney to deny or confirm on behalf of your client,

4  correct?

5  A    Just as you are when you deny the allegations in your

6  answer, yeah.

7  Q    And you're aware that both as attorney and as client,

8  you can be sanctioned under Rule 11 for the factual

9  insufficiency in the complaint, right?

10 A    If it's been highlighted to you and it's not withdrawn

11 in a timely fashion and it's found that it was -- it was not

12 true, then yes.

13 Q    And you're aware that your withdrawal as attorney on

14 Mr. Heaston's case does not excuse or insulate you for your

15 plea withdrawal sanctionable conduct, correct?

16 A    You're getting into -- you're getting into legal areas

17 Mr. --

18        THE COURT:  Yes, sustain.

19        Mr. Sundaran, again, you can make arguments, but I

20 don't know what the purpose is of asking Mr. Pawar these

21 questions.

22        MR. SUNDARAN:  Your Honor, I will move on.

23        THE COURT:  Yes, please do.

24 BY MR. SUNDARAN:

25 Q    Mr. Pawar, August 3rd of 2020, you sent of photos to

1   me; do you recall that?

2   A    Yes, yes.

3   Q    And those photos contained images of Mr. Heaston and

4   Salim Blake, correct?

5   A    No --

6   Q    Did you --

7   A    -- well --

8   Q    -- show your client those photos --

9   A    Yes.

10  Q    -- your former client?

11  A    Yes.

12  Q    Did he identify himself in those photos?

13  A    He said that, It's definitely my twin brother.

14  Q    Did he identify Mr. Blake in those photos?

15  A    He -- he act -- the responses that I received from my

16  client -- from my former client regarding those photographs

17  were unsatisfactory to me, and at that point I realized that

18  I could not represent him going forward.

19  Q    Did Mr. Heaston identify -- there were a lot of

20  individuals in those, correct?

21  A    If I recall correctly, yes.  Yes.

22  Q    Did Mr. Heaston identify himself in any of those

23  photos?

24  A    No.  He said that, It's definitely my twin.

25  Q    All right.  Did he tell you that he was not in any of

1   those photos?

2   A    The sum and substance of the conversation was by text

3   message -- which I'm willing to share with the Court if

4   Judge wants -- but the sum and substance of the conversation

5   was that, How can you or your brother be friends with

6   somebody who essentially screwed you out of a deposit?  And

7   his response was, What date is that Facebook -- Facebook

8   post from?  And this woman, she -- she can do weird stuff

9   and modify these images.  And at that point, I -- I -- I

10  didn't -- I didn't think it was a satisfactory answer from

11  him.

12  Q    So on August 3rd after your communication with the

13  plaintiff, you withdraw -- you decided to withdraw as his

14  attorney?

15  A    I filed a motion with the Court outlining my reasons,

16  and the Court granted my application.

17  Q    And that is after you had settled with Borris, Inc.,

18  correct?

19  A    Absolutely.

20  Q    So did you ask Plaintiff to return any of the money he

21  received from the Borris, Inc. settlement?

22  A    If Alex or his clients would have reached out to me and

23  told me about these things, I would have, of course, spoken

24  to him about it.

25  Q    Sir, as an attorney, did you ask your client to return

1  any of the money with respect to the settlement that he

2  received from Borris, Inc.?

3  A    The private defendants didn't ask for it, and since

4  they didn't ask for it, my answer -- my -- to answer the

5  question, the answer is no.

6  Q    Instead on August 6th you made an application to

7  withdraw as counsel, correct?

8  A    That date seems about right.

9  Q    Did Plaintiff tell you to withdraw as counsel or did he

10 want his case withdrawn?

11 A    I filed my -- I don't recall when I filed my motion to

12 withdraw.  But as the motion was pending or my application

13 was pending, Plaintiff said, I can't go forward with this by

14 myself.  I advised him he can get another lawyer.  He can

15 get a *pro bono* lawyer, but -- or he can get somebody on a

16 contingency, like I took the case on, but I can't -- I

17 cannot go forward with the case.  And then he said, They're

18 lying.  They're lying.  What -- you know, How can this

19 happen to me?  And I said, The judge only cares about the

20 truth.  If you're telling the truth, then you have nothing

21 to worry about, you can move forward with this lawsuit, but

22 you can't do it with me.

23 Q    Did Plaintiff tell you to withdraw the case?

24 A    Not after it was too late, that I had already filed my

25 application to withdraw as counsel.

1   Q    Did Plaintiff tell you at any point to withdraw the
2   case?
3   A    He did, and I told him that I cannot do it.  I think it
4   was -- it may have been after the judge granted my
5   application or my application was pending.  And I told
6   him -- and I gave Judge Chen -- the link to Judge Chen's
7   chambers and deputy's phone, and I said, Either you get a
8   lawyer or we can call the judge or the Eastern District and
9   find out how to conduct the case on your own.
10  Q    Did Plaintiff ask you to withdraw the case before you
11  filed your withdrawal application?
12  A    I don't believe so.
13  Q    According to you, you gave Plaintiff two options:  One,
14  you could proceed *pro se*; or two, he could find an attorney,
15  correct?
16  A    Or I -- I may have told him he can go to the *pro bono*
17  office in the Eastern District.
18  Q    Okay.  So three options, right?
19  A    Yes.
20  Q    But none of those options included the options to just
21  withdraw the case on August 3rd, 2020?
22  A    I -- I -- I don't recall.  But I do remember telling
23  him that I can't do anything for you, to contact the Court
24  and ask how to dismiss your lawsuit.
25  Q    So did you advise Plaintiff to simply withdraw the

1   case?

2   A    It was his choice.

3   Q    Did you advise the plaintiff to withdraw the case?

4           THE COURT:  I'm sorry.  When, during the same

5   conversation?

6   BY MR. SUNDARAN:

7   Q    In the month of October 2020 -- I mean, in August of

8   2020?

9   A    I -- I told him that I cannot give him legal advice,

10  and then I gave him the option of --

11          UNIDENTIFIED FEMALE SPEAKER:  He doesn't want

12  to -- it's a yes-or-no question.  He doesn't want to answer

13  the question.

14          THE COURT:  All right.  I don't know whose voice I

15  just heard --

16  Q    Sir --

17          THE COURT:   -- but somebody's voice.

18          But let's move on, Mr. Sundaran.

19  BY MR. SUNDARAN:

20  Q    Mr. Pawar, I'm just asking you yes-or-no questions.

21  Did you ask Plaintiff to simply withdraw the case at any

22  time in August of 2020?

23  A    No.  I was not in a position to give him legal advice.

24  Q    Before you withdrew as his attorney, did you ask him to

25  withdraw the case?

1   A     At any point?

2   Q     Before you withdrew as his attorney.

3   A     Yes, and he -- and he said no, I can't, because they're

4   messing with me.

5   Q     And why did you ask him to withdraw the case before you

6   withdrew as attorney?

7   A     Because things were piling up which weren't starting to

8   make sense.

9   Q     And when did things start piling up and didn't start to

10  make sense?

11  A     The photograph that he sent to me on August 3rd, and I

12  don't -- I don't know -- I don't know how long he had had

13  them for.  When I -- when I got those pictures, I confronted

14  him with it, and he didn't have a satisfactory answer, so

15  that's when I decided that I'm not going to go forward with

16  it.  And I'm not sure if I told him withdraw from the case.

17  I may have just said, I'm filing a motion to withdraw as

18  lawyer.  I'm not giving you any legal advice.  I gave him

19  the options.  And then I said, if he really wanted to move

20  forward with the case, he would have to do something

21  different.

22  Q     So you told him that in August of 2020 after Defendants

23  had served -- or filed their letter with the Court asking

24  for a hearing, correct?

25  A     I think your letter was in July.

1   Q    Yes, in July, I'm sorry.  July 2020?

2   A    No.  It was after he sent me the photos, which I don't

3   know how long he had had them -- he had had them for, or if

4   he was setting a trap.  But after I got the photographs, I

5   confronted him with it, and I was unhappy with his

6   responses.

7              (Pause in proceedings.)

8   BY MR. SUNDARAN:

9   Q    Mr. Pawar, did you realize that those photos were

10  produced by Ms. Kirkland, correct?

11  A    I have no idea -- I have no idea who produced those

12  photos.

13  Q    There was an affidavit from Ms. Kirkland that was

14  filed; you're aware of that, right?

15  A    Yes.

16  Q    And those photos were referenced as an exhibit to her

17  affidavit; you're aware of that, right?

18  A    I'll take your word for it.

19  Q    All right.  And that affidavit from Ms. Kirkland was

20  filed in connection with Defendants' sanctions motion,

21  correct?

22              (No audible response.)

23              THE COURT:  Wait.  I think we lost Mr. Pawar.

24              THE WITNESS:  No, I'm here.

25              THE COURT:  Oh, okay.  Then you broke up.  I only

1  heard half of your answer.

2          THE WITNESS:  No, I -- I didn't give an answer.

3          Judge, I -- once I was released as counsel, I

4  wasn't necessarily paying attention to a case that I had

5  spent a lot of time on it, so I -- I didn't want to -- I

6  didn't want to spend any more time on a case that I had

7  wasted many hours on.

8  BY MR. SUNDARAN:

9  Q    So the answer is --

10         THE COURT:  So, Mr. Sundaran--

11 A    So the answer is --

12         THE COURT:  Well, hang on, Mr. Sundaran.

13         The record needs to be a little clearer.  You keep

14 referencing Ms. Kirkland's affidavit being filed.  It was

15 not filed in the state court?

16         MR. SUNDARAN:  I'm sorry, Your Honor, yes.

17 Ms. Kirkland filed only one affidavit in connection with

18 this action, this lawsuit and was in support of Defendants'

19 Motion for Sanctions.

20         THE COURT:  And was it after Mr. Pawar had

21 resigned as his -- or been allowed to withdraw as --

22         MR. SUNDARAN:  It was -- it was served on the

23 plaintiff and filed after Mr. Pawar was dismissed.

24         THE COURT:  Go ahead, Mr. Pawar.  Finish your

25 answer.  Maybe I'm the only one who did not hear all of it.

1    THE WITNESS:  Yeah, Judge.  I think -- I don't

2 think -- I had spent a lot of time on this case, and I don't

3 know exactly when Ms. Kirkland's affidavit was filed with

4 the Court in support of the sanctions hearing, but I knew

5 that I was -- believed that I was dismissed from the case

6 already, and I wasn't going around reading things that were

7 filed on ECF.

8 BY MR. SUNDARAN:

9 Q    Mr. Pawar, when you said after the photos -- after

10 Defendants served you with the photos, you began to look at

11 it more careful, correct, the case?

12 A    No.

13 Q    Okay.

14 A    After he -- after he -- you know, after he sent the

15 photos on August 3rd, I confronted Plaintiff about those

16 photographs.  I didn't get a satisfactory response, and

17 that's when I filed my motion to withdraw.  I think I've

18 stated --

19 Q    Sir --

20 A    -- that before.

21 Q    Sir, did you confront Plaintiff with any of the housing

22 court documents that you attached to the --

23 A    No.

24 Q    -- Second Amended Complaint?

25 A    No -- wait.  I'm sorry, what?

1   Q    The housing court documents that you received from

2   Defendants with the correct leases, did you confront

3   Plaintiff with that?

4   A    With the correct, what?

5             (Continued on the next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   DIRECT EXAMINATION

2   BY MR. SUNDARAN (Continued):

3   Q     The correct leases in the housing profile.  Defendants

4   produced the entire Queens civil housing court file to you,

5   right?

6   A     I have an email, yes, okay.

7   Q     In that housing court file, it linked the certificate of

8   occupancy, the statement or invoice for the renovations that

9   were being done to 84-21 Chapin Parkway, as well as leases in

10  connection with the apartment at issue at

11  84-21 Chapin Parkway, do you remember that?

12  A     Okay, I'll take your word for it.

13  Q     Did you confront plaintiff with any of those documents?

14  A     Yes.

15  Q     What did you say to him when you confronted him with

16  those documents?

17  A     I said, how do you explain the fact that there are other

18  tenants at this place where you supposedly had a lease with?

19  And he said, it happens all the time where you have --

20        You know what, Judge, I don't recall exactly what he

21  said.  I don't want to make anything up, so I don't recall

22  what he said.

23        But he was confronted about that fact, yes.

24  Q     The housing court file also contained affidavits from

25  Mr. Vyacheslav Kandkhorov and Edna Davoudi, do you remember

1  that?

2  A    Yes, I believe so, yes.

3  Q    Did you confront plaintiff with those affidavits?

4  A    His position was, it didn't matter if they were moving to

5  vacate the default, there was an order from the state court in

6  effect at the time he was arrested.

7  Q    Mr. Pawar, just to sum this up, the whole predicate of

8  your lawsuit on behalf of plaintiff was based on the housing

9  court order?

10  A    And plaintiff's statement to me, yes.

11        MR. SUNDARAN:  Your Honor, if I could just have a

12  moment to confer, I think I might be done.

13        THE COURT:  Yes, okay.

14        MR. SUNDARAN:  Nothing further, your Honor.

15        THE COURT:  Okay, thank you.

16        Mr. Sullivan.  Mr. Sullivan, do you have any

17  questions?  Mr. Sullivan, are you still on the call?

18        MR. SULLIVAN:  Yes.

19        THE COURT:  Okay, yes, we can hear you.

20        Do you have any questions for Mr. Pawar?

21  CROSS-EXAMINATION

22  BY MR. SULLIVAN:

23  Q    Mr. Pawar, how did you first meet the plaintiff?

24  A    Another attorney looked over his case, and he walked to

25  my office with plaintiff and he stated -- excuse me -- Judge,

1  I'm just going to drink some.

2          THE COURT:  Okay.  Everyone else, please mute their

3  phones.

4  A    I first met Mr. Heaston when he came to my office with an

5  attorney, and the attorney showed me the documents that

6  Mr. Heaston had.  And the attorney told me that this is a very

7  interesting case take this on.  I looked at it.  I said, let

8  me talk to him.  The attorney left.  Then I spoke to

9  Mr. Heaston about the documents that the other attorney came

10 to me with.

11 Q    About how long was your interview with Mr. Heaston?

12 A    I would say 30 minutes to an hour.

13 Q    And did you prepare a notice of claim on that day?

14 A    I may have, I don't know.  I don't recall the date that I

15 met Mr. Heaston, but I do recall his signature on the notice

16 of claim.

17 Q    Let me ask you this, other than when you met Mr. Heaston

18 at your office that was brought to you by the attorney, when

19 was the next time you saw him after that?

20 A    I can't tell you, but I can tell that you we communicated

21 by text almost on a regular basis.

22 Q    My question was, when was the next time that you saw him

23 physically?

24 A    I don't recall.

25 Q    You had never since the day met him sign that notice of

1  claim; isn't that correct?

2  A    I missed the first part of the question.

3  Q    Is it right, counselor, since the date that he came and

4  signed that notice of claim that you have never met him since

5  that time personally?

6  A    That's absolutely false.

7  Q    Where did you meet him subsequently?

8  A    In my office.

9  Q    When was that?

10 A    Sitting here, I don't know.

11 Q    Do you knowing what the circumstances were that caused

12 you too see him a second time?

13 A    It may have been with an issue that he was having with

14 the police when he had called me in the middle of the night

15 saying, I'm being harassed by this police officer, my

16 girlfriend and I are being harassed by this police officer.

17        And I told him, I said, don't do anything

18 irrational, come and see me in any office at some point.

19        So I don't --

20 Q    In regard to this case, this litigation, other than

21 when -- on the date the notice of claim -- when you first saw

22 him, by the way, May 8 does that sound about the right when

23 you first met him?

24 A    I don't know.

25 Q    Did you do intake agreement?

1   A     I believe I did, yes.

2   Q     Would the retainer agreement and notice of claim would

3   have happened on the same date?

4   A     The retainer agreement would have been on the done on the

5   same date.  The notice of claim, I don't know.

6   Q     And other than the date that you signed the notice of

7   claim, and you mentioned he called about something else, in

8   regard to this particular case did you ever meet with him in

9   person again?

10  A     Yes.  He came in late once for his 50-H Hearing.  He

11  said -- I don't know -- he said, I'm driving in.  And then he

12  said the traffic was bad.  He came upstairs.  I don't know if

13  he had his kid with him or not.  But I said, look, it's late

14  but if you want to go forward with this lawsuit next time

15  there is a 50-H Hearing you got to be here on time.  The next

16  time there was a 50-H Hearing, I couldn't be there he came and

17  met with my partner.

18  Q     So after the 50-H Hearing -- by the way, by the time of

19  the 50-H Hearing you had already started the lawsuit?

20  A     I had at the time of the 50 -- look, the record speaks

21  for itself.  I don't know what date the 50-H Hearing was.  My

22  complaint was filed on a certain date.  The Judge can take

23  notice of what happened first.

24  Q     But my question is, as you sit here now, you have no

25  recollection as to whether the 50-H Hearing was done before or

1    after the lawsuit was first filed, correct?

2    A    That is correct.

3    Q    And when you first filed the lawsuit -- before you filed

4    the lawsuit you never sent the copy of the complaint to the

5    plaintiffs, did you?

6    A    If your question is whether the plaintiff reviewed the

7    contents of the complaint, the answer is no.  But, everything

8    in the complaint was information that I received from the

9    plaintiff.

10   Q    But after you prepared the complaint, you never sent a

11   copy to the plaintiff; is that correct?

12   A    I rarely do; that is correct.

13   Q    And as far as what goes into the lawsuit, what facts to

14   include in the lawsuit, that was your decision; is that

15   correct?

16   A    No.  My decision is to the legal causes of action.  The

17   facts come from the client.

18   Q    Well, the complaint here, sir, isn't it fact that the

19   complaint here stated notice of claim was a false arrest on

20   April 2019 at 2:00 p.m.

21   A    That's what the notice of claim states, yes.

22   Q    And you said that to put in that it was due to arrest,

23   negligent assault, and battery; is that correct?

24   A    Yes.  For state law claims usually if you touch somebody

25   that's considered battery, even there was no excessive force.

1  Q    But you were the one that put those things in, correct?

2  A    The legal aspect of it, yes, that's correct.

3  Q    As far as the injuries are concerned, what injuries did

4  he tell you that he said he received in the course of the

5  arrest?

6  A    He talked about things, traumatized, talked about being

7  psychologically affected, he talked about his family

8  witnessing his arrest, afraid to come back to his place, which

9  he rented.  He talked about how he was afraid the police.  He

10 talked about that he couldn't trust the system.  So that's

11 what he said.

12 Q    What about physical, what physical injuries did he tell

13 you how he got those physical injuries?

14 A    He talked about when he was handcuffed, the handcuffs

15 were tight.

16 Q    That's the only injury that he said to you; is that

17 correct?

18 A    That is correct, physical injury.

19 Q    Right.  He never said anything about his head, neck,

20 eyes, his ears, his mouth, his --

21      (Audio interruption.)

22 Q    -- did he?

23 A    When you file a notice of claim at an early stage you

24 have to cover a wide spectrum of injuries.  You don't know

25 what could happen to the plaintiff from his wrist from the

1    handcuff injury.  So did he complain about his neck hurting?

2    He may have.  Did he complain about his head hurting?  He may

3    have, when he was put inside the car or the police car after

4    his arrest.  But his ears, head, it's something that you have

5    to be careful; otherwise, God forbid something happens the

6    client turns around and sues you for malpractice.

7    Q    I don't want to get into malpractice.  What I'm just

8    asking is, he didn't tell you to put in this thing that he had

9    injury to his body, head, neck, eyes, mouth, and face, and

10   legs, he never told you that, he never uttered those words to

11   you; isn't that correct?

12   A    What is correct is that he reviewed the first few pages

13   before he signed it.  If he objected to any of the things that

14   I put in there, I would have taken it out.

15   Q    I'm not asking if he objected.  I'm saying, it was your

16   idea to put those things in, not his idea.

17   A    Yes, but he looked at when he signed it.

18   Q    That is after you put it on the notice of claim; is that

19   correct?

20   A    Yes, I prepared the notice of claim.  I asked him to

21   review it.  And then he signed the back of it.

22   Q    You told him to sign it, correct?

23   A    Well, I didn't put a gun to his head.  He wanted to move

24   forward with the lawsuit so, yes.

25            THE COURT:  Let's move on, Mr. Sullivan.  I get the

1   point.  Move on, please.

2   Q     (Audio interruption.)

3   A     Repeat the question.

4   Q     With respect to the attachments to the complaint, he

5   never told you what attachments to put on the complaint to put

6   any attachment, did he?

7   A     I thought it was a very good idea to attach the judge's

8   civil court order to the complaint.

9   Q     Just whether or not he told you to do that.

10  A     No, it was an independent judgment by me.

11  Q     And my understanding is you said filed a second amended

12  complaint, correct -- you filed an amended?

13  A     I did a first amended.  And I think the last one was a

14  second amended, that's correct.

15  Q     Isn't it correct to say you never sent the plaintiff any

16  of those copies of those complaints?

17  A     It's true that he did not review or receive the copy of

18  the first, the initial, complaint the first amended complaint

19  or the second amended complaint.

20  Q     Did you ever send a letter to the plaintiff or e-mail to

21  the plaintiff saying, I have filed a lawsuit on your behalf in

22  federal court?

23  A     No, because he knew that I did.

24  Q     And how did you indicate to plaintiff that you had

25  actually filed a complaint in federal court?  How did you do

1  that?

2  A    I'm sorry, could you repeat your question please?

3  Q    What had you said that he knew you filed a federal

4  lawsuit?  My question to you is how did you make him know

5  that?  Did you e-mail him?  Did you send a letter to him?  How

6  did you notify him that you had filed a federal lawsuit on his

7  behalf?

8  A    Okay, two answers to your -- I'm going to answer that in

9  two-parts.

10        Number one, he knew the process of the 50-H Hearing,

11 and after the 50 hearing a lawsuit would happen.  That's one.

12        Number two, he sent me a text message.  I don't know

13 who it was from, but somebody was mocking him, telling him --

14 and I remember it was a screen shot of the docket sheet -- and

15 the person, whoever the person was, was telling him, so your

16 case got dismissed again, huh.

17        Then he told me, with a snap shot of the lawsuit,

18 saying, Look, what I'm going through.  This woman will not

19 stop harassing.

20        So he was aware of the federal lawsuit because he

21 sent me a picture of the docket sheet.

22 Q    Do you knowing when he sent you the picture of that

23 docket sheet approximately as to when?

24 A    Give me a second.  There was one on June 23.

25 Q    Is that June 23 of 2020, sir?

1  A    Yes.

2  Q    This was him communicating to you about this lawsuit,

3  right, picture of the lawsuit, right?

4  A    Well --

5  Q    Of the docket sheet?

6  A    I told him we have a conference in a couple of weeks.

7  Then I said, Is the sister crazy?  Why would she say you're

8  faking the lawsuit?

9        Then he said, Bitch call ACS on her own sister.  I

10 can send you all the text how she is doing brutal to destroy

11 us.

12       Then he sent a lengthy text.  Then a text message

13 from somebody, something about checkmate, got exactly what I

14 wanted.

15       And then it was a docket sheet from.

16 Q    Were those communications between yourself Margaret

17 Kirkland and Mr. Heaston?

18       THE COURT:  Let's curtail this line of questioning.

19 It's not relevant because it's so late, June 23, 2020 is after

20 the second amended complaint was filed.

21       The question is, Mr. Pawar, what, if anything, did

22 you do to notify Mr. Heaston about the filing of the initial

23 lawsuit.  Now you mentioned the 50-H Hearing and what appears

24 to me an assumption that he know that what happened after the

25 50H claim being filed was a lawsuit, filed in federal court.

1   But what, if anything, did you do to notify him about you

2   filing the first complaint, not in June 2020, the first

3   complaint filed a year earlier?

4                   THE WITNESS:  Judge --

5                   (Audio interruption.) --

6                   THE WITNESS:  -- the question is whether Mr. Heaston

7   was aware of an existence of lawsuit.  He knew that I was

8   settling the case with the private defendants and he requested

9   I send him a check.

10                  THE COURT:  How did he know that?

11                  THE WITNESS:  I communicated with him saying, look,

12  the private defendants want to this much money.  And he said

13  okay.  And then he asked me, Can I come pick up the check in

14  your office.

15                  There was some interval between when I got the check

16  from the defendants.  And then when I received the check he

17  called me and said, Can I come and pick it up in the office?

18  I said no because no one is in the office because of

19  Coronavirus, but if you give me the address I can mail you the

20  check.  I mailed the check.  I asked him, Did you get the

21  check?  He replied in the affirmative.

22                  THE COURT:  Again, wasn't that in 2020 as well?

23                  THE WITNESS:  Yes.

24                  THE COURT:  Let's talk about when you filed the

25  complaint, focus on that period.  What did you do to let him

1  know that you filed a federal case?  What would happen next

2  after you filed it?

3          THE WITNESS:  Usually when I file -- I cannot

4  independently, your Honor.  But when a client comes into my

5  office and signs retainer and the notice of claim, they ask me

6  what the process is.  And I explain the process that usually I

7  have to follow.  I'm going to go forward with the federal

8  lawsuit because you have receipts here, you have the Housing

9  Court order.  Then after you do your 50-H Hearing, we'll

10 include your state law claims.

11         So those are the types of conversation that I have

12 with my clients on a regular basis.  To suggest that I would

13 not have had one with this particular client, would be

14 extremely unusual.

15 BY MR. SULLIVAN:

16 Q    But you have no specific recollection regarding this

17 particular client; isn't that correct?

18 A    Yes, that is correct.

19 Q    And --

20         (Audio interruption.)

21 Q    -- look this over to make sure it's okay, none of that,

22 right?

23 A    Like I said, no client -- very rarely does a client

24 review a copy of the complaint before it's filed.

25 Q    That's your answer, that you never did that, right?

1   A    I don't believe so, no.

2   Q    You mentioned the settlement with the five defendants.

3   Would it be correct to say, sir, that as an attorney you don't

4   have to file a lawsuit in order to settle a case with someone,

5   right?

6   A    If happens, but it has never happened in a 1983 or 1981

7   case.

8   Q    Did my client know anything about 1983 and 1981 and who

9   all the defendants were?

10  A    Well, he told me Salim Blake was one of them, Borris was

11  one of them.  Then I asked him, What do they look like?  And

12  he actually -- I asked him, Do you see post, the ad for the

13  apartment?  He said, My girlfriend or wife saw it on

14  Craigslist.  I asked for the information on the Craigslist.

15  He said he didn't have it.  We exchanged some photographs.  I

16  said, Does this look like him?  He said, Maybe, but he was of

17  West Indian descent.

18       So, I apologize, what was your question?  I'm sorry.

19  Q    You never had any discussion with him about 1983, 1981 or

20  who the culpable parties who are defendants in the lawsuit,

21  you never had any such conversation with Mr. Heaston; isn't

22  that correct?

23  A    I didn't have a conversation with him about 1981 or 1983,

24  because most people wouldn't understand that.  But I did have

25  a conversation about who we could name as possible defendants.

1   He told me the officers who arrested him, and the owner of the

2   building, and the person that he signed, the person he gave

3   the deposit to, and the realtor who was instrumental in this

4   whole deal with him, and the landlord.

5   Q    Is it your testimony that the client was telling you who

6   should be sued?

7   A    No.  But he was telling me possible people and I made the

8   determination of -- I asked him, who was the broker who did

9   this?  And he said, he didn't give me a name, but he said the

10  building is owned by Borris, and the realtor is so and so, and

11  the officers, and Salim Blake.  That was information I didn't

12  pull out of thin air.  He gave that information to me.

13  Q    He didn't know the officers names, did he?

14  A    No, neither did I until I got the sources from the city.

15  Q    You got certain discovery in the case.  Did you ever

16  share that discovery with the plaintiff?

17  A    No.

18  Q    After you turned over the file, I know you turned over

19  the file at a certain point when you withdrew.  Prior to

20  withdrawing, had you turned over any of the discovery with the

21  police reports or anything provided to you by the city to the

22  defendants?

23  A    I discussed the information that I received about the

24  wanted poster and the blinds or what the private defendant had

25  said earlier about they put the locks in.  And he gave me a

1  whole list of things that he owned that were missing from his

2  apartment and that's why he called 911 to report a burglary.

3  Q    My question, sir, is whether you turned over the

4  discovery documents that were provided to you by the city,

5  whether you turned them over to Mr. Heaston prior to giving

6  him his file when you withdrew?

7  A    I couldn't, I was still his lawyer.  But I discussed the

8  contents of what was given to me by the city with him.

9  Q    And would it be correct to say --

10           (Audio interruption.)

11           MR. SULLIVAN:  Am I back?

12           THE COURT:  Yes.

13 BY MR. SULLIVAN:

14 Q    Would it be correct to say that your main mode of

15 communicating with Mr. Heaston was to through text messages?

16 A    And by telephone.

17 Q    Are we lost again?

18 A    No.

19 Q    Hello?

20 A    I said by text message and telephone.

21           MR. SULLIVAN:  Hello?  I can't hear anything.

22           THE COURT:  Yes, I can hear you.

23           Mr. Sullivan, are you still there?

24 BY MR. SULLIVAN:

25 Q    Would it be correct, sir, that your main mode of

1  communicating with the plaintiff was through text messages?

2  A    By text messages and telephone calls.

3  Q    After you told him about these problems, rather these

4  allegations that were made, isn't it a fact that he told you,

5  sir, that you should just withdraw the case?

6  A    First I asked him for an explanation about the pictures,

7  which was turned over to me on August 3rd.  And he gave me

8  several reasons why I should not believe what the pictures

9  depict.

10          Let me finish my answer.

11          At that point, I had reason to believe that I could

12  not fully cause this action, and I filed my motion to

13  withdraw.  He may have asked me to dismiss the case.  And I

14  told him, I said, if you believe in what is right you can

15  either hire another lawyer, go to the pro bono office, or

16  continue with the lawsuit on your own.  But I cannot give you

17  any legal advice because my application to withdraw is

18  pending.  I don't know if I told him in such words, but.

19  Q    But he gave you permission to withdraw the case, but you

20  told him you couldn't do it, correct?

21  A    That's not true.

22  Q    Okay, what did you tell him?

23  A    My application to withdraw was pending so I could not act

24  on his behalf while I had issues, I had reason to believe that

25  I may not have been -- I don't know how to answer that

1  question, Judge.

2  Q    Let me ask it another way first.

3        Is it correct to say that he asked you to withdraw

4  the case because he thought it was inappropriate because you

5  were asking to withdraw as attorney?

6  A    That's not true.

7  Q    Isn't it a fact that he told you to withdraw the case?

8  A    That's after I filed my motion to withdraw.  And I think

9  after the judge granted my motion to withdraw.

10  Q    And is that the subject of text messages?  Is that how

11  that was communicated?

12  A    I believe so, yes.

13  Q    So you would have the exact date on your phone as to when

14  he asked you to withdraw the case; isn't that correct?

15  A    Yes, I think so.

16  Q    You didn't happen to erase those text messages, have you?

17  A    No.

18  Q    When you met with the plaintiff for the first time, when

19  you decided to accept this case for prosecution, did he show

20  you a letter from the Queens District Attorney's Office

21  indicating that they were dismissing the case?

22  A    I believe that was one of the documents that I saw the

23  first time I met him, yes.

24  Q    What was the significance of that document to your

25  decision whether to take this case or not?

1  A     Well, it was significant issue because if the DA had

2  prosecuted him or indicted him it would have created a

3  presumption of probable cause and it would have made the case

4  a little more difficult.  The fact that the DA dismissed it

5  led me believe that the charge he was arrested for were false.

6  Q     The lawsuit, was for the false arrest that occurred that

7  day based on that letter from the DA's office?

8  A     Yes, but I should clarify for the record, the initial

9  complaint had contained mal-pros and denial of right to a fair

10  trial.  After it was brought to my attention, not from the

11  client but from the city, that there was no prosecution, and

12  there was no denial of right to a fair trial, then I believe

13  either the first or second amended complaint, those causes of

14  action were withdrawn.  So to answer your question, false

15  arrest, yes.

16              (Continued on the next page.)

17

18

19

20

21

22

23

24

25

1          (Via videoconference.)

2     CROSS-EXAMINATION

3     BY MR. SULLIVAN (continuing):

4     Q    By false arrest, it was meant so -- at the point where

5     you called the plaintiff did you know the reasons why

6     plaintiff had been arrested?

7     A    I'm sorry.  Did I know?  Could you repeat your question,

8     please.

9     Q    At the time you met with the plaintiff for the first

10    time, did you know the basis of the arrest?

11         Did he know why he was arrested or what the legal

12    charges were against him?

13    A    No.  The first time I met plaintiff, he said that he was

14    just going back to his apartment with his family, and he

15    called 911 because his property was missing and the cops came

16    and arrested him.  So I don't think he knew why he was being

17    arrested.

18    Q    And you said you were shown certain photographs in

19    discovery, and it was your opinion that the person depicted in

20    that photograph depicted a black male but did not appear to be

21    the plaintiff; is that correct?

22    A    Look, I don't want to put myself in a difficult position,

23    not because of your questions, but it was the nature -- it was

24    hard for me to decipher who the individual was on those

25    camera -- I guess a screen shot from a video.

1   Q    So it was not clear to you at that point, from looking at

2   that photograph, you didn't form the opinion that that was the

3   plaintiff; is that correct?

4   A    It's still not clear to me.

5          THE COURT:  Okay.  Let's move this along,

6   Mr. Sullivan.

7          MR. SULLIVAN:  I'm almost done.

8          THE COURT:  Okay.

9          (Pause.)

