UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
IRA HEASTON,

                Plaintiff,

       - against -

CITY OF NEW YORK, P.O. JOSEPH ESSIG,
DET. RAMON PORTILLO, and P.O.
AMANDA F/K/A AMANDA MUROLO
LORBER,

              Defendants.
--------------------------------------------------------x

**MEMORANDUM & ORDER**
19-CV-5569 (PKC) (VMS)

PAMELA K. CHEN, United States District Judge:

      Plaintiff Ira Heaston filed this action on October 2, 2019, asserting claims pursuant to various federal and state civil rights laws.  Plaintiff alleged that, on April 26, 2019, he called the police to ask for help because he was locked out of his apartment in violation of a court order, but that instead of providing assistance, the police falsely arrested him.  Represented by Attorney Vik Pawar, Plaintiff sued several private entities and individuals allegedly in charge of his apartment building, as well as the City of New York, the New York City Police Department, and two individual officers (collectively, the "City Defendants").  After Plaintiff and Attorney Pawar filed two amended complaints and settled with the private parties, the City Defendants moved for sanctions against both Plaintiff and Attorney Pawar.  In short, Defendants purported to have information demonstrating that the circumstances giving rise to the April 26, 2019 arrest were an elaborate scheme orchestrated by Plaintiff involving the falsification of a lease and court order, and that Attorney Pawar had failed to conduct basic due diligence before filing pleadings.

      On September 11, 2020, the parties stipulated to dismiss the case with prejudice but continued to litigate the sanctions motion.  On October 5, 2020, the Court held a video hearing on

1

the sanctions motion and heard testimony from four witnesses, including Plaintiff, Attorney Pawar, and two people associated with the subject apartment building.  All briefing on the motion is now complete.  For the reasons explained below, the Court sanctions both Plaintiff and Attorney Pawar, and awards Defendants $25,000, inclusive of attorneys' fees and costs, against Plaintiff and Attorney Pawar jointly and severally.

## BACKGROUND

### I.    Initial Complaint

Plaintiff's first complaint named as defendants Boris, Inc.,[1] Salim Blake and Jane Blake (collectively, the "Blakes"), the City of New York (the "City"), and New York City Police Department ("NYPD") Officers John and Jane Doe 1–2.  (Compl., Dkt. 1.)  Plaintiff alleged that he had entered into a lease with the Blakes and Boris, Inc. to rent a second-floor apartment in Queens (the "Apartment") from January 15, 2019, to January 15, 2021.  (*Id.* ¶¶ 10–11.)  According to Plaintiff, the Blakes and Boris, Inc. had locked Plaintiff, his wife, and their two children out of the Apartment in violation of the lease sometime between January and April 2019, and again on April 4, 2019.  (*Id.* ¶ 13.)  Plaintiff alleged that the Blakes and Boris, Inc. had "allowed [P]laintiff and his family access after locking them out the first time," but that after being locked out again on April 4, 2019, Plaintiff obtained an order from the New York City Housing Court ("Housing Court") "directing that [P]laintiff and his family be allowed to regain possession of the [Apartment] and direct[ing] the NYPD to assist [P]laintiff and restore their rights[.]"  (*Id.* ¶¶ 13–15.)

---

[1] Though, as discussed below, Plaintiff changed the spelling of "Boris, Inc." to "Borris, Inc." in his First Amended Complaint, the Court relies on the spelling from the original complaint in describing the allegations therein.

Plaintiff claimed that, on April 26, 2019, he and his family were locked out of the Apartment a third time, so he called the NYPD's 107th precinct for assistance.  (*Id.* ¶¶ 16–17.) When the NYPD officers arrived at the Apartment, Plaintiff showed them a copy of the Housing Court Order "directing the NYPD to assist [P]laintiff and his family to gain access to the subject premises."  (*Id.* ¶ 19.)  Instead of helping Plaintiff, however, the officers arrested Plaintiff and took him back to the 107th Precinct.  (*Id.* ¶¶ 21.)  The charges against Plaintiff were dismissed, and he thereafter filed the instant action, represented by Attorney Pawar.  (*See id.* ¶ 23.)

## II.   First Amended Complaint, Settlement With Private Parties, and Second Amended Complaint

On October 9, 2019, Plaintiff amended his complaint, naming the same defendants, except spelling "Boris, Inc." as "Borris, Inc.," and adding new Defendants R.K.H.L. Inc. and GMA Enterprises.  (First Amended Complaint ("FAC"), Dkt. 7.)  Following a pre-motion conference on January 10, 2020, Plaintiff reached a settlement with Borris, Inc. and R.K.H.L. Inc.  (1/10/2020 Minute Entry; *see* Notice of Settlement, Dkt. 32.)  On March 9, 2020, Plaintiff filed his Second Amended Complaint ("SAC")—the final operative complaint in this case—naming as Defendants only the City of New York, NYPD officers Joseph Essig and Amanda Lorber, and NYPD detective Ramon Portillo (collectively "Defendants").  (SAC, Dkt. 33.)  Jane and Salim Blake were thus dropped as defendants without ever settling or appearing in this action.

On July 1, 2020, Defendants answered the SAC and the parties proceeded with discovery. (Answer, Dkt. 40; *see, e.g.*, 4/13/2020 Docket Order.)