10          MR. SULLIVAN:  I have nothing further, Your Honor.

11          THE COURT:  Thank you, Mr. Sullivan.

12          Mr. Pawar, I just have a few very focused questions

13   for you.

14          THE WITNESS:  Yes, judge.

15          THE COURT:  You said you talked with Mr. Heaston for

16   about a half an hour the first time you met.  Is that right?

17          THE WITNESS:  Judge, I believe my testimony was

18   between a half hour to an hour.

19          THE COURT:  Okay.  And as best you recall, what

20   exactly did Mr. Heaston tell you about the circumstances that

21   led to his arrest?

22          THE WITNESS:  That he had -- judge, if you just give

23   me a moment to jog my memory.

24          He said he had rented the place and he had receipts

25   and he had got the place from -- from -- from -- excuse me --

1    information from Craig's List and that he had paid all this

2    money and that the first time he went the landlord had locked

3    him out.  So, and he had family and kids with him.  And I felt

4    really bad.  I really did.

5            Then he said that the next time the situation

6    happened, they had changed the locks on him -- no.  They

7    changed the locks on him the first time.  I don't know how he

8    got possession of the property again.  I don't know if he got

9    a locksmith or not, but he gained possession of the property

10   again.

11           And then I remember him saying and then I went back

12   to the place -- I believe it may have been April 29, Your

13   Honor -- and he said that the place had been burglarized and

14   my wife and my kids were out on the street crying.

15           Actually, no -- yeah -- no -- no.  I apologize,

16   judge.

17           So after the second time he was locked out, he went

18   to family court and he got the order; and then the third time

19   he went there, he went inside and found that a bunch of his

20   belongings were missing.  So he told me that he called 911 and

21   when the police arrived he showed them the order from the

22   family court and -- I'm sorry, the housing court -- and then

23   the police arrested him anyway.  I felt this was a massive

24   miscarriage of justice.

25           So I thought this was a very good case and I signed

1  him up.

2          THE COURT:  Okay.  Now, attached to the second

3  amended complaint was this housing order and then some

4  receipts.

5          THE WITNESS:  Yes.

6          THE COURT:  When did Mr. Heaston give you those

7  documents?

8          THE WITNESS:  I believe they were -- I believe they

9  were --

10          THE COURT:  Hang on.  Let me back up.

11          Did he give you any documents the first time you

12  met?

13          THE WITNESS:  Absolutely.  He came with the other

14  attorney with documents with him, yes.

15          THE COURT:  Which ones, if you recall?

16          THE WITNESS:  I believe it was the -- the housing

17  court, the housing court order and the receipts.

18          THE COURT:  Okay.  The receipts were supposedly from

19  Borris, Inc., showing he had paid a security deposit and first

20  month's rent?

21          THE WITNESS:  Yes.  And I believe, judge, he also

22  showed me a lease with his name on it for two years.  Then for

23  the second or third month, which really bothered me at the

24  time, that this could happen to someone.

25          THE COURT:  Okay.  Now, if I'm not mistaken --

1          THE WITNESS:  I apologize.  I didn't realize my

2     thought process at the time, but that's what I was thinking,

3     was that this guy has two years of lease and he keeps getting

4     arrested and he's got an order from the court.

5          THE COURT:  Actually your internal thoughts are

6     relevant because, of course, you are being accused of having

7     violated your duty of care in this case.

8          Correct me if I'm wrong, but I don't believe you

9     attached any of the documents that we just discussed, the

10    housing court order, the receipts, or any lease to the first

11    complaint.  Is that correct?

12         THE WITNESS:  That is correct, judge.

13         THE COURT:  And is there a reason why?

14         THE WITNESS:  Judge, if I can just look at my file

15    and look at the initial complaint that I filed, I will tell

16    you.

17         THE COURT:  Let me just say this.  The records speak

18    for themselves.  I can tell you that, based on the docket,

19    there aren't any documents attached to the original complaint

20    and the first amended complaint.

21         I just wanted to know if you recall -- and, if you

22    don't, say so -- why you didn't attach those documents the

23    first time around.

24         THE WITNESS:  I don't know, but I do know that I did

25    have a copy of the New York City court's order because I

1  mentioned it in paragraph 19.

2          THE COURT:  All right.  You didn't just take that on

3  face value.  You actually recall having the physical order?

4          THE WITNESS:  Yes, judge.

5          THE COURT:  All right.  One last question, then.

6  You mentioned that eventually you decided that you could not

7  represent -- did not feel comfortable representing Mr. Heaston

8  any more, and that decision came about or was prompted by the

9  photographs sent to you that purport to be from Salim,

10  S-A-L-I-M -- I'm sorry, now I have forgotten the last name.

11          THE WITNESS:  Blake.

12          THE COURT:  I'm sorry?

13          THE WITNESS:  Blake.

14          THE COURT:  Yes, Blake.  I'm sorry.  Salim Blake,

15  one of the original defendants.  Was the fact that -- or let

16  me figure out how to phrase this correctly.

17          Was your concern that the photographs you received

18  seem to show your client, Mr. Heaston, with Salim Blake in a

19  very comfortable and friendly manner, and you didn't feel like

20  Mr. Heaston's answers about the photos allayed the concerns

21  you had?

22          THE WITNESS:  Absolutely, and quite the contrary,

23  judge.  He was coming up with reasons as to why I should not

24  believe that those photographs were authentic; but I didn't

25  feel comfortable with his explanation.

1          THE COURT:  Did you come to suspect or worry that

2     Mr. Heaston and Mr. Blake had a close relationship at the time

3     this case was brought to you?

4          THE WITNESS:  Judge, I was -- Your Honor wants to

5     know the state of my mind.  I thought I was taking on a noble

6     cause, to take on a case, and that I wasted all this time; and

7     I came to believe that it's not something that I signed up

8     for, and I think it was time for me to be not part of the

9     case.

10          I had advised -- and I had advised Mr. Heaston that

11     if you lie you could be subject to perjury, but if you are

12     telling the truth then you should let the judge know about all

13     these conspiracy theories that you are telling me, but I don't

14     feel comfortable going forward with this.

15          THE COURT:  Remind me.  The original complaint

16     alleged that Salim Blake was responsible for what, though, for

17     which he was liable in the lawsuit?

18          THE WITNESS:  I'm looking up, judge.

19          THE COURT:  You know what.  I will look at the

20     document.  We don't need to waste any time with that.

21          THE WITNESS:  Yeah.  It says, on paragraph seven, it

22     says, Defendants Borris, Inc., Salim Blake, and Jane, in

23     quotations, Blake, quotations, private defendants, are, upon

24     information and belief, a New York corporation or otherwise

25     residents of the State of New York.

1          THE COURT:  Right, but I wasn't sure what exactly

2     they had done.  Were they responsible supposedly for keeping

3     him -- so Mr. Blake was supposedly the landlord, I guess.

4          THE WITNESS:  Right, which he had the receipt for

5     Borris, Inc., but then signed by Salim or someone Blake.

6          THE COURT:  And that's the document you attached to

7     the second amended complaint, I believe?

8          THE WITNESS:  That's correct, judge.

9          THE COURT:  Thank you very much.  Those are the

10    questions I had.

11         Very quickly, Mr. Sundaran, do you have any

12    follow-up based on what I have just asked?

13         MR. SUNDARAN:  Very quickly, Your Honor.

14    REDIRECT EXAMINATION

15    BY MR. SUNDARAN:

16    Q    Mr. Pawar, did --

17         MR. SUNDARAN:  Ms. Shin, if you could put up

18    Defendants' 50-H (SIC), Exhibit 2.  It's the cover page.

19         (Published.)

20    Q    Mr. Pawar, do you recognize this as the 50-H transcript

21    for plaintiff on November 13, 2019?

22    A    Yeah.  That's the first page, and I think there are other

23    pages, but, yes.

24         MR. SUNDARAN:  Okay.  Ms. Shin, can you go to

25    Defendants' A, please.

1           (Published.)

2    Q    Do you recognize this as the initial complaint filed on

3    October 2, 2019, a month earlier?

4    A    Yes, yes.

5           MR. SUNDARAN:  Ms. Shin, can you go to Exhibit B,

6    please.

7           (Published.)

8    Q    Mr. Pawar, do you recognize this as the first amended

9    complaint you filed on October 9, 2019, also a month earlier

10   to the 50-H?

11   A    Yes, yes.

12   Q    Was plaintiff aware that an original complaint or first

13   amended complaint had been filed at the time that he sat for

14   his 50-H hearing?

15   A    Honestly, I don't know.  I mean, he should have been.

16   Q    Sir, did you tell him that you filed two complaints on

17   his behalf prior to him sitting for his 50-H?

18   A    I wasn't present at his 50-H, but I don't know.  I don't

19   know.

20   Q    Mr. Pawar, do you understand the difference, as a

21   practicing attorney, the difference between probable cause to

22   arrest and probable cause to prosecute?

23   A    Yes.

24   Q    And defendants filed a sanctions motion against you as

25   well.  Were you aware of that?

1  A    I am today.

2  Q    And is there a reason why you didn't file any opposition?

3  A    Because the court's ruling was you withdraw within 21

4  days the offending pleading, which, I take it, happened; and I

5  withdrew from the lawsuit.

6         So, I mean, are you accusing me of violating

7  Rule 11?  I suppose you are, but I don't suppose there is

8  anything else I could have done and, therefore, the

9  information I had at the time I filed these complaints.

10 Q    You withdrew as counsel, not the complaint, correct?

11 A    Well, from what I understand the lawsuit was dismissed

12 with prejudice.

13 Q    You withdrew yourself as counsel, not the complaint,

14 correct?

15 A    I did not withdraw the complaint, correct.

16         MR. SUNDARAN:  Nothing further, Your Honor.

17         THE COURT:  Mr. Sullivan, anything else from you?

18 RECROSS-EXAMINATION

19 BY MR. SULLIVAN:

20 Q    Sir, in the later stages of the proceedings, after he

21 told you about seeing the lawsuit and in between the docket

22 sheet he sent you, did he also send you messages indicating

23 that he was having -- that there was animosity between himself

24 and Margaret Kirkland?  Is that correct?

25 A    I don't know her name, but I know he was sending me

1  messages about him having animosity with his mother-in-law,

2  yes.

3  Q    Did you see messages that he sent you indicating that she

4  was going to destroy him?

5  A    I got something along those lines, yes.

6           MR. SULLIVAN:  I have nothing further.

7           THE COURT:  Okay.  Thank you.  Now let's address the

8  procedural question.

9           Mr. Pawar, you are free to go.  Thank you very much.

10          THE WITNESS:  Judge, may I just ask Your Honor for

11  one indulgence?

12          THE COURT:  Yes.  What's that?

13          THE WITNESS:  If Your Honor wants me to submit

14  something in the Rule 11 sanctions, I will be happy to do it.

15          THE COURT:  Well, the only question, I suppose, is

16  whether or not it would be worthwhile to get your text

17  messages with Mr. Heaston, which might show the chronology of

18  events, as well as a document that you testified to in terms

19  of notifying Mr. Heaston as to the various stages of his

20  lawsuit starting from the filing of the complaint onward.

21          Have you actually kept all of your texts with

22  Mr. Heaston, as best you recall?

23          THE WITNESS:  I believe I do, judge, but I wanted to

24  address Mr. Sundaran's question, and just may I address.

25          When I file a complaint in federal court, whether

1    it's a personal complaint -- an initial complaint, the first

2    amended complaint, or the second amended complaint -- either I

3    have explicit or expressed knowledge and directions from my

4    client before I do that.  I don't just go around filing

5    complaints without letting the client know that a lawsuit is

6    filed.

7            I have hundreds of these lawsuits going on at any

8    time.  Actually, not hundreds, maybe 10, 15; and the client

9    knows that I'm filing a lawsuit.  It's not something that I'm

10   doing behind the client's back.

11           THE COURT:  Understood.  I understand that's your

12   position, and fair enough.

13           It also sounds like the reason you didn't respond to

14   the sanctions motion is that you stopped monitoring the docket

15   after you withdrew.

16           THE WITNESS:  Yeah, but I must say, I was getting

17   e-mails from the City Law Department attaching the motion and

18   addressing -- I do remember seeing something that, since I

19   filed an opposition I should be considered in default and I

20   should be sanctioned for my conduct.

21           THE COURT:  All right.  Let me hear from the

22   defendants' attorney about what happens next, because I have

23   enough information, I think, to resolve these motions, this

24   motion.  I don't think I need to hear from the detective.  I'm

25   not sure what it would add exactly.

1          To me, it comes down to did Mr. Heaston mislead his

2   attorney and provide false information to him that led

3   Mr. Pawar to file what turned out to be -- fairly clearly to

4   me to be -- a fraudulent complaint, in that it's based on a

5   fraudulently obtained housing court order and false claims of

6   a right to live in or access the premises in question.

7          Then, there is the issue of did Mr. Pawar fail to

8   carry out his duty.

9          It's clear the City is arguing to independently

10  verify this information or later respond when contrary

11  information surfaced and was provided to Mr. Pawar.  Beyond

12  that, I don't see -- rather, I see that as a focus of the

13  motion for sanctions.  And I don't know if the detective's

14  testimony would add anything to that.

15         So I don't want to prolong or keep the hearing open,

16  and I'm prepared to take this under advisement and simply rule

17  based on what I have already heard and the prior submissions

18  of the parties.

19         So let me hear first from defense counsel.

20         MR. SUNDARAN:  Yes, Your Honor.  Raju Sundaran.

21         Just before I respond, two quick questions.  I just

22  want to make sure that Exhibits O and Q have been admitted

23  into evidence.  That's the notice of claim and the 50-H

24  transcript.

25         THE COURT:  Yes, they were.

1          MR. SUNDARAN:  Okay, okay.  Your Honor, the only

2     reason that we intended to proffer Detective Portillo is that

3     the standard for the inherent powers of the court to sanction

4     a litigant include whether or not the plaintiff or the

5     litigant had any colorable basis for his claims.  What we were

6     going to proffer Detective Portillo for was to lay out the

7     foundation for the PC for the arrest, which Mr. Sullivan has

8     now raised as an issue, saying that they didn't have probable

9     cause because the D.A. dismissed it.

10          That would be our only reason to have Portillo

11    testify, basically to lay out the fact that he had probable

12    cause for the arrest, based on statements by complaining

13    victims.

14          THE COURT:  Right, but I'm not sure I understand

15    that.  The plaintiff went to Mr. Pawar, as I understand it,

16    and said, here is what happened.

17          MR. SUNDARAN:  Right.

18          THE COURT:  I think at this point it's clear to me

19    that that was all false; but he reportedly said I have legal

20    possession of this apartment, I have been locked out, I called

21    the police on April 26, 2019, or called 911, and the police

22    showed up and arrested me instead of helping me gain access to

23    my apartment.

24          So the claim that Mr. Pawar alleged in the complaint

25    is that there was no probable cause.  But that may not be the

1    case, based on further discovery or other evidence that would

2    be brought to bear in this case.  Namely, maybe that the

3    officers really had probable cause because they knew this

4    whole thing was a scam or they believed that Mr. Heaston had

5    burglarized the apartment before.  That doesn't make

6    Mr. Pawar's conduct violate Rule 11, nor do I think it

7    supports my inherent authority to find Mr. Pawar did anything

8    wrong.

9             The allegations he put into the complaint were

10   based -- and I should credit this testimony today -- upon the

11   plaintiff's allegations.  There is always another side to the

12   story; and, obviously, that's what the defense would have

13   brought out, which was that there was probable cause based on

14   other evidence that Mr. Pawar was unaware of at the time he

15   filed the complaint.

16            So I'm not sure that it will probably change things

17   much for me to know that in fact the officers had probable

18   cause for the arrest.  The question becomes:  How would

19   Mr. Pawar have known any of this information?

20            MR. SUNDARAN:  I accept, Your Honor.  We will

21   dispense with the detective's testimony.

22            THE COURT:  Okay.  And certainly you can make an

23   argument, if you think I'm wrong.  I mean, I guess the

24   question is -- I mean, I would prefer just to reserve on this

25   and rule.  As I said, it's been briefed and, I think, the

1  facts, the relevant facts, have been elicited.

2          So, unless anyone objects, that's my proposal.  I

3  don't think we need to convene any further evidentiary

4  hearing.

5          MR. SULLIVAN:  May I respond, judge?

6          THE COURT:  Yes, Mr. Sullivan.

7          MR. SULLIVAN:  So somehow --

8          THE COURT REPORTER:  I'm having a difficult time

9  hearing Mr. Sullivan.

10          THE COURT:  Let's do this.  Given your technical

11  difficulties, Mr. Sullivan, really we can't go on this way

12  anymore.

13          The parties will have the opportunity to submit one

14  final -- if you want to call it a closing statement or

15  argument, where you put together both the law and the facts

16  that you believe have been established through this hearing.

17  I don't want to have oral argument.  That would be torturous

18  for everybody, because, Mr. Sullivan, your video connection is

19  awful.  It would be easier, it wouldn't disadvantage you, but

20  you will have your say.

21          Why don't the parties in two weeks submit any kind

22  of final argument or proposed findings of fact, if you want to

23  do it that way; and I will then rule after I get the benefit

24  of both sides' final briefing on this, in the vein of a

25  summation, if you will, but let's do that in writing.

1          So two weeks from now is the 19th of October.  So

2     how about you have your submission filed by then.  You can put

3     it in letter form or brief form.  I'm indifferent on this.

4               MR. PAWAR:  Judge, may I be excused?

5               THE COURT:  Yes, Mr. Pawar.  You are excused.  Thank

6     you very much.

7               MR. PAWAR:  Thank you.

8               THE COURT:  Okay.  All right.  I have to go because,

9     as it is now, I'm already late for this other appointment.  So

10    let me go, and, if there are any other questions, submit

11    something in writing.

12              MR. SUNDARAN:  Thank you, Your Honor.

13              THE COURT:  Thank you, everyone.

14              MR. SULLIVAN:  All right.

15              (Proceedings concluded.)

16

17                          --oo0oo--

18

19

20

21

22

23     *I (we) certify that the foregoing is a correct transcript*
       *from the record of proceedings in the above-entitled matter.*

24

25      */s/ David R. Roy*                    *October 13, 2020*
        *DAVID R. ROY*                        *Date*

*Michele Nardone, CSR, CRR  -  Official Court Reporter*

## *W I T N E S S E S*

### I R A   H E A S T O N

DIRECT EXAMINATION
BY MR. SUNDARAN                                    24

CROSS-EXAMINATION
BY MR. SULLIVAN                                    71

REDIRECT EXAMINATION
BY MR. SUNDARAN                                    86


### V Y A C H E S L A V   K A N D K H O R O V

DIRECT EXAMINATION
BY MR. SUNDARAN                                    90

CROSS-EXAMINATION
BY MR. SULLIVAN                                    103

REDIRECT EXAMINATION
BY MR. SUNDARAN                                    108

RECROSS EXAMINATION
BY MR. SULLIVAN                                    109


### E D N A   D A V O U D I

DIRECT EXAMINATION
BY MS. SHIN                                        112

CROSS-EXAMINATION
BY MR. SULLIVAN                                    130

W I T N E S S E S (Continued)


V I K R A N T   P A W A R

DIRECT EXAMINATION
BY MR. SUNDARAN                                136

CROSS-EXAMINATION
BY MR. SULLIVAN                                182

REDIRECT EXAMINATION
BY MR. SUNDARAN                                207

RECROSS-EXAMINATION
BY MR. SULLIVAN                                209


E X H I B I T S

Defendants' Exhibits A, B, C, D, E, F, G, H, I,
J, K, and Q                                    46

Defendants' Exhibit O                          60

Defendants' Exhibit T                          92

Defendants' Exhibit U                          94

Defendants' Exhibit V                          96

Defendants' Exhibit W                          101

## $

**$2,000** [7] - 33:10, 33:12, 33:14, 35:2, 77:8, 87:21
**$2,650** [3] - 35:5, 35:9, 35:17
**$3,000** [2] - 77:1, 77:6
**$500** [1] - 138:5

## /

**/s** [1] - 216:24

## 0

**038106492** [1] - 59:8

## 1

**1** [12] - 63:3, 63:14, 76:19, 100:4, 100:14, 100:17, 100:23, 116:1, 124:1, 124:2, 140:19, 160:16
**1-2** [2] - 1:7, 1:20
**10** [5] - 60:17, 128:18, 146:15, 158:12, 211:8
**100** [2] - 1:19, 126:9
**10007** [1] - 1:19
**101** [1] - 218:20
**103** [1] - 217:14
**108** [1] - 217:16
**1080** [1] - 1:15
**109** [1] - 217:17
**11** [9] - 13:15, 14:2, 153:24, 158:12, 170:2, 170:8, 209:7, 210:14, 214:6
**112** [1] - 217:21
**11201** [1] - 2:4
**11415** [1] - 1:24
**11550** [1] - 1:16
**12** [1] - 147:4
**13** [5] - 43:25, 65:9, 147:7, 207:21, 216:24
**130** [1] - 217:23
**132** [1] - 138:9
**136** [1] - 218:6
**13th** [5] - 46:24, 143:19, 144:6, 144:17, 145:5
**14** [2] - 129:18, 147:10
**14th** [1] - 143:10
**15** [11] - 30:18, 41:13, 55:12, 110:9, 128:24, 128:25, 146:23, 147:13, 151:13, 211:8
**16** [1] - 147:16
**17** [3] - 99:23, 99:24, 147:19
**17-CV-931** [1] - 138:12
**17th** [5] - 99:25, 125:5, 166:8, 166:13, 166:16
**18** [2] - 136:14, 147:22
**181** [1] - 138:13
**182** [1] - 218:8
**19** [3] - 136:14, 147:25, 205:1
**19-CV-5569** [2] - 1:3, 2:16
**1981** [5] - 16:11, 194:6, 194:8, 194:19, 194:23
**1983** [5] - 137:11, 194:6, 194:8, 194:19,

194:23
**19th** [1] - 216:1
**1:00** [2] - 1:8, 163:5
**1st** [4] - 96:18, 106:5, 115:14, 125:5

## 2

**2** [11] - 9:10, 9:23, 9:24, 60:25, 77:20, 77:24, 124:1, 124:3, 130:10, 207:18, 208:3
**2,550** [1] - 101:3
**20** [4] - 96:5, 110:9, 148:3, 150:19
**200** [1] - 1:16
**2003** [2] - 137:1, 137:3
**2017** [7] - 90:18, 92:18, 94:9, 96:10, 113:24, 114:16, 150:16
**2018** [7] - 92:21, 93:5, 100:4, 100:13, 100:14, 106:3, 106:4
**2019** [84] - 11:14, 12:12, 29:22, 29:23, 30:7, 30:8, 31:8, 31:16, 31:21, 33:25, 34:5, 34:10, 35:6, 35:9, 35:12, 35:16, 43:16, 43:18, 43:25, 46:25, 47:1, 47:14, 47:21, 50:6, 59:19, 65:10, 65:12, 65:16, 93:25, 94:1, 94:6, 94:10, 94:11, 96:11, 96:18, 99:23, 99:24, 100:12, 100:15, 100:17, 100:24, 107:20, 107:22, 108:18, 108:20, 109:5, 115:15, 116:1, 116:10, 116:15, 117:6, 118:20, 119:17, 123:20, 125:6, 128:24, 129:6, 130:2, 130:10, 138:14, 139:4, 141:19, 143:1, 143:18, 143:19, 144:6, 144:17, 144:24, 145:2, 145:5, 146:9, 146:23, 149:6, 150:12, 150:24, 151:3, 151:13, 162:17, 186:20, 207:21, 208:3, 208:9, 213:21
**2020** [30] - 1:8, 39:24, 43:19, 43:22, 100:7, 100:19, 100:24, 138:23, 156:21, 157:3, 157:11, 161:7, 161:19, 161:23, 165:3, 165:13, 165:19, 166:16, 170:25, 174:21, 175:7, 175:8, 175:22, 176:22, 177:1, 190:25, 191:19, 192:2, 192:22, 216:24
**2021** [2] - 128:25, 146:23
**207** [1] - 218:9
**209** [1] - 218:11
**20th** [2] - 138:13, 161:23
**21** [3] - 148:6, 148:11, 209:3
**22** [1] - 148:13
**225** [1] - 2:3
**23** [4] - 148:14, 190:24, 190:25, 191:19
**23rd** [1] - 151:13
**24** [5] - 148:16, 148:18, 158:15, 158:17, 217:6
**24th** [1] - 143:1
**25** [1] - 76:6
**26** [14] - 12:12, 31:8, 31:16, 31:21, 47:1, 47:14, 47:20, 50:6, 50:12, 107:20, 107:22, 108:20, 120:9, 213:21
**2650** [1] - 35:13
**26th** [4] - 44:12, 130:10, 139:8, 160:24
**27** [1] - 120:9
**28** [5] - 93:5, 93:25, 94:1, 150:24,

162:17
**28th** [1] - 94:1
**29** [1] - 202:12
**29th** [5] - 20:19, 161:6, 161:19, 161:23, 165:3
**2:00** [2] - 9:4, 186:20
**2:05** [3] - 8:6, 8:7, 9:3
**2:20** [1] - 8:11
**2:30** [1] - 42:8
**2:45** [3] - 41:20, 55:16, 81:13
**2nd** [3] - 43:16, 141:19, 144:23

## 3

**3** [6] - 55:20, 56:3, 92:21, 124:1, 124:4, 144:6
**30** [2] - 76:6, 183:12
**300** [1] - 137:16
**30th** [4] - 100:7, 100:15, 100:19, 100:24
**3:15** [1] - 73:10
**3rd** [9] - 92:18, 118:22, 150:16, 170:25, 172:12, 174:21, 176:11, 179:15, 197:7

## 4

**4** [6] - 108:18, 117:6, 118:20, 124:4, 140:6, 140:7
**42** [2] - 159:3, 159:5
**43** [1] - 160:6
**46** [1] - 218:15
**4:30** [1] - 133:18
**4th** [5] - 116:10, 119:17, 129:6, 151:3, 151:7

## 5

**5** [1] - 1:8
**50** [2] - 185:20, 190:11
**50-H** [32] - 65:6, 65:9, 65:19, 141:23, 141:25, 142:25, 143:9, 143:13, 143:17, 144:8, 144:11, 144:13, 144:17, 145:4, 156:21, 185:10, 185:15, 185:16, 185:18, 185:19, 185:21, 185:25, 190:10, 191:23, 193:9, 207:18, 207:20, 208:10, 208:14, 208:17, 208:18, 212:23
**50-h** [8] - 43:25, 44:18, 44:24, 45:3, 45:8, 45:13, 46:16, 46:24
**50H** [1] - 191:25
**571-353-2300** [1] - 59:8
**5th** [3] - 106:6, 116:12, 116:15

## 6

**6** [1] - 138:23
**60** [1] - 218:16
**600** [1] - 1:23
**6th** [1] - 173:6

## 7

**71** [1] - 217:7
**7:30** [1] - 129:6

**7th** [1] - 165:13

## 8

**8** [2] - 59:19, 184:22
**80** [1] - 39:8
**80-02** [1] - 1:23
**84** [1] - 75:1
**84-21** [73] - 25:4, 29:22, 30:13, 31:8,
  31:12, 31:18, 34:4, 35:3, 35:7, 35:10,
  35:14, 35:18, 36:5, 44:25, 47:15,
  49:20, 49:23, 50:9, 50:14, 50:17,
  68:14, 75:2, 75:9, 81:21, 82:9, 83:25,
  84:12, 84:16, 85:11, 85:23, 90:19,
  90:23, 91:25, 92:10, 93:4, 93:22, 96:4,
  99:7, 101:13, 101:16, 102:14, 102:19,
  103:15, 103:20, 104:1, 107:7, 108:18,
  108:21, 113:7, 113:11, 114:1, 114:9,
  115:4, 124:10, 124:14, 126:5, 126:7,
  127:8, 128:21, 146:17, 148:23, 149:1,
  150:15, 150:23, 151:19, 152:8,
  152:12, 152:17, 153:22, 162:6,
  165:22, 181:9, 181:11
**84-24** [1] - 125:19
**86** [1] - 217:9
**8th** [2] - 139:4, 165:19

## 9

**9** [2] - 43:18, 208:9
**90** [1] - 217:13
**911** [6] - 167:16, 168:14, 196:2, 200:15,
  202:20, 213:21
**92** [1] - 218:17
**94** [1] - 218:18
**96** [1] - 218:19
**9th** [11] - 43:19, 43:22, 130:2, 143:18,
  143:21, 145:2, 146:9, 149:6, 156:21,
  157:3, 157:11

## A

**a.m** [1] - 81:13
**abandoned** [2] - 132:13, 133:1
**abbreviate** [1] - 34:13
**ability** [1] - 11:2
**able** [4] - 7:1, 53:12, 56:18, 105:11
**above-entitled** [1] - 216:23
**Absolutely** [15] - 128:9, 128:23, 129:1,
  129:5, 130:1, 130:7, 130:9, 131:7,
  131:18, 141:21, 145:11, 146:19,
  149:4, 203:13, 205:22
**absolutely** [9] - 39:3, 42:9, 125:12,
  125:20, 157:2, 167:7, 167:20, 172:19,
  184:6
**absolve** [1] - 162:13
**abundantly** [1] - 69:14
**abused** [1] - 164:6
**accept** [5] - 25:11, 134:10, 149:25,
  198:19, 214:20
**acceptable** [1] - 133:7
**accepted** [1] - 65:18
**access** [6] - 2:20, 59:8, 98:22, 129:11,

212:6, 213:22
**accident** [1] - 59:13
**According** [3] - 68:25, 69:2, 69:17
**according** [6] - 69:1, 69:15, 81:8, 124:1,
  174:13
**account** [2] - 77:14, 77:15
**accused** [1] - 204:6
**accusing** [3] - 164:3, 164:9, 209:6
**ACRIS** [4] - 152:8, 152:11, 152:18,
  152:23
**ACS** [1] - 191:9
**act** [1] - 113:4, 171:15, 197:23
**action** [12] - 12:6, 19:18, 25:12, 25:17,
  27:18, 33:24, 36:5, 140:24, 178:18,
  186:16, 197:12, 199:14
**actions** [2] - 13:17, 29:1
**actual** [5] - 15:11, 20:23, 69:24, 143:24,
  144:5
**ad** [1] - 194:12
**add** [2] - 211:25, 212:14
**added** [1] - 167:21
**addition** [1] - 160:23
**additional** [2] - 165:16, 165:20
**address** [20] - 6:5, 6:7, 10:15, 77:3,
  80:25, 82:12, 87:13, 87:14, 87:15,
  87:17, 90:20, 152:7, 152:22, 153:21,
  154:10, 154:13, 192:19, 210:7, 210:24
**addressed** [1] - 142:25
**addressing** [1] - 211:18
**adjourn** [1] - 134:11
**adjourned** [1] - 143:25
**adjournment** [3] - 143:9, 143:17, 143:20
**adjudicate** [1] - 11:3
**adjust** [2] - 140:23, 141:12
**admission** [1] - 58:3
**admissions** [1] - 136:20
**admit** [2] - 19:6, 19:10
**admitted** [11] - 6:17, 46:19, 57:25,
  60:12, 92:14, 94:15, 95:25, 101:9,
  136:21, 137:4, 212:22
**admonish** [1] - 164:7
**adversarial** [1] - 167:6
**adversary's** [1] - 167:11
**advice** [28] - 24:12, 24:17, 24:22, 25:1,
  25:5, 25:9, 25:14, 25:19, 29:6, 29:18,
  29:24, 30:4, 30:9, 31:9, 31:14, 31:19,
  31:23, 32:2, 34:1, 34:6, 34:11, 45:1,
  45:6, 52:16, 175:9, 175:23, 176:18,
  197:17
**advise** [5] - 50:16, 52:22, 78:5, 174:25,
  175:3
**advised** [8] - 27:20, 51:6, 51:10, 78:2,
  80:3, 173:14, 206:10
**advisement** [1] - 212:16
**advising** [1] - 52:14
**advocates** [1] - 26:11
**affect** [2] - 6:9, 7:17
**affected** [1] - 187:7
**affects** [1] - 155:10
**affidavit** [7] - 6:24, 16:15, 16:17, 17:4,
  17:6, 34:8, 68:16, 68:19, 69:17, 74:23,