## III.   Revelations About Plaintiff's Alleged Fraud

On July 17, 2020, Defendants requested an evidentiary hearing before the Court on the basis that Plaintiff had filed fraudulent pleadings.  (Dkt. 42.)  According to Defendants, they were

contacted by Margaret Kirkland, the sister of the woman with Plaintiff at the time of his April 26, 2019 arrest.  Ms. Kirkland notified Defendants of the following:

- Plaintiff and [Salim] Blake are lifelong friends and grew up in the same foster home and currently reside two doors down from where Ms. Kirkland lives;

- Plaintiff and [Salim] Blake devised a scheme in order to illegally gain access to the [Apartment];

- [Salim] Blake created a company called Boris Inc.,[2] which . . . does not exist;

- Plaintiff doctored a lease agreement and rent receipts pertaining to the [Apartment] which were then presented to [the] . . . Housing Court in order to obtain a default judgment and an order of entry.

(Dkt. 42 at 2–3.)  Defendants had also attached a copy of Plaintiff's Housing Court Order, which was issued after Plaintiff obtained a default judgment against the non-existent entity "Boris, Inc." (*Id.* at 3.)  According to Defendants, Borris, Inc., the real owner of the apartment, became aware of the Housing Court order through the instant action, and had filed an order to show cause to vacate the default judgment, with affirmations and affidavits consistent with what Ms. Kirkland had informed Defendants—namely, that Borris, Inc. had never entered into a lease with Plaintiff, that Plaintiff had never lived at the apartment or paid any security deposit or rent, that the apartment was vacant at the time Plaintiff's purported lease began, and that the apartment had been leased to another tenant between April 5, 2019, and April 5, 2020, which overlapped with Plaintiff's purported lease.  (*Id.*[3])

---

[2] As discussed below, there is a real company called Borris, Inc., which later became involved in the underlying Housing Court matter involving Plaintiff.

[3] Attorney Pawar filed a letter opposing the request for a hearing.  (Dkt. 43.)

The Court granted Defendants' request for a hearing regarding these allegations of Plaintiff's fraud on July 20, 2020. (*See* 7/20/2020 Docket Order.) On August 6, 2020, Attorney Pawar filed a motion to withdraw as attorney (Dkt. 44), which the Court granted (8/6/2020 Docket Order). On September 11, 2020, the parties submitted a stipulation dismissing this case with prejudice. (Dkt. 50.) And on September 14, 2020, Defendants filed the pending motion seeking to (1) sanction Attorney Pawar pursuant to Rule 11 of the Federal Rules of Civil Procedure; (2) sanction both Plaintiff and Attorney Pawar pursuant to the Court's inherent powers; and (3) recover attorneys' fees and costs jointly from Plaintiff and Pawar. (Dkt. 53.)

## IV. Factual Findings

The Court held a five-hour evidentiary hearing via video on October 5, 2020. (10/5/2020 Minute Entry.) Four witnesses testified: (1) Plaintiff Ira Heaston (Transcript of Civil Cause for Evidentiary Hearing ("Tr."), Dkt. 77, at 23:22–88:9); (2) Vyacheslav Kandkhorov, the owner of Borris, Inc. (*id.* at 90:10–110:19); (3) Edna Davoudi, the property manager for the subject premises (*id.* at 111:17–134:3); and (4) Attorney Pawar (*id.* at 135:19–210:6). The parties also introduced numerous exhibits. (*See* Dkts. 59, 60, 66.) The Court finds that the following facts have been established based on clear and convincing evidence.

On April 4, 2019, Borris, Inc. received a call from the company that operated the security system in the building where the Apartment is located, asking if there was authorized activity in the Apartment. (Tr., Dkt. 77, at 117:6–18.) Davoudi replied that there was not and notified the police. (*Id.* at 118:9–11.) The police secured and entered the unit along with Davoudi. (*Id.* at 118:15–19.) Davoudi observed that the alarm panel inside the unit was broken and there were black blinds over the windows. (*Id.* at 118:15–119:1.) The intruder had also changed the locks on the door. (*Id.* at 119:4–5.) The security system captured a video of the suspected burglar,

which was reviewed by the police and added to police files on the burglary.  (*Id.* at 119:12–22;

NYPD Burglary Documents, Dkt. 54-5, Ex. E, at ECF 16.[4])[5]

On April 26, 2019, Plaintiff called the police from outside the Apartment and said he was

illegally locked out.[6]  (Tr., Dkt. 77, at 47:14–16, 202:17–23; 50-H Hearing Transcript ("50-H

Tr."), Dkt. 60-3, at 9:10–10:2.)  He told the police that all of his possessions had been stolen from

the unit.  (Tr., Dkt. 77, at 202:17–23; 50-H Tr., Dkt. 60-3, at 9:17–10:2.)  After he proffered

documents purportedly demonstrating that he lawfully resided in the unit, the police arrested him.[7]

(50-H Tr., Dkt. 60-3, at 46:6–43:2; Tr., Dkt. 77, at 202:17–23.)  This all occurred in the presence

---

[4] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

[5] The facts set forth in this paragraph were established through the testimony of Kandkhorov, as well as supporting evidence.