75:8, 81:8, 86:22, 87:1, 87:6, 134:10,
  177:13, 177:17, 177:19, 178:14,
  178:17, 179:3
**affidavits** [3] - 162:4, 181:24, 182:3
**afraid** [2] - 187:8, 187:9
**African** [5] - 165:6, 167:15, 168:13,
  168:14, 168:20
**African-American** [5] - 165:6, 167:15,
  168:13, 168:14, 168:20
**afternoon** [8] - 4:11, 4:13, 4:14, 4:18,
  5:12, 24:9, 24:10, 90:12
**afterwards** [1] - 39:5
**agent** [4] - 113:4, 113:10, 154:4, 167:17
**agents** [1] - 115:22
**ago** [3] - 12:21, 81:4, 98:1
**agree** [10] - 95:2, 144:24, 144:25, 145:2,
  145:3, 145:4, 158:21, 160:21, 164:18
**agreed** [1] - 20:20
**agreement** [4] - 45:4, 184:25, 185:2,
  185:4
**agreements** [2] - 155:19, 155:20
**ahead** [57] - 6:13, 7:10, 10:11, 12:2,
  23:16, 31:3, 32:6, 33:5, 34:17, 51:14,
  53:2, 53:10, 55:15, 59:1, 59:6, 59:8,
  59:9, 61:7, 61:16, 62:12, 64:1, 66:18,
  71:20, 72:11, 73:13, 73:15, 73:19,
  73:23, 75:7, 75:24, 88:18, 88:23, 89:1,
  89:4, 89:23, 91:20, 95:22, 96:17,
  96:25, 98:25, 99:3, 102:4, 104:18,
  110:5, 110:16, 112:9, 118:7, 121:6,
  135:16, 142:20, 142:21, 163:7, 164:2,
  167:1, 178:24
**aid** [1] - 167:16
**air** [1] - 195:12
**al** [1] - 2:17
**alarm** [20] - 106:12, 106:25, 109:21,
  110:2, 110:8, 115:1, 115:2, 115:5,
  116:5, 116:12, 116:20, 116:25, 117:2,
  117:11, 117:12, 118:25, 119:3, 124:5
**Alex** [5] - 121:20, 122:22, 154:11, 155:9,
  172:22
**Alexander** [1] - 4:19
**ALEXANDER** [1] - 1:24
**aliases** [1] - 24:11
**Alison** [1] - 138:12
**allayed** [1] - 205:20
**allegation** [2] - 142:11, 167:9
**allegations** [17] - 17:8, 18:13, 19:16,
  20:8, 20:9, 27:18, 78:2, 78:5, 145:12,
  145:17, 157:1, 158:22, 166:21, 170:5,
  197:4, 214:9, 214:11
**allege** [2] - 46:25, 59:16
**alleged** [4] - 47:5, 47:7, 139:23, 153:5,
  206:16, 213:24
**alleging** [2] - 15:8, 69:7
**allow** [3] - 11:9, 16:9, 28:11
**allowed** [4] - 52:22, 129:10, 130:4,
  178:21
**almost** [4] - 114:19, 183:21, 201:7
**Alternatively** [1] - 134:15
**Alzheimer's** [1] - 132:14

**Amended** [23] - 12:8, 21:4, 25:22, 28:6, 29:2, 32:22, 43:17, 43:19, 44:2, 45:17, 45:20, 46:11, 46:13, 156:15, 157:8, 157:10, 157:13, 158:7, 158:23, 161:2, 179:24

**amended** [23] - 69:22, 145:1, 145:8, 145:9, 145:13, 145:20, 146:8, 149:5, 189:11, 189:12, 189:13, 189:14, 189:18, 189:19, 191:20, 199:13, 203:3, 204:20, 207:7, 208:8, 208:13, 211:2

**amendment** [2] - 25:6, 144:20

**Amendment** [65] - 24:14, 24:18, 24:23, 25:2, 25:10, 25:15, 25:20, 27:3, 27:6, 27:15, 27:23, 28:10, 28:15, 29:7, 29:19, 29:25, 30:5, 30:10, 31:10, 31:15, 31:20, 31:24, 34:2, 34:7, 34:12, 34:14, 34:15, 34:22, 34:25, 35:4, 35:8, 35:11, 35:15, 35:19, 36:2, 45:1, 45:6, 45:11, 47:19, 47:23, 48:1, 48:4, 49:6, 49:9, 49:12, 49:15, 49:21, 49:24, 50:2, 50:5, 50:7, 50:11, 50:18, 50:25, 51:7, 51:23, 52:22, 64:19, 66:3, 68:1, 68:3, 75:6, 75:23, 142:5

**American** [5] - 165:6, 167:15, 168:13, 168:14, 168:20

**amount** [10] - 32:1, 35:5, 35:13, 63:1, 63:15, 76:15, 87:20, 140:20, 150:1

**ample** [1] - 13:12

**AND** [1] - 1:7

**ANDERSON** [1] - 1:22

**angry** [1] - 166:1

**animosity** [2] - 209:23, 210:1

**another..** [1] - 159:12

**answer** [46] - 28:21, 32:3, 32:4, 32:5, 32:7, 36:7, 37:19, 38:24, 51:14, 52:23, 61:14, 65:22, 103:18, 142:6, 142:8, 144:11, 145:16, 148:10, 149:11, 149:12, 149:16, 150:9, 152:1, 153:19, 157:14, 160:17, 161:8, 168:9, 170:6, 172:10, 173:4, 173:5, 175:12, 176:14, 178:1, 178:2, 178:9, 178:11, 178:25, 186:7, 190:8, 193:25, 197:10, 197:25, 199:14

**answered** [2] - 142:7, 144:2

**answering** [1] - 82:14

**answers** [2] - 190:8, 205:20

**anytime** [1] - 159:19

**anyway** [4] - 41:23, 122:18, 150:5, 202:23

**apartment** [44] - 20:4, 29:21, 35:3, 35:6, 35:10, 35:14, 35:17, 36:4, 47:21, 75:5, 75:9, 82:12, 83:25, 84:4, 84:8, 84:12, 84:16, 84:19, 85:11, 85:22, 99:9, 104:3, 117:14, 117:20, 117:25, 118:5, 118:21, 118:23, 119:9, 119:11, 124:13, 124:25, 128:20, 146:16, 148:22, 167:16, 181:10, 194:13, 196:2, 200:14, 213:20, 213:23, 214:5

**apartments** [4] - 99:6, 101:13, 101:16, 115:10

**apologies** [2] - 22:1, 168:8

**apologize** [12] - 17:9, 54:23, 54:25, 55:14, 95:9, 113:20, 129:17, 133:25, 142:2, 194:18, 202:15, 204:1

**appear** [7] - 17:19, 54:2, 67:21, 68:8, 150:4, 158:25, 200:20

**appearance** [1] - 4:21

**appearances** [2] - 2:19, 3:2

**appeared** [6] - 5:11, 7:18, 65:9, 139:20, 144:8, 152:22

**appearing** [2] - 2:14, 3:19

**apple** [1] - 45:23

**application** [11] - 26:22, 26:23, 172:16, 173:6, 173:12, 173:25, 174:5, 174:11, 197:17, 197:23

**applies** [1] - 28:8

**apply** [4] - 23:1, 95:16, 142:10

**appointment** [2] - 133:18, 216:9

**appreciate** [3] - 7:18, 30:21, 135:16

**approach** [1] - 110:12

**approved** [2] - 150:19, 153:2

**April** [53] - 12:12, 14:15, 20:19, 29:23, 30:8, 31:8, 31:16, 31:21, 33:25, 34:5, 34:10, 35:16, 44:12, 47:1, 47:14, 47:20, 50:6, 50:12, 100:7, 100:15, 100:19, 100:24, 106:6, 107:20, 107:22, 108:18, 108:20, 109:5, 116:10, 116:12, 116:15, 117:6, 118:20, 118:22, 119:17, 120:9, 129:6, 130:2, 130:10, 139:8, 150:19, 151:3, 151:7, 151:13, 160:24, 161:23, 165:3, 186:20, 202:12, 213:21

**architect** [1] - 124:6

**architect's** [1] - 155:23

**area** [1] - 99:15

**areas** [1] - 170:16

**arguing** [1] - 212:9

**argument** [6] - 21:19, 169:23, 214:23, 215:15, 215:17, 215:22

**arguments** [2] - 164:17, 170:19

**arms** [4] - 59:20, 64:5, 64:13, 140:9

**arraigned** [1] - 14:25

**arrange** [1] - 14:19

**arrest** [44] - 14:5, 14:18, 14:19, 14:21, 15:5, 15:8, 15:12, 15:13, 15:20, 17:17, 17:20, 18:8, 20:16, 44:12, 44:19, 47:1, 81:9, 81:10, 84:15, 84:23, 106:10, 106:15, 106:18, 106:22, 106:24, 107:4, 107:25, 139:8, 160:24, 168:23, 186:19, 186:22, 187:5, 187:8, 188:4, 199:6, 199:15, 200:4, 200:10, 201:21, 208:22, 213:7, 213:12, 214:18

**arrested** [57] - 12:11, 14:14, 14:19, 14:20, 14:22, 15:7, 15:9, 16:24, 19:14, 19:24, 20:1, 20:10, 20:11, 20:18, 45:9, 74:18, 74:19, 74:21, 74:24, 75:18, 80:9, 81:5, 81:11, 81:15, 81:16, 81:17, 81:20, 81:21, 82:25, 83:4, 83:6, 83:10, 85:3, 107:6, 107:16, 107:23, 120:12, 159:6, 159:15, 159:22, 164:13, 167:15, 168:1, 168:15, 182:6, 195:1,

199:5, 200:6, 200:11, 200:16, 200:17, 202:23, 204:4, 213:22

**arrived** [1] - 202:21

**aside** [2] - 118:23, 133:19

**aspect** [1] - 187:2

**assault** [1] - 186:23

**assert** [4] - 28:14, 51:10, 51:12, 52:6

**assertions** [2] - 13:13, 152:5

**assist** [1] - 130:5

**assistance** [3] - 31:17, 167:23, 168:15

**ASSISTANT** [1] - 1:18

**Assisted** [1] - 2:6

**associate** [5] - 86:16, 94:24, 100:25, 108:24, 122:2

**associated** [2] - 131:4, 161:9

**assume** [3] - 19:4, 98:14, 107:19

**assuming** [1] - 89:20

**assumption** [1] - 191:24

**AT&T** [2] - 134:22, 134:23

**attach** [2] - 189:7, 204:22

**attached** [19] - 12:7, 25:22, 28:5, 29:1, 45:14, 46:11, 46:13, 155:17, 155:24, 156:2, 160:7, 160:14, 160:16, 160:19, 179:22, 203:2, 204:9, 204:19, 207:6

**attaching** [1] - 211:17

**attachment** [1] - 189:6

**attachments** [3] - 162:5, 189:4, 189:5

**attempted** [1] - 13:18

**attempting** [1] - 58:11

**attempts** [1] - 153:12

**attention** [4] - 115:11, 159:2, 178:4, 199:10

**attorney** [53] - 3:13, 10:18, 14:25, 18:25, 23:2, 28:11, 32:5, 32:8, 33:9, 54:24, 71:12, 72:16, 76:2, 121:20, 121:24, 122:21, 122:24, 123:24, 127:13, 127:21, 128:1, 128:3, 135:4, 136:10, 136:11, 142:15, 150:6, 152:3, 154:11, 170:3, 170:7, 170:13, 172:14, 172:25, 174:14, 175:24, 176:2, 176:6, 182:24, 183:5, 183:6, 183:8, 183:9, 183:18, 194:3, 198:5, 203:14, 208:21, 211:22, 212:2

**Attorney** [1] - 20:20

**attorney's** [1] - 121:25

**Attorney's** [4] - 16:8, 26:25, 27:17, 198:20

**attorney/client** [2] - 13:18, 13:21

**attorneys** [3] - 4:7, 7:17, 134:8

**audible** [2] - 5:21, 177:22

**audio** [12] - 13:2, 18:1, 72:3, 104:9, 132:17, 148:7, 149:16, 152:22, 187:21, 192:5, 193:20, 196:10

**Audio** [15] - 11:17, 24:13, 24:19, 26:12, 26:19, 32:10, 32:12, 38:2, 38:4, 38:14, 38:16, 38:18, 39:9, 163:2, 189:2

**August** [20] - 63:9, 70:7, 78:12, 79:9, 92:18, 92:21, 113:24, 138:23, 143:10, 150:16, 170:25, 172:12, 173:6, 174:21, 175:7, 175:22, 176:11, 176:22, 179:15, 197:7

**authentic** [1] - 205:24
**authority** [1] - 214:7
**authorize** [7] - 69:5, 78:25, 79:3, 79:6, 79:14, 101:12, 101:15
**authorized** [3] - 18:11, 64:18, 79:2
**Avenue** [2] - 1:15, 125:19
**aware** [55] - 15:5, 25:16, 25:21, 27:25, 28:9, 28:25, 29:16, 30:1, 36:17, 37:1, 37:10, 37:11, 37:12, 37:15, 37:20, 38:13, 38:19, 43:21, 44:10, 47:10, 47:12, 65:7, 68:10, 68:13, 69:7, 69:24, 70:15, 70:17, 70:19, 86:22, 87:1, 87:6, 120:23, 127:25, 128:7, 129:24, 130:8, 141:19, 152:4, 155:7, 155:16, 155:19, 155:23, 156:25, 157:15, 158:3, 170:7, 170:13, 177:14, 177:17, 190:20, 192:7, 208:12, 208:25
**awful** [1] - 215:19

## B

**backing** [1] - 19:13
**bad** [4] - 10:24, 13:17, 185:12, 202:4
**bag** [1] - 137:10
**ballpark** [1] - 137:12
**Bank** [2] - 95:2, 96:10
**Barbara** [1] - 138:13
**Barry** [5] - 94:23, 94:25, 95:2, 95:14, 96:10
**based** [16] - 12:12, 27:15, 27:18, 86:1, 134:5, 142:10, 182:8, 199:7, 204:18, 207:12, 212:4, 212:17, 213:12, 214:1, 214:10, 214:13
**basic** [1] - 52:13
**basis** [12] - 10:24, 13:23, 15:4, 15:21, 20:13, 20:16, 84:23, 114:20, 183:21, 193:12, 200:10, 213:5
**bathroom** [3] - 114:6, 163:5, 163:6
**battery** [2] - 186:23, 186:25
**bear** [3] - 6:5, 126:12, 214:2
**became** [4] - 70:15, 70:17, 70:19, 155:6
**become** [2] - 115:13, 120:23
**becomes** [1] - 214:18
**bedroom** [1] - 114:5
**beds** [1] - 49:4
**BEFORE** [1] - 1:11
**began** [5] - 100:23, 114:8, 114:14, 137:15, 179:10
**begin** [2] - 99:22, 100:3
**beginning** [3] - 97:13, 97:16, 140:22
**behalf** [20] - 36:19, 37:1, 37:13, 37:20, 39:22, 40:15, 40:18, 65:2, 139:20, 140:24, 141:13, 141:15, 146:9, 150:5, 170:3, 182:8, 189:21, 190:7, 197:24, 208:17
**behavior** [1] - 11:1
**behind** [2] - 13:17, 211:10
**belief** [2] - 164:12, 206:24
**believes** [1] - 20:20
**belonged** [1] - 132:13
**belongings** [13] - 72:22, 75:4, 82:9,

83:7, 83:11, 83:25, 84:2, 84:9, 86:7, 86:8, 86:10, 115:25, 202:20
**benefit** [1] - 215:23
**Bernie** [1] - 94:23
**best** [6] - 7:20, 19:18, 19:20, 145:16, 201:19, 210:22
**better** [1] - 133:2
**between** [14] - 15:16, 41:6, 42:17, 94:5, 96:4, 96:10, 123:16, 166:6, 191:16, 192:15, 201:18, 208:21, 209:21, 209:23
**Beyond** [1] - 212:11
**bills** [2] - 122:10
**bit** [10] - 37:9, 39:14, 43:5, 88:16, 88:22, 91:13, 92:1, 93:19, 93:20, 118:18
**Bitch** [1] - 191:9
**bites** [1] - 38:25
**black** [7] - 116:5, 117:13, 118:18, 159:7, 159:16, 159:23, 200:20
**Blake** [40] - 29:5, 29:16, 35:1, 49:11, 49:13, 49:17, 49:19, 49:22, 50:1, 67:14, 68:10, 68:13, 86:23, 87:3, 87:7, 101:15, 101:19, 101:22, 120:21, 125:10, 125:22, 125:23, 152:21, 153:6, 153:21, 171:4, 171:14, 194:10, 195:11, 205:11, 205:13, 205:14, 205:18, 206:2, 206:16, 206:22, 206:23, 207:3, 207:5
**BLAKE** [2] - 1:6, 1:6
**Blake's** [3] - 67:21, 68:2, 68:8
**blank** [1] - 98:5
**blanketly** [1] - 28:14
**blinds** [10] - 116:6, 117:14, 117:16, 117:25, 118:5, 118:19, 118:24, 119:20, 125:2, 195:24
**blinds'** [1] - 118:18
**block** [1] - 151:8
**Blossner** [26] - 5:13, 5:15, 5:17, 7:19, 7:22, 8:8, 8:13, 8:16, 8:19, 9:3, 41:24, 42:6, 44:7, 55:18, 55:21, 55:25, 86:15, 86:17, 135:2, 135:5, 135:9, 135:15, 143:13, 143:24, 144:10, 144:12
**BLOSSNER** [1] - 5:15
**Blossner's** [3] - 8:16, 9:8, 135:13
**blue** [1] - 90:6
**blurry** [2] - 91:13, 96:6
**body** [4] - 59:19, 64:4, 140:8, 188:9
**bogus** [1] - 84:15
**bono** [3] - 173:15, 174:16, 197:15
**booking** [4] - 14:24, 80:10, 81:12, 83:1
**boom** [1] - 78:8
**BORIS** [1] - 32:19
**BORR** [2] - 32:19, 126:2
**BORRIS** [2] - 1:6, 32:21
**Borris** [61] - 1:23, 2:17, 5:4, 5:8, 12:18, 23:1, 23:3, 25:12, 29:17, 32:1, 32:18, 32:20, 33:8, 33:22, 34:9, 35:2, 43:22, 45:5, 68:11, 88:1, 88:20, 90:13, 90:15, 90:17, 90:19, 112:21, 112:22, 113:5, 113:10, 122:20, 125:22, 125:25, 126:2, 126:4, 128:7, 131:3, 149:7,

150:14, 150:18, 150:22, 151:2, 151:6, 154:4, 154:7, 155:7, 155:20, 157:4, 157:7, 157:12, 157:16, 157:20, 158:6, 162:3, 172:17, 172:21, 173:2, 194:10, 195:10, 203:19, 206:22, 207:5
**Borris's** [1] - 12:18
**bother** [1] - 156:6
**bothered** [1] - 203:23
**bottom** [2] - 62:6, 121:25
**bought** [7] - 91:2, 113:12, 113:24, 123:8, 132:4, 132:6, 132:7
**BOWMAN** [1] - 1:22
**box** [3] - 22:12, 74:1, 119:20
**boxes** [1] - 49:4
**boy** [5] - 45:23, 97:20, 104:11, 146:2, 147:4
**brazenly** [1] - 13:7
**break** [4] - 88:11, 133:16, 134:17, 163:5
**breaking** [3] - 104:15, 105:5, 105:14
**brief** [2] - 89:2, 216:3
**briefed** [1] - 214:25
**briefing** [1] - 215:24
**briefly** [19] - 11:17, 13:2, 14:12, 24:13, 24:19, 26:12, 26:19, 32:10, 32:12, 38:2, 38:4, 38:14, 38:16, 38:18, 39:9, 86:3, 127:19, 134:14, 163:2
**bring** [4] - 12:6, 76:3, 111:7, 137:8
**bringing** [3] - 138:25, 139:2, 152:3
**Britt** [2] - 138:3, 138:11
**broad** [1] - 27:7
**broadly** [1] - 21:3
**broke** [5] - 13:3, 104:24, 117:16, 119:1, 177:25
**broken** [2] - 99:9, 125:1
**broker** [4] - 122:3, 131:24, 131:25, 195:8
**Brooklyn** [2] - 1:6, 2:4
**brother** [2] - 171:13, 172:5
**brought** [13] - 10:24, 14:24, 17:18, 25:12, 36:19, 60:5, 137:13, 167:22, 183:18, 199:10, 206:3, 214:2, 214:13
**brutal** [1] - 191:10
**building** [13] - 11:15, 90:22, 113:24, 114:1, 114:2, 115:3, 115:7, 115:8, 115:13, 119:7, 162:16, 195:2, 195:10
**Buildings** [4] - 123:9, 150:19, 151:20, 153:1
**bunch** [1] - 202:19
**Bureau** [1] - 15:19
**burglarized** [2] - 12:10, 202:13, 214:5
**burglary** [6] - 50:14, 50:17, 108:21, 120:8, 161:10, 196:2
**burgundy** [2] - 48:2, 86:12
**business** [10] - 49:22, 68:14, 90:20, 94:24, 112:15, 112:17, 116:22, 122:3, 126:4, 154:13
**busy** [1] - 102:9
**buy** [1] - 113:2
**BY** [71] - 1:20, 1:24, 24:8, 24:24, 25:7, 28:24, 29:15, 31:5, 33:6, 33:19, 34:18, 36:12, 43:20, 46:23, 49:2, 53:3, 59:11,

61:8, 61:17, 64:2, 66:14, 71:23, 72:15, 73:14, 73:20, 76:1, 86:5, 90:11, 91:21, 93:2, 103:5, 105:21, 108:16, 109:17, 127:2, 130:19, 136:3, 137:7, 150:10, 155:5, 158:16, 163:13, 165:1, 167:3, 170:1, 170:24, 175:6, 175:19, 177:8, 178:8, 179:8, 181:2, 182:22, 193:15, 196:13, 196:24, 200:3, 207:15, 209:19, 217:6, 217:7, 217:9, 217:13, 217:14, 217:16, 217:17, 217:23, 218:6, 218:8, 218:9, 218:11

## C

**cable** [1] - 74:1
**Cadman** [1] - 2:3
**calm** [1] - 164:16
**camera** [2] - 29:9, 200:25
**cannot** [16] - 20:25, 27:7, 28:14, 65:23, 96:6, 97:17, 98:24, 102:9, 104:8, 110:25, 117:15, 173:17, 174:3, 175:9, 193:3, 197:16
**capable** [2] - 142:17, 142:18
**captured** [1] - 168:18
**car** [2] - 188:3
**care** [7] - 40:22, 40:24, 66:4, 69:6, 128:4, 128:5, 204:7
**careful** [3] - 118:3, 179:11, 188:5
**cares** [1] - 173:19
**carry** [1] - 212:8
**case** [92] - 10:23, 13:8, 13:16, 14:3, 16:5, 16:22, 20:21, 20:23, 23:5, 23:14, 41:4, 44:16, 44:21, 59:5, 70:8, 70:12, 74:4, 77:19, 78:13, 78:15, 78:17, 80:2, 87:8, 87:25, 88:3, 88:25, 102:11, 120:15, 121:2, 121:10, 127:4, 127:22, 128:1, 138:4, 150:1, 155:10, 155:14, 156:4, 157:9, 161:20, 162:3, 164:10, 166:1, 166:9, 170:14, 173:10, 173:16, 173:17, 173:23, 174:2, 174:9, 174:10, 174:21, 175:1, 175:3, 175:21, 175:25, 176:5, 176:16, 176:20, 178:4, 178:6, 179:2, 179:5, 179:11, 182:24, 183:7, 184:20, 185:8, 190:16, 192:8, 193:1, 194:4, 194:7, 195:15, 197:5, 197:13, 197:19, 198:4, 198:7, 198:14, 198:19, 198:21, 198:25, 199:3, 202:25, 204:7, 206:3, 206:6, 206:9, 214:1, 214:2
**cases** [6] - 15:13, 77:10, 137:8, 137:11, 137:12, 164:5
**cast** [1] - 13:12
**category** [1] - 64:15
**caught** [2] - 38:24, 39:7
**CAUSE** [1] - 1:11
**caused** [4] - 14:2, 81:8, 148:21, 184:11
**causes** [2] - 186:16, 199:13
**causing** [2] - 58:19, 71:14
**central** [4] - 14:24, 80:10, 81:12, 83:1
**certain** [6] - 27:7, 159:17, 185:22, 195:15, 195:19, 200:18
**certainly** [5] - 15:13, 15:22, 18:11, 142:12, 214:22

**Certificate** [3] - 93:15, 151:20, 153:2
**certificate** [13] - 93:12, 93:21, 94:2, 95:17, 106:8, 113:16, 124:3, 137:6, 150:23, 155:17, 162:6, 162:17, 181:7
**certified** [5] - 11:15, 11:19, 12:2, 92:20, 93:3
**certify** [1] - 216:23
**challenges** [1] - 54:14
**chambers** [1] - 174:7
**change** [7] - 63:3, 117:17, 120:1, 120:4, 120:6, 151:16, 214:16
**changed** [7] - 119:5, 119:7, 119:10, 129:9, 151:8, 202:6, 202:7
**Chapin** [74] - 25:4, 29:22, 30:13, 31:8, 31:12, 31:18, 34:4, 35:3, 35:7, 35:10, 35:14, 35:18, 36:5, 44:25, 47:15, 49:20, 49:23, 50:9, 50:14, 50:17, 68:14, 75:1, 75:2, 75:9, 81:22, 82:9, 83:25, 84:12, 84:16, 85:11, 85:23, 90:19, 90:23, 91:25, 92:10, 93:4, 93:22, 96:4, 99:7, 101:13, 102:14, 102:19, 103:15, 103:20, 104:1, 107:7, 108:18, 108:21, 113:7, 113:11, 114:1, 114:9, 115:4, 124:10, 124:14, 125:19, 126:5, 126:7, 127:8, 128:21, 146:17, 148:23, 149:1, 150:15, 150:23, 151:19, 152:8, 152:12, 152:17, 153:22, 162:6, 165:22, 181:9, 181:11
**charge** [2] - 20:8, 199:5
**charged** [1] - 14:17
**charges** [3] - 108:7, 108:9, 200:12
**charging** [1] - 166:24
**Charlie** [1] - 45:24
**chase** [1] - 164:8
**check** [29] - 32:14, 32:15, 33:14, 33:17, 33:20, 42:18, 55:20, 56:5, 77:1, 77:5, 77:6, 77:14, 87:14, 87:17, 87:20, 87:23, 102:12, 115:23, 157:17, 157:18, 157:21, 192:9, 192:13, 192:15, 192:16, 192:20, 192:21
**checking** [1] - 77:14
**checkmate** [1] - 191:13
**Chen** [3] - 54:23, 59:3, 174:6
**CHEN** [1] - 1:11
**Chen's** [1] - 174:6
**childhood** [1] - 49:11
**children** [1] - 129:20
**chilling** [1] - 167:6
**choice** [2] - 71:7, 175:2
**chronologic** [1] - 123:7
**chronology** [1] - 210:17
**Church** [1] - 1:9
**circumstances** [11] - 14:5, 16:8, 16:10, 18:5, 81:10, 106:14, 106:17, 106:22, 107:3, 184:11, 201:20
**city** [6] - 155:15, 195:14, 195:21, 196:4, 196:8, 199:11
**CITY** [2] - 1:6, 1:18
**City** [24] - 1:18, 14:1, 14:16, 15:19, 44:11, 52:2, 53:5, 59:13, 65:4, 95:15, 129:20, 138:3, 138:12, 140:19,

140:23, 141:12, 152:7, 152:11, 157:19, 157:23, 161:23, 204:25, 211:17, 212:9
**City's** [1] - 16:6
**civil** [17] - 2:15, 27:12, 28:2, 127:11, 127:14, 127:15, 127:18, 127:25, 128:2, 128:5, 128:7, 137:11, 137:12, 139:16, 167:13, 181:4, 189:8
**CIVIL** [1] - 1:11
**Civil** [12] - 11:9, 12:11, 15:16, 33:25, 34:5, 34:9, 34:20, 34:24, 35:21, 129:25, 160:6, 161:24
**claim** [66] - 15:14, 17:23, 18:5, 18:6, 19:13, 20:17, 31:17, 31:25, 43:22, 44:11, 44:12, 52:1, 52:3, 52:6, 57:17, 59:13, 59:16, 59:18, 59:19, 60:2, 62:17, 62:20, 62:25, 65:1, 69:23, 76:8, 76:19, 81:9, 84:24, 85:4, 85:5, 85:6, 86:6, 138:25, 139:2, 139:4, 139:10, 139:17, 139:20, 140:7, 140:15, 140:23, 140:25, 141:12, 154:5, 165:21, 167:14, 183:13, 183:16, 184:1, 184:4, 184:21, 185:2, 185:5, 185:7, 186:19, 186:21, 187:23, 188:18, 188:20, 191:25, 193:5, 212:23, 213:24
**claimant** [2] - 140:22, 141:4
**Claimant** [1] - 62:10
**claimed** [2] - 64:23, 140:20
**claiming** [7] - 30:6, 31:7, 31:12, 34:4, 69:15, 122:8, 123:10
**claims** [13] - 10:23, 18:8, 151:23, 152:16, 156:23, 163:15, 167:4, 168:22, 168:24, 186:24, 193:10, 212:5, 213:5
**clarify** [4] - 93:10, 117:20, 159:17, 199:8
**clear** [18] - 26:3, 26:10, 26:15, 27:2, 36:10, 45:15, 62:9, 69:14, 95:19, 100:9, 100:12, 101:2, 121:13, 201:1, 201:4, 212:9, 213:18
**clearer** [1] - 178:13
**clearly** [4] - 90:5, 119:18, 158:22, 212:3
**click** [1] - 8:2
**client** [54] - 16:7, 16:13, 17:4, 17:24, 17:25, 18:4, 18:6, 18:22, 26:3, 26:9, 27:2, 52:14, 56:15, 66:6, 122:14, 122:15, 122:20, 151:12, 152:1, 155:11, 162:18, 162:21, 164:6, 165:7, 165:10, 166:18, 168:9, 168:11, 168:14, 168:16, 168:21, 170:3, 170:7, 171:8, 171:10, 171:16, 172:25, 186:17, 188:6, 193:4, 193:13, 193:17, 193:23, 194:8, 195:5, 199:11, 205:18, 211:4, 211:5, 211:8
**client's** [3] - 165:4, 167:8, 211:10
**clients** [4] - 151:15, 155:10, 172:22, 193:12
**close** [1] - 206:2
**closed** [1] - 150:15
**closer** [5] - 18:17, 24:20, 26:1, 26:5, 89:14

**closing** [1] - 215:14
**clothes** [1] - 49:4
**clue** [1] - 128:2
**co** [4] - 70:23, 158:6, 162:3, 167:17
**CO** [1] - 93:11
**co-counsel** [1] - 70:23
**co-defendant** [3] - 158:6, 162:3, 167:17
**code** [1] - 59:8
**colleague** [1] - 22:13
**collected** [1] - 131:13
**college** [1] - 99:14
**colleges** [1] - 99:15
**colorable** [3] - 10:23, 15:21, 213:5
**comfortable** [5] - 112:6, 205:7, 205:19, 205:25, 206:14
**coming** [2] - 83:5, 205:23
**commence** [4] - 33:24, 128:24, 140:24, 146:22
**commenced** [1] - 14:13
**commentary** [1] - 148:7
**comments** [1] - 21:18
**communicate** [1] - 65:24
**communicated** [14] - 83:14, 142:1, 143:3, 143:14, 144:1, 144:3, 145:9, 145:13, 145:19, 145:21, 159:10, 183:20, 192:11, 198:11
**communicating** [3] - 191:2, 196:15, 197:1
**communication** [1] - 172:12
**communications** [2] - 22:14, 191:16
**company** [4] - 124:5, 130:22, 131:3, 151:7
**complain** [3] - 47:20, 188:1, 188:2
**complainants** [1] - 161:12
**complained** [2] - 162:18, 169:7
**complaining** [2] - 161:16, 213:12
**complains** [1] - 15:7
**Complaint** [23] - 12:8, 21:4, 25:22, 28:6, 29:2, 32:22, 43:17, 43:19, 44:2, 45:17, 45:20, 46:11, 46:13, 156:15, 157:8, 157:10, 157:13, 158:7, 158:23, 161:2, 179:24
**complaint** [99] - 12:8, 12:13, 15:7, 17:3, 17:25, 18:12, 18:13, 18:15, 18:23, 19:4, 19:7, 19:8, 19:15, 20:24, 34:21, 40:14, 40:17, 42:17, 43:16, 45:16, 45:19, 53:4, 64:7, 65:14, 69:19, 69:21, 69:23, 70:17, 70:18, 70:20, 77:16, 85:2, 120:8, 121:9, 141:18, 142:14, 144:19, 144:23, 145:2, 145:8, 145:9, 145:12, 145:13, 145:17, 145:20, 145:22, 146:8, 149:6, 160:15, 161:10, 170:9, 185:22, 186:4, 186:7, 186:8, 186:10, 186:18, 186:19, 189:4, 189:5, 189:8, 189:12, 189:18, 189:19, 189:25, 191:20, 192:2, 192:3, 192:25, 193:24, 199:9, 199:13, 203:3, 204:11, 204:15, 204:19, 204:20, 206:15, 207:7, 208:2, 208:9, 208:12, 208:13, 209:10, 209:13, 209:15, 210:20, 210:25, 211:1, 211:2, 212:4, 213:24,