[6] The facts set forth in the next several paragraphs were established through the testimony of Plaintiff and Attorney Pawar.  Although Plaintiff refused to answer numerous questions at the evidentiary hearing, invoking his Fifth Amendment right against self-incrimination, he had testified to many of the relevant factual matters at a prior 50-h hearing, the transcript of which was admitted as Defense Exhibit Q, and can be found at Dkt. 60-3 at ECF 5–59.  (Under N.Y. Gen. Mun. Law § 50-h, upon the filing of a notice of claim against the City, the City has "the right to demand an examination of the claimant relative to the occurrence and extent of the injuries or damages for which claim is made[.]")  The Court notes that, because the contempt hearing was civil rather than criminal in nature, the Court is permitted to draw a negative inference from the Plaintiff's refusal to answer questions by invoking the Fifth Amendment.  *Baxter v. Palmigiano*, 425 U.S. 308, 318–19, (1976) ("[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them[.]"); *United States v. One Parcel of Prop. Located at 15 Black Ledge Drive, Marlborough, Conn.*, 897 F.2d 97, 103 (2d Cir. 1990); *United States v. Ianniello*, 824 F.2d 203, 208 (2d Cir. 1987).

[7] Plaintiff said that a detective asked him to come down to the station to talk about the paperwork showing that he had possession of the unit (50-H Hearing Tr., Dkt. 60-3, at 41:15–20), but then denied that the detective asked him to return to the precinct for that reason (Tr., Dkt. 77, at 50:12–15).

6

of Plaintiff's significant other, Toi Williams.[8]  (50-H Tr., Dkt. 60-3, at 22:8–14.)   Shortly

thereafter, the arrest was dismissed and sealed.  (Tr., Dkt. 77, at 198:18–199:5; Pl.'s Ex. 1, Dkt.

59-1.)

Plaintiff initially sought counsel from an attorney other than Pawar, seeking to initiate a

lawsuit focused primarily on his allegedly missing property, but that lawyer referred Plaintiff to

Attorney Pawar for a civil rights consultation, and Plaintiff retained Pawar.  (Tr., Dkt. 77, at 17:16–

20, 138:20–24, 183:4–10; *see, e.g.*, Notice of Claim, Dkt. 58-1, at 2.)  Plaintiff provided Pawar

with a fraudulent lease between himself, Borris Inc., and Salim Blake,[9] as well as fraudulent

receipts for first month's rent and security deposit on the Apartment.  (Tr., Dkt. 77, at 146:15–19,

203:11–17.)  Based on Plaintiff's representations and fraudulent documentation, Pawar believed

that Plaintiff had a legal claim to the Apartment.  (*Id.* at 147:21–148:5.)

Against the City, Plaintiff alleged that as a result of his arrest on April 26, 2019, he suffered

physical injuries.[10]  (*Id.* at 46:24–47:9.)   The Complaint alleged that the police had arrested

---

[8] With respect to Plaintiff's relationship with Ms. Williams, the record, including Plaintiff's testimony, alternates between wife, fiancé, and girlfriend.  (*See, e.g.*, Tr., Dkt. 77, at 129:6–13, 184:16, 194:13–14; Affidavit of Margaret Kirkland In Support of Defendants' Motion for Sanctions and Attorneys' Fees ("Kirkland Aff."), Dkt. 54-10, at 2; 50-H Tr., Dkt. 54-9, at 4:25, 12:8–9; Texts Between Plaintiff and Pawar, Dkt. 74-1, at 3.)

[9] The fraudulent lease was not the standard lease used by Borris, Inc.  (Tr., Dkt. 77, at 125:18–20.)  It listed Borris, Inc. and Salim Blake as the landlords even though, according to property manager Davoudi, Salim Blake was not associated with Borris, Inc.  (Tr., Dkt. 77, at 125:21–24 (Davoudi testifying, *inter alia*, that she did not know anyone named Salim Blake).)  In addition, despite identifying one of the landlords as "Borris, Inc.," the lease misspelled the name of the management company as "Boris, Inc."  (Tr., Dkt. 77, at 125:25–126:3.)

[10] The notice of claim lists specific injuries (Notice of Claim, Dkt. 58-1, at 1), but it is not clear where those allegations came from.  Plaintiff denied in the hearing that he had sworn to specific injuries, despite his signature affirming them.  (Tr., Dkt. 77, at 59:16–24.)  Attorney Pawar said that he includes that list of injuries in every filing, but assumed that he must have gotten some indication from Plaintiff that Plaintiff had suffered them.  (Tr., Dkt. 77, at 140:7–18.)  Pawar later

Plaintiff merely because he looked like another black male, *i.e.*, the April 4, 2019 burglary suspect, but Attorney Pawar could not recall if Plaintiff had claimed that or if Pawar had inserted it himself. (*Id.* at 159:22–25.)   According to Pawar, although Plaintiff never reviewed the Complaint, its contents were taken from Plaintiff's telling of events.   (*Id.* at 186:6–9.)