214:9, 214:15
**complaints** [13] - 13:11, 16:17, 46:10, 65:15, 69:21, 70:14, 144:18, 158:24, 189:16, 208:16, 209:9, 211:5
**completely** [3] - 36:23, 69:18, 105:5
**completion** [1] - 57:7
**Complies** [2] - 29:11, 155:3
**Computer** [1] - 2:6
**computer** [20] - 4:3, 9:9, 18:17, 22:24, 24:21, 26:1, 26:6, 39:14, 42:3, 43:10, 53:10, 53:16, 71:17, 71:18, 96:23, 97:23, 105:3, 105:7, 156:22
**Computer-Assisted** [1] - 2:6
**concern** [5] - 7:14, 66:2, 66:4, 156:7, 205:17
**concerned** [2] - 131:14, 187:3
**concerning** [1] - 160:24
**concerns** [1] - 205:20
**concluded** [1] - 216:15
**conduct** [11] - 129:21, 151:22, 152:4, 152:14, 152:25, 153:25, 156:1, 170:15, 174:9, 211:20, 214:6
**conducted** [1] - 156:12
**confer** [3] - 70:23, 102:3, 182:12
**conference** [19] - 5:19, 6:6, 7:23, 22:22, 23:2, 23:15, 41:20, 41:25, 42:2, 55:13, 55:16, 55:19, 56:5, 58:18, 58:23, 73:8, 91:20, 165:14, 191:6
**confidential** [1] - 13:7
**confirm** [2] - 153:1, 170:3
**conflict** [1] - 143:12
**confront** [4] - 179:21, 180:2, 181:13, 182:3
**confronted** [5] - 176:13, 177:5, 179:15, 181:15, 181:23
**connect** [3] - 9:11, 58:10, 105:9
**connected** [2] - 71:17, 91:24
**connection** [36] - 21:13, 22:21, 25:17, 30:2, 33:21, 34:21, 35:6, 35:13, 35:25, 36:4, 36:14, 36:19, 44:10, 44:11, 47:4, 52:1, 53:5, 59:13, 68:17, 68:19, 87:7, 92:9, 93:22, 94:20, 99:6, 104:16, 104:20, 134:13, 154:5, 157:18, 157:24, 177:20, 178:17, 181:10, 215:18
**consequence** [1] - 57:11
**consequences** [1] - 13:17
**considered** [2] - 186:25, 211:19
**conspiracy** [2] - 166:5, 206:13
**construction** [3] - 106:9, 113:14, 114:21
**consulting** [1] - 78:25
**contact** [5] - 7:1, 37:7, 58:17, 150:11, 174:23
**contacted** [2] - 149:17, 149:24
**contained** [4] - 145:21, 171:3, 181:24, 199:9
**contains** [1] - 156:23
**contents** [4] - 62:17, 62:21, 186:7, 196:8
**contest** [1] - 162:14

**contingency** [1] - 173:16
**Continue** [1] - 75:25
**continue** [4] - 13:25, 28:18, 55:24, 197:16
**continued** [2] - 94:10, 167:14
**Continued** [12] - 2:1, 48:5, 92:23, 93:2, 126:16, 127:2, 154:14, 155:5, 180:5, 181:2, 199:16, 218:3
**Continuing** [3] - 51:19, 70:11, 73:3
**continuing** [2] - 49:2, 200:3
**contract** [1] - 95:14
**contrary** [5] - 12:24, 16:15, 18:10, 205:22, 212:10
**convene** [1] - 215:3
**conversation** [10] - 74:8, 155:9, 165:20, 172:2, 172:4, 175:5, 193:11, 194:21, 194:23, 194:25
**conversations** [1] - 69:10
**convert** [1] - 150:20
**convince** [2] - 122:11, 123:5
**copies** [11] - 35:20, 35:24, 36:13, 36:17, 37:11, 50:3, 69:18, 85:15, 98:14, 161:24, 189:16
**cops** [8] - 106:12, 110:11, 117:17, 118:11, 118:13, 118:15, 164:7, 200:15
**copy** [11] - 34:23, 40:14, 40:17, 49:25, 63:16, 63:20, 186:4, 186:11, 189:17, 193:24, 204:25
**Coronavirus** [1] - 192:19
**CORPORATE** [1] - 1:18
**corporate** [2] - 5:6, 5:7
**corporation** [3] - 150:5, 154:8, 206:24
**Corporations'** [1] - 154:9
**Correct** [3] - 134:21, 138:6, 204:8
**correct** [163] - 3:25, 5:2, 16:3, 16:19, 17:14, 19:14, 20:1, 30:23, 30:24, 32:24, 44:8, 44:12, 57:21, 62:18, 62:21, 65:7, 65:10, 65:16, 65:19, 68:11, 68:14, 68:25, 69:3, 69:8, 69:19, 69:25, 70:20, 75:10, 79:24, 82:12, 88:1, 88:4, 98:15, 99:8, 100:20, 100:24, 106:15, 106:18, 107:23, 109:19, 118:2, 124:24, 125:3, 125:7, 130:22, 131:4, 131:24, 132:3, 136:5, 136:6, 138:7, 138:20, 138:23, 139:1, 139:11, 139:12, 139:14, 139:18, 139:24, 139:25, 140:25, 141:1, 141:10, 141:11, 141:14, 141:16, 141:17, 141:20, 141:23, 142:1, 143:12, 144:3, 144:4, 145:6, 146:11, 149:7, 152:5, 152:23, 154:1, 156:13, 157:4, 157:12, 157:16, 157:20, 158:3, 158:24, 160:14, 160:25, 161:10, 161:11, 161:13, 161:16, 161:20, 161:25, 162:22, 163:15, 165:4, 165:8, 165:17, 165:18, 165:22, 166:14, 166:21, 167:6, 167:7, 167:19, 167:20, 169:8, 169:11, 169:12, 170:4, 170:15, 171:4, 171:20, 172:18, 173:7, 174:15, 176:24, 177:10, 177:21, 179:11, 180:2, 180:4, 181:3, 184:1, 186:1,

186:2, 186:11, 186:12, 186:15,
186:23, 187:1, 187:2, 187:17, 187:18,
188:11, 188:12, 188:19, 188:22,
189:12, 189:14, 189:15, 193:17,
193:18, 194:3, 194:22, 196:9, 196:14,
196:25, 197:20, 198:3, 198:14,
200:21, 201:3, 204:11, 204:12, 207:8,
209:10, 209:14, 209:15, 209:24,
216:23
**corrected** [1] - 13:10
**correctly** [2] - 171:21, 205:16
**cost** [1] - 102:10
**couch** [1] - 86:12
**counsel** [41] - 10:22, 11:2, 19:17, 24:12,
24:17, 24:22, 25:1, 25:5, 25:9, 25:14,
25:19, 26:3, 26:24, 29:6, 29:18, 29:24,
30:4, 30:9, 31:9, 31:14, 31:19, 31:23,
32:2, 34:1, 34:7, 34:11, 68:25, 69:8,
69:11, 70:23, 133:17, 138:20, 165:14,
165:19, 173:7, 173:9, 173:25, 178:3,
209:10, 209:13, 212:19
**COUNSEL** [1] - 1:18
**counsel's** [2] - 45:1, 45:6
**counselor** [1] - 184:3
**country** [1] - 150:4
**County** [2] - 15:1, 15:2
**couple** [3] - 6:25, 108:13, 191:6
**course** [11] - 19:18, 19:20, 102:20,
102:24, 109:9, 119:13, 158:2, 172:23,
187:4, 204:6
**court** [97] - 2:22, 2:24, 3:1, 10:12, 10:15,
13:19, 14:1, 20:7, 25:13, 25:21, 25:23,
26:4, 28:20, 29:1, 29:2, 30:3, 31:6,
31:22, 33:21, 33:24, 35:25, 36:5,
36:15, 36:20, 36:24, 37:2, 37:13,
37:21, 43:1, 43:15, 44:17, 50:3, 51:20,
70:2, 70:4, 72:23, 85:16, 85:21, 86:14,
89:20, 93:11, 95:7, 127:4, 127:11,
127:14, 127:15, 127:18, 127:25,
128:2, 128:5, 128:7, 134:16, 137:20,
137:23, 138:1, 138:18, 139:1, 146:5,
151:1, 153:13, 153:14, 153:15, 155:8,
155:11, 156:2, 156:7, 160:19, 160:23,
163:17, 164:11, 167:18, 168:24,
168:25, 176:23, 178:15, 179:22,
180:1, 181:4, 181:7, 181:24, 182:5,
182:9, 189:8, 189:22, 189:25, 191:25,
202:18, 202:22, 203:17, 204:4,
204:10, 210:25, 212:5, 213:3
**COURT** [463] - 1:1, 3:6, 3:9, 3:12, 3:17,
3:21, 4:1, 4:11, 4:14, 4:16, 4:20, 4:22,
4:23, 4:24, 5:1, 5:4, 5:9, 5:14, 5:16,
5:22, 5:24, 6:2, 6:13, 6:19, 7:4, 7:7,
7:9, 7:14, 8:3, 8:18, 8:22, 9:1, 9:12,
9:14, 9:16, 9:21, 9:24, 10:6, 10:9,
10:11, 11:18, 11:22, 11:24, 12:1, 13:3,
14:10, 15:24, 16:12, 16:21, 17:1, 17:5,
17:9, 17:11, 17:21, 18:16, 18:20, 19:3,
19:11, 19:13, 19:22, 19:25, 20:3,
20:13, 20:16, 20:22, 21:6, 21:10,
21:15, 21:24, 22:1, 22:6, 22:15, 22:18,
23:4, 23:8, 23:13, 24:4, 24:16, 24:20,

25:3, 25:25, 26:5, 26:14, 26:20, 26:23,
27:4, 29:8, 29:12, 29:14, 30:14, 30:17,
30:21, 31:1, 32:6, 32:13, 32:15, 32:17,
32:23, 33:1, 33:4, 33:13, 33:16, 33:18,
34:13, 34:17, 36:9, 37:16, 37:18, 38:6,
38:9, 38:20, 39:4, 39:12, 39:16, 39:20,
39:25, 40:2, 40:4, 40:8, 40:13, 40:19,
40:23, 41:1, 41:6, 41:10, 41:13, 41:18,
41:22, 42:2, 42:7, 42:9, 42:11, 42:13,
42:21, 43:4, 43:9, 43:12, 45:15, 45:22,
45:25, 46:6, 46:17, 46:19, 50:21,
50:23, 51:4, 51:12, 52:11, 52:19,
52:21, 53:6, 53:9, 53:15, 53:20, 53:23,
54:5, 54:9, 54:13, 54:16, 54:19, 55:1,
55:5, 55:7, 55:9, 55:12, 55:15, 55:17,
55:22, 56:4, 56:7, 56:10, 56:14, 56:23,
57:1, 57:10, 57:18, 57:21, 57:24, 58:2,
58:7, 58:9, 58:14, 58:16, 59:1, 59:6,
59:9, 60:12, 61:2, 61:12, 61:22, 62:9,
62:12, 62:23, 63:10, 63:16, 63:22,
64:1, 65:23, 66:4, 66:9, 66:11, 66:18,
66:21, 70:9, 70:25, 71:4, 71:16, 71:20,
71:25, 72:2, 72:6, 72:8, 72:13, 73:5,
73:10, 73:13, 73:16, 73:18, 73:22,
74:14, 74:20, 74:23, 75:2, 75:4, 75:7,
75:13, 75:21, 75:24, 79:4, 79:6, 79:19,
80:5, 80:12, 80:15, 80:17, 80:20,
80:24, 81:4, 81:14, 81:19, 81:23,
81:25, 82:3, 82:8, 82:11, 82:14, 82:22,
83:2, 83:9, 83:13, 83:20, 83:23, 84:3,
84:7, 84:11, 84:14, 84:18, 84:21, 85:1,
85:9, 85:16, 85:20, 85:25, 86:25, 87:5,
87:10, 88:7, 88:10, 88:14, 88:23, 89:4,
89:7, 89:19, 89:22, 89:23, 89:25, 90:1,
90:4, 90:9, 91:15, 91:19, 92:14, 93:9,
93:14, 93:16, 94:15, 95:7, 95:19,
95:22, 95:25, 96:13, 96:16, 96:22,
97:17, 97:20, 97:22, 98:6, 98:8, 98:11,
98:13, 98:17, 98:22, 99:3, 100:9,
100:11, 100:16, 100:19, 101:9,
101:25, 102:4, 102:16, 103:3, 103:7,
103:11, 103:15, 103:18, 103:23,
103:25, 104:4, 104:8, 104:11, 104:13,
104:15, 104:18, 104:22, 104:24,
105:3, 105:8, 105:13, 105:17, 105:19,
105:25, 107:5, 107:11, 107:13,
107:15, 107:18, 108:12, 108:23,
109:2, 109:13, 110:4, 110:7, 110:16,
110:18, 110:21, 110:24, 111:4, 111:7,
111:10, 111:14, 112:2, 112:5, 112:8,
117:19, 118:3, 118:7, 119:2, 121:6,
130:15, 132:19, 132:23, 132:25,
133:6, 133:11, 133:16, 133:24, 134:2,
134:4, 134:7, 134:20, 134:23, 135:4,
135:11, 135:15, 136:1, 136:19,
136:25, 137:3, 142:8, 142:20, 146:1,
146:3, 149:11, 149:12, 149:15,
149:20, 162:25, 163:3, 163:7, 163:11,
163:25, 164:15, 164:21, 164:23,
164:25, 166:24, 167:1, 168:8, 169:14,
169:23, 170:18, 170:23, 175:4,
175:14, 175:17, 177:23, 177:25,

178:10, 178:12, 178:20, 178:24,
182:13, 182:15, 182:19, 183:2,
188:25, 191:18, 192:10, 192:22,
192:24, 196:12, 196:22, 201:5, 201:8,
201:11, 201:15, 201:19, 203:2, 203:6,
203:10, 203:15, 203:18, 203:25,
204:5, 204:13, 204:17, 205:2, 205:5,
205:12, 205:14, 206:1, 206:15,
206:19, 207:1, 207:6, 207:9, 209:17,
210:7, 210:12, 210:15, 211:11,
211:21, 212:25, 213:14, 213:18,
214:22, 215:6, 215:8, 215:10, 216:5,
216:8, 216:13
**Court** [44] - 2:3, 7:2, 7:12, 10:5, 10:17,
10:20, 11:9, 12:11, 13:11, 13:24, 14:8,
15:4, 15:16, 16:7, 16:18, 25:18, 33:25,
34:5, 34:10, 34:20, 34:24, 35:22,
36:23, 43:16, 43:18, 45:13, 51:16,
129:20, 129:25, 130:3, 132:15,
138:10, 138:11, 148:8, 160:7, 161:24,
166:10, 166:17, 172:3, 172:15,
172:16, 174:23, 179:4, 193:9
**court's** [3] - 156:5, 204:25, 209:3
**Court's** [2] - 13:19, 134:5
**court-issued** [1] - 2:24
**Courthouse** [1] - 1:5
**courtroom** [3] - 7:23, 8:10
**COURTROOM** [17] - 2:15, 8:1, 24:1,
30:24, 57:22, 58:1, 58:12, 59:2, 59:7,
89:14, 89:18, 105:11, 111:21, 111:24,
134:18, 134:21, 135:23
**courts** [1] - 136:15
**cover** [2] - 187:24, 207:18
**covered** [2] - 143:13, 143:24
**Craig's** [1] - 202:1
**Craigslist** [2] - 194:14
**crazy** [2] - 122:24, 191:7
**created** [1] - 199:2
**creating** [1] - 96:24
**credentials** [1] - 2:24
**credibility** [1] - 19:19
**credit** [1] - 214:10
**crime** [2] - 14:15, 142:9
**crimes** [1] - 14:17
**criminal** [6] - 16:10, 16:11, 27:14, 28:2,
28:9, 78:22
**CROSS** [9] - 71:22, 103:4, 130:18,
182:21, 200:2, 217:7, 217:14, 217:22,
218:7
**CROSS-EXAMINATION** [9] - 71:22,
103:4, 130:18, 182:21, 200:2, 217:7,
217:14, 217:22, 218:7
**crux** [1] - 15:12
**crying** [1] - 202:14
**culpable** [1] - 194:20
**current** [2] - 136:9, 167:21
**curtail** [1] - 191:18
**curtains** [1] - 49:7
**cut** [3] - 11:22, 21:17, 164:8
**cuts** [15] - 11:17, 13:2, 24:13, 24:19,
26:12, 26:19, 32:10, 32:12, 38:2, 38:4,

38:14, 38:16, 38:18, 39:9, 163:2
**cutting** [2] - 70:9, 133:6

# D

**D-a-v-o-u-d-i** [1] - 112:4
**D.A** [4] - 85:14, 108:6, 108:7, 213:9
**DA** [2] - 199:1, 199:4
**DA's** [2] - 199:7
**daily** [1] - 114:20
**damages** [1] - 140:13
**date** [28] - 14:14, 93:24, 108:19, 120:10, 123:10, 123:18, 139:6, 143:3, 143:6, 143:10, 143:20, 144:5, 144:17, 144:18, 150:13, 157:5, 161:8, 172:7, 173:8, 183:14, 184:3, 184:21, 185:3, 185:5, 185:6, 185:21, 185:22, 198:13
**Date** [1] - 216:25
**dated** [8] - 59:18, 138:13, 143:10, 143:18, 143:20, 144:23, 166:13, 166:16
**dates** [3] - 123:8, 144:21, 145:4
**daughter** [1] - 129:7
**daunting** [1] - 43:6
**David** [11] - 4:21, 7:5, 11:23, 17:9, 17:12, 38:10, 38:23, 39:17, 42:13, 46:2, 216:24
**DAVID** [2] - 2:3, 216:25
**Davoudi** [30] - 56:2, 97:4, 110:23, 111:7, 111:15, 111:23, 112:1, 112:3, 112:15, 121:12, 123:19, 124:9, 127:10, 133:25, 149:6, 149:17, 150:11, 150:14, 150:18, 150:22, 151:2, 151:6, 151:11, 151:14, 151:18, 151:25, 153:1, 161:13, 162:4, 181:25
**days** [5] - 6:25, 63:14, 76:18, 78:16, 209:4
**DD5's** [2] - 161:9, 161:12
**deal** [3] - 57:3, 134:9, 195:4
**decide** [1] - 102:12
**decided** [8] - 17:23, 19:17, 57:4, 121:24, 172:13, 176:15, 198:19, 205:6
**deciding** [1] - 27:16
**decipher** [1] - 200:24
**decision** [7] - 15:6, 34:20, 160:12, 186:14, 186:16, 198:25, 205:8
**declaration** [1] - 18:24
**declined** [1] - 85:14
**deed** [5] - 91:2, 91:24, 92:9, 110:13
**deem** [1] - 6:16
**deemed** [1] - 3:1
**default** [5] - 127:16, 162:3, 162:11, 182:5, 211:19
**defend** [2] - 20:22, 27:9
**defendant** [15] - 4:19, 5:1, 15:15, 23:5, 88:3, 155:15, 157:4, 157:7, 158:6, 161:19, 162:3, 167:17, 167:18, 169:2, 195:24
**defendant's** [1] - 14:1
**defendants** [47] - 1:8, 4:9, 4:12, 5:7, 6:15, 10:18, 10:20, 13:8, 15:9, 15:20, 43:15, 45:13, 77:10, 89:5, 92:12,

94:13, 95:23, 101:8, 128:20, 129:9, 129:10, 129:22, 130:12, 134:6, 146:16, 154:12, 156:3, 157:22, 159:5, 165:2, 166:9, 173:3, 176:22, 179:10, 180:2, 192:8, 192:12, 192:16, 194:2, 194:9, 194:20, 194:25, 195:22, 205:15, 206:23, 208:24
**Defendants** [5] - 1:18, 1:22, 46:1, 181:3, 206:22
**Defendants'** [35] - 45:14, 46:21, 57:16, 60:9, 60:13, 64:8, 66:12, 66:16, 66:23, 67:2, 67:8, 68:5, 91:3, 91:5, 92:13, 92:15, 93:8, 94:14, 94:16, 95:5, 96:1, 96:19, 101:10, 140:1, 142:24, 145:24, 147:4, 207:18, 207:25, 218:15, 218:16, 218:17, 218:18, 218:19, 218:20
**defendants'** [9] - 4:7, 16:6, 68:17, 68:19, 150:5, 156:16, 177:20, 178:18, 211:22
**defense** [21] - 21:22, 26:24, 28:11, 133:17, 135:4, 142:12, 142:13, 165:14, 165:19, 212:19, 214:12
**Defense** [2] - 155:2, 162:2
**definitely** [2] - 171:13, 171:24
**definition** [1] - 154:2
**definitively** [1] - 16:23
**delay** [1] - 58:20
**delays** [1] - 30:18
**demonstrated** [1] - 46:15
**denial** [3] - 2:25, 199:9, 199:12
**deny** [3] - 19:10, 170:3, 170:5
**Department** [6] - 14:16, 123:9, 150:19, 151:20, 152:25, 211:17
**department** [1] - 162:16
**DEPARTMENT** [1] - 1:18
**depict** [1] - 197:9
**depicted** [3] - 90:5, 200:19, 200:20
**depicting** [1] - 51:21
**deposit** [10] - 30:7, 35:2, 35:21, 35:24, 36:3, 36:13, 36:18, 172:6, 195:3, 203:19
**deposits** [1] - 129:3
**DEPUTY** [17] - 2:15, 8:1, 24:1, 30:24, 57:22, 58:1, 58:12, 59:2, 59:7, 89:14, 89:18, 105:11, 111:21, 111:24, 134:18, 134:21, 135:23
**deputy's** [1] - 174:7
**descent** [1] - 194:17
**despite** [3] - 12:23, 161:18, 167:17
**destroy** [2] - 191:10, 210:4
**details** [6] - 97:4, 97:5, 100:25, 106:24, 152:8, 152:12
**detective** [10] - 5:18, 50:12, 50:16, 51:21, 72:8, 88:16, 119:15, 119:16, 133:20, 211:24
**Detective** [7] - 5:20, 8:5, 12:12, 72:9, 134:9, 213:2, 213:6
**detective's** [2] - 212:13, 214:21
**detectives** [3] - 50:6, 50:8, 120:7
**detectors** [1] - 115:10

**determination** [1] - 195:8
**determine** [4] - 10:16, 21:1, 21:12, 27:10
**determined** [1] - 15:2
**device** [3] - 3:15, 3:16, 55:8
**difference** [2] - 208:20, 208:21
**different** [12] - 8:23, 22:3, 28:8, 40:10, 52:16, 55:10, 71:12, 87:14, 118:23, 119:4, 154:3, 176:21
**difficult** [4] - 22:21, 199:4, 200:22, 215:8
**difficulties** [2] - 18:20, 215:11
**difficulty** [1] - 3:15
**DIRECT** [13] - 24:7, 49:1, 90:10, 93:1, 112:13, 127:1, 136:2, 155:4, 181:1, 217:5, 217:12, 217:21, 218:6
**direct** [3] - 83:20, 128:11, 142:8
**directed** [1] - 130:5
**directing** [2] - 115:11, 130:3
**directions** [1] - 211:3
**disadvantage** [1] - 215:19
**disappeared** [1] - 91:8
**disciplined** [1] - 137:20
**disclosing** [1] - 87:2
**disclosures** [2] - 161:4, 161:9
**disconnect** [3] - 7:24, 8:2, 53:25
**disconnected** [2] - 153:11, 153:13
**discovery** [8] - 138:14, 165:16, 195:15, 195:16, 195:20, 196:4, 200:19, 214:1
**discuss** [2] - 76:17, 80:19
**discussed** [3] - 195:23, 196:7, 204:9
**discussing** [1] - 19:17
**discussion** [4] - 18:9, 76:16, 117:21, 194:19
**discussions** [1] - 17:18
**disgruntled** [1] - 169:8
**dismiss** [4] - 79:16, 155:12, 174:24, 197:13
**dismissed** [8] - 87:25, 88:3, 178:23, 179:5, 190:16, 199:4, 209:11, 213:9
**dismissing** [2] - 20:21, 198:21
**dispense** [3] - 89:19, 135:13, 214:21
**displaying** [1] - 167:18
**disputed** [1] - 162:20
**District** [11] - 20:20, 136:16, 136:22, 137:5, 137:9, 137:25, 174:8, 174:17, 198:20
**DISTRICT** [3] - 1:1, 1:1, 1:12
**district** [1] - 14:25
**Districts** [1] - 137:13
**Division** [1] - 154:9
**divulging** [1] - 86:23
**DOB** [1] - 162:20
**Docket** [2] - 2:16, 138:9
**docket** [14] - 13:9, 58:13, 98:23, 98:25, 138:13, 156:5, 190:14, 190:21, 190:23, 191:5, 191:15, 204:18, 209:21, 211:14
**document** [38] - 59:23, 59:24, 60:18, 60:25, 64:8, 64:18, 64:22, 76:7, 76:11, 85:17, 85:21, 91:7, 91:12, 91:22, 92:4,

93:24, 95:11, 95:13, 97:2, 97:3, 97:18,
97:21, 100:17, 101:6, 125:14, 125:15,
127:22, 127:24, 139:13, 140:3, 149:4,
156:16, 162:10, 162:22, 198:24,
206:20, 207:6, 210:18
**documentary** [3] - 10:19, 12:20, 12:22
**documents** [29] - 12:7, 50:3, 76:22,
90:25, 98:2, 98:3, 98:5, 122:7, 123:22,
124:2, 127:3, 156:2, 160:14, 162:7,
179:22, 180:1, 181:13, 181:16, 183:5,
183:9, 196:4, 198:22, 203:7, 203:11,
203:14, 204:9, 204:19, 204:22
**DOE** [1] - 1:7
**Doe** [1] - 1:19
**dollar** [1] - 150:1
**dollars** [4] - 63:6, 63:11, 65:2, 65:4
**domestic** [1] - 154:7
**done** [18] - 8:12, 8:20, 56:5, 95:16, 96:4,
96:9, 126:4, 133:9, 134:1, 164:4,
164:19, 181:9, 182:12, 185:4, 185:25,
201:7, 207:2, 209:8
**door** [3] - 118:13, 118:15, 119:10
**double** [1] - 126:2
**doubt** [2] - 13:12, 18:4
**doubts** [1] - 56:17
**down** [7] - 67:10, 92:1, 93:18, 97:21,
125:21, 164:16, 212:1
**downstairs** [2] - 118:14, 119:10
**drawing** [1] - 168:19
**drink** [1] - 183:1
**driveway** [1] - 119:19
**driving** [2] - 13:25, 185:11
**drop** [1] - 167:12
**dropped** [4] - 30:23, 38:11, 149:10,
152:22
**dropping** [1] - 39:17
**drroyofcr@gmail.com** [1] - 2:4
**due** [2] - 116:16, 186:22
**duly** [5] - 23:23, 89:11, 111:18, 129:2,
135:20
**duplex** [1] - 114:7
**during** [5] - 8:11, 61:13, 114:17, 117:12,
175:4
**duty** [3] - 106:25, 204:7, 212:8
**dying** [1] - 133:4

# E

**e-d-n-a** [1] - 112:3
**e-mail** [8] - 76:23, 76:24, 78:17, 79:10,
117:1, 123:18, 189:20, 190:5
**e-mails** [5] - 78:18, 78:19, 123:6, 211:17
**ear** [1] - 52:25
**early** [3] - 30:16, 78:12, 187:23
**ears** [5] - 59:20, 64:4, 140:9, 187:20,
188:4
**earshot** [1] - 6:8
**easier** [1] - 215:19
**East** [1] - 2:3
**Eastern** [7] - 136:16, 136:21, 137:5,
137:9, 137:13, 174:8, 174:17

**EASTERN** [1] - 1:1
**ECF** [2] - 98:21, 179:7
**echo** [1] - 71:14
**Edna** [10] - 94:24, 97:4, 101:1, 106:20,
108:24, 110:22, 111:23, 112:1,
117:25, 181:25
**effect** [3] - 142:16, 167:6, 182:6
**effective** [1] - 93:24
**effectively** [1] - 8:10
**efficiency** [1] - 147:2
**eight** [2] - 39:8, 69:23
**either** [10] - 7:14, 9:25, 22:19, 55:25,
85:10, 143:25, 174:7, 197:15, 199:13,
211:2
**electrical** [1] - 133:13
**electricity** [1] - 114:25
**electronic** [2] - 46:7, 98:18
**elephant** [1] - 46:3
**elicited** [1] - 215:1
**email** [1] - 181:6
**emphatic** [1] - 65:25
**end** [6] - 63:6, 70:3, 92:3, 92:4, 100:5,
125:22
**ended** [1] - 100:24
**enforcement** [1] - 167:23
**engineer** [1] - 96:10
**engineering** [2] - 94:19, 94:22
**enlarge** [5] - 66:19, 66:20, 96:8, 96:21,
97:1
**ensure** [1] - 7:21
**enter** [1] - 29:20
**entered** [3] - 45:4, 128:19, 146:15
**Enterprises** [1] - 1:23
**enters** [2] - 30:15, 41:9
**entire** [6] - 4:5, 19:1, 19:7, 115:7, 119:7,
169:16, 169:20, 181:4
**entirely** [3] - 9:19, 10:23, 104:20
**entitled** [4] - 84:15, 84:19, 85:22,
216:23
**entrance** [2] - 119:9, 167:16
**entrances** [2] - 115:8, 115:9
**entry** [2] - 2:24, 2:25
**erase** [1] - 198:16
**erratic** [1] - 169:10
**erred** [1] - 111:10
**escape** [1] - 13:16
**ESQ** [4] - 1:15, 1:20, 1:20, 1:24
**essential** [1] - 4:5
**essentially** [1] - 172:6
**establish** [1] - 15:22
**established** [1] - 215:16
**estate** [3] - 112:16, 131:24, 131:25
**estimated** [1] - 8:5
**et** [1] - 2:17
**event** [1] - 56:16
**events** [4] - 115:2, 160:14, 167:21,
210:18
**eventually** [1] - 205:6
**evict** [1] - 113:13
**evidence** [35] - 6:10, 6:12, 10:20, 10:25,
12:20, 12:22, 12:24, 13:12, 13:23,

15:22, 21:18, 46:2, 46:22, 57:17,
60:11, 60:14, 87:11, 92:13, 92:16,
94:14, 94:17, 95:24, 96:2, 101:8,
101:11, 121:5, 124:17, 125:14,
126:11, 127:20, 128:19, 161:18,
212:23, 214:1, 214:14
**EVIDENTIARY** [1] - 1:11
**evidentiary** [3] - 2:16, 10:16, 215:3
**exact** [5] - 19:8, 120:10, 123:18, 169:5,
198:13
**exactly** [11] - 18:7, 77:8, 119:8, 123:15,
149:8, 179:3, 181:20, 191:13, 201:20,
207:1, 211:25
**exam** [1] - 58:21
**EXAMINATION** [32] - 24:7, 49:1, 71:22,
86:4, 90:10, 93:1, 103:4, 108:15,
109:16, 112:13, 127:1, 130:18, 136:2,
155:4, 181:1, 182:21, 200:2, 207:14,
209:18, 217:5, 217:7, 217:8, 217:12,
217:14, 217:15, 217:17, 217:21,
217:22, 218:6, 218:7, 218:9, 218:10
**examined** [4] - 23:24, 89:12, 111:19,
135:21
**example** [1] - 28:4
**Except** [2] - 148:5, 148:7
**exception** [5] - 13:20, 46:12, 142:10,
142:11
**excessive** [1] - 186:25
**exchange** [1] - 8:12
**exchanged** [1] - 194:15
**excuse** [5] - 29:8, 40:8, 170:14, 182:25,
201:25
**excused** [6] - 133:25, 134:1, 134:3,
216:4, 216:5
**exercise** [2] - 50:24, 51:7
**exercised** [3] - 26:9, 26:10, 26:11
**exercising** [2] - 26:16, 27:3
**Exhibit** [50] - 45:14, 46:2, 57:16, 60:9,
60:13, 63:17, 64:8, 67:2, 67:8, 91:4,
91:5, 92:13, 92:15, 93:8, 94:14, 94:16,
95:6, 95:20, 96:1, 96:20, 101:8,
101:10, 121:5, 121:8, 124:1, 124:2,
124:3, 124:4, 124:17, 125:14, 127:20,
128:11, 128:19, 140:2, 142:24, 143:7,
145:25, 155:2, 160:7, 160:16, 207:18,
208:5, 218:16, 218:17, 218:18,
218:19, 218:20
**exhibit** [9] - 18:7, 25:22, 45:18, 46:14,
67:23, 128:13, 160:9, 160:11, 177:16
**exhibits** [9] - 6:15, 6:16, 10:19, 45:16,
46:9, 98:15, 98:18, 98:21, 98:23
**Exhibits** [4] - 45:21, 46:21, 66:13,
66:16, 126:12, 127:6, 127:20, 212:22,
218:15
**existence** [1] - 192:7
**exiting** [1] - 7:23
**exits** [2] - 21:8, 42:12
**expected** [1] - 70:2
**expedite** [3] - 6:11, 6:19, 88:22
**explain** [6] - 110:1, 122:2, 123:7, 124:4,
181:17, 193:6

explained [2] - 80:8, 122:6
explaining [3] - 73:15, 73:18, 73:23
explanation [3] - 95:15, 197:6, 205:25
explicit [1] - 211:3
exposure [1] - 28:2
expressed [1] - 211:3
extended [1] - 11:3
extension [2] - 122:21, 123:5
extremely [2] - 8:17, 193:14
eyes [5] - 59:20, 64:4, 140:8, 187:20, 188:9