After Attorney Pawar filed Plaintiff's initial Complaint,[11] Davoudi called Pawar on behalf of Borris, Inc. two or three times to explain that the suit was fraudulent and offered to provide documents showing that Plaintiff had no connection to the unit.   (*Id.* at 121:16–122:17, 123:2–12, 150:11–151:21.)[12]   Pawar, however, declined to drop the suit, said he was going to move forward, and advised Davoudi that Borris, Inc. should get an attorney.   (*Id.* at 122:24–25, 150:2.)

Despite the rebuff, Davoudi sent the documents to Pawar anyway.   (*Id.* at 123:22–124:8.) According to Davoudi, those included the certificate of occupancy for the Apartment, invoices from the alarm company, listing history, and invoices from the architect, among other documents—all of which tended to corroborate Davoudi's assertion that Plaintiff had no lease for the Apartment with Borris, Inc. or any other entity or person, and that Plaintiff never possessed a

---

said that Plaintiff described mostly mental injuries and only described physical injury from the handcuffs being too tight.  (Tr., Dkt. 77, at 187:3–18.)

[11] One point of contention is when Plaintiff learned that this suit was filed on his behalf by Pawar.  Pawar testified that he notified Plaintiff as soon as the suit was filed.  (Tr., Dkt. 77, at 141:18–21.)  Pawar stated that the "substance of the allegations in the complaint were received from plaintiff and the fact that a lawsuit was filed was communicated to plaintiff."  (*Id.* at 145:15–23.)  Plaintiff, on the other hand, testified that he was unaware that a federal lawsuit had been filed on his behalf.  (*Id.* at 37:9–14, 39:1–3.)  Plaintiff testified that he only learned of the lawsuit in the summer of 2020 because he googled his name.  (*Id.* at 39:21–40:18.)  Later, Plaintiff equivocated about whether he knew of the lawsuit and clarified that he was never aware of the contents of the Complaint.  (*Id.* at 69:17–22.)  While there are obvious reasons to doubt Plaintiff's credibility, the Court cannot resolve this factual question based on the record before it.  Furthermore, the Court finds it unnecessary to do so.

[12] The remaining facts found by the Court were established through the testimony of all of the witnesses, as well as supporting documentation.

8

legal claim to the Apartment.  (*Id.* at 123:24–124:8.)  Pawar conducted no independent investigation into those documents or the veracity of Plaintiff's claims (*id.* at 151:6–152:2), but declined to drop the suit because he "had no reason to believe one way or the other" (*id.* at 151:16–17).  Additionally, Pawar was unable to locate the landlord named in the lease as "Salim Blake." (*Id.* at 153:5–16.)  Pawar never visited the unit.  (*Id.* at 153:21–23.)

Even though Plaintiff never leased the apartment in question (*id.* at 124:13–15), some time before March 9, 2019, Borris, Inc. settled the claim for $2,000 (*id.* at 33:7–10, 157:11–14).[13]  On February 24, 2020, Borris, Inc. filed a motion to vacate the Housing Court Order; the motion attached all of the documentation demonstrating that Plaintiff had no relationship to the apartment. (*Id.* at 155:6–25; Borris Motion to Vacate ("Exhibit H"), Dkt. 54-8, at ECF 11.)  Attorney Pawar was aware of the order to show cause from the Housing Court, but could not recall what was attached to the motion.  (Tr., Dkt. 77, at 155:6–25; Exhibit H, Dkt. 54-8, at ECF 2.)  Pawar conducted no investigation into anything relating to the Housing Court proceeding.  (Tr., Dkt. 77, at 156:1–6.)[14]

In addition, on January 29, 2020, the City Defendants served Attorney Pawar with the police files on the April 4, 2019 burglary of the Apartment and Plaintiff's April 26, 2019 arrest. (*Id.* at 161:3–17; NYPD Burglary Documents, Dkt. 54-5.)  The files showed that, after responding to the Apartment on April 4, 2019, the police learned that no one lived in the unit, obtained and reviewed a video of the suspected burglar entering the unit, and created a still photo of the burglar

---

[13] Plaintiff initially acknowledged that he had received the settlement, but later stated that he was unaware that it had occurred.  (Tr., Dkt. 77, at 31:25–33:23, 43:21–23.)  The record does not indicate whether Pawar received attorney's fees as part of that settlement.

[14] As discussed below, shortly after filing the Second Amended Complaint, the City Defendants provided Pawar with a copy of the Housing Court file.

from the video.  (NYPD Burglary Documents, Dkt. 54-5, at ECF 7, 15–16.)  Contrary to Plaintiff's

allegations in all three versions of his complaint, the police files that Pawar received did not

indicate that Plaintiff had called the police to report being locked out of the Apartment on April

26, 2019; rather, the files indicated that the police had gone to the Apartment that day because they

had received a report that the unit was once again being burglarized.  (*Id.* at ECF 27.)  When the

police arrived, they showed Plaintiff the photograph of the person entering the Apartment on April

4, 2019.  Although confirming that he was the person in the photograph, Plaintiff insisted that he

had a right to enter the Apartment.  (*Id.* at ECF 28.)  Plaintiff claimed that he had rented the

Apartment from Salim Blake, and showed the police his falsified documents.  (*Id.*)  The police

told Plaintiff that they would need to bring him to the precinct to investigate the validity of his

documents, but Plaintiff refused, at which point he was arrested.  (*Id.*)  Notably, this account from

the police files regarding Plaintiff's arrest is consistent with Plaintiff's testimony at the 50-h

hearing.  (50-H Hearing Tr., Dkt. 60-3, at 40:19–42:17.)