## F

fabrications [1] - 14:7
face [5] - 59:20, 64:5, 140:9, 188:9, 205:3
Facebook [2] - 172:7
fact [25] - 10:22, 12:7, 15:21, 19:7, 37:3, 52:13, 106:7, 141:12, 145:18, 158:3, 158:4, 158:5, 166:19, 166:20, 168:11, 181:17, 181:23, 186:17, 198:7, 199:4, 205:15, 213:11, 214:17, 215:22
facts [9] - 14:4, 154:1, 158:9, 158:11, 186:13, 186:17, 215:1, 215:15
Facts [1] - 128:17
factual [8] - 13:13, 145:12, 146:14, 152:5, 152:16, 157:1, 158:21, 170:8
fail [1] - 212:7
failed [1] - 159:5
fair [7] - 101:21, 103:6, 113:4, 139:19, 199:9, 199:12, 211:12
fairly [2] - 88:21, 212:3
faith [1] - 10:24
faking [1] - 191:8
False [2] - 49:15, 49:18
false [23] - 10:21, 12:6, 15:8, 15:13, 18:8, 20:16, 20:25, 21:1, 44:12, 81:9, 84:23, 84:24, 126:8, 126:9, 184:6, 186:19, 199:5, 199:6, 199:14, 200:4, 212:2, 212:5, 213:19
falsely [7] - 15:7, 16:24, 19:14, 19:24, 20:1, 45:9, 85:3
falsified [1] - 11:8
familiar [5] - 138:3, 138:15, 140:3, 156:16, 170:2
families [1] - 151:4
family [9] - 129:11, 130:3, 130:11, 169:8, 187:7, 200:14, 202:3, 202:18, 202:22
far [6] - 14:6, 43:9, 85:7, 131:14, 186:13, 187:3
fashion [2] - 56:18, 170:11
fast [1] - 146:4
fault [1] - 54:13
favor [1] - 22:18
February [3] - 35:9, 94:11, 138:13
federal [24] - 12:9, 25:13, 36:5, 36:15, 120:15, 121:2, 127:22, 128:1, 128:6, 136:15, 137:20, 137:23, 139:2, 139:16, 144:18, 189:22, 189:25,

190:3, 190:6, 190:20, 191:25, 193:1, 193:7, 210:25
feed [1] - 104:9
feedback [1] - 112:12
fell [1] - 73:19
felt [2] - 202:3, 202:23
FEMALE [1] - 175:11
few [8] - 57:7, 79:10, 120:10, 123:6, 124:8, 163:4, 188:12, 201:12
Fida [9] - 7:20, 7:24, 21:12, 30:23, 57:21, 58:9, 89:9, 105:8, 134:7
fifteen [1] - 55:20
fifth [1] - 86:9
Fifth [103] - 24:14, 24:18, 24:23, 25:2, 25:6, 25:10, 25:15, 25:19, 27:3, 27:6, 27:15, 27:21, 27:23, 28:1, 28:6, 28:10, 28:15, 29:7, 29:19, 29:24, 30:4, 30:9, 31:9, 31:15, 31:20, 31:24, 34:2, 34:7, 34:11, 34:14, 34:15, 34:22, 34:25, 35:4, 35:8, 35:11, 35:15, 35:19, 36:2, 45:1, 45:6, 45:11, 47:19, 47:23, 48:1, 48:4, 49:6, 49:9, 49:12, 49:15, 49:21, 49:24, 50:2, 50:5, 50:7, 50:11, 50:18, 50:25, 51:7, 51:23, 52:22, 62:22, 64:6, 64:19, 65:20, 66:2, 66:25, 67:4, 67:6, 67:9, 67:15, 67:20, 67:22, 68:1, 68:3, 68:7, 68:9, 68:12, 68:15, 68:21, 70:21, 75:6, 75:23, 80:18, 82:7, 82:10, 83:12, 84:5, 84:10, 84:13, 85:4, 85:19, 85:24, 86:11, 86:13, 86:19, 86:21, 87:16, 87:19, 87:24, 88:2, 142:5
figure [1] - 205:16
file [24] - 16:23, 34:8, 40:20, 68:16, 68:19, 127:4, 139:2, 150:9, 155:12, 161:25, 162:2, 181:4, 181:7, 181:24, 187:23, 193:3, 194:4, 195:18, 195:19, 196:6, 204:14, 209:2, 210:25, 212:3
filed [110] - 12:21, 13:11, 15:8, 15:14, 16:13, 16:18, 16:22, 18:23, 21:4, 25:22, 29:2, 36:14, 36:24, 37:1, 37:4, 37:5, 37:6, 37:12, 37:20, 37:23, 38:15, 38:19, 39:2, 39:5, 39:21, 40:15, 40:17, 42:17, 42:22, 43:16, 43:17, 43:19, 65:7, 65:15, 69:17, 69:24, 70:1, 77:17, 98:20, 121:9, 127:11, 138:25, 139:4, 139:20, 141:15, 141:18, 144:19, 145:2, 145:10, 145:14, 145:18, 146:8, 151:1, 151:19, 155:7, 156:18, 156:20, 157:13, 158:6, 161:1, 166:9, 166:11, 172:15, 173:11, 173:24, 174:11, 176:23, 177:14, 177:20, 178:14, 178:15, 178:17, 178:23, 179:3, 179:7, 179:17, 185:22, 186:1, 186:3, 189:11, 189:12, 189:21, 189:25, 190:3, 190:6, 191:20, 191:25, 192:3, 192:24, 193:1, 193:2, 193:24, 197:12, 198:8, 204:15, 208:2, 208:9, 208:13, 208:16, 208:24, 209:9, 211:6, 211:19, 214:15, 216:2
filing [13] - 13:9, 44:2, 138:22, 149:5, 157:10, 176:17, 191:22, 192:2, 210:20, 211:4, 211:9
filled [1] - 25:17

final [3] - 215:14, 215:22, 215:24
financially [1] - 137:18
findings [1] - 215:22
fine [10] - 8:22, 8:24, 9:14, 9:21, 22:6, 22:7, 54:7, 88:13, 123:19, 135:7
fined [1] - 138:5
finish [11] - 32:6, 58:21, 70:24, 109:24, 110:1, 110:4, 132:21, 164:1, 178:24, 197:10
finished [2] - 100:15, 113:15
firm [2] - 94:19, 94:22
First [6] - 43:17, 44:2, 45:17, 45:20, 158:7, 197:6
first [77] - 8:16, 10:1, 21:20, 21:23, 23:23, 27:5, 63:15, 64:16, 70:15, 70:17, 77:18, 89:11, 101:21, 106:3, 106:5, 109:6, 111:18, 111:24, 113:12, 114:3, 114:4, 114:8, 115:20, 120:14, 120:15, 121:2, 121:18, 121:19, 124:24, 129:11, 135:3, 135:20, 143:5, 144:20, 144:23, 145:1, 145:7, 145:8, 145:9, 145:13, 146:8, 149:5, 151:3, 158:23, 182:23, 183:4, 184:2, 184:21, 184:23, 185:23, 186:1, 186:3, 188:12, 189:13, 189:18, 192:2, 198:2, 198:18, 198:23, 199:13, 200:9, 200:13, 201:16, 202:2, 202:7, 203:11, 203:19, 204:10, 204:20, 204:23, 207:22, 208:8, 208:12, 211:1, 212:19
five [5] - 10:8, 57:6, 57:8, 88:10, 194:2
five-minute [1] - 88:10
fix [2] - 72:6, 134:13
flip [1] - 126:12
floor [18] - 29:21, 106:3, 106:4, 106:5, 106:6, 114:4, 114:6, 114:7, 116:11, 116:15, 117:21, 117:22, 117:23, 124:25, 128:20, 146:16
flyer [2] - 165:3, 168:18
focus [3] - 15:15, 192:25, 212:12
focused [1] - 201:12
folks [3] - 9:16, 9:22, 88:10
follow [4] - 34:3, 169:20, 193:7, 207:12
follow-up [2] - 169:20, 207:12
Following [1] - 129:18
following [2] - 2:19, 166:8
follows [4] - 23:25, 89:13, 111:20, 135:22
followup [1] - 108:13
FOR [1] - 1:11
forbid [1] - 188:5
force [1] - 186:25
forces [1] - 13:25
foreclosure [1] - 132:6
foregoing [2] - 62:17, 216:23
forget [2] - 52:12, 132:19
forgot [1] - 133:25
forgotten [1] - 205:10
form [7] - 33:14, 33:17, 63:11, 125:18, 201:2, 216:3
format [2] - 46:7, 91:19
former [1] - 10:17, 10:22, 11:1, 32:8,

32:11, 138:20, 151:12, 162:18,
162:21, 171:10, 171:16
**forth** [3] - 10:21, 17:2, 102:9
**forward** [14] - 122:12, 122:17, 122:25,
155:14, 171:18, 173:13, 173:17,
173:21, 176:15, 176:20, 185:14,
188:24, 193:7, 206:14
**foster** [1] - 49:14
**foundation** [2] - 6:16, 213:7
**foundational** [1] - 57:8
**four** [5] - 40:12, 64:3, 64:9, 64:10, 64:23
**frame** [1] - 102:11
**Frank** [1] - 46:3
**fraud** [4] - 10:16, 13:19, 142:9, 169:1
**fraudulent** [6] - 30:3, 86:23, 121:22,
156:10, 169:3, 212:4
**fraudulently** [2] - 156:8, 212:5
**free** [1] - 210:9
**friend** [6] - 72:18, 74:5, 75:20, 80:4,
82:18
**friendly** [1] - 205:19
**friends** [2] - 49:11, 172:5
**front** [6] - 60:6, 63:2, 91:7, 91:12, 139:5,
139:21
**frozen** [1] - 56:11
**fruitful** [1] - 54:10
**full** [1] - 136:4
**fully** [1] - 197:12
**furniture** [1] - 115:25
**future** [2] - 2:24, 2:25

## G

**gain** [1] - 213:22
**gained** [1] - 202:9
**gaining** [1] - 167:16
**gap** [1] - 9:5
**garbage** [1] - 118:18
**Gardens** [2] - 1:23, 1:24
**Garnett** [1] - 3:19
**GARNETT** [1] - 1:15
**Gary** [1] - 46:3
**gather** [1] - 162:9
**general** [1] - 2:21
**gentleman** [3] - 90:5, 119:21, 123:17
**GILL** [1] - 1:22
**girlfriend** [2] - 184:16, 194:13
**Given** [1] - 215:10
**given** [2] - 18:14, 196:8
**GMA** [1] - 1:22
**God** [2] - 40:16, 188:5
**Googled** [7] - 40:3, 40:4, 40:6, 63:9,
63:13, 77:24
**government's** [1] - 16:5
**Grand** [1] - 1:15
**granted** [5] - 2:20, 37:8, 172:16, 174:4,
198:9
**great** [1] - 30:19
**grew** [1] - 49:13
**Group** [1] - 5:8
**guess** [9] - 22:2, 71:7, 72:18, 99:5,

111:14, 137:1, 200:25, 207:3, 214:23
**guidance** [1] - 13:19
**gun** [1] - 188:23
**guy** [11] - 74:9, 75:16, 80:2, 80:8, 82:18,
116:5, 116:20, 117:3, 117:11, 117:12,
204:3
**guys** [1] - 72:3

## H

**H-E-A-S-T-O-N** [1] - 24:3
**half** [6] - 8:6, 114:6, 134:17, 178:1,
201:16, 201:18
**hand** [10] - 3:7, 5:23, 5:25, 23:18, 61:10,
61:19, 62:6, 89:7, 111:16, 135:17
**handcuff** [1] - 188:1
**handcuffed** [1] - 187:14
**handcuffs** [1] - 187:14
**handle** [2] - 9:16, 105:22
**handwriting** [3] - 141:4, 141:5, 141:6
**handy** [1] - 59:5
**hang** [41] - 7:4, 11:18, 13:3, 17:11,
24:16, 37:18, 38:6, 38:7, 38:9, 39:12,
41:18, 42:14, 73:22, 75:21, 82:22,
83:2, 83:23, 91:15, 95:19, 98:8,
100:11, 118:3, 169:16, 178:12
**Hang** [10] - 52:11, 73:22, 74:23, 75:21,
81:14, 82:22, 83:2, 83:23, 132:19,
203:10
**happy** [1] - 210:14
**harassed** [2] - 184:15, 184:16
**harassing** [1] - 190:19
**hard** [5] - 46:8, 66:19, 70:10, 79:4,
200:24
**Harry** [1] - 46:4
**head** [11] - 4:4, 4:5, 9:2, 59:19, 64:4,
140:8, 187:19, 188:2, 188:4, 188:9,
188:23
**hear** [77] - 4:7, 11:6, 11:13, 12:9, 12:16,
13:10, 13:22, 21:18, 22:23, 25:25,
35:23, 41:23, 50:21, 53:9, 53:12,
53:15, 53:17, 53:18, 53:20, 53:24,
54:1, 54:18, 54:19, 54:22, 55:3, 55:6,
56:7, 56:8, 56:15, 56:24, 58:23, 61:6,
61:24, 66:9, 71:6, 72:2, 72:4, 73:16,
80:16, 89:15, 90:2, 103:7, 104:8,
104:14, 104:18, 105:15, 105:19,
120:1, 120:2, 120:14, 130:23, 132:4,
132:22, 132:24, 133:1, 133:21,
133:22, 135:6, 149:13, 162:24,
162:25, 163:3, 178:25, 182:19,
196:21, 196:22, 211:21, 211:24,
212:19
**heard** [11] - 14:9, 63:3, 63:4, 78:16,
120:16, 120:19, 120:20, 153:1,
175:15, 178:1, 212:17
**hearing** [46] - 2:16, 6:24, 10:16, 14:3,
16:2, 18:20, 26:6, 39:11, 44:4, 44:13,
44:14, 44:15, 65:6, 66:7, 70:3, 71:24,
88:21, 130:2, 141:23, 141:25, 142:25,
143:3, 143:6, 143:10, 143:11, 143:13,
143:17, 143:20, 143:24, 144:5,

144:11, 144:13, 144:17, 145:5,
156:21, 166:12, 167:4, 176:24, 179:4,
190:11, 208:14, 212:15, 215:4, 215:9,
215:16
**HEARING** [1] - 1:11
**Hearing** [14] - 43:25, 44:18, 46:16,
46:24, 185:10, 185:15, 185:16,
185:18, 185:19, 185:21, 185:25,
190:10, 191:23, 193:9
**hearings** [2] - 2:25
**HEASTON** [6] - 1:3, 3:5, 3:8, 3:11, 3:24,
97:25
**Heaston** [177] - 2:16, 3:5, 3:6, 3:11,
3:20, 3:22, 4:2, 17:22, 21:23, 22:8,
23:18, 24:3, 24:9, 24:25, 25:3, 25:8,
25:11, 25:16, 27:20, 27:25, 28:25,
29:4, 29:10, 29:16, 29:20, 30:1, 30:6,
30:11, 31:2, 31:6, 31:11, 31:16, 31:21,
31:25, 33:2, 33:7, 33:20, 33:24, 34:3,
34:8, 34:19, 35:1, 35:20, 36:22, 37:9,
42:16, 43:21, 43:24, 46:24, 47:3,
47:14, 49:10, 49:13, 49:16, 49:19,
49:25, 51:6, 51:8, 51:14, 51:20, 51:24,
53:4, 53:6, 53:10, 53:12, 53:13, 53:17,
53:20, 53:24, 54:1, 55:3, 55:5, 56:10,
57:12, 58:22, 59:12, 60:18, 60:23,
61:4, 61:6, 61:9, 61:12, 61:18, 62:1,
62:6, 62:24, 64:3, 64:20, 65:9, 65:24,
66:15, 66:23, 67:7, 67:12, 67:18,
67:24, 68:10, 68:16, 68:22, 69:23,
70:14, 71:9, 72:16, 73:15, 73:19, 76:2,
79:22, 81:7, 83:21, 85:9, 86:6, 87:13,
87:25, 88:25, 96:14, 98:19, 99:16,
101:12, 101:18, 101:22, 102:13,
102:18, 102:23, 103:12, 103:19,
103:25, 106:10, 106:15, 106:18,
106:23, 107:4, 107:6, 107:13, 107:23,
108:8, 109:10, 109:19, 120:14,
120:17, 124:13, 125:10, 129:24,
139:10, 141:5, 142:12, 159:14,
159:19, 159:22, 169:10, 171:3,
171:19, 171:22, 183:4, 183:6, 183:9,
183:11, 183:15, 183:17, 191:17,
191:22, 192:6, 194:21, 196:5, 196:15,
201:15, 201:20, 203:6, 205:7, 205:18,
206:2, 206:10, 210:17, 210:19,
210:22, 212:1, 214:4
**Heaston's** [5] - 16:17, 54:21, 57:3,
170:14, 205:20
**held** [2] - 14:24, 77:4
**Hello** [8] - 55:6, 61:20, 72:1, 72:3,
72:12, 196:19, 196:21
**hello** [4] - 104:12, 104:17, 105:16,
105:18
**help** [2] - 44:16, 44:21
**helpful** [1] - 4:4
**helping** [1] - 213:22
**Hempstead** [1] - 1:16
**hereon** [1] - 7:17
**Hi** [1] - 135:1
**hiding** [1] - 13:17
**highlighted** [1] - 170:10

**highly** [1] - 80:3
**himself** [3] - 171:12, 171:22, 209:23
**hire** [5] - 121:20, 122:21, 127:15, 151:24, 197:15
**hired** [1] - 127:17
**hiring** [1] - 122:16
**history** [1] - 12:17
**hit** [1] - 41:3
**hm** [1] - 116:3
**Hold** [1] - 153:18
**hold** [4] - 88:16, 96:13, 153:18, 169:14
**home** [8] - 49:14, 63:12, 63:17, 76:18, 77:3, 87:13, 87:15, 150:20
**honest** [1] - 40:16
**honestly** [5] - 33:3, 36:21, 44:20, 64:24, 76:17
**Honestly** [1] - 208:15
**Honor** [111] - 3:4, 4:10, 4:15, 4:18, 4:25, 5:12, 5:15, 6:12, 6:15, 6:22, 7:7, 7:11, 9:11, 10:3, 10:14, 10:15, 11:24, 12:4, 13:6, 20:15, 21:22, 22:4, 22:16, 23:7, 23:12, 24:6, 28:19, 29:13, 30:25, 31:4, 32:20, 32:21, 32:25, 41:16, 43:11, 43:14, 45:12, 50:22, 51:3, 52:19, 54:7, 54:18, 56:1, 56:12, 57:6, 57:15, 59:10, 60:10, 62:4, 65:21, 70:9, 70:22, 71:2, 73:7, 79:5, 86:3, 88:6, 89:3, 89:5, 89:22, 91:18, 92:12, 94:13, 95:9, 95:21, 95:24, 98:21, 100:20, 101:7, 102:2, 103:2, 104:21, 108:14, 109:12, 110:6, 110:22, 111:13, 112:10, 117:24, 118:8, 128:10, 129:16, 130:14, 134:5, 135:7, 138:10, 142:3, 142:6, 146:7, 162:23, 162:24, 164:22, 168:6, 170:22, 178:16, 182:11, 182:14, 193:4, 201:10, 202:13, 206:4, 207:13, 209:16, 210:10, 210:13, 212:20, 213:1, 214:20, 216:12
**Honor's** [1] - 11:2
**HONORABLE** [1] - 1:11
**hope** [1] - 27:25
**host** [1] - 52:6
**hour** [7] - 8:6, 82:20, 134:17, 183:12, 201:16, 201:18
**hours** [1] - 178:7
**house** [4] - 108:4, 132:11, 132:13, 151:4
**Housing** [7] - 34:5, 34:10, 34:20, 34:24, 35:22, 161:24, 193:8
**housing** [33] - 25:21, 29:1, 30:3, 31:22, 33:24, 35:25, 50:3, 85:16, 85:21, 127:3, 127:11, 151:1, 155:8, 156:2, 156:7, 160:19, 160:23, 167:18, 168:24, 168:25, 179:21, 180:1, 181:3, 181:4, 181:7, 181:24, 182:8, 202:22, 203:3, 203:16, 203:17, 204:10, 212:5
**hundreds** [2] - 211:7, 211:8
**hung** [1] - 74:7
**hurting** [2] - 188:1, 188:2

---

**I**

**i-s** [1] - 126:2

**I..** [1] - 167:13
**idea** [13] - 44:18, 85:7, 107:18, 131:12, 131:15, 134:24, 165:24, 166:7, 177:11, 188:16, 189:7
**identification** [5] - 66:13, 93:8, 95:6, 96:20, 142:24
**identified** [1] - 50:10
**identify** [4] - 171:12, 171:14, 171:19, 171:22
**illegal** [4] - 31:17, 34:21, 129:19, 129:21
**illegal-lockout** [1] - 31:17
**illegally** [6] - 30:12, 31:7, 47:17, 130:11, 132:10, 151:16
**image** [2] - 51:21, 68:4
**images** [2] - 171:3, 172:9
**immaterial** [1] - 168:23
**impartially** [1] - 11:2
**implication** [1] - 27:15
**important** [3] - 88:24, 135:6, 135:11
**impossible** [2] - 11:13, 105:14
**impression** [1] - 117:2
**imprisonment** [1] - 140:10
**improper** [1] - 10:24
**inappropriate** [1] - 198:4
**inaudible** [3] - 130:21, 131:17, 150:20
**inaudible)** [1] - 145:25
**INC** [1] - 1:6
**Inc** [55] - 1:22, 1:23, 2:17, 5:8, 12:18, 23:1, 23:3, 25:12, 29:17, 32:1, 32:21, 33:8, 33:22, 34:9, 35:2, 43:22, 45:5, 68:11, 88:1, 88:20, 90:13, 90:15, 90:17, 90:19, 112:21, 112:22, 113:5, 113:10, 120:20, 125:22, 126:1, 126:4, 128:7, 149:7, 150:14, 150:18, 150:22, 151:2, 151:6, 154:4, 154:7, 155:7, 155:20, 157:4, 157:7, 157:12, 157:16, 157:20, 158:6, 172:17, 172:21, 173:2, 203:19, 206:22, 207:5
**Inc.'s** [1] - 162:3
**incendiary** [1] - 166:21
**incident** [2] - 117:1, 129:10
**include** [4] - 86:10, 186:14, 193:10, 213:4
**included** [8] - 12:22, 161:9, 161:12, 162:2, 162:4, 162:5, 165:3, 174:20
**including** [1] - 2:23
**inconvenienced** [1] - 129:21
**incorrect** [1] - 23:4
**increase** [1] - 91:13
**indeed** [1] - 23:7
**independent** [3] - 151:22, 153:25, 189:10
**independently** [3] - 152:11, 193:4, 212:9
**Indian** [1] - 194:17
**indicate** [1] - 189:24
**indicated** [4] - 14:23, 26:9, 76:7, 131:20
**Indicates** [1] - 3:8
**indicating** [7] - 8:25, 15:3, 34:9, 143:10, 198:21, 209:22, 210:3
**indicted** [1] - 199:2

**indifferent** [1] - 216:3
**indiscernible** [1] - 18:1
**indistinguishable** [1] - 18:1
**individual** [3] - 6:16, 141:8, 200:24
**individual's** [1] - 67:12
**individuals** [6] - 4:17, 6:8, 67:18, 68:5, 114:11, 171:20
**indulgence** [1] - 210:11
**infer** [1] - 28:7
**inference** [2] - 27:15, 28:3
**inferred** [3] - 168:11, 168:12, 168:16
**inferring** [2] - 27:22, 166:3
**inform** [6] - 150:14, 150:18, 150:22, 151:2, 151:6, 151:11
**information** [35] - 50:13, 140:16, 145:21, 145:22, 146:18, 146:20, 146:25, 147:5, 147:8, 147:11, 147:14, 147:17, 147:20, 147:23, 148:1, 148:4, 148:12, 148:19, 151:7, 154:8, 160:24, 165:21, 186:8, 194:14, 195:11, 195:12, 195:23, 202:1, 206:24, 209:9, 211:23, 212:2, 212:10, 212:11, 214:19
**informed** [2] - 6:24, 165:19
**Ingrid** [1] - 46:4
**inherent** [2] - 213:3, 214:7
**initial** [10] - 138:23, 141:18, 161:4, 161:9, 189:18, 191:22, 199:8, 204:15, 208:2, 211:1
**injuries** [18] - 46:25, 47:5, 47:8, 52:7, 59:16, 59:19, 64:9, 64:14, 64:17, 64:23, 139:23, 140:8, 140:13, 187:3, 187:12, 187:13, 187:24
**injury** [6] - 64:4, 64:12, 187:16, 187:18, 188:1, 188:9
**inquest** [2] - 166:9, 166:11, 166:14
**inquire** [4] - 24:4, 90:9, 112:9, 136:1
**inserted** [2] - 160:1, 160:3
**Inside** [1] - 81:23
**inside** [9] - 20:9, 84:16, 85:11, 115:10, 116:4, 118:16, 118:17, 188:3, 202:19
**inspection** [2] - 123:9, 123:11
**inspections** [3] - 95:16, 122:9, 123:8
**install** [1] - 115:1
**instance** [1] - 124:2
**instant** [1] - 12:6
**instead** [7] - 13:13, 14:20, 14:25, 133:20, 168:15, 173:6, 213:22
**instructing** [1] - 50:24
**instruction** [2] - 134:6, 134:12
**instrumental** [1] - 195:3
**insufficiency** [1] - 170:9
**insulate** [1] - 170:14
**intake** [1] - 184:25
**integrity** [1] - 14:5
**intended** [1] - 213:2
**intending** [1] - 16:2
**interest** [2] - 95:10, 147:2
**interested** [1] - 116:23
**interesting** [1] - 183:7
**interfered** [1] - 11:2
**interference** [2] - 132:17, 148:8

**internal** [1] - 204:5
**interpreted** [1] - 17:12
**interrupt** [3] - 54:21, 59:2, 79:20
**interrupted** [2] - 17:9, 99:4
**interruption** [6] - 113:19, 187:21, 189:2, 192:5, 193:20, 196:10
**interval** [1] - 192:15
**intervention** [1] - 129:19
**interview** [2] - 133:18, 183:11
**introduce** [5] - 35:20, 35:24, 36:3, 36:13, 74:12
**introduced** [2] - 36:17, 75:12
**introducing** [1] - 10:19
**invention** [1] - 142:15
**investigate** [2] - 163:14, 163:24
**investigation** [8] - 151:22, 152:5, 152:14, 154:1, 156:1, 156:13, 159:6, 164:9
**investigator** [1] - 151:25
**invocation** [7] - 27:6, 27:8, 27:10, 27:21, 28:2, 28:8, 28:13
**invoice** [2] - 155:24, 181:8
**invoices** [2] - 124:5, 124:6
**invoke** [7] - 7:16, 24:22, 25:2, 25:6, 25:9, 25:14, 28:6, 29:6, 29:18, 29:24, 30:4, 30:9
**invokes** [1] - 27:23
**invoking** [11] - 25:19, 28:1, 28:10, 31:9, 31:15, 31:19, 31:24, 34:2, 34:7, 34:11, 34:14
**involved** [1] - 124:10
**involving** [1] - 97:4
**IRA** [2] - 1:3, 24:3
**Ira** [25] - 3:5, 3:11, 3:20, 21:23, 24:3, 99:16, 101:12, 101:18, 101:22, 103:12, 106:10, 106:15, 106:18, 106:23, 107:4, 107:23, 108:8, 109:19, 120:14, 120:16, 124:13, 125:10, 129:24, 139:10, 141:5
**irrational** [1] - 184:18
**issue** [13] - 12:15, 17:19, 20:5, 20:6, 20:7, 21:19, 34:19, 159:20, 181:10, 184:13, 199:1, 212:7, 213:8
**issued** [5] - 2:24, 15:2, 130:3, 155:20, 162:16
**issues** [5] - 19:19, 41:14, 43:5, 56:13, 197:24
**item** [1] - 130:20
**itself** [4] - 145:22, 148:8, 162:13, 185:21

### J

**Jamaica** [1] - 113:7
**JANE** [2] - 1:6, 1:7
**Jane** [2] - 1:19, 206:22
**January** [15] - 11:14, 29:22, 30:7, 35:6, 94:5, 94:10, 96:11, 128:24, 128:25, 146:23, 151:13, 161:6, 161:19
**Jersey** [1] - 136:14
**job** [1] - 166:18
**jog** [1] - 201:23

**John** [2] - 1:19, 46:4
**join** [1] - 8:2
**Jose** [1] - 98:9
**Judge** [46] - 3:25, 4:22, 8:1, 16:4, 16:20, 41:21, 50:19, 52:18, 54:23, 55:14, 59:2, 73:2, 73:4, 88:17, 88:19, 105:12, 108:11, 108:25, 110:17, 130:17, 133:3, 133:23, 134:18, 135:2, 137:1, 138:7, 142:2, 142:19, 142:21, 150:7, 160:12, 165:15, 172:4, 174:6, 179:1, 181:20, 182:25, 185:22, 192:4, 198:1, 201:17, 204:14, 206:4, 210:10, 216:4
**judge** [39] - 3:14, 8:15, 9:8, 9:20, 14:12, 17:2, 22:25, 34:19, 34:23, 41:15, 53:22, 55:11, 55:16, 57:22, 79:18, 81:11, 85:13, 88:9, 110:25, 121:4, 166:18, 168:4, 173:19, 174:4, 174:8, 178:3, 198:9, 201:14, 201:22, 202:16, 203:21, 204:12, 205:4, 205:23, 206:12, 206:18, 207:8, 210:23, 215:5
**JUDGE** [1] - 1:12
**judge's** [2] - 153:19, 189:7
**judges** [1] - 138:12
**judgment** [3] - 162:4, 162:11, 189:10
**judicial** [6] - 14:6, 43:15, 43:17, 43:18, 45:13, 138:11
**July** [7] - 37:23, 166:8, 166:13, 166:16, 176:25, 177:1
**jumbled** [1] - 26:6
**June** [7] - 37:23, 63:8, 63:9, 190:24, 190:25, 191:19, 192:2
**justice** [1] - 202:24
**justified** [2] - 14:18, 14:21

### K

**Kadochnikov** [1] - 4:19
**KADOCHNIKOV** [6] - 1:22, 1:24, 4:15, 4:18, 5:3, 5:6
**Kandkhorov** [38] - 54:15, 56:2, 89:6, 89:8, 90:12, 91:7, 91:12, 91:17, 91:22, 92:9, 92:17, 93:10, 93:17, 93:21, 94:19, 95:11, 96:3, 96:18, 97:3, 98:11, 99:3, 99:5, 99:22, 100:10, 100:23, 101:12, 102:6, 102:22, 108:17, 109:4, 110:5, 110:19, 111:4, 111:11, 111:12, 118:12, 161:13, 181:25
**Kandkhorov's** [1] - 91:16
**Kate** [1] - 46:5
**keep** [9] - 56:21, 73:10, 78:13, 78:14, 116:21, 134:16, 142:16, 178:13, 212:15
**Keep** [3] - 92:7, 92:8
**keeping** [2] - 88:16, 207:2
**keeps** [1] - 204:3
**kept** [2] - 79:17, 210:21
**Kew** [2] - 1:23, 1:24
**key** [2] - 114:13, 117:15
**keys** [1] - 119:6
**kid** [1] - 185:13
**kids** [2] - 202:3, 202:14
**Kimberly** [1] - 98:9

**kind** [4] - 91:13, 115:11, 125:16, 215:21
**Kirkland** [17] - 6:23, 7:5, 78:3, 86:18, 86:22, 87:1, 87:6, 165:20, 165:23, 166:6, 169:8, 177:10, 177:13, 177:19, 178:17, 191:17, 209:24
**Kirkland's** [2] - 178:14, 179:3
**knowing** [3] - 131:23, 184:11, 190:22
**knowledge** [10] - 11:12, 17:24, 62:18, 78:9, 106:22, 107:3, 144:8, 160:3, 162:20, 211:3
**known** [3] - 150:15, 169:2, 214:19
**knows** [2] - 101:1, 211:9

### L

**laden** [1] - 19:16
**lady** [3] - 78:3, 111:1, 132:13
**Lai** [2] - 34:19, 160:12
**Lai's** [1] - 34:23
**landlord** [15] - 15:16, 97:6, 97:7, 97:10, 99:18, 125:22, 153:5, 162:9, 162:10, 162:13, 165:24, 166:6, 195:4, 202:2, 207:3
**landlord's** [1] - 167:17
**landlords** [1] - 151:15
**language** [1] - 169:5
**last** [19] - 7:3, 7:11, 8:5, 14:15, 26:15, 28:21, 37:25, 44:5, 64:25, 70:3, 79:8, 111:24, 118:20, 131:1, 132:20, 189:13, 205:5, 205:10
**lastly** [1] - 5:10
**late** [5] - 173:24, 185:10, 185:13, 191:19, 216:9
**latter** [1] - 6:19
**Law** [1] - 211:17
**law** [12] - 16:11, 86:16, 137:17, 138:17, 155:11, 156:23, 166:1, 167:23, 186:24, 193:10, 210:1, 215:15
**LAW** [1] - 1:18
**lawful** [3] - 11:7, 148:22, 148:25
**lawfully** [2] - 114:9, 114:13
**lawsuit** [101] - 11:4, 12:9, 12:21, 12:25, 13:24, 14:1, 14:13, 15:10, 15:18, 16:13, 16:23, 17:24, 18:11, 19:20, 28:9, 30:2, 33:21, 36:14, 36:19, 36:23, 37:1, 37:12, 37:20, 38:15, 39:1, 39:21, 42:22, 52:2, 53:5, 65:7, 68:23, 69:3, 69:4, 69:5, 69:18, 69:20, 69:24, 70:1, 70:15, 79:1, 79:7, 79:14, 115:12, 120:13, 120:20, 120:23, 121:15, 121:17, 128:6, 128:8, 139:1, 139:2, 141:15, 141:20, 144:19, 145:8, 145:18, 152:4, 157:1, 157:19, 157:24, 158:6, 160:16, 173:21, 174:24, 178:18, 182:8, 185:14, 185:19, 186:1, 186:3, 186:4, 186:13, 186:14, 188:24, 189:21, 190:4, 190:6, 190:11, 190:17, 190:20, 191:2, 191:3, 191:8, 191:23, 191:25, 192:7, 193:8, 194:4, 194:20, 197:16, 199:6, 206:17, 209:5, 209:11, 209:21, 210:20, 211:5, 211:9
**lawsuits** [4] - 25:17, 167:12, 167:13,