Despite being aware of the Housing Court proceedings and having access to the Housing

Court filings, and despite having received the police files from the City Defendants, Pawar filed

the SAC in this case with many of the same allegations as before on March 9, 2020.  (SAC, Dkt.

33.)  The SAC still contained allegations that Plaintiff had a valid lease to the apartment and

Housing Court order to enter the apartment—even attaching both documents as exhibits—and that

Plaintiff was falsely arrested.  (*Id.*)

On April 29, 2020, the City Defendants provided Attorney Pawar with the complete

Housing Court file, which included documentation proving that Plaintiff never had a relationship

to the Apartment.  (Tr., Dkt. 77, at 161:23–162:15, 181:3–6.)  At that point, Pawar confronted

Plaintiff with the documentation.  While Pawar could not recall what Plaintiff said, Pawar was

presumably satisfied with Plaintiff's explanation because he continued representing Plaintiff for roughly four more months and did not seek to withdraw or amend the false allegations in the SAC. (Tr., Dkt. 77, at 181:13–23.)

Sometime prior to May 8, 2020, the City Defendants were approached by Margaret Kirkland. (Tr., Dkt. 77, at 165:19–166:1.) Kirkland is the younger sister of Toi Williams, Plaintiff's significant other at the time of his arrest on April 26, 2019, and has known Plaintiff for around 20 years. (Kirkland Aff., Dkt. 54-10, at 1.) Kirkland swore that Plaintiff and Salim Blake are long-time friends; that Plaintiff had resided at an apartment in Queens separate from the unit owned by Borris, Inc. for the preceding three years; that Plaintiff asked Kirkland to write a fake obituary for Plaintiff's aunt (apparently supporting Plaintiff's claim to the Apartment), and that she believed that Plaintiff and Williams hatched a scheme to split the settlement money from this lawsuit with each other. (*Id.* at 3–5.) Affixed to Kirkland's affidavit were several pictures captured from social media depicting Plaintiff and Salim Blake in friendly poses. (*Id.* at 2; Tr., Dkt. 77, at 177:13–18.) That information was relayed to Attorney Pawar by the City Defendants' counsel on May 8, 2020 (Tr., Dkt. 77, at 165:19–166:1), but Pawar dismissed it after Plaintiff told Pawar that Kirkland "was an angry mother-in-law who was trying to sabotage [his] case" (*id.* at 165:25–166:1, 209:20–210:5).

Around August 3, 2020, however, Attorney Pawar asked Plaintiff about pictures of Plaintiff with Salim Blake, and Plaintiff told Pawar that the pictures were of Plaintiff's twin brother, not of him, or else were doctored. (*Id.* at 170:25–171:13, 172:2–11.) It was at that point, Pawar says, that he became sufficiently suspicious of Plaintiff's story that he decided that he could no longer represent Plaintiff. (*Id.* at 171:14–18, 176:11–21, 205:17–206:14.) Pawar discussed withdrawing

11

the case with Plaintiff,[15] but Pawar did not ask Plaintiff to return the settlement money to Borris, Inc.  (*Id.* at 172:20–173:5; 176:2–4.)

Attorney Pawar moved to withdraw as counsel for Plaintiff on August 6, 2020, and advised Plaintiff to get another lawyer.  (*Id.* at 173:6–22.)  After Pawar withdrew, Plaintiff asked Pawar to withdraw the case.  (*Id.* at 68:22–24, 174:1–3, 198:7–9.)  Pawar told Plaintiff that he could not on account of his having already withdrawn as counsel.  (*Id.* at 174:22–24.)  After withdrawing, Pawar stopped monitoring the docket.  (*Id.* at 211:13–20.)

After the hearing, at the Court's direction, Defendants submitted a calculation and documentation of the attorneys' fees and costs they expended litigating this action since its commencement, and requested to recover attorneys' fees in excess of $190,000.  (Declaration of Raju Sundaran ("Raju Decl."), Dkt. 73, ¶¶ 36, 38.)

## LEGAL STANDARDS

### I.  Rule 11 of the Federal Rules of Civil Procedure

Rule 11 provides that, "[b]y presenting to the court a pleading, written motion, or other paper[,] . . . an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances[,] . . . the claims, defenses, and other legal contentions are warranted by existing law[,] . . . [and that] the factual contentions have evidentiary support."  Fed. R. Civ. P. 11(b)(2)–(3).  "If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation."  Fed. R. Civ. P. 11(c)(1).

---

[15] Attorney Pawar contradicted himself during his testimony, first saying that he never advised Plaintiff to drop the case (Tr., Dkt. 77, at 175:20–23), then testifying that he did (Tr., Dkt. 77, at 176:2–4).