211:7

**lawyer** [35] - 3:17, 14:23, 15:6, 15:8, 16:10, 17:16, 17:18, 21:2, 36:17, 53:7, 54:16, 61:13, 69:12, 72:19, 72:21, 73:25, 78:22, 80:4, 84:25, 85:5, 85:6, 91:16, 102:10, 111:5, 112:5, 132:20, 150:2, 173:14, 173:15, 174:8, 176:18, 196:7, 197:15

**lawyers** [4] - 5:11, 63:19, 88:11, 111:12

**lay** [4] - 6:15, 57:7, 213:6, 213:11

**lead** [2] - 27:21, 28:3

**leading** [2] - 108:22, 118:4

**leads** [1] - 119:11

**learned** [2] - 101:21, 127:10

**learning** [1] - 128:6

**lease** [55] - 11:14, 28:5, 28:25, 29:20, 30:1, 30:3, 31:22, 45:4, 49:25, 97:6, 97:13, 97:16, 99:6, 99:9, 99:13, 99:16, 99:22, 99:23, 100:2, 100:6, 100:14, 100:15, 100:23, 101:3, 124:11, 124:20, 124:22, 125:4, 125:8, 125:11, 125:16, 125:18, 126:8, 126:9, 126:10, 128:19, 128:24, 131:1, 131:5, 131:8, 131:12, 146:15, 146:22, 151:3, 151:12, 153:6, 153:22, 155:19, 155:20, 160:20, 181:18, 203:22, 204:3, 204:10

**leaseholder** [1] - 165:22

**leases** [5] - 105:22, 162:5, 180:2, 181:3, 181:9

**least** [2] - 4:17, 6:6

**leather** [2] - 48:3, 86:12

**leave** [11] - 7:13, 7:22, 8:10, 9:13, 22:19, 22:23, 41:11, 42:13, 73:6, 135:4, 135:10

**leaving** [4] - 41:4, 66:10, 71:5, 72:9

**led** [8] - 79:9, 106:15, 106:18, 106:22, 107:3, 199:5, 201:21, 212:2

**leeway** [1] - 169:19

**left** [9] - 37:6, 38:10, 63:2, 74:1, 76:14, 119:24, 120:4, 141:10, 183:8

**legal** [9] - 170:16, 175:9, 175:23, 176:18, 186:16, 187:2, 197:17, 200:11, 213:19

**legally** [1] - 104:2

**legs** [5] - 59:20, 64:5, 64:12, 140:9, 188:10

**lengthy** [1] - 191:12

**letter** [13] - 14:1, 15:3, 166:9, 166:11, 166:13, 166:15, 176:23, 176:25, 189:20, 190:5, 198:20, 199:7, 216:3

**letting** [2] - 150:7, 211:5

**level** [9] - 114:2, 114:7, 115:12, 116:18, 116:19, 118:1, 118:6, 124:23, 124:25

**liable** [1] - 206:17

**license** [1] - 136:15

**licensed** [3] - 136:11, 136:13, 152:3

**licenses** [1] - 136:18

**lie** [2] - 129:13, 206:11

**lied** [1] - 21:2

**lies** [1] - 13:23

**lieu** [1] - 134:10

**life** [1] - 119:22

**light** [3] - 16:4, 72:20

**likely** [1] - 112:6

**limited** [1] - 8:17

**line** [5] - 57:1, 134:22, 134:24, 191:18

**lines** [2] - 71:12, 210:5

**link** [2] - 8:2, 174:6

**linked** [1] - 181:7

**list** [6] - 8:23, 22:5, 89:23, 140:13, 196:1

**List** [1] - 202:1

**listed** [7] - 8:16, 64:14, 64:23, 99:16, 153:21, 154:8, 157:7

**listen** [10] - 56:20, 57:2, 61:13, 66:5, 117:13, 121:21, 122:4, 122:6, 122:23, 123:9

**listened** [1] - 82:21

**listing** [4] - 115:21, 124:3, 124:7, 151:19

**lists** [1] - 8:23

**litigant** [2] - 213:4, 213:5

**litigation** [1] - 184:20

**live** [3] - 49:19, 134:10, 212:6

**lived** [2] - 109:10, 162:7

**living** [19] - 68:13, 80:9, 80:13, 80:15, 80:17, 80:21, 80:25, 81:2, 81:5, 106:3, 114:11, 122:8, 123:10, 132:9, 132:10, 132:16, 132:18, 162:18

**LLP** [1] - 1:22

**located** [1] - 35:17

**location** [1] - 154:12

**lock** [4] - 117:16, 119:9, 151:16

**locked** [9] - 30:12, 31:7, 31:12, 47:17, 129:8, 130:11, 202:2, 202:17, 213:20

**locking** [1] - 129:11

**lockout** [4] - 31:17, 34:21, 129:19, 129:22

**locks** [16] - 117:17, 119:4, 119:5, 119:7, 119:8, 119:10, 119:11, 119:25, 120:1, 120:4, 129:9, 151:8, 151:16, 195:25, 202:6, 202:7

**locksmith** [1] - 202:9

**Look** [2] - 190:18, 200:22

**look** [22] - 40:2, 53:7, 66:15, 74:12, 121:2, 140:7, 152:7, 152:11, 153:19, 158:9, 159:17, 168:21, 179:10, 185:13, 185:20, 192:11, 193:21, 194:11, 194:16, 204:14, 204:15, 206:19

**looked** [16] - 40:1, 47:21, 75:19, 83:16, 113:16, 152:10, 159:7, 159:12, 159:15, 159:23, 163:17, 163:19, 168:20, 182:24, 183:7, 188:17

**looking** [10] - 62:7, 64:3, 90:5, 97:23, 97:24, 128:12, 156:15, 160:17, 201:1, 206:18

**looks** [2] - 90:7, 146:12

**lose** [3] - 22:20, 58:17, 58:22

**lost** [11] - 21:10, 54:16, 74:21, 96:14, 98:17, 104:20, 149:11, 149:12, 149:16, 177:23, 196:17

**loud** [1] - 128:14

**louder** [2] - 18:18, 130:23

**love** [2] - 48:3, 102:24

**lower** [1] - 93:20

**Lydia** [1] - 34:19

**lying** [3] - 21:2, 173:18

## M

**machine** [1] - 2:6

**Madam** [1] - 51:16

**mail** [7] - 76:23, 76:24, 78:17, 79:10, 117:1, 123:18, 189:20, 190:5, 192:19

**mailbox** [1] - 120:24

**mailed** [3] - 87:14, 87:17, 192:20

**mails** [5] - 78:18, 78:19, 123:6, 211:17

**main** [2] - 196:14, 196:25

**maintain** [1] - 30:12

**majority** [1] - 137:10

**mal** [1] - 199:9

**mal-pros** [1] - 199:9

**male** [10] - 111:5, 159:7, 159:16, 159:23, 165:6, 167:15, 168:13, 168:14, 168:21, 200:20

**malpractice** [2] - 188:6, 188:7

**man** [1] - 102:9

**manage** [2] - 113:7, 114:18

**management** [3] - 112:23, 112:24, 112:25

**manager** [4] - 12:17, 113:10, 124:10, 126:7

**manager's** [1] - 12:13

**managing** [3] - 114:8, 115:20, 131:25

**manner** [1] - 205:19

**March** [16] - 35:12, 43:19, 43:22, 93:5, 93:25, 94:1, 94:5, 99:23, 99:24, 99:25, 125:5, 150:24, 157:11, 162:17

**march** [1] - 88:12

**marching** [1] - 96:23

**Margaret** [7] - 78:3, 78:6, 86:18, 165:20, 165:23, 191:16, 209:24

**marked** [8] - 46:22, 60:13, 63:17, 92:15, 94:16, 96:1, 99:1, 101:10

**marred** [1] - 14:6

**mask** [2] - 9:17, 112:6

**massive** [1] - 202:23

**material** [2] - 14:7, 169:1

**materially** [1] - 10:21

**matter** [7] - 6:17, 7:3, 11:3, 19:7, 127:11, 182:4, 216:23

**matters** [1] - 6:5

**mean** [27] - 19:23, 37:3, 37:22, 44:20, 46:7, 54:13, 64:12, 65:20, 69:1, 77:10, 78:23, 80:18, 81:16, 82:16, 99:23, 116:18, 132:8, 135:9, 143:19, 151:24, 161:1, 165:9, 175:7, 208:15, 209:6, 214:23, 214:24

**mean..** [1] - 168:5

**meant** [1] - 200:4

**media** [1] - 2:24

**medical** [3] - 47:3, 47:4, 140:10

**meet** [5] - 71:24, 72:16, 182:23, 184:7,

185:8
**member** [1] - 169:8
**memory** [1] - 201:23
**mentioned** [8] - 6:4, 77:20, 123:22, 185:7, 191:23, 194:2, 205:1, 205:6
**merit** [2] - 10:24, 15:11
**meritless** [2] - 11:4, 12:25
**mesmerized** [1] - 121:19
**message** [4] - 172:3, 190:12, 191:12, 196:20
**messages** [10] - 169:11, 196:15, 197:1, 197:2, 198:10, 198:16, 209:22, 210:1, 210:3, 210:17
**messing** [1] - 176:4
**met** [20] - 17:22, 18:5, 39:10, 73:21, 73:23, 75:14, 78:1, 183:4, 183:15, 183:17, 183:25, 184:4, 184:23, 185:17, 198:18, 198:23, 200:9, 200:13, 201:16, 203:12
**mic** [1] - 72:10
**Michele** [1] - 89:21
**microphone** [5] - 22:19, 22:23, 72:10, 89:15, 105:4
**microwave** [1] - 49:4
**middle** [3] - 21:17, 29:21, 184:14
**might** [8] - 71:14, 74:4, 80:2, 109:1, 154:2, 156:8, 182:12, 210:17
**million** [11] - 63:3, 63:6, 63:11, 63:14, 65:2, 65:4, 76:19, 77:20, 77:21, 77:24, 140:19
**mind** [4] - 6:5, 42:14, 72:9, 206:5
**mine** [1] - 154:3
**minor** [1] - 129:20
**minorities** [1] - 167:23
**minority** [1] - 168:2
**minute** [6] - 70:23, 71:11, 88:10, 98:1, 128:10, 129:16
**minutes** [13] - 10:8, 30:18, 41:13, 55:20, 57:6, 57:7, 57:9, 76:6, 110:9, 163:4, 163:8, 183:12
**miscarriage** [1] - 202:24
**misconduct** [2] - 138:14, 167:5
**mislead** [1] - 212:1
**misleads** [1] - 91:19
**missed** [1] - 184:2
**Missing** [1] - 74:22
**missing** [7] - 17:17, 49:5, 49:8, 74:22, 196:1, 200:15, 202:20
**misspoke** [2] - 143:22, 143:24
**mistaken** [2] - 94:23, 203:25
**mixed** [1] - 137:10
**MLS** [4] - 124:4, 124:7, 124:8, 151:18
**mm-hm** [1] - 116:3
**mocking** [1] - 190:13
**mode** [2] - 196:14, 196:25
**modify** [1] - 172:9
**moment** [8] - 6:3, 16:14, 63:12, 81:4, 98:18, 102:3, 182:12, 201:23
**Monday** [1] - 1:8
**monetary** [5] - 32:1, 38:17, 38:22, 63:1, 63:15

**money** [15] - 33:7, 33:9, 62:24, 63:5, 65:18, 70:6, 87:25, 102:22, 102:25, 131:13, 158:5, 172:20, 173:1, 192:12, 202:2
**monies** [1] - 25:11
**monitoring** [1] - 211:14
**month** [8] - 35:5, 35:9, 35:12, 35:16, 175:7, 203:23, 208:3, 208:9
**month's** [1] - 203:20
**monthly** [2] - 101:3, 129:3
**months** [2] - 29:22, 30:7
**more..** [2] - 13:5
**morning** [1] - 81:13
**Moses** [2] - 138:7, 138:13
**most** [3] - 88:24, 100:25, 194:24
**mother** [2] - 166:1, 210:1
**mother-in-law** [2] - 166:1, 210:1
**motion** [29] - 12:22, 13:15, 14:2, 16:16, 17:7, 27:16, 68:17, 68:20, 88:4, 115:10, 151:1, 155:7, 155:12, 155:24, 172:15, 173:11, 173:12, 176:17, 177:20, 178:19, 179:17, 197:12, 198:8, 198:9, 208:24, 211:14, 211:17, 211:24, 212:13
**motions** [1] - 211:23
**mouth** [5] - 59:20, 64:4, 140:9, 187:20, 188:9
**move** [24] - 21:16, 21:18, 43:7, 46:1, 52:16, 57:5, 58:3, 61:22, 66:11, 89:14, 92:13, 94:14, 95:23, 108:25, 109:3, 111:15, 164:17, 170:22, 173:21, 175:18, 176:19, 188:23, 188:25, 201:5
**Move** [1] - 189:1
**moved** [1] - 57:19
**moving** [2] - 125:5, 182:4
**multiple** [1] - 85:15
**must** [5] - 19:6, 140:18, 154:13, 166:5, 211:16
**mute** [13] - 5:22, 6:2, 43:13, 53:13, 53:14, 54:2, 71:18, 96:22, 112:11, 142:13, 149:19, 168:6, 183:2
**muted** [1] - 168:8

# N

**name** [39] - 3:18, 24:2, 40:1, 40:3, 40:5, 40:6, 40:7, 60:25, 61:9, 61:18, 67:12, 67:21, 68:2, 68:8, 73:1, 75:17, 75:18, 82:19, 94:22, 111:1, 111:22, 111:25, 112:2, 112:7, 120:14, 120:16, 120:19, 120:20, 121:25, 132:20, 135:24, 136:4, 161:12, 194:25, 195:9, 203:22, 205:10, 209:25
**Namely** [1] - 214:2
**names** [3] - 109:11, 161:14, 195:13
**Nathan** [1] - 138:12
**nature** [3] - 18:7, 20:7, 200:23
**near** [3] - 52:25, 145:10, 145:14
**necessarily** [2] - 152:24, 178:4
**necessary** [3] - 3:1, 54:11, 57:11
**neck** [6] - 59:19, 64:4, 140:8, 187:19, 188:1, 188:9

**need** [28] - 18:16, 41:10, 41:16, 43:2, 52:15, 55:23, 57:5, 61:2, 65:25, 71:18, 72:6, 73:5, 74:4, 83:6, 88:10, 89:14, 133:16, 133:19, 134:13, 155:14, 163:1, 163:4, 163:6, 169:15, 206:20, 211:24, 215:3
**needlessly** [1] - 11:3
**needn't** [2] - 164:18, 169:18
**needs** [2] - 60:6, 178:13
**negative** [2] - 27:14, 28:3
**negatively** [2] - 27:22, 28:7
**negligent** [1] - 186:23
**negotiated** [1] - 13:7
**neighbor** [1] - 108:3
**neighbor's** [1] - 110:10
**neighborhood** [1] - 107:9
**neighbors** [1] - 108:1
**nerves** [3] - 59:20, 64:5, 140:9
**nervous** [3] - 59:20, 64:5, 140:9
**Never** [1] - 90:21
**never** [68] - 11:7, 11:11, 12:19, 13:10, 13:15, 16:17, 18:14, 19:8, 19:9, 40:14, 40:16, 40:19, 42:14, 60:17, 60:19, 76:24, 85:12, 99:17, 101:14, 101:17, 102:20, 102:21, 103:9, 103:13, 103:19, 104:1, 104:2, 104:3, 104:4, 104:5, 104:6, 106:9, 106:11, 107:14, 107:24, 119:22, 120:18, 120:22, 124:15, 125:16, 126:9, 126:15, 127:14, 127:15, 128:7, 129:4, 130:21, 131:19, 166:11, 183:25, 184:4, 186:4, 186:10, 187:19, 188:10, 189:5, 189:15, 193:25, 194:6, 194:19, 194:21
**new** [2] - 70:3, 143:10
**NEW** [3] - 1:1, 1:7, 1:18
**New** [29] - 1:6, 1:16, 1:18, 1:19, 1:24, 2:4, 14:16, 15:19, 25:4, 59:13, 113:8, 128:21, 129:19, 129:24, 136:14, 136:16, 138:4, 138:12, 140:19, 146:17, 152:7, 152:11, 152:23, 154:9, 204:25, 206:24, 206:25
**next** [31] - 4:8, 6:21, 41:23, 48:5, 56:13, 62:3, 78:10, 79:11, 88:14, 92:23, 97:10, 99:15, 99:18, 110:21, 118:10, 126:16, 133:19, 134:4, 146:22, 154:14, 163:11, 164:14, 180:5, 183:19, 183:22, 185:14, 185:15, 193:1, 199:16, 202:5, 211:22
**Next** [5] - 54:15, 67:16, 67:17, 67:23, 68:4
**nice** [1] - 106:5
**nicknames** [1] - 24:11
**night** [2] - 119:16, 184:14
**noble** [1] - 206:5
**nobody** [2] - 116:10, 121:22
**noise** [1] - 96:24
**None** [1] - 131:18
**none** [2] - 174:20, 193:21
**note** [1] - 2:19
**nothing** [15] - 9:18, 18:9, 70:6, 70:12, 79:18, 103:1, 108:11, 109:11, 109:12,

110:17, 130:14, 133:23, 173:20, 201:10, 210:6
**Nothing** [4] - 71:2, 88:6, 182:14, 209:16
**notice** [48] - 17:23, 18:5, 18:6, 43:15, 43:17, 43:18, 45:13, 52:1, 52:6, 57:17, 59:12, 59:16, 59:18, 60:2, 62:17, 62:20, 65:17, 76:7, 76:19, 125:25, 138:11, 138:25, 139:2, 139:4, 139:10, 139:20, 140:15, 142:25, 143:14, 143:20, 144:2, 144:5, 183:13, 183:15, 183:25, 184:4, 184:21, 185:2, 185:5, 185:6, 185:23, 186:9, 186:21, 187:23, 188:18, 188:20, 193:5, 212:23
**Notice** [1] - 52:3
**noticed** [2] - 11:11, 65:15
**notices** [3] - 139:17, 141:22, 141:25
**notification** [3] - 110:8, 117:6, 117:9
**notified** [1] - 12:17
**notify** [3] - 190:6, 191:22, 192:1
**notifying** [1] - 210:19
**November** [16] - 43:25, 44:5, 46:24, 65:9, 65:12, 96:5, 96:10, 123:16, 123:17, 123:19, 143:19, 144:6, 144:17, 145:5, 150:12, 207:21
**nowhere** [1] - 122:11
**nugget** [1] - 41:3
**number** [14] - 58:12, 59:3, 59:7, 72:19, 72:20, 73:24, 121:25, 138:9, 138:13, 153:8, 153:11, 153:13, 164:4
**Number** [6] - 159:3, 159:5, 160:6, 164:5, 190:10, 190:12
**numbered** [1] - 147:3
**numbers** [1] - 45:18
**numerous** [1] - 79:16
**NYC** [2] - 130:2, 148:8
**NYPD** [7] - 1:7, 1:19, 45:10, 130:5, 159:5, 160:6, 165:3

# O

**o'clock** [6] - 9:10, 9:23, 9:24, 55:20, 56:3, 163:5
**oath** [4] - 44:24, 45:3, 45:8, 53:4
**object** [2] - 25:24, 166:20
**objected** [2] - 188:13, 188:15
**objecting** [2] - 26:2, 26:8
**Objection** [3] - 86:24, 87:4, 87:9
**objection** [5] - 27:5, 101:23, 102:15, 108:22, 117:5
**objects** [1] - 215:2
**obligation** [3] - 152:4, 153:25, 170:2
**observe** [1] - 57:13
**obtain** [2] - 11:9, 150:9
**obtained** [3] - 106:7, 156:9, 212:5
**obtaining** [1] - 12:11
**obvious** [2] - 121:21, 121:22
**obviously** [2] - 88:25, 214:12
**Occupancy** [2] - 151:20, 153:2
**occupancy** [15] - 92:20, 93:3, 93:12, 93:15, 93:21, 94:3, 95:17, 106:8, 113:16, 124:3, 155:17, 162:6, 162:17,

162:20, 181:8
**occupants** [1] - 15:17
**occupation** [2] - 136:9, 150:23
**occupied** [12] - 11:16, 11:19, 12:3, 103:13, 103:20, 104:1, 104:2, 104:5, 114:9, 115:13, 115:14, 132:5
**occupying** [1] - 132:3
**occurred** [3] - 11:12, 18:9, 199:6
**October** [20] - 1:8, 37:24, 37:25, 43:16, 43:18, 65:15, 114:16, 123:16, 123:19, 141:19, 144:23, 145:2, 146:9, 149:6, 150:12, 175:7, 208:3, 208:9, 216:1, 216:24
**OF** [3] - 1:1, 1:6, 1:11
**offending** [1] - 209:4
**offer** [3] - 60:10, 101:8, 151:18
**offering** [1] - 46:14
**office** [28] - 37:6, 37:24, 44:8, 49:22, 63:25, 76:3, 76:4, 82:20, 115:21, 117:10, 135:3, 141:23, 143:1, 144:2, 144:10, 161:5, 174:17, 182:25, 183:4, 183:18, 184:8, 184:18, 192:14, 192:17, 192:18, 193:5, 197:15, 199:7
**Office** [4] - 16:8, 26:25, 27:18, 198:20
**Officer** [1] - 22:10
**officer** [3] - 47:20, 184:15, 184:16
**officers** [13] - 14:16, 15:20, 31:22, 45:9, 50:1, 157:19, 167:19, 169:2, 195:1, 195:11, 195:13, 214:3, 214:17
**officially** [1] - 115:14
**often** [2] - 114:23, 115:24
**old** [2] - 129:7
**older** [1] - 75:16
**once** [7] - 8:20, 13:15, 129:21, 130:11, 143:25, 178:3, 185:10
**One** [2] - 131:1, 205:5
**one** [67] - 5:8, 9:8, 16:1, 23:5, 27:7, 39:7, 40:4, 41:15, 50:8, 52:11, 57:18, 60:4, 60:5, 62:23, 63:7, 63:20, 63:22, 63:23, 70:22, 77:9, 77:10, 96:13, 99:6, 99:16, 100:6, 100:14, 103:7, 113:20, 114:5, 117:11, 119:9, 120:24, 122:23, 123:4, 126:2, 126:3, 127:17, 128:10, 129:16, 130:20, 131:22, 134:10, 141:5, 141:7, 142:13, 145:15, 151:14, 151:17, 164:4, 174:13, 178:17, 178:25, 187:1, 189:13, 190:10, 190:11, 190:24, 192:18, 193:13, 194:10, 194:11, 198:22, 205:15, 210:11, 215:13
**one-year** [2] - 100:6, 100:14
**ones** [3] - 57:18, 102:22, 203:15
**ongoing** [1] - 112:17
**onward** [1] - 210:20
**oo0oo** [2] - 2:12, 216:17
**open** [2] - 161:10, 212:15
**opened** [1] - 118:15
**opening** [2] - 10:4, 14:11
**operative** [1] - 12:8
**opinion** [2] - 200:19, 201:2
**opportunity** [7] - 14:4, 14:8, 18:14,

57:13, 163:14, 163:22, 215:13
**oppose** [1] - 155:13
**opposed** [1] - 27:14
**opposite** [1] - 51:9
**opposition** [15] - 16:16, 17:7, 68:16, 167:4, 167:14, 167:21, 168:22, 168:24, 169:3, 169:6, 169:7, 169:16, 169:20, 209:2, 211:19
**option** [1] - 175:10
**options** [5] - 174:13, 174:18, 174:20, 176:19
**oral** [1] - 215:17
**order** [53] - 8:23, 11:9, 12:11, 22:5, 22:7, 27:8, 31:22, 34:20, 34:23, 41:25, 55:23, 130:3, 130:8, 138:2, 138:14, 138:15, 142:6, 148:8, 151:1, 153:13, 153:14, 153:15, 153:19, 155:11, 155:12, 155:13, 155:16, 155:21, 156:7, 160:11, 163:17, 164:11, 167:18, 168:25, 169:3, 182:5, 182:9, 189:8, 193:9, 194:4, 202:18, 202:21, 203:3, 203:17, 204:4, 204:10, 204:25, 205:3, 212:5
**ordinarily** [1] - 52:25
**original** [12] - 40:14, 43:16, 138:22, 144:19, 145:7, 145:8, 145:12, 158:23, 204:19, 205:15, 206:15, 208:12
**otherwise** [4] - 86:1, 167:12, 188:5, 206:24
**outlet** [1] - 133:13
**outlining** [1] - 172:15
**outside** [7] - 20:11, 47:15, 81:23, 81:24, 81:25, 82:2, 82:12
**oven** [1] - 49:4
**overrule** [1] - 27:4
**overruled** [4] - 101:25, 102:16, 108:23, 109:2
**overseas** [1] - 122:19
**overwhelming** [1] - 12:24
**own** [11] - 7:16, 9:16, 13:17, 14:18, 40:4, 81:8, 90:13, 91:1, 174:9, 191:9, 197:16
**owned** [4] - 90:17, 131:17, 195:10, 196:1
**owner** [15] - 12:13, 29:17, 68:11, 90:16, 94:24, 109:7, 109:8, 110:12, 118:12, 131:9, 131:21, 152:19, 152:21, 195:1
**owners** [1] - 11:11

# P

**P-A-W-A-R** [1] - 135:25
**p.m** [4] - 1:8, 129:6, 130:10, 186:20
**P.O** [2] - 1:7, 1:19
**P1** [1] - 142:24
**P2** [1] - 143:7
**P3** [1] - 143:16
**PACER** [1] - 77:24
**packaging** [1] - 118:18
**packet** [2] - 19:1
**page** [19] - 48:5, 60:20, 60:25, 61:19, 62:6, 62:8, 67:13, 91:11, 92:6, 92:23,

97:9, 126:16, 140:21, 141:2, 154:14, 180:5, 199:16, 207:18, 207:22
**pages** [2] - 188:12, 207:23
**paid** [7] - 30:6, 102:23, 114:12, 127:17, 129:3, 202:1, 203:19
**PAMELA** [1] - 1:11
**panel** [5] - 118:25, 119:1, 119:2, 119:3
**paper** [14] - 60:4, 60:5, 60:6, 62:14, 62:15, 63:3, 63:13, 63:16, 63:20, 63:23, 76:14, 121:1
**papers** [6] - 16:6, 19:2, 37:24, 63:5, 63:19, 63:25
**paperwork** [11] - 47:12, 72:23, 74:12, 75:20, 76:18, 79:10, 83:17, 83:18, 85:13, 95:15
**paragraph** [17] - 19:9, 19:10, 64:3, 64:9, 64:22, 69:23, 128:16, 128:18, 129:18, 140:6, 140:7, 140:22, 146:22, 148:16, 159:5, 205:1, 206:21
**Paragraph** [17] - 64:10, 146:15, 147:4, 147:7, 147:10, 147:13, 147:16, 147:19, 147:22, 147:25, 148:3, 148:6, 148:9, 148:11, 148:18, 159:3, 160:6
**paragraphs** [1] - 147:3
**Parkway** [71] - 25:4, 29:22, 30:13, 31:8, 31:12, 31:18, 34:4, 35:3, 35:7, 35:10, 35:14, 35:18, 36:5, 44:25, 47:15, 49:20, 49:23, 50:9, 50:14, 50:17, 68:14, 75:2, 75:9, 82:9, 83:25, 84:12, 84:16, 85:11, 85:23, 90:19, 90:23, 91:25, 92:10, 93:4, 93:22, 96:4, 99:7, 101:13, 102:14, 102:19, 103:15, 103:20, 104:1, 107:7, 108:18, 108:21, 113:7, 113:11, 114:1, 114:9, 115:4, 124:10, 124:14, 126:5, 126:7, 127:8, 128:21, 146:17, 148:23, 149:1, 150:15, 150:23, 151:19, 152:8, 152:12, 152:17, 153:22, 162:6, 165:22, 181:9, 181:11
**part** [11] - 6:20, 26:15, 33:8, 38:24, 60:21, 61:11, 65:3, 87:2, 105:10, 184:2, 206:8
**participants** [1] - 2:14
**participate** [2] - 43:24, 58:18
**participated** [2] - 44:17, 165:13
**particular** [8] - 14:14, 14:15, 14:17, 70:7, 80:4, 185:8, 193:13, 193:17
**particularly** [6] - 16:4, 26:13, 26:17, 26:18, 26:21, 74:15
**parties** [8] - 2:18, 3:2, 13:20, 23:9, 194:20, 212:18, 215:13, 215:21
**partner** [1] - 185:17
**partnerships** [1] - 112:18
**parts** [2] - 20:25, 190:9
**party** [3] - 23:13, 139:10, 167:9
**past** [2] - 6:25, 11:4
**Pause** [13] - 21:5, 21:9, 26:7, 38:5, 56:22, 58:8, 58:15, 71:1, 72:7, 104:10, 168:7, 177:7, 201:9
**pause** [6] - 96:15, 97:19, 98:16, 102:5, 111:9, 113:22

**PAWAR** [30] - 5:12, 8:15, 8:19, 9:7, 9:13, 9:15, 9:20, 9:23, 30:16, 30:20, 41:12, 41:15, 41:20, 42:1, 42:4, 42:8, 42:10, 55:11, 55:14, 55:16, 56:3, 56:6, 73:2, 73:4, 73:7, 73:12, 135:2, 135:9, 216:4, 216:7
**Pawar** [162] - 5:12, 5:16, 7:19, 7:22, 8:6, 8:12, 9:5, 12:16, 12:17, 12:19, 12:25, 13:10, 13:14, 13:16, 13:25, 17:20, 17:23, 18:5, 18:9, 30:15, 30:17, 33:15, 33:17, 33:18, 33:21, 37:11, 40:9, 40:10, 40:11, 40:14, 40:19, 40:21, 40:23, 41:9, 41:10, 42:12, 42:18, 43:21, 47:4, 47:8, 47:10, 55:12, 55:15, 55:25, 61:2, 68:22, 68:25, 69:1, 69:2, 69:4, 69:7, 69:10, 69:15, 70:14, 72:17, 73:1, 73:5, 73:21, 73:23, 75:8, 75:11, 75:12, 75:14, 75:16, 76:5, 76:22, 76:23, 76:25, 77:16, 78:1, 78:2, 78:11, 78:18, 79:22, 79:25, 80:6, 80:20, 80:24, 81:5, 81:7, 81:8, 81:14, 81:19, 82:15, 82:17, 83:14, 83:16, 85:2, 85:10, 85:20, 85:21, 88:15, 88:25, 121:24, 123:3, 123:14, 133:20, 134:6, 134:7, 135:1, 135:8, 135:17, 136:4, 136:5, 137:8, 138:15, 140:3, 140:7, 142:25, 143:9, 143:17, 146:8, 149:5, 149:15, 149:19, 150:11, 150:14, 151:18, 151:22, 152:3, 152:19, 155:6, 159:9, 159:21, 163:14, 164:1, 164:15, 164:18, 165:2, 167:4, 167:14, 170:2, 170:20, 170:25, 175:20, 177:9, 177:23, 178:20, 178:23, 178:24, 179:9, 182:7, 182:20, 182:23, 191:21, 201:12, 207:16, 207:20, 208:8, 208:20, 210:9, 212:3, 212:7, 212:11, 213:15, 213:24, 214:7, 214:14, 214:19, 216:5
**Pawar's** [6] - 8:11, 40:7, 44:8, 76:3, 76:4, 214:6
**pay** [9] - 35:1, 35:5, 35:9, 35:12, 122:22, 122:24, 122:25, 140:23, 141:12
**paying** [2] - 122:10, 178:4
**payment** [3] - 35:13, 35:16, 63:9
**payments** [1] - 129:2
**PC** [1] - 213:7
**PD** [1] - 22:13
**pending** [5] - 173:12, 173:13, 174:5, 197:18, 197:23
**penny** [1] - 129:4
**people** [11] - 15:2, 101:17, 106:3, 113:13, 129:4, 132:3, 132:9, 132:16, 132:18, 194:24, 195:7
**percent** [1] - 126:9
**perfect** [3] - 5:17, 34:16, 45:25
**perfectly** [1] - 8:22
**perhaps** [6] - 4:5, 54:5, 54:21, 71:6, 142:3, 142:13
**period** [2] - 77:19, 192:25
**perjury** [1] - 206:11
**permission** [3] - 12:14, 121:5, 197:19