Under Rule 11, courts may sanction attorneys "for conduct that was objectively unreasonable," such as "misrepresenting facts or making frivolous legal arguments." *Muhammad v. Walmart Stores E., L.P.*, 732 F.3d 104, 108 (2d Cir. 2013) (citing *Storey v. Cello Holdings, L.L.C.*, 347 F.3d 370, 388 (2d Cir. 2003)). "In considering a motion for sanctions, courts evaluate the objective reasonableness of the pleading's allegations at the time the pleading was signed." *Sweetwater Estates, Ltd. v. Carpenter*, No. 16-CV-1578 (SJF) (SIL), 2018 WL 1175158, at *4 (E.D.N.Y. Mar. 6, 2018) (citing, *inter alia*, *Oliveri v. Thompson*, 803 F.2d 1265, 1274 (2d Cir. 1986)). "With regard to factual contentions, 'sanctions may not be imposed unless a particular allegation is utterly lacking in support.'" *Storey*, 347 F.3d at 388 (quoting *O'Brien v. Alexander*, 101 F.3d 1479, 1489 (2d Cir. 1996)).

## II.     The Court's Inherent Powers

A court has the inherent power to sanction a party "for conduct which abuses the judicial process." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45 (1991). The Court may impose sanctions under its inherent powers against a party or attorney "who has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *Ransmeier v. Mariani*, 718 F.3d 64, 68 (2d Cir. 2013) (quoting *Chambers*, 501 U.S. at 45–46). "Because of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers*, 501 U.S. at 44. "Sanctionable conduct must be proven by clear and convincing evidence and the district court must make a specific finding of bad faith." *Amerisource Corp. v. RX USA Int'l Inc.*, No. 02–CV–2514, 2010 WL 2730748, at *5 (E.D.N.Y. July 6, 2010) (citing *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 136 (2d Cir. 1998)). "[I]nherent-power sanctions are appropriate only if there is clear evidence that the conduct at issue is (1) entirely without color and (2) motivated by improper purposes." *Wolters Kluwer Fin. Servs. Inc. v. Scivantage*, 564 F.3d 110, 114 (2d Cir. 2009). "A claim lacks colorable

basis when it is utterly devoid of legal or factual basis." *Mahoney v. Yamaha Motor Corp. U.S.A.*, 290 F.R.D. 363, 367 (E.D.N.Y. 2013).

## DISCUSSION

The Court finds that Attorney Pawar should be sanctioned under Rule 11 and Plaintiff should be sanctioned under the Court's inherent powers, but that Defendants should be awarded significantly less than the full amount of their requested attorneys' fees.

## I.   Attorney Pawar

The Court finds that Attorney Pawar violated Rule 11 by presenting pleadings to the Court without conducting an inquiry that was "reasonable under the circumstances." Fed. R. Civ. P. 11(b). That is true, at minimum, with respect to the filing of the SAC. By the time of that filing: (1) Pawar had been provided with documents by the Apartment's property manager, Edna Davoudi, demonstrating that Plaintiff had no connection or entitlement to the Apartment, including the certificate of occupancy, invoices from the alarm company, listing history, and invoices from the architect, among other documents (Tr., Dkt. 77, at 123:24–124:8); (2) Pawar was aware of Borris, Inc.'s Housing Court motion, which included all the documents similarly demonstrating that Plaintiff had no relationship or claim to the Apartment (*id.* at 155:6–25; Exhibit H, Dkt. 54-8, at ECF 11); and (3) Pawar had received the police files for the April 4, 2019 burglary of the Apartment and Plaintiff's April 26, 2019 arrest, which showed, among other things, that Plaintiff had admitted to the police that he was the person captured on video entering the Apartment on April 4, 2019, when the building's owner told the police that no one had rightful access to the apartment (Tr., Dkt. 77, at 160:23–161:17; Exhibit E, Dkt. 54-5). Nevertheless, Attorney Pawar conducted no investigation into this trove of documents and evidence that were available to him that directly contradicted Plaintiff's claims, nor did he otherwise probe the veracity of Plaintiff's claims despite receiving this information, before filing the SAC. Instead, Attorney Pawar doubled-

down on Plaintiff's claims of false arrest against the City Defendants, even attaching the fabricated Housing Court order and lease provided by Plaintiff, the authenticity of which were seriously called into question by the documentation Pawar had received from Davoudi and the City Defendants.  (SAC, Dkt. 33, ¶¶ 10–15.)

Under these circumstances, Attorney Pawar's failure to further investigate his client's claims in the SAC about false arrest, which "utterly lack[ed] support," was patently unreasonable. *Storey*, 347 F.3d at 388 (internal quotation marks omitted); *see* Fed. R. Civ. P. 11(b).  The Court gave Attorney Pawar notice and an opportunity to explain why he failed to conduct further investigation before filing the SAC, but Attorney Pawar failed to provide an adequate explanation. *See* Fed. R. Civ. P. 11(c)(1).