**permits** [1] - 113:14
**perpetrated** [1] - 10:17
**persisted** [1] - 12:25
**person** [13] - 79:17, 86:15, 89:17, 96:23, 118:10, 131:13, 131:17, 185:9, 190:15, 195:2, 200:19
**personal** [3] - 107:2, 115:25, 211:1
**personally** [3] - 105:22, 106:11, 184:5
**Persons** [1] - 2:19
**pertaining** [1] - 50:14
**petition** [2] - 34:3, 160:12
**phone** [33] - 40:11, 53:9, 53:16, 57:2, 57:11, 58:10, 58:12, 58:18, 58:19, 58:23, 59:3, 59:7, 71:16, 71:17, 74:8, 96:22, 104:25, 105:1, 105:9, 105:13, 121:25, 133:1, 133:2, 133:5, 133:8, 133:12, 133:13, 134:21, 134:24, 153:8, 174:7, 198:13
**phones** [1] - 183:3
**photo** [12] - 66:24, 67:3, 67:5, 67:7, 67:16, 67:17, 67:19, 68:2, 68:6, 68:8, 165:10, 168:18
**photograph** [10] - 50:9, 51:21, 67:21, 67:25, 165:4, 165:5, 165:7, 176:11, 200:20, 201:2
**photographing** [1] - 2:21
**photographs** [9] - 138:7, 171:16, 177:4, 179:16, 194:15, 200:18, 205:9, 205:17, 205:24
**photos** [18] - 47:7, 47:11, 66:16, 170:25, 171:3, 171:8, 171:12, 171:14, 171:23, 172:1, 177:2, 177:9, 177:12, 177:16, 179:9, 179:10, 179:15, 205:20
**phrase** [1] - 205:16
**physical** [10] - 46:25, 47:5, 47:7, 52:7, 59:16, 187:12, 187:13, 187:18, 205:3
**physically** [3] - 77:19, 107:8, 183:23
**pick** [2] - 192:13, 192:17
**picture** [7] - 119:18, 119:19, 119:21, 152:9, 190:21, 190:22, 191:3
**pictures** [3] - 176:13, 197:6, 197:8
**piece** [11] - 60:4, 60:5, 62:14, 62:15, 63:2, 63:13, 63:20, 63:22, 63:23, 76:13, 76:14
**piling** [2] - 176:7, 176:9
**PKC** [1] - 1:3
**place** [11] - 20:9, 94:5, 113:15, 137:5, 143:3, 181:18, 187:8, 201:24, 201:25, 202:12, 202:13
**plaintiff** [135] - 3:3, 3:20, 10:17, 10:22, 11:1, 11:5, 11:7, 11:13, 11:16, 12:5, 12:9, 12:13, 12:19, 13:14, 13:25, 14:3, 14:13, 15:9, 15:14, 16:2, 21:23, 46:15, 53:8, 53:19, 53:21, 54:4, 55:4, 56:25, 62:2, 71:11, 102:6, 102:8, 103:6, 103:9, 103:12, 129:7, 129:10, 129:19, 130:3, 130:5, 130:10, 139:23, 140:8, 140:17, 140:18, 140:24, 141:19, 142:1, 142:4, 143:4, 143:14, 144:1, 144:3, 144:8, 145:9, 145:13, 145:18, 145:19, 145:23, 146:18, 146:25,

147:5, 147:7, 147:10, 147:13, 147:16, 147:19, 147:22, 147:25, 148:3, 148:11, 148:18, 148:21, 151:12, 152:9, 152:17, 153:8, 153:14, 153:15, 156:8, 156:20, 156:25, 157:15, 158:3, 159:7, 159:9, 159:11, 162:7, 163:15, 164:12, 165:25, 167:15, 168:1, 168:3, 172:13, 172:20, 173:9, 173:13, 173:23, 174:1, 174:10, 174:13, 174:25, 175:3, 175:21, 178:23, 179:15, 179:21, 180:3, 181:13, 182:3, 182:8, 182:23, 182:25, 186:6, 186:9, 186:11, 187:25, 189:15, 189:20, 189:21, 189:24, 195:16, 197:1, 198:18, 200:5, 200:6, 200:20, 200:13, 200:21, 201:3, 207:21, 208:12, 213:4, 213:15
**Plaintiff** [7] - 1:4, 1:15, 15:6, 101:22, 128:19, 129:2, 146:15
**plaintiff's** [27] - 11:1, 13:13, 13:24, 14:5, 15:18, 17:6, 46:10, 138:20, 138:25, 139:7, 139:20, 141:13, 141:15, 146:9, 151:23, 152:16, 153:5, 154:5, 160:3, 160:11, 160:13, 160:20, 162:3, 165:21, 168:23, 182:10, 214:11
**Plaintiff's** [2] - 56:11, 167:5
**plaintiffs** [2] - 127:12, 186:5
**plaintiffs'** [1] - 160:24
**plan** [5] - 150:19
**planning** [1] - 122:19
**plans** [1] - 151:19
**Plaza** [1] - 2:3
**plea** [1] - 170:15
**Plead** [35] - 49:6, 49:9, 49:12, 49:15, 49:21, 49:24, 50:2, 50:5, 50:7, 50:11, 50:18, 65:20, 67:4, 67:6, 67:9, 67:20, 67:22, 68:1, 68:3, 68:7, 68:9, 68:12, 68:15, 68:21, 70:21, 75:6, 82:10, 86:11, 86:13, 86:19, 86:21, 87:16, 87:19, 87:24, 88:2
**plead** [31] - 34:22, 35:4, 35:8, 35:11, 35:15, 35:19, 36:2, 45:1, 45:6, 45:11, 47:19, 47:23, 48:1, 48:4, 51:23, 62:22, 64:6, 64:19, 66:25, 67:15, 75:23, 80:18, 82:6, 83:12, 84:5, 84:10, 84:13, 85:4, 85:18, 85:24, 86:9
**pleading** [2] - 138:23, 209:4
**plug** [2] - 133:8, 133:12
**point** [25] - 23:5, 27:1, 42:17, 54:5, 54:10, 54:20, 78:1, 85:9, 85:20, 94:8, 101:7, 119:23, 133:20, 150:7, 171:17, 172:9, 174:1, 176:1, 184:18, 189:1, 195:19, 197:11, 200:4, 201:1, 213:18
**police** [47] - 14:16, 14:20, 15:19, 19:14, 31:16, 47:14, 47:17, 47:20, 47:24, 48:2, 49:3, 49:7, 50:1, 50:4, 50:25, 82:1, 82:3, 82:8, 82:11, 83:10, 84:8, 85:3, 106:10, 107:11, 107:16, 108:4, 108:20, 109:4, 109:8, 109:18, 109:21, 110:8, 119:12, 119:24, 120:4, 164:6, 184:14, 184:15, 184:16, 187:9, 188:3, 195:21, 202:21, 202:23, 213:21

**Police** [1] - 14:16
**Pollak** [1] - 41:21
**Portillo** [6] - 5:20, 12:12, 22:10, 213:2, 213:6, 213:10
**PORTILLO** [3] - 5:23, 6:1, 22:16
**Portillo's** [2] - 8:5, 134:9
**portion** [4] - 18:2, 28:22, 38:12, 39:19
**pose** [1] - 61:6
**posed** [1] - 61:4
**position** [4] - 4:4, 29:9, 90:15, 175:23, 182:4, 200:22, 211:12
**positioned** [1] - 4:3
**possession** [5] - 11:10, 130:4, 202:8, 202:9, 213:20
**possessions** [6] - 74:16, 74:21, 74:24, 75:9, 79:23, 84:3
**possibility** [1] - 88:15
**possible** [6] - 123:11, 139:9, 142:4, 151:4, 194:25, 195:7
**possibly** [1] - 39:13
**post** [4] - 72:20, 172:8, 194:12
**poster** [2] - 168:13, 195:24
**posting** [1] - 137:25
**posture** [1] - 23:10
**potential** [1] - 6:6
**power** [2] - 133:3, 133:4
**powers** [1] - 213:3
**practice** [5] - 16:9, 136:15, 137:17, 138:17, 139:17
**practiced** [2] - 16:11, 78:22
**practicing** [1] - 208:21
**practitioner** [1] - 139:16
**precautions** [1] - 9:17
**preceded** [1] - 145:4
**precinct** [1] - 50:13
**predicate** [1] - 182:7
**prefer** [2] - 22:4, 214:24
**preference** [1] - 16:9
**prejudice** [1] - 209:12
**preliminary** [1] - 6:5
**premises** [33] - 11:8, 11:15, 12:10, 12:19, 20:11, 31:17, 35:3, 74:2, 74:24, 74:25, 79:23, 81:24, 91:1, 96:4, 102:14, 103:10, 103:15, 103:20, 104:1, 104:5, 104:23, 105:23, 106:8, 107:22, 108:17, 109:10, 119:24, 128:21, 129:8, 130:4, 130:6, 146:17, 212:6
**prepare** [1] - 183:13
**prepared** [5] - 17:23, 18:6, 186:10, 188:20, 212:16
**prerogative** [1] - 15:1
**present** [16] - 3:22, 4:17, 7:15, 31:21, 43:24, 95:15, 106:14, 106:17, 106:19, 107:6, 107:22, 110:8, 150:6, 159:18, 208:18
**presentation** [2] - 6:9, 6:12
**presented** [6] - 12:5, 12:23, 12:24, 13:12, 134:12, 156:8
**presently** [2] - 25:8, 136:7
**president** [2] - 23:1, 90:16

**presume** [1] - 79:20
**presumption** [1] - 199:3
**previous** [1] - 98:3
**previously** [1] - 129:10
**principal** [1] - 29:17
**printed** [3] - 60:25, 61:9, 61:18
**private** [16] - 13:8, 128:20, 129:8, 129:22, 130:12, 146:16, 151:24, 154:12, 156:3, 157:4, 157:22, 173:3, 192:8, 192:12, 195:24, 206:23
**Private** [1] - 129:10
**privilege** [4] - 13:18, 13:21, 51:11, 51:12
**pro** [4] - 173:15, 174:14, 174:16, 197:15
**probable** [11] - 15:5, 15:12, 15:14, 15:20, 17:19, 20:19, 199:3, 208:21, 208:22, 213:8, 213:11, 213:25, 214:3, 214:13, 214:17
**problem** [2] - 73:12, 143:23
**problems** [1] - 197:3
**procedural** [2] - 57:15, 210:8
**proceed** [7] - 22:6, 29:13, 43:11, 51:3, 56:12, 56:18, 174:14
**proceeding** [17] - 21:9, 27:13, 27:14, 28:2, 29:1, 30:15, 36:1, 38:5, 41:9, 43:1, 45:9, 59:4, 88:13, 156:2, 156:6, 165:16
**Proceedings** [1] - 2:6
**proceedings** [16] - 2:20, 2:22, 14:6, 21:5, 21:8, 21:14, 25:21, 26:7, 28:16, 30:3, 160:20, 168:7, 177:7, 209:20, 216:15, 216:23
**process** [5] - 6:20, 190:10, 193:6, 204:2
**procure** [1] - 14:18
**procured** [1] - 169:1
**produce** [3] - 47:3, 47:7, 49:10
**produced** [5] - 2:6, 47:10, 177:10, 177:11, 181:4
**production** [1] - 165:2
**professional** [3] - 95:3, 96:10, 123:25
**proffer** [3] - 46:6, 213:2, 213:6
**profile** [1] - 181:3
**prohibition** [1] - 2:21
**prohibitions** [1] - 2:23
**prolong** [1] - 212:15
**prompted** [1] - 205:8
**proof** [3] - 34:9, 151:18, 153:2
**proper** [4] - 27:11, 28:13, 155:20, 159:6
**properly** [2] - 11:11, 56:21
**properties** [4] - 113:1, 113:2, 115:1, 116:4
**property** [42] - 11:10, 11:12, 12:13, 12:17, 12:18, 17:16, 90:22, 91:24, 92:10, 94:20, 113:10, 114:5, 114:8, 114:15, 114:17, 114:18, 114:19, 114:24, 115:20, 115:23, 116:18, 117:14, 123:23, 124:10, 124:11, 126:7, 131:9, 131:17, 131:21, 131:22, 132:1, 132:2, 132:3, 132:6, 150:15, 152:7, 152:10, 152:19, 152:22, 200:15, 202:8, 202:9

**proposal** [1] - 215:2
**proposed** [1] - 215:22
**pros** [1] - 199:9
**prosecute** [4] - 15:1, 81:18, 85:14, 208:22
**prosecuted** [1] - 199:2
**prosecuting** [1] - 15:3
**prosecution** [3] - 15:4, 198:19, 199:11
**prosecutor** [2] - 81:17, 108:7
**prospects** [1] - 165:16
**protect** [1] - 28:1
**protected** [1] - 13:20
**provide** [17] - 98:18, 122:7, 127:7, 146:18, 146:25, 147:5, 147:7, 147:10, 147:13, 147:16, 147:19, 147:22, 147:25, 148:3, 148:11, 148:18, 212:2
**provided** [8] - 12:20, 98:20, 161:6, 161:24, 165:20, 195:21, 196:4, 212:11
**providing** [2] - 142:17, 142:18
**proving** [1] - 162:7
**psychologically** [1] - 187:7
**public** [4] - 6:17, 46:14, 46:20, 162:22
**publish** [1] - 121:5
**Published** [6] - 60:15, 66:22, 91:9, 207:19, 208:1, 208:7
**pull** [1] - 195:12
**pulling** [1] - 156:22
**purchase** [1] - 12:18
**purchased** [3] - 92:17, 92:20, 132:2
**purport** [1] - 205:9
**purpose** [3] - 10:25, 168:4, 170:20
**purposes** [1] - 27:16
**pursuant** [1] - 158:5
**pursue** [1] - 17:24
**pursuing** [1] - 12:25
**push** [1] - 133:18
**put** [42] - 10:21, 60:8, 62:15, 66:12, 91:3, 93:7, 95:5, 96:19, 112:6, 115:9, 116:5, 117:13, 117:16, 123:25, 133:4, 134:14, 140:1, 140:14, 142:23, 143:7, 143:16, 145:24, 148:8, 151:8, 155:1, 186:22, 187:1, 188:3, 188:8, 188:14, 188:16, 188:18, 188:23, 189:5, 195:25, 200:22, 207:17, 214:9, 215:15, 216:2

## Q

**Queens** [19] - 11:9, 12:11, 15:1, 15:2, 15:16, 25:4, 33:25, 34:5, 34:9, 34:20, 34:24, 35:21, 108:7, 128:21, 146:17, 154:13, 161:24, 181:4, 198:20
**questioned** [1] - 38:3
**questioning** [3] - 26:3, 26:9, 191:18
**questions** [26] - 27:2, 27:8, 27:9, 28:12, 44:22, 57:8, 71:8, 71:21, 79:21, 105:25, 108:13, 109:11, 109:19, 130:15, 142:6, 142:7, 142:9, 170:21, 175:20, 182:17, 182:20, 200:23, 201:12, 207:10, 212:21, 216:10
**quick** [2] - 88:21, 212:21

**quickly** [5] - 3:10, 22:25, 70:23, 207:11, 207:13
**quite** [1] - 205:22
**quotations** [2] - 206:23
**quote** [1] - 159:7

## R

**R.K.H.L** [2] - 1:22, 5:8
**R1** [3] - 66:13, 66:16, 66:23
**R2** [1] - 67:2
**R4** [1] - 67:8
**R7** [1] - 68:2
**R8** [3] - 66:13, 66:16, 68:5
**raise** [6] - 3:6, 5:24, 23:18, 89:7, 111:15, 135:17
**raised** [3] - 19:19, 142:12, 213:8
**Raised** [1] - 142:13
**raising** [1] - 5:23
**RAJU** [1] - 1:20
**Raju** [2] - 4:9, 212:20
**Ramon** [1] - 12:12
**rarely** [2] - 186:12, 193:23
**rather** [5] - 52:13, 58:10, 142:18, 197:3, 212:12
**reach** [3] - 22:13, 150:8, 154:4
**reached** [3] - 149:7, 149:8, 172:22
**react** [1] - 107:1
**read** [23] - 18:2, 20:23, 21:7, 28:22, 38:10, 38:12, 39:19, 51:17, 51:18, 59:25, 62:16, 62:20, 64:7, 64:22, 64:24, 65:1, 65:3, 128:12, 128:13, 158:12, 169:15, 169:18, 169:20
**reading** [4] - 60:3, 128:18, 145:15, 179:6
**reads** [1] - 159:5
**ready** [1] - 113:14
**real** [5] - 112:16, 124:21, 131:24, 131:25, 162:5
**realize** [2] - 177:9, 204:1
**realized** [3] - 22:2, 77:21, 171:17
**really** [16] - 37:2, 74:11, 82:16, 82:17, 118:17, 121:22, 132:11, 150:2, 155:10, 156:6, 176:19, 202:4, 203:23, 214:3, 215:11
**realtor** [2] - 195:3, 195:10
**reason** [19] - 9:8, 27:12, 37:5, 83:7, 84:8, 84:15, 133:3, 148:24, 151:14, 151:17, 156:10, 161:21, 197:11, 197:24, 204:13, 209:2, 211:13, 213:2, 213:10
**reasonable** [6] - 152:5, 152:14, 153:25, 156:1, 156:12, 164:12
**reasonableness** [1] - 154:2
**reasons** [6] - 14:22, 27:5, 172:15, 197:8, 200:5, 205:23
**rebroadcasting** [1] - 2:22
**receipt** [4] - 35:21, 36:18, 207:4
**receipts** [18] - 35:25, 36:4, 36:14, 36:18, 49:10, 127:7, 131:16, 131:18, 131:19, 160:13, 160:21, 164:11, 193:8,

201:24, 203:4, 203:17, 203:18, 204:10
**receive** [6] - 33:7, 34:23, 76:22, 78:18, 117:6, 189:17
**received** [31] - 33:9, 46:22, 60:13, 76:24, 78:19, 92:15, 93:5, 93:22, 94:2, 94:16, 96:1, 98:14, 101:10, 118:9, 141:22, 144:2, 145:18, 145:22, 150:18, 150:22, 151:6, 157:17, 171:15, 172:21, 173:2, 180:1, 186:8, 187:4, 192:16, 195:23, 205:17
**receiving** [3] - 87:25, 117:9, 161:18
**Recess** [1] - 163:10
**recognize** [19] - 5:17, 66:17, 66:23, 67:3, 67:5, 67:7, 67:18, 67:24, 68:5, 95:11, 97:3, 98:7, 98:9, 119:21, 121:9, 124:18, 207:20, 208:2, 208:8
**recollection** [2] - 185:25, 193:16
**reconnect** [2] - 8:7, 53:25
**reconnects** [1] - 21:14
**record** [31] - 3:3, 3:18, 6:18, 24:2, 45:15, 46:14, 58:3, 62:9, 69:14, 81:6, 91:5, 92:17, 95:19, 100:9, 100:12, 111:11, 111:22, 134:15, 134:17, 134:18, 134:20, 134:25, 135:24, 136:4, 141:12, 162:22, 178:13, 185:20, 199:8, 216:23
**Record** [1] - 51:18
**record's** [1] - 36:9
**recorded** [1] - 2:6
**recording** [1] - 2:21
**records** [6] - 11:8, 46:20, 47:3, 90:25, 160:23, 204:17
**recover** [1] - 86:6
**RECROSS** [4] - 109:16, 209:18, 217:17, 218:10
**RECROSS-EXAMINATION** [2] - 209:18, 218:10
**redacted** [1] - 161:15
**redirect** [2] - 79:20, 86:2
**REDIRECT** [6] - 86:4, 108:15, 207:14, 217:8, 217:15, 218:9
**refer** [3] - 16:7, 98:25, 159:2
**referee's** [1] - 92:9
**reference** [1] - 161:16
**referenced** [3] - 45:16, 87:13, 177:16
**references** [1] - 160:9
**referencing** [1] - 178:14
**referred** [2] - 17:20, 26:25
**referring** [1] - 86:14
**refusal** [1] - 166:8
**refused** [1] - 123:12
**regain** [1] - 130:4
**regard** [2] - 109:19, 141:23, 184:20, 185:8
**regarding** [7] - 108:7, 120:7, 138:14, 165:15, 165:21, 171:16, 193:16
**registered** [1] - 154:7
**regular** [3] - 110:13, 183:21, 193:12
**related** [1] - 123:23
**relationship** [3] - 29:4, 87:7, 206:2
**relationships** [1] - 112:17

**released** [1] - 178:3
**releases** [1] - 47:4
**relevant** [4] - 74:15, 191:19, 204:6, 215:1
**remain** [3] - 23:10, 23:14, 91:16
**remarks** [1] - 166:21
**remember** [20] - 23:20, 42:14, 52:8, 53:11, 75:17, 95:7, 108:19, 109:6, 109:7, 123:15, 143:25, 149:9, 149:24, 151:9, 174:22, 181:11, 181:25, 190:14, 202:11, 211:18
**remind** [1] - 153:24
**Remind** [1] - 206:15
**reminded** [1] - 2:20
**remote** [1] - 2:20
**removal** [1] - 2:23
**remove** [2] - 116:24, 117:3
**removed** [1] - 118:25
**renovate** [1] - 113:2
**renovated** [1] - 113:15
**renovation** [3] - 94:4, 94:7, 153:3
**renovations** [5] - 94:5, 94:20, 114:14, 114:18, 181:8
**rent** [12] - 30:7, 101:3, 101:15, 113:2, 124:13, 128:20, 129:3, 131:22, 146:16, 160:13, 160:21, 203:20
**rental** [8] - 35:12, 35:21, 35:25, 36:3, 36:14, 36:18, 105:22, 115:21
**rentals** [1] - 104:23
**rented** [10] - 12:19, 106:5, 106:6, 106:8, 113:17, 116:12, 116:16, 167:17, 187:9, 201:24
**Repeat** [2] - 68:18, 189:3
**repeat** [6] - 28:20, 51:15, 59:4, 120:3, 190:2, 200:7
**repeatedly** [1] - 10:21
**rephrase** [1] - 84:22
**replied** [1] - 192:21
**reply** [3] - 16:6, 166:15
**report** [5] - 50:14, 82:5, 119:13, 152:18, 196:2
**reportedly** [1] - 213:19
**REPORTER** [14] - 4:22, 4:24, 7:7, 11:24, 50:21, 52:19, 66:9, 70:9, 73:16, 79:4, 89:22, 89:25, 149:11, 215:8
**reporter** [5] - 28:20, 89:20, 93:11, 95:8, 146:5
**Reporter** [2] - 2:3, 51:16
**reporter's** [1] - 10:12
**reporters** [1] - 134:16
**reports** [2] - 50:17, 195:21
**represent** [4] - 5:6, 5:7, 171:18, 205:7
**representation** [1] - 150:9
**representations** [3] - 44:24, 45:3, 45:8
**representative** [1] - 23:13
**represented** [4] - 44:7, 131:8, 138:22, 144:12
**representing** [3] - 5:5, 13:14, 205:7
**request** [1] - 8:19
**Requested** [4] - 18:2, 28:22, 38:12, 39:19

**requested** [1] - 192:8
**required** [1] - 129:2
**resembled** [1] - 165:7
**reserve** [1] - 214:24
**reside** [3] - 12:14, 24:25, 101:13
**resided** [1] - 25:3
**residence** [2] - 153:14, 153:16
**resident** [5] - 34:4, 44:25, 106:19, 148:22, 148:25
**Residential** [1] - 90:24
**residential** [3] - 91:1, 126:6, 153:22
**residents** [1] - 206:25
**residing** [1] - 49:17
**resigned** [1] - 178:21
**resolve** [1] - 211:23
**resolved** [1] - 23:14
**respect** [7] - 11:5, 27:5, 51:10, 81:3, 102:10, 173:1, 189:4
**respectfully** [5] - 31:14, 31:19, 31:23, 34:1, 34:6
**respectively** [1] - 45:21
**respond** [5] - 50:6, 211:13, 212:10, 212:21, 215:5
**responded** [11] - 31:22, 47:24, 48:2, 49:3, 50:4, 50:8, 50:12, 50:16, 51:22, 82:11, 127:14
**responding** [1] - 50:1
**response** [5] - 5:21, 167:22, 172:7, 177:22, 179:16
**responses** [2] - 171:15, 177:6
**responsibilities** [1] - 113:11
**responsibility** [2] - 21:3, 162:13
**responsible** [2] - 206:16, 207:2
**rest** [4] - 54:9, 63:21, 98:24, 103:13
**restore** [2] - 14:5, 130:5
**restored** [2] - 11:10, 153:16
**restrictive** [1] - 2:24
**result** [3] - 2:23, 25:12, 47:1
**retainer** [10] - 76:12, 96:12, 122:23, 122:25, 127:16, 127:17, 128:4, 185:2, 185:4, 193:5
**retainers** [1] - 102:10
**retroactively** [1] - 142:3
**return** [4] - 40:11, 97:13, 172:20, 172:25
**review** [4] - 18:14, 188:21, 189:17, 193:24
**reviewed** [2] - 186:6, 188:12
**right-hand** [3] - 61:10, 61:19, 62:6
**rightful** [2] - 11:11, 102:19
**rights** [9] - 15:17, 26:16, 27:3, 27:16, 130:5, 137:11, 137:12, 139:16, 167:13
**Road** [1] - 1:23
**Robert** [2] - 5:13, 44:7
**room** [17] - 8:9, 8:21, 9:13, 22:24, 23:2, 23:11, 52:17, 66:1, 66:10, 71:5, 71:6, 72:9, 83:17, 111:2, 111:4
**Rosenberg** [14] - 75:17, 82:19, 82:24, 83:3, 83:9, 83:14, 83:24, 84:1, 84:7, 84:11, 84:14, 85:10, 85:21, 86:14
**Rosenblatt** [1] - 86:15
**routine** [1] - 110:13

**ROY** [2] - 2:3, 216:25
**roy** [1] - 216:24
**RPR** [1] - 2:3
**Rs** [1] - 32:21
**rude** [1] - 74:6
**rule** [5] - 28:8, 52:13, 212:16, 214:25, 215:23
**Rule** [9] - 7:16, 13:15, 14:2, 153:24, 170:2, 170:8, 209:7, 210:14, 214:6
**ruling** [1] - 209:3
**run** [3] - 102:11, 128:24, 146:23
**running** [1] - 114:25
**runs** [1] - 94:24
**rush** [1] - 10:12
**rushing** [1] - 95:10

## S

**S00-YOUNG** [1] - 1:20
**sabotage** [1] - 166:1
**safety** [1] - 9:17
**sake** [1] - 10:13
**SALIM** [1] - 205:10
**Salim** [36] - 29:4, 29:16, 35:1, 49:11, 49:13, 49:17, 49:19, 49:22, 67:14, 67:21, 68:2, 68:8, 68:10, 68:13, 86:23, 87:2, 87:7, 101:15, 101:18, 101:21, 120:21, 125:10, 125:22, 125:23, 152:21, 153:6, 153:21, 171:4, 194:10, 195:11, 205:9, 205:14, 205:18, 206:16, 206:22, 207:5
**SALMIN** [1] - 1:6
**Samsung** [2] - 47:24, 86:10
**sanction** [4] - 137:24, 138:1, 138:14, 213:3
**sanctionable** [1] - 170:15
**sanctioned** [5] - 137:23, 138:5, 138:6, 170:8, 211:20
**sanctions** [12] - 2:23, 3:1, 11:5, 12:15, 16:16, 27:13, 27:16, 68:17, 68:20, 88:4, 177:20, 178:19, 179:4, 208:24, 210:14, 211:14, 212:13
**sat** [5] - 65:6, 65:18, 111:4, 156:20, 208:13
**satisfactory** [3] - 172:10, 176:14, 179:16
**savvy** [1] - 9:9
**saw** [19] - 16:17, 76:17, 76:18, 98:2, 98:3, 107:12, 119:22, 120:15, 122:18, 124:15, 125:2, 125:17, 127:3, 183:19, 183:22, 184:21, 194:13, 198:22
**scam** [2] - 121:21, 214:4
**Scanlon** [2] - 150:7, 165:15
**scene** [1] - 50:6
**schedule** [1] - 143:12
**scheduled** [2] - 99:22, 100:2
**scheme** [2] - 86:23, 87:2
**screen** [11] - 56:11, 90:4, 90:6, 91:8, 97:23, 98:4, 98:24, 124:19, 128:14, 190:14, 200:25
**screwed** [1] - 172:6

scroll [11] - 67:10, 91:10, 92:3, 92:4, 93:18, 97:21, 125:21, 140:5, 158:10, 158:13
se [1] - 174:14
search [1] - 152:25
seat [2] - 48:3, 135:1
seated [1] - 52:24
Second [18] - 12:8, 21:4, 25:22, 28:6, 29:2, 32:22, 43:19, 45:17, 45:20, 46:11, 46:13, 156:15, 157:8, 157:10, 157:13, 158:23, 161:2, 179:24
second [51] - 12:15, 27:12, 29:21, 37:18, 52:11, 60:20, 61:5, 80:12, 91:11, 92:22, 96:13, 97:9, 98:13, 99:21, 106:4, 106:6, 113:21, 114:6, 115:12, 116:11, 116:15, 117:21, 117:23, 118:1, 118:6, 120:11, 124:23, 124:25, 128:20, 129:9, 129:18, 132:21, 140:21, 141:2, 143:6, 145:1, 145:15, 146:16, 184:12, 189:11, 189:14, 189:19, 190:24, 191:20, 199:13, 202:17, 203:2, 203:23, 207:7, 211:2
second-floor [1] - 29:21
second-level [2] - 118:1, 124:23
section [1] - 158:11
security [15] - 30:6, 35:2, 35:21, 35:24, 36:3, 36:13, 36:18, 114:24, 117:7, 118:10, 129:2, 151:7, 160:13, 160:21, 203:19
see [78] - 3:12, 4:3, 8:9, 9:1, 17:25, 18:12, 18:23, 27:1, 29:10, 31:1, 31:2, 42:24, 54:19, 56:15, 57:12, 57:14, 58:24, 60:16, 64:3, 64:8, 64:12, 64:14, 65:1, 66:19, 68:2, 68:8, 74:20, 78:20, 78:21, 81:12, 89:17, 90:2, 91:7, 91:8, 91:12, 91:17, 91:22, 91:23, 94:1, 96:6, 97:17, 98:4, 98:24, 107:11, 107:13, 107:15, 107:25, 110:10, 110:11, 110:25, 111:2, 114:21, 115:25, 116:11, 117:10, 118:16, 119:18, 119:19, 121:2, 121:12, 121:13, 122:7, 124:18, 124:20, 127:3, 128:12, 140:11, 160:7, 160:17, 162:14, 184:12, 184:18, 194:12, 210:3, 212:12
seeing [6] - 18:10, 64:16, 97:12, 150:25, 209:21, 211:18
seek [2] - 121:4, 140:19
seeking [1] - 62:24
seeks [1] - 13:16
seem [3] - 30:23, 149:15, 205:18
send [9] - 77:3, 79:10, 102:12, 123:22, 189:20, 190:5, 191:10, 192:9, 209:22
sending [2] - 37:11, 209:25
sense [2] - 176:8, 176:10
sensors [1] - 115:9
sent [30] - 19:1, 32:9, 32:11, 32:13, 32:14, 32:15, 42:18, 65:14, 70:6, 70:14, 77:2, 77:3, 77:4, 123:24, 166:17, 169:10, 170:25, 176:11, 177:2, 179:14, 186:4, 186:10, 189:15,

190:12, 190:21, 190:22, 191:12, 205:9, 209:22, 210:3
sentence [1] - 103:13
separate [1] - 27:17
September [3] - 143:18, 143:21, 144:6
series [2] - 139:23, 141:22
serious [2] - 13:12, 166:21
served [7] - 11:11, 13:15, 88:3, 154:12, 176:23, 178:22, 179:10
service [5] - 34:8, 34:9, 116:21, 116:22, 165:15
set [3] - 17:2, 42:5, 143:6
setting [2] - 52:12, 177:4
settle [8] - 31:25, 102:6, 102:8, 102:12, 102:13, 102:18, 150:1, 194:4
settled [14] - 23:9, 23:14, 32:9, 32:11, 33:2, 43:21, 77:10, 156:4, 157:3, 157:9, 157:11, 157:15, 172:17
settlement [17] - 13:8, 13:9, 25:11, 33:8, 41:7, 65:18, 77:1, 87:14, 87:17, 87:20, 87:22, 157:5, 157:22, 165:17, 172:21, 173:1, 194:2
settling [1] - 192:8
seven [4] - 57:7, 57:9, 129:7, 206:21
seven-year [1] - 129:7
several [3] - 13:10, 31:13, 197:8
shades [1] - 49:7
share [3] - 3:16, 172:3, 195:16
sheet [7] - 58:13, 190:14, 190:21, 190:23, 191:5, 191:15, 209:22
shield [1] - 13:18
shin [13] - 93:7, 94:18, 96:8, 96:19, 96:21, 97:1, 97:8, 97:15, 99:20, 112:9, 118:3, 155:1, 159:4
Shin [41] - 4:12, 10:1, 11:20, 12:2, 13:3, 14:10, 21:21, 22:13, 24:5, 60:8, 66:12, 66:18, 66:20, 67:1, 67:10, 67:16, 67:23, 68:4, 91:3, 91:10, 92:3, 92:4, 93:18, 95:5, 117:19, 118:3, 135:12, 140:1, 140:5, 140:21, 142:23, 143:7, 143:16, 145:24, 146:13, 148:16, 158:10, 158:14, 207:17, 207:24, 208:5
SHIN [29] - 1:20, 4:12, 10:10, 10:14, 11:21, 12:4, 13:6, 22:25, 23:6, 23:12, 54:23, 71:11, 71:14, 88:17, 88:19, 110:15, 110:22, 112:10, 112:14, 117:24, 118:8, 121:4, 121:7, 127:2, 128:10, 129:16, 130:14, 155:3, 217:21
shirt [1] - 90:6
SHIRYAK [1] - 1:22
short [3] - 74:3, 75:19, 146:5
shorthand [1] - 2:6
shortly [1] - 12:21
shot [3] - 190:14, 190:17, 200:25
show [29] - 10:20, 10:25, 49:25, 50:3, 50:9, 70:4, 85:16, 85:20, 90:25, 110:12, 115:23, 119:15, 119:16, 119:20, 123:6, 124:16, 125:13, 126:11, 127:19, 152:18, 155:12, 155:16, 155:21, 160:11, 165:10, 171:8, 198:19, 205:18, 210:17

showed [10] - 40:14, 84:8, 85:13, 119:18, 131:5, 149:4, 183:5, 202:21, 203:22, 213:22
showing [3] - 6:23, 121:7, 203:19
showings [1] - 122:9
shown [4] - 51:21, 130:20, 131:1, 200:18
sic [1] - 61:2
side [5] - 61:10, 61:19, 62:6, 93:25, 214:11
sides' [1] - 215:24
sign [10] - 37:24, 52:1, 53:4, 59:23, 62:15, 83:18, 139:17, 183:25, 188:22
signature [16] - 60:7, 60:22, 61:1, 62:7, 62:13, 92:6, 97:10, 97:11, 99:18, 139:13, 139:15, 139:19, 141:9, 141:10, 183:15
signatures [2] - 61:23, 98:9
signed [35] - 18:6, 59:24, 59:25, 60:2, 60:4, 60:6, 60:21, 62:8, 62:14, 63:5, 63:10, 63:15, 64:22, 64:24, 76:7, 76:9, 76:12, 76:13, 99:23, 99:25, 125:4, 125:8, 130:21, 131:3, 151:2, 184:4, 185:6, 188:13, 188:17, 188:21, 195:2, 202:25, 206:7, 207:5
significance [1] - 198:24
significant [1] - 199:1
signing [2] - 76:11, 124:11
signs [1] - 193:5
silent [1] - 91:16
silverware [1] - 49:3
similar [1] - 158:22
Similarly [1] - 91:15
similarly [1] - 91:15
simply [7] - 6:17, 13:14, 69:8, 159:6, 174:25, 175:21, 212:16
sister [3] - 77:23, 191:7, 191:9
Sit [1] - 52:10
sit [8] - 30:11, 31:6, 31:11, 40:21, 40:23, 66:7, 133:12, 185:24
Sitting [1] - 184:10
sitting [8] - 23:1, 36:22, 37:10, 88:20, 111:1, 159:24, 208:17
situation [2] - 80:6, 202:5
size [1] - 97:1
skip [2] - 67:16, 105:9
skipped [1] - 58:4
slightly [1] - 23:8
slower [3] - 18:18, 95:8, 95:10
slowly [2] - 111:25, 158:14
small [1] - 38:25
snap [1] - 190:17
so.. [1] - 151:5
sold [1] - 132:14
sole [1] - 13:23
solely [1] - 142:14
solicit [1] - 13:18
someone [10] - 39:10, 47:21, 55:24, 71:16, 72:5, 72:25, 151:8, 194:4, 203:24, 207:5
sometime [3] - 44:5, 150:11, 157:11