To make matters worse, after receiving the Housing Court file from the City Defendants in April 2020—again demonstrating the baselessness of Plaintiff's claims to the Apartment and against the City Defendants, as well as Plaintiff's fraudulent conduct in Housing Court and before this Court—Pawar chose to believe Plaintiff's explanations and continued to represent him for almost four more months.  Then, in May 2020, Pawar was again presented with more evidence of Plaintiff's deception and the falsity of his claims, this time in the form of Margaret Kirkland's detailed statements, as well as photos of Salim Blake and Plaintiff together.  Once again, Pawar did no investigation of his own, such as interviewing Kirkland, and instead chose to believe Plaintiff that Kirkland "was an angry mother-in-law who was trying to sabotage [his] case" (Tr., Dkt. 77, at 165:25–166:1, 209:20–210:5).  It was not until August 2020, after Plaintiff told Pawar that the pictures of Plaintiff with Salim Blake were of Plaintiff's twin brother or were doctored, that Pawar finally decided that he could no longer represent Plaintiff.  Yet, even then, Pawar did nothing to rectify the fraud that had been perpetrated on the parties and the Court or to prevent its

perpetuation, instead seeking to withdraw as counsel before moving on Plaintiff's behalf to voluntarily dismiss the lawsuit.

Attorney Pawar filed the lawsuit on October 2, 2019.  It was not dismissed until September 11, 2020, almost one year later, by agreement of Plaintiff, represented by new counsel, and Defendants.  Considerable resources of Defendants and the Court were unnecessarily expended on a litigation that either never should have been brought or should have been terminated over a year ago (before the filing of the SAC), but for Pawar's lack of reasonable diligence.

Accordingly, the Court sanctions Attorney Pawar under Rule 11 of the Federal Rules of Civil Procedure.

## II.    Plaintiff

Based on the evidence presented at the contempt hearing, the Court finds, by clear and convincing evidence, that Plaintiff commenced this action in bad faith and based on fraudulent evidence.  Plaintiff argues that sanctions are inappropriate because his false arrest claim against the City and NYPD officers had more than a "colorable basis" in fact and law, that the charges against him were dismissed, and that the Housing Court proceedings were "not necessarily directly germane to [P]laintiff's false arrest claim."  (Plaintiff's Memorandum of Law in Opposition to Defendants Motion to Rule 11 Sanctions ("Pl's Opp."), Dkt. 52, at 3–4.)  These arguments are utterly meritless.

Sometime before his arrest in April 2019, Plaintiff hatched a scheme with his friend, Salim Blake, to falsely claim that he (Plaintiff) had a lease for the Apartment running from January 15, 2019 to January 15, 2021.  Plaintiff prepared a false lease (even misspelling Borris, Inc.) and fraudulently obtained a Housing Court Order to support this bogus claim.  On April 4, 2019,

Plaintiff unlawfully entered the Apartment and was captured on video doing so.[16]  On April 29, 2019, the police responded to a call about the Apartment possibly being re-burglarized.  When the police arrived, Plaintiff admitted, in effect, to being the person who had entered the Apartment on April 4, 2019, but he falsely claimed that he had a lease for the Apartment and was entitled to enter it.  (NYPD Burglary Documents, Dkt. 54-5, at ECF 7, 15–16, 27–28.)  To bolster these false claims, Plaintiff gave the police the fabricated lease and Housing Court order.  (*See id.* at ECF 28.)  Thus, at the time of his arrest, Plaintiff clearly knew there was probable cause for his arrest and thus no colorable basis for his false arrest claim.[17]  The fact that the District Attorney, at her discretion, decided not to prosecute the case, does not establish that there was no probable cause for Plaintiff's arrest.  *Louis v. City of New York*, No. 15-CV-5229 (ER), 2017 WL 568323, at *4 n.6 (S.D.N.Y. Feb. 10, 2017) (district attorney's decision not to prosecute not relevant to probable cause analysis); *see also Pierson v. Ray*, 386 U.S. 547, 555 (1967) (eventual disposition of case irrelevant to probable cause determination, even where suspect is later proven to be innocent).

Plaintiff is also incorrect that the Housing Court proceedings are "not germane" to his false arrest claim.  Plaintiff's entire basis for arguing that there was no probable cause for his arrest was that he showed the police that he had a right to access the apartment.  But—as discussed—the Court finds that Plaintiff knew all along that he had no legal right to access or enter the Apartment.  Clear and convincing evidence establishes that Plaintiff falsified a lease, used that falsified lease

---

[16] Plaintiff's reason for doing so is unclear.  Perhaps he was illegally squatting at the Apartment and/or perhaps it was in furtherance of his scheme with Salim Blake.

[17] Indeed, based on Kirkland's statements, it is clear that the goal of this scheme, at a minimum, was to obtain money through a settlement with Borris, Inc., which Plaintiff, in fact, achieved.  Following his arrest, with Attorney Pawar's assistance, Plaintiff decided to expand his potential ill-gotten gains by initiating false claims against both Borris, Inc. and the City Defendants.

to fraudulently obtain a Housing Court order, and then submitted both the falsified lease and fraudulently obtained Housing Court order to this Court in support of a false arrest claim, all while knowing that there was in fact probable cause for his arrest.  Thus, the Housing Court proceedings are central to showing that Plaintiff's false arrest claim in this case is baseless, and that the officers had probable cause to arrest Plaintiff on April 29, 2019 not only for attempted burglary or unlawful entry into the Apartment, but for fraud as well.

This is a clear case of the Plaintiff acting in bad faith and, without any colorable claim, abusing the judicial process, motivated by improper purposes.  *See Wolters Kluwer*, 564 F.3d at 114.  Accordingly, the Court finds it appropriate to sanction Plaintiff pursuant to its inherent powers.