**Sometime** [1] - 65:12
**somewhat** [1] - 15:25
**Somewhat** [1] - 59:17
**Somewhere** [1] - 78:12
**somewhere** [7] - 21:17, 66:7, 77:3, 80:21, 80:25, 81:5, 123:16
**son** [1] - 129:8
**Soo** [2] - 4:12, 10:8
**Soo-Young** [2] - 4:12, 10:8
**soon** [2] - 56:4, 114:25
**sorry** [65] - 3:6, 3:9, 5:16, 16:6, 17:3, 20:15, 26:20, 30:17, 32:7, 35:23, 36:7, 37:16, 37:19, 38:21, 39:17, 41:6, 41:11, 42:14, 46:11, 51:4, 55:9, 58:14, 59:2, 62:23, 63:22, 73:10, 73:17, 88:18, 91:18, 92:7, 96:18, 97:22, 100:16, 103:21, 103:22, 109:20, 113:20, 113:23, 120:1, 120:2, 122:13, 130:23, 132:4, 132:20, 136:24, 138:10, 148:7, 149:22, 159:14, 166:2, 168:23, 169:16, 169:17, 175:4, 177:1, 178:16, 179:25, 190:2, 194:18, 200:7, 202:22, 205:10, 205:12, 205:14
**Sorry** [5] - 53:22, 72:10, 75:13, 93:14, 135:25
**sort** [3] - 50:13, 166:5, 167:9
**sorts** [1] - 96:24
**sought** [2] - 65:2, 129:19
**sound** [4] - 53:8, 55:4, 56:25, 184:22
**sounds** [3] - 9:14, 22:20, 211:13
**sources** [1] - 195:14
**South** [1] - 1:16
**Southern** [5] - 136:16, 136:21, 137:9, 137:13, 137:24
**speaker** [1] - 72:10
**SPEAKER** [3] - 54:18, 55:6, 175:11
**speaking** [6] - 61:5, 76:2, 98:13, 108:6, 116:9, 136:19
**speaks** [1] - 185:20
**specific** [9] - 18:12, 27:7, 27:9, 27:22, 37:10, 63:18, 110:3, 151:10, 193:16
**Specifically** [1] - 59:18
**specifically** [3] - 16:7, 112:24, 168:16
**spectrum** [1] - 187:24
**spell** [6] - 24:1, 32:18, 111:21, 111:24, 112:2, 135:23
**spelled** [1] - 32:20
**spelling** [3] - 32:24, 89:19, 112:7
**spend** [2] - 76:5, 178:6
**spent** [2] - 178:5, 179:2
**spoken** [1] - 172:23
**squatters** [3] - 114:12, 132:7, 132:8
**stage** [2] - 19:21, 187:23
**stages** [2] - 209:20, 210:19
**stairs** [1] - 114:4
**stance** [2] - 158:8, 159:12
**stand** [8] - 17:4, 17:7, 17:13, 52:15, 52:23, 52:24, 65:24, 66:6
**standard** [4] - 125:16, 125:18, 139:17, 213:3
**standards** [1] - 140:14

**standing** [2] - 9:18, 82:2
**stands** [1] - 27:10
**staring** [1] - 100:17
**start** [6] - 22:8, 23:16, 38:7, 135:7, 176:9
**Start** [1] - 149:15
**started** [10] - 6:9, 59:4, 72:24, 100:14, 113:14, 114:16, 117:18, 149:16, 149:18, 185:19
**starters** [1] - 6:14
**starting** [4] - 3:3, 11:14, 176:7, 210:20
**State** [2] - 154:9, 206:25
**state** [19] - 2:18, 3:2, 3:18, 24:1, 89:18, 111:11, 111:21, 135:23, 137:21, 137:23, 155:11, 156:23, 163:17, 164:11, 178:15, 182:5, 186:24, 193:10, 206:5
**statement** [8] - 10:4, 96:3, 96:9, 155:24, 164:23, 181:8, 182:10, 215:14
**statements** [5] - 10:21, 12:6, 16:13, 70:19, 213:12
**STATES** [2] - 1:1, 1:12
**states** [2] - 18:7, 186:21
**States** [1] - 1:5
**stating** [2] - 151:17, 169:9
**stay** [3] - 7:13, 43:9
**Stenographic** [1] - 2:6
**step** [2] - 61:2, 135:3
**steps** [1] - 70:20
**Steve** [2] - 118:11, 120:25
**still** [12] - 20:3, 30:11, 31:7, 31:11, 43:9, 122:8, 122:9, 182:17, 196:7, 196:23, 201:4
**stolen** [2] - 47:25, 48:3
**stop** [20] - 26:14, 38:20, 38:21, 52:15, 53:1, 66:7, 74:14, 82:23, 98:13, 116:14, 163:25, 164:3, 190:19
**Stop** [5] - 61:5, 61:13, 80:12, 82:22, 83:23
**stopped** [1] - 211:14
**stopping** [1] - 16:14
**story** [3] - 74:3, 75:19, 214:12
**Street** [1] - 1:19
**street** [2] - 118:15, 202:14
**strike** [2] - 69:16, 108:25
**struck** [1] - 65:22
**students** [2] - 99:14, 106:6
**stuff** [4] - 73:25, 74:1, 74:12, 172:8
**subject** [16] - 11:7, 11:14, 12:10, 12:19, 114:5, 115:11, 119:9, 119:11, 124:22, 128:21, 129:8, 130:4, 130:6, 146:17, 198:10, 206:11
**submission** [1] - 216:2
**submissions** [1] - 212:17
**submit** [7] - 15:10, 15:21, 25:1, 210:13, 215:13, 215:21, 216:10
**submitted** [9] - 6:24, 11:8, 16:15, 17:7, 30:1, 86:22, 87:1, 87:6, 166:15
**Subsequent** [1] - 76:21
**subsequent** [2] - 14:2, 17:17
**subsequently** [1] - 184:7

**substance** [4] - 145:17, 148:10, 172:2, 172:4
**sued** [2] - 101:22, 195:6
**sues** [1] - 188:6
**suffered** [2] - 46:25, 140:8
**sufficient** [1] - 57:13
**suggest** [6] - 53:25, 58:17, 88:15, 105:6, 133:19, 193:12
**suggested** [5] - 16:21, 80:1, 80:2, 80:3, 128:3
**suing** [1] - 76:16
**suit** [2] - 38:17, 157:21
**Suite** [2] - 1:16, 1:23
**Sullivan** [79] - 3:19, 14:11, 15:24, 17:11, 17:12, 18:16, 21:8, 21:11, 21:14, 21:16, 25:25, 26:5, 29:9, 50:21, 50:23, 51:6, 52:14, 52:21, 55:7, 55:9, 56:7, 56:8, 56:14, 56:19, 56:23, 57:1, 58:5, 58:7, 58:16, 59:3, 65:23, 66:9, 71:4, 71:8, 71:21, 72:11, 72:13, 73:13, 73:16, 75:24, 88:8, 90:1, 96:14, 96:22, 97:17, 97:22, 98:14, 98:17, 98:19, 98:22, 103:3, 103:7, 104:8, 104:13, 104:19, 104:24, 105:14, 107:18, 109:14, 110:4, 110:16, 130:15, 132:25, 133:22, 134:12, 163:3, 182:16, 182:17, 188:25, 196:23, 201:6, 201:11, 209:17, 213:7, 215:6, 215:9, 215:11, 215:18
**SULLIVAN** [124] - 1:15, 3:4, 3:14, 3:19, 3:25, 14:12, 16:4, 16:19, 16:25, 17:2, 17:6, 17:10, 17:15, 17:22, 18:3, 18:19, 18:25, 19:6, 19:12, 19:15, 19:23, 20:2, 20:6, 20:14, 20:18, 21:25, 25:24, 26:2, 26:8, 26:13, 26:18, 26:22, 26:24, 29:11, 32:3, 50:19, 50:24, 51:9, 52:8, 52:10, 52:18, 55:8, 55:10, 55:18, 56:9, 58:25, 66:2, 71:10, 71:13, 71:19, 71:23, 72:12, 72:14, 72:15, 73:14, 73:20, 76:1, 79:18, 86:24, 87:4, 87:9, 88:9, 89:17, 90:3, 90:8, 97:12, 97:24, 98:2, 99:2, 101:23, 102:15, 103:5, 103:14, 103:17, 104:12, 104:14, 104:17, 104:21, 105:2, 105:7, 105:16, 105:18, 105:20, 105:21, 107:21, 108:11, 108:22, 108:25, 109:17, 110:17, 110:25, 111:6, 117:5, 130:17, 130:19, 130:25, 133:3, 133:9, 133:15, 133:23, 162:23, 163:1, 163:4, 182:18, 182:22, 193:15, 196:11, 196:13, 196:21, 196:24, 200:3, 201:7, 201:10, 209:19, 210:6, 215:5, 215:7, 216:14, 217:7, 217:14, 217:17, 217:23, 218:8, 218:11
**Sullivan's** [1] - 21:13
**sum** [8] - 13:22, 148:10, 148:21, 158:8, 159:12, 172:2, 172:4, 182:7
**summation** [1] - 215:25
**summer** [2] - 39:23, 39:24
**summertime** [1] - 42:19
**summon** [1] - 167:23

**Sundaran** [57] - 4:9, 6:4, 7:10, 8:15, 9:1, 10:1, 21:20, 24:4, 28:11, 28:17, 29:8, 32:18, 33:5, 37:18, 43:5, 53:2, 55:24, 57:4, 57:24, 58:21, 59:1, 59:9, 61:5, 61:7, 61:16, 61:22, 62:12, 64:1, 79:19, 85:25, 90:9, 95:7, 96:13, 96:25, 98:17, 100:16, 108:12, 109:3, 109:13, 110:21, 111:14, 135:12, 136:1, 142:22, 145:15, 146:4, 163:12, 163:25, 164:1, 164:17, 169:14, 170:19, 175:18, 178:10, 178:12, 207:11, 212:20

**SUNDARAN** [184] - 1:20, 4:9, 6:11, 6:14, 6:21, 7:11, 8:25, 10:3, 10:8, 21:22, 22:4, 22:12, 22:17, 23:7, 24:6, 24:8, 24:24, 25:7, 28:19, 28:23, 28:24, 29:13, 29:15, 31:4, 31:5, 32:20, 32:24, 33:6, 33:19, 34:18, 36:12, 43:11, 43:14, 43:20, 45:12, 45:19, 45:23, 46:1, 46:9, 46:18, 46:23, 49:2, 51:3, 51:16, 53:3, 53:12, 53:22, 54:7, 54:12, 54:15, 56:1, 56:12, 57:6, 57:15, 57:20, 58:5, 59:10, 59:11, 60:8, 61:8, 61:17, 61:21, 62:1, 62:3, 64:2, 65:21, 66:12, 66:14, 66:20, 67:1, 67:10, 67:16, 67:23, 68:4, 70:22, 71:2, 86:3, 86:5, 87:12, 88:6, 88:13, 88:18, 89:2, 89:5, 90:11, 91:3, 91:10, 91:14, 91:21, 92:2, 92:6, 92:12, 93:2, 93:7, 93:18, 94:13, 94:18, 95:5, 95:9, 95:21, 95:23, 96:8, 96:19, 97:1, 97:8, 97:15, 98:20, 99:20, 100:18, 100:20, 101:7, 102:2, 103:1, 108:13, 108:16, 109:12, 111:13, 134:5, 135:7, 135:13, 136:3, 136:24, 137:7, 138:9, 140:1, 140:5, 142:23, 143:7, 143:16, 145:24, 146:2, 146:7, 146:13, 148:16, 149:14, 149:19, 149:21, 150:10, 155:1, 155:5, 158:10, 158:13, 158:16, 159:4, 163:13, 164:20, 164:22, 164:24, 165:1, 166:25, 167:3, 168:6, 169:22, 169:25, 170:1, 170:22, 170:24, 175:6, 175:19, 177:8, 178:8, 178:16, 178:22, 179:8, 181:2, 182:11, 182:14, 207:13, 207:15, 207:17, 207:24, 208:5, 209:16, 212:20, 213:1, 213:17, 214:20, 216:12, 217:6, 217:9, 217:13, 217:16, 218:6, 218:9

**Sundaran's** [2] - 61:14, 210:24

**supplemental** [1] - 165:2

**support** [5] - 6:25, 16:16, 137:18, 178:18, 179:4

**supports** [1] - 214:7

**suppose** [5] - 152:20, 152:21, 209:7, 210:15

**supposed** [7] - 98:4, 100:5, 107:1, 110:13, 137:25, 164:12, 167:10

**supposedly** [6] - 77:24, 167:2, 181:18, 203:18, 207:2, 207:3

**surfaced** [1] - 212:11

**surprising** [2] - 121:3, 121:18

**surveillance** [1] - 168:18

**suspect** [1] - 159:8, 159:16, 159:23, 206:1

**suspended** [1] - 138:17

**sustain** [1] - 170:18

**Sustained** [3] - 86:25, 87:5, 87:10

**sustained** [2] - 139:24, 166:24

**swear** [1] - 59:12

**sweatshirt** [1] - 90:6

**switch** [3] - 57:2, 134:23, 134:24

**sworn** [3] - 23:19, 60:2, 135:18

**sworn-to** [1] - 60:2

**sworn/affirmed** [4] - 23:24, 89:12, 111:19, 135:21

**system** [15] - 59:21, 64:5, 72:23, 106:12, 106:25, 114:24, 115:5, 116:12, 117:7, 119:3, 140:9, 152:8, 152:12, 167:6, 187:10

**systems** [1] - 115:1

# T

**technical** [4] - 3:15, 41:14, 43:5, 215:10

**technically** [3] - 52:24, 69:12, 136:19

**technology** [2] - 7:21, 56:13

**telephone** [7] - 41:20, 113:19, 165:14, 196:16, 196:20, 197:2

**ten** [3] - 55:20, 57:6, 163:8

**tenant** [10] - 11:7, 15:17, 102:19, 116:21, 116:23, 151:3, 152:17, 153:14, 153:15, 162:12

**tenants** [11] - 98:10, 99:13, 99:16, 106:5, 113:16, 120:24, 124:21, 127:7, 132:11, 151:16, 181:18

**term** [2] - 128:25, 146:23

**terms** [6] - 6:14, 7:20, 13:9, 26:10, 112:25, 210:18

**testified** [5] - 23:24, 89:12, 111:19, 135:21, 210:18

**testify** [9] - 7:15, 16:2, 16:10, 52:15, 53:7, 55:18, 91:17, 135:5, 213:11

**testifying** [2] - 29:10, 118:4

**testimony** [34] - 7:12, 8:5, 8:11, 8:17, 10:19, 10:25, 13:22, 22:23, 27:19, 40:13, 54:6, 54:21, 57:4, 61:13, 101:18, 103:9, 103:11, 103:19, 103:25, 109:18, 134:9, 134:11, 134:14, 135:11, 135:14, 142:17, 142:18, 159:19, 195:5, 201:17, 212:14, 214:10, 214:21

**text** [16] - 22:13, 79:8, 79:15, 172:2, 183:21, 190:12, 191:10, 191:12, 196:15, 196:20, 197:1, 197:2, 198:10, 198:16, 210:16

**texted** [2] - 79:12, 79:16

**texts** [1] - 210:21

**themselves** [3] - 131:8, 144:21, 204:18

**theories** [1] - 206:13

**therefore** [3] - 142:14, 142:16, 209:8

**thereof** [1] - 62:17

**thin** [1] - 195:12

**thinking** [3] - 91:20, 117:11, 204:2

**third** [9] - 106:4, 114:6, 114:7, 116:11, 116:18, 116:19, 117:21, 202:18, 203:23

**thoughts** [2] - 105:8, 204:5

**threatening** [1] - 169:11

**three** [12] - 6:6, 25:16, 40:12, 114:2, 114:3, 114:5, 115:8, 122:2, 123:4, 129:7, 151:4, 174:18

**three-level** [1] - 114:2

**three-year** [1] - 129:7

**throughout** [1] - 88:20

**tight** [3] - 40:21, 40:24, 187:15

**timely** [1] - 170:11

**title** [1] - 90:15

**today** [13] - 6:23, 11:6, 12:23, 30:11, 31:6, 31:11, 36:22, 37:10, 98:15, 133:17, 159:24, 209:1, 214:10

**today's** [1] - 28:16

**together** [1] - 215:15

**Toi** [1] - 86:20

**Tom** [1] - 91:6

**took** [7] - 37:7, 63:17, 72:23, 94:5, 128:5, 149:3, 173:16

**top** [6] - 4:3, 63:13, 63:14, 67:13, 141:4, 141:10

**torturous** [1] - 215:17

**Total** [1] - 129:13

**touch** [3] - 118:13, 154:11, 186:24

**traffic** [1] - 185:12

**TRANSCRIPT** [1] - 1:11

**transcript** [5] - 2:6, 45:14, 207:20, 212:24, 216:23

**Transcription** [1] - 2:6

**trap** [1] - 177:4

**traumatized** [1] - 187:6

**treatment** [1] - 140:10

**trial** [2] - 199:10, 199:12

**tried** [3] - 122:1, 122:23, 123:11

**trip** [1] - 122:19

**Troy** [2] - 138:3, 138:11

**true** [22] - 19:5, 19:9, 49:11, 49:13, 49:16, 62:18, 62:21, 89:16, 128:22, 128:25, 129:12, 129:15, 129:22, 130:12, 152:24, 156:14, 167:10, 170:12, 189:17, 197:21, 198:6

**trust** [3] - 74:11, 83:19, 187:10

**truth** [9] - 14:4, 44:14, 44:15, 44:21, 152:1, 173:20, 206:12

**truthful** [2] - 142:17, 142:18

**try** [16] - 22:13, 39:16, 39:20, 43:7, 54:9, 58:12, 58:21, 107:5, 122:2, 122:11, 123:5, 123:7, 130:25, 132:21, 134:15, 164:18

**trying** [6] - 55:10, 82:17, 86:6, 88:23, 154:10, 166:1

**turn** [7] - 22:19, 22:22, 43:4, 105:17, 113:21, 120:13, 124:9

**turned** [8] - 98:5, 195:18, 195:20, 196:3, 196:5, 197:7, 212:3

**turning** [3] - 12:15, 72:9

**turns** [1] - 188:6

**TV** [2] - 47:24, 86:10
**twice** [1] - 143:25
**twin** [5] - 49:4, 159:19, 159:20, 171:13, 171:24
**Two** [3] - 33:13, 76:18, 77:7
**two** [40] - 5:7, 5:10, 7:17, 27:5, 32:21, 45:4, 49:4, 56:2, 61:12, 63:4, 63:14, 65:15, 71:12, 77:21, 88:19, 119:8, 119:10, 119:11, 122:1, 123:4, 123:5, 128:25, 129:20, 137:16, 139:7, 144:18, 146:24, 164:5, 174:13, 174:14, 190:8, 190:9, 190:12, 203:22, 204:3, 208:16, 212:21, 215:21, 216:1
**two-parts** [1] - 190:9
**two-year** [1] - 45:4
**type** [6] - 90:22, 112:15, 114:1, 127:6, 137:8
**types** [1] - 193:11
**typical** [1] - 23:9
**typically** [1] - 137:8
**Typically** [1] - 139:16

# U

**U.S** [3] - 16:8, 26:25, 27:17
**uh-oh** [1] - 30:14
**ultimately** [1] - 14:2
**unaware** [5] - 36:23, 69:18, 69:20, 214:14
**under** [31] - 16:8, 16:10, 18:4, 24:12, 24:22, 25:1, 25:5, 25:9, 25:14, 25:19, 29:6, 29:18, 29:24, 30:4, 30:9, 31:9, 31:14, 31:23, 32:2, 34:6, 44:24, 45:3, 45:6, 45:8, 53:4, 106:9, 117:2, 125:22, 153:24, 170:8, 212:16
**undergoing** [1] - 114:17
**undersigned** [1] - 140:22
**understood** [5] - 132:14, 140:23, 157:18, 164:20, 164:22
**Understood** [2] - 146:7, 211:11
**undertake** [1] - 159:6
**unfortunately** [2] - 3:14, 167:22
**unhappy** [1] - 177:5
**UNIDENTIFIED** [3] - 54:18, 55:6, 175:11
**unit** [13] - 115:12, 115:13, 115:14, 116:16, 118:1, 119:25, 120:5, 122:11, 124:22, 124:23, 125:1, 126:6, 133:12
**UNITED** [2] - 1:1, 1:12
**United** [1] - 1:5
**units** [1] - 114:3
**unlawful** [1] - 140:10
**unlawfully** [1] - 12:10
**Unless** [1] - 57:4
**unless** [2] - 21:7, 215:2
**Unmute** [2] - 149:20, 149:21
**unmute** [3] - 23:20, 53:13, 54:2
**unprecedented** [1] - 167:5
**unsatisfactory** [1] - 171:17
**unstable** [1] - 58:19
**unusual** [6] - 15:25, 22:20, 52:12, 162:14, 162:16, 193:14

**up** [64] - 6:23, 9:19, 13:4, 17:18, 39:7, 40:1, 40:2, 42:5, 49:14, 60:8, 66:12, 69:15, 70:4, 70:24, 74:7, 77:4, 84:8, 91:3, 92:1, 93:7, 95:5, 96:19, 99:20, 104:15, 104:24, 105:5, 105:14, 114:3, 117:25, 131:22, 133:18, 140:1, 140:13, 140:17, 142:23, 143:7, 143:16, 146:20, 148:21, 152:7, 152:11, 152:18, 153:19, 155:1, 156:22, 158:15, 158:17, 169:20, 176:7, 176:9, 177:25, 181:21, 182:7, 192:13, 192:17, 203:1, 203:10, 205:23, 206:7, 206:18, 207:12, 207:17, 213:22
**upper** [2] - 61:9, 61:18, 93:25
**upstairs** [1] - 185:12
**usual** [2] - 23:10, 167:22
**utility** [1] - 122:10
**uttered** [1] - 188:10

# V

**V-I-K** [1] - 135:25
**vacant** [2] - 115:17, 115:19
**vacate** [5] - 151:1, 155:7, 155:13, 155:24, 182:5
**vacated** [1] - 162:11
**valid** [1] - 165:21
**validity** [1] - 13:13
**value** [2] - 63:5, 205:3
**various** [1] - 210:19
**vein** [1] - 215:24
**verbally** [1] - 79:8
**verification** [4] - 62:16, 62:20, 141:8
**verified** [2] - 34:3, 160:12
**verify** [3] - 59:12, 151:25, 212:10
**version** [2] - 160:13, 160:20
**versions** [2] - 13:10, 98:18
**versus** [3] - 2:16, 138:3, 138:11
**Via** [1] - 200:1
**via** [5] - 2:14, 3:22, 58:19, 58:23, 134:12
**victim** [1] - 161:16
**victims** [1] - 213:13
**Victor** [2] - 95:20, 95:21
**Video** [1] - 149:10
**video** [29] - 3:22, 53:19, 53:21, 54:4, 55:4, 56:20, 56:25, 58:11, 58:19, 62:2, 90:4, 90:6, 104:25, 105:10, 105:17, 110:25, 111:3, 119:14, 133:1, 133:4, 133:10, 133:14, 134:12, 134:13, 134:17, 134:19, 200:25, 215:18
**videoconference** [2] - 2:14, 200:1
**view** [2] - 26:22, 26:23
**Vik** [25] - 5:12, 33:15, 33:17, 33:18, 40:7, 64:13, 64:25, 72:16, 73:1, 73:3, 73:23, 74:5, 74:6, 74:7, 74:8, 74:9, 76:25, 78:20, 78:21, 79:2, 79:3, 79:6, 121:24, 134:6, 135:25
**Vik's** [1] - 86:16
**Vikrant** [2] - 73:23, 136:5
**violate** [1] - 214:6

**violated** [1] - 204:7
**violating** [1] - 209:6
**violation** [2] - 2:22, 138:1
**visible** [2] - 4:5, 128:14
**visit** [1] - 76:9
**visited** [1] - 114:19
**voice** [2] - 175:14, 175:17
**Vyacheslav** [2] - 89:6, 181:25

# W

**Wait** [2] - 61:5, 67:10
**wait** [9] - 6:7, 24:20, 54:16, 56:15, 58:5, 58:7, 61:5, 177:23, 179:25
**waited** [1] - 118:15
**waiting** [4] - 41:3, 56:21, 88:21, 135:15
**waived** [2] - 142:4, 142:16
**waiver** [1] - 142:11
**walk** [2] - 74:9, 114:3
**walk-in** [1] - 114:3
**walked** [2] - 76:4, 182:24
**walking** [2] - 119:19, 119:20
**wall** [1] - 133:12
**wants** [7] - 15:15, 57:24, 135:10, 162:13, 172:4, 206:4, 210:13
**waste** [1] - 206:20
**wasted** [2] - 178:7, 206:6
**wear** [1] - 9:17
**wearing** [1] - 90:6
**web** [1] - 13:23
**website** [1] - 154:9
**weeks** [5] - 120:10, 139:7, 191:6, 215:21, 216:1
**weird** [1] - 172:8
**welcome** [1] - 110:20
**West** [1] - 194:17
**whatsoever** [2] - 107:3, 128:2
**whispering** [1] - 52:25
**whole** [8] - 115:2, 117:18, 119:13, 169:18, 182:7, 195:4, 196:1, 214:4
**wide** [1] - 187:24
**wife** [5] - 120:25, 129:7, 129:20, 194:13, 202:14
**Williams** [1] - 86:20
**willing** [1] - 172:3
**window** [1] - 116:6
**windows** [1] - 118:19
**withdraw** [46] - 14:3, 19:20, 68:22, 69:2, 69:4, 69:5, 69:6, 78:13, 78:15, 78:17, 79:1, 79:7, 161:19, 166:8, 172:13, 173:7, 173:9, 173:12, 173:23, 173:25, 174:1, 174:10, 174:21, 174:25, 175:3, 175:21, 175:25, 176:5, 176:16, 176:17, 178:21, 179:17, 197:5, 197:13, 197:17, 197:19, 197:23, 198:3, 198:5, 198:7, 198:8, 198:9, 198:14, 209:3, 209:15
**withdrawal** [5] - 76:22, 79:14, 170:13, 170:15, 174:11
**withdrawing** [1] - 195:20
**withdrawn** [7] - 15:10, 19:15, 119:23,

120:19, 170:10, 173:10, 199:14
**withdrew** [15] - 13:14, 13:16, 19:1,
68:25, 69:8, 69:11, 175:24, 176:2,
176:6, 195:19, 196:6, 209:5, 209:10,
209:13, 211:15
**withholding** [1] - 138:6
**witness** [30] - 10:2, 21:20, 21:23, 23:3,
23:17, 23:23, 52:24, 54:15, 54:24,
56:13, 61:3, 62:3, 70:24, 71:3, 77:23,
88:14, 89:11, 89:23, 100:21, 103:2,
109:15, 110:21, 111:2, 111:18,
117:19, 121:8, 130:16, 133:19, 134:4,
135:20
**Witness** [2] - 134:3, 135:18
**WITNESS** [159] - 23:21, 24:3, 25:5, 32:4,
32:14, 32:16, 33:3, 33:14, 33:17,
34:16, 36:11, 37:22, 38:8, 39:3, 39:6,
39:10, 39:15, 39:23, 40:1, 40:3, 40:6,
40:10, 40:16, 40:21, 40:25, 41:2, 41:8,
41:17, 41:19, 42:19, 42:23, 43:8, 51:2,
51:15, 61:20, 61:24, 62:5, 62:11, 63:1,
63:12, 63:18, 63:24, 66:10, 72:1, 72:3,
74:18, 74:22, 75:1, 75:3, 75:6, 75:11,
75:15, 75:23, 79:25, 80:7, 80:14,
80:16, 80:18, 80:23, 81:2, 81:11,
81:16, 81:21, 81:24, 82:1, 82:5, 82:10,
82:13, 82:16, 82:25, 83:5, 83:12,
83:16, 83:22, 84:2, 84:5, 84:10, 84:13,
84:17, 84:20, 84:25, 85:4, 85:12,
85:18, 85:24, 89:16, 91:18, 92:1,
93:12, 93:15, 98:12, 100:14, 100:22,
103:21, 103:24, 104:2, 104:5, 105:24,
107:8, 107:12, 107:14, 107:17, 110:6,
110:20, 111:23, 112:1, 112:3, 112:7,
113:20, 113:23, 117:23, 118:6, 119:3,
132:22, 132:24, 134:1, 135:25,
136:23, 137:1, 137:4, 142:2, 142:19,
142:21, 149:22, 166:22, 168:4,
177:24, 178:2, 179:1, 192:4, 192:6,
192:11, 192:23, 193:3, 201:14,
201:17, 201:22, 203:5, 203:8, 203:13,
203:16, 203:21, 204:1, 204:12,
204:14, 204:24, 205:4, 205:11,
205:13, 205:22, 206:4, 206:18,
206:21, 207:4, 207:8, 210:10, 210:13,
210:23, 211:16
**witness's** [1] - 7:12
**witnesses** [10] - 6:6, 7:13, 7:17, 10:18,
11:6, 22:5, 54:6, 56:2, 88:19, 88:24
**witnessing** [1] - 187:8
**woman** [5] - 165:24, 165:25, 166:7,
172:8, 190:18
**wonder** [1] - 162:11
**word** [8] - 138:16, 139:21, 149:3,
151:23, 167:11, 177:18, 181:12
**words** [3] - 64:4, 188:10, 197:18
**works** [1] - 109:21
**worry** [3] - 77:12, 173:21, 206:1
**worthwhile** [1] - 210:16
**wrist** [1] - 187:25
**wrists** [1] - 64:13

**writing** [2] - 215:25, 216:11
**writings** [1] - 165:15
**written** [1] - 34:19
**wrote** [2] - 77:14, 167:24

## Y

**year** [15] - 11:4, 12:21, 14:15, 37:25,
44:5, 45:4, 64:25, 70:3, 100:6, 100:14,
106:4, 129:7, 192:3
**years** [5] - 128:25, 136:14, 146:24,
203:22, 204:3
**yes-or-no** [2] - 175:12, 175:20
**YORK** [3] - 1:1, 1:7, 1:18
**York** [28] - 1:6, 1:16, 1:19, 1:19, 1:24,
2:4, 14:16, 15:19, 25:4, 59:14, 113:8,
128:21, 129:20, 129:25, 136:14,
136:16, 138:4, 138:12, 140:19,
146:17, 152:7, 152:11, 152:23, 154:9,
204:25, 206:24, 206:25
**Young** [2] - 4:12, 10:8
**yourself** [13] - 4:4, 28:1, 43:24, 50:10,
53:14, 54:3, 104:23, 118:4, 137:18,
150:2, 158:12, 191:16, 209:13
**Yup** [2] - 140:4, 152:6

## Z

**zeros** [1] - 63:7