## III.    Sanctions Amount

Defendants seek to recover roughly $194,500, which would reimburse Defendants for $677.97 in costs and 553.75 hours of attorneys' fees.  (Sundaran Decl., Dkt. 73, ¶ 6, 48.)  The 553.75 hours includes 211 hours spent prior to uncovering the fraud.  (*Id.* at 2, n.1.)  Thus, more than 70% of defense counsel's time was expended *after* they had reason to believe that Plaintiff's claims were meritless.  For all of those hours, Defendants request that the Court either (1) deviate from the prevailing hourly rate for attorneys' fees in the Eastern District and instead apply the prevailing rate in the Southern District, specifically $600 per hour for Defendants' more experienced counsel and $325 per hour for Defendants' less experienced counsel; or (2), in the alternative, award a blended rate of $350 per hour for all 553.75 hours.  (*Id.* ¶ 38.)

The Court finds both the total hours and hourly rate requested by Defendants to be unreasonable.  In awarding attorneys' fees as sanctions under Rule 11 and this court's inherent powers, the Court has "wide discretion" to craft an appropriate sanction, and may consider the

effects on the parties and the full knowledge of the relevant facts gained during the sanctions hearing. *Oliveri*, 803 F.2d at 1280.

The Court finds that defense counsel expended much more time than necessary in litigating this case. For example, defense counsel expended 174 hours preparing their sanctions motion and 59 hours on their reply. (Sundaran Decl., Dkt. 73, ¶¶ 13, 22.) Though Defendants' briefing was certainly thorough, the Court finds that defense counsel could have been more efficient in preparing Defendants' filings, such as by omitting out-of-place pop culture references that may have served as entertainment for counsel, but did little to advance their clients' case. (*See, e.g.*, Dkt. 57, at 2 n.2 (citing episode 3 in season 1 of *Star Trek: The Original Series*); *id.* at 6 n.4 (citing a *Dictionary.com* entry entitled "Pop Culture Dictionary: What Happens in Vegas, Stays in Vegas").) Defense counsel also spent 110 hours preparing for the sanctions hearing, which lasted approximately five hours. (Sundaran Decl., Dkt. 73, ¶ 24.) In addition, defense counsel also expended *an additional* 80 hours on their post-hearing brief, even though the factual and legal issues remained largely unchanged. (*Id.* ¶¶ 27.)

Another example of defense counsel spending far more time than required by the case is the fact that, in response to this Court's October 27, 2020 Docket Order requesting a supplemental calculation and documentation of attorneys' fees and costs, counsel spent two hours organizing time entries and 11.5 hours researching and drafting a supporting declaration. (*See* Dkt. 73-1, at 17.) Those 11.5 hours were almost entirely unnecessary. The Court directed submission of only a "*supplemental calculation and documentation* of the full amount of attorneys' fees, costs, and expenses [Defendants] seek to recover" (*see* 10/27/2020 Docket Order (emphasis added)), *not* a 20-page declaration consisting of 48 paragraphs, much of which consisted of case law regarding whether the Court should deviate from the standard fee rate in this District. (10/27/2020 Docket

Order; Sundaran Decl., Dkt. 73.)  Furthermore, though the case involved misrepresentation, the fraudulent scheme at issue was not complicated or subtle, and the law around sanctions did not involve complex or novel issues.

In sum, the Court finds that a reasonable amount of attorney hours is 200, rather than 553.75.

The Court also finds Defendants' requested hourly rate excessive.  Defendants seek an hourly rate similar to attorneys at private firms whose entire practice is based on prosecuting civil rights cases, and who bill at an hourly rate.  Defense counsel never mentions their hourly rates.  As attorneys for the City, they do not bill at hourly rates, and they are tasked with representing the interests of the City, not private clients.  Accordingly, the Court finds it entirely inappropriate to award Defendants attorneys' fees at an hourly rate commensurate with private attorneys representing civil rights plaintiffs.  In this case, the Court finds that an hourly rate much closer to $150 is appropriate.

In determining an appropriate sanction award in this case, the Court also considers what would be an appropriate, but not unduly harsh, punishment for Attorney Pawar; the fact that Plaintiff likely has limited means given his efforts to squat at a vacant apartment; and the fact that Plaintiff may still face criminal prosecution related to this matter.  Accordingly, while Defendants seek an award of attorneys' fees and costs of roughly $194,500, the Court awards Defendants $25,000, inclusive of attorneys' fees and costs.  Plaintiff and Attorney Pawar shall be jointly and severally liable for that amount.

## CONCLUSION

For the reasons explained in this Memorandum & Order, the Court makes the following rulings: the Court sanctions Attorney Pawar under Rule 11 of the Federal Rules of Civil Procedure; the Court sanctions Plaintiff under the Court's inherent powers; and the Court awards Defendants

$25,000, inclusive of attorneys' fees and costs, for which Plaintiff and Attorney Pawar are jointly and severally liable.  Given that all other matters in this case have been resolved, and the parties have stipulated to dismiss this case with prejudice (Dkt. 50), the Clerk of Court is respectfully requested to enter judgment for Defendants and close this case.

SO ORDERED.

_/s/ Pamela K. Chen_
Pamela K. Chen
United States District Judge

Dated: January 20, 2022
      Brooklyn, New